Jeffery Hoffman, SBN: 118768
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941; Fax: (707) 528-0125
Email:  jhoffmn@crla.org

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA  94612
Telephone: (510) 891-9794; Fax: (510) 891-9727
Email:  mmorris@pilpca.org
            mrawson@pilpca.org

Alicia Roman, SBN:  260101
LAW OFFICE OF ALICIA ROMAN
719 Orchard Street
Santa Rosa, CA  95404
Telephone:  (707) 526-4100; Fax:  (707) 573-1094
Email: aliciaromanlaw@yahoo.com

Attorneys for Plaintiffs

Additional Counsel on last page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Deborah Drake,  Samantha Jenkins, Nicholle Vannucci, Steven Robert Singleton, and Ellen Brown *individuals*; and Homeless Action!, *an unincorporated association*,<br><br>            Plaintiffs,<br>      v.<br><br>County of Sonoma, Sonoma County Community Development Commission, City of Santa Rosa, Does 1 to 10,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.      Plaintiffs, five homeless individuals living in an encampment at the Roseland site in Santa Rosa, California, and a local unincorporated association providing advocacy on behalf of, and assistance to, persons who are homeless in Sonoma County California, bring this action to enjoin the scheduled enforcement of the closure of the encampment ("Roseland Village") on April 3, 2018 as well as the enforcement of Defendants' anti-camping and related ordinances which effectively punish them due to their status as homeless persons.  The Roseland Village camp sits on a site owned by the Sonoma County Community Development Commission (hereinafter CDC).

2.      Neither the Defendant City of Santa Rosa (City), Defendant (CDC), nor the Defendant County of Sonoma (County) have provided adequate placements for their homeless populations.

3.      As a result, Sonoma County residents who have no other option but to live outside have, formed encampments of various sizes throughout the County, including the two Roseland Encampments where Plaintiffs live.  Yet, in the past year, the City has been systematically closing the homeless encampments in its jurisdiction.[1]  This has resulted in the illegal confiscation and destruction of personal property and the shifting of persons from one encampment to another.[2]  A further result is that the current encampment at Roseland Village has more than doubled in size.  Defendants now intend to close this encampment without sufficient placement opportunities for its residents, which will

---

[1] Santa Rosa Press Democrat Article November 17, 2017 – Santa Rosa cleans up downtown homeless camps under Highway 101.
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=6&cad=rja&uact=8&ved=0ahUKEwizuMfW-5HaAhVK9WMKHa8qCcUQFghZMAU&url=http%3A%2F%2Fwww.pressdemocrat.com%2Fnews%2F7654296-181%2Fsanta-rosa-cleans-up-downtown&usg=AOvVaw1PkXMocrSXYtZnHrAG6PHt

[2] Santa Rosa Press Democrat Article November 24, 2017 – Tent village in southwest Santa Rosa expands after downtown homeless camps cleared out.
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved=0ahUKEwi7xZa0_pHaAhUK9WMKHQ84AKcQFggnMAA&url=http%3A%2F%2Fwww.pressdemocrat.com%2Fnews%2F7671361-181%2Ftent-village-in-southwest-santa&usg=AOvVaw1iHbBxLDd7E-yKa1doj49i

perpetuate this ongoing problematic cycle, violate the constitutional rights of Roseland Encampments residents, and result in discrimination on the basis of disability.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

5.      Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

6.      Venue is proper in the Northern District of California because the events and conduct complained of herein all occurred in Sonoma County.

## PLAINTIFFS

7.      Plaintiffs Deborah Drake, Samantha Jenkins, Nicholle Vannucci, Steven Robert Singleton, and Ellen Brown are homeless individuals who are currently residing at the Roseland Encampments, encampments located on a site owned by Defendant CDC and located within the territorial boundary of the City of Santa Rosa.

8.      Plaintiff HOMELESS ACTION! (hereinafter HA), an unincorporated association, is a group of grassroots activists in Northern California working towards ending the suffering of people who do not have a home. HA works with and for homeless people in Sonoma County.

9.      The members of HA include students, church members, activists, people who are homeless or have been homeless, and concerned individuals working to obtain housing and better conditions for people without homes. HA has helped create the safe parking program, held events, protests, and marches, educated the public, done emergency response work, lobbied county and city officials and published articles in local papers.

10.      Ensuring that the residents of the Roseland Encampments are not forcibly removed from the Roseland site without alternative shelter, that their personal possessions are not

seized and destroyed without pre-deprivation process of law, and that residents with disabilities are offered referrals appropriate to their disability-related needs is consistent with the mission and purpose of HA, and the planned sweep of the Roseland Encampments would frustrate that mission.

## DEFENDANTS

11.    Defendant CDC is an agency of Sonoma County and is the successor agency to the County's redevelopment agency.  It is a government entity with the capacity to sue and be sued.

12.    The CDC "houses the Sonoma County Housing Authority and administers all affordable housing finance programs for the unincorporated County of Sonoma. The Commission also hosts and staffs the Sonoma County Continuum of Care and is the largest funder of homeless services county-wide," including the administration of federal housing funds.

13.    The CDC owns the Roseland site and posted the Notice to Vacate the site.

14.    The CDC has requested that the police department of Defendant City of Santa Rosa remove the Roseland Encampments' residents and their belongings from the Roseland site if those residents have not vacated by April 3, 2018.

15.    CDC, its employees and agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs.  The acts complained of herein constitute policies, practices and customs of the CDC.

16.    Defendant Sonoma County (County) is a government entity organized under the laws of the State of California with the capacity to sue and be sued.  It is the former owner of the Roseland site, and is the larger government entity of which Defendant CDC is a part.

17.    County, its employees and agents participated in the unlawful conduct challenged herein, and to the extent they did not personally participate, it authorized, acquiesced, set

in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs.  The acts complained of herein constitute policies, practices and customs of the County.

18.    Defendant City of Santa Rosa (hereinafter City) is a municipal corporation organized under the laws of the state of California and the Santa Rosa City Charter, with the capacity to sue and be sued.  The Departments of the City include the Department of Housing and Community Services and the Police Department.

19.    The City, its employees and its agents participated in the unlawful conduct challenged herein, and to the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs.  The acts complained of herein constitute policies, practices and customs of the City.

20.    If the sweep of the Roseland Encampments moves forward on April 3, 2018, the Santa Rosa Police Department will perform the sweep.

21.    Defendant City of Santa Rosa is a recipient of federal funds, including Community Development Block Grant Funds.

## STATEMENT OF FACTS

**Homelessness in Sonoma County**

22.    In recent years, the problem of homelessness in Sonoma County, as it has in many parts of the state and the country, has become more visible and has reached crisis proportions.  The 2014 update to the 10-Year Homeless Action Plan for the County of Sonoma states that the regional rate of homelessness for Sonoma County is almost four times the national rate.[3]   As the problem has become more acute and visible, the City and County have taken more restrictive actions to enforce their anti-camping and related ordinances.[4]

---

[3] Sonoma County Continuum of Care 10- Year Homeless Action Plan 2014 Plan Update (pg. 7) http://www.sonoma-county.org/cdc/pdf/cofctenyearactionplan.pdf

[4] Santa Rosa Press Democrat Article- August 9, 2017-Santa Rosa to take stronger stance on

23.    According to the 2014 update to the County's 10-Year Homeless Action Plan, there are shelter beds and housing available for fewer than 1 in 4 persons.[5]

24.    On August 9, 2016, the Santa Rosa City Council declared that "there exists within the territorial limits of the City of Santa Rosa conditions of extreme peril to the safety of persons and property caused by homelessness and the lack of available affordable housing, which conditions are likely to be beyond the control of the services, personnel, equipment and facilities of the City and require the combined forces of other political subdivisions to combat." Based on that declaration, the City proclaimed "a state of local homeless emergency within the City of Santa Rosa."

25.    The emergency declaration further states that "a significant number of persons within the jurisdiction of Santa Rosa are without the ability to obtain shelter, and that the situation has resulted in a threat to the health and safety of those persons." In its declaration, the City acknowledged that, "there is a shortage of available and affordable housing units in Santa Rosa due to the very low rental vacancy rate (approximately 1 percent) . . . ."[6]

26.    In its declaration, the City noted that, pursuant to Sonoma County's 2016 point-in-time homeless count, on a given night there were 2906 homeless persons in the County, 66% of whom were unsheltered.[7] Of that count, 63 percent of the total homeless persons were located in the central area of the City, including its unincorporated areas, and 65

nuisance crimes associated with homeless population
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=newssearch&cd=1&cad=rja&uact=8&ved=0ahUKEwidp9ylk5LaAhUUH2MKHevGBkwQqQIIJigAMAA&url=http%3A%2F%2Fwww.pressdemocrat.com%2Fnews%2F7283835-181%2Fsanta-rosa-to-take-stronger&usg=AOvVaw3ZIRMuvj1-JcDJyqluGRj9

[5] Sonoma County Continuum of Care 10- Year Homeless Action Plan 2014 Plan Update (pg. 2) http://www.sonoma-county.org/cdc/pdf/cofctenyearactionplan.pdf

[6] City of Santa Rosa Resolution Number 28838 –
 http://santa-rosa.granicus.com/DocumentViewer.php?file=santa-rosa_cc41ae53c890fc32b88b1234997568c6.pdf&view=1

[7] 2016 Sonoma County Homeless Point-In-Time Census & Survey Comprehensive Report (pg.16)  http://www.sonoma-county.org/cdc/pdf/2016_Sonoma_County_Homeless_Point-In-Time_Survey_Census.pdf

1    percent of those the homeless persons within the city were unsheltered.[8]

2    27.    The City has continued to extend its declaration of a homeless emergency to the

3    present date.

4    28.    The 2017 Sonoma County Homeless Point-In-Time Census & Survey, conducted

5    in January 2017, identified 2,835 homeless individuals living in Sonoma County.  Of

6    those, 1847 - 65 percent, were unsheltered.[9]

7    29.    People with disabilities are disproportionately homeless in Sonoma County, and

8    homeless individuals with disabilities are more likely to live outside than to be sheltered.

9    According to the County's 2017 Homeless Point-In Time Census, 41 percent of the

10    homeless individuals surveyed identified as having a physical or mental disability.[10]

11    Moreover, according to the County's Homeless Action Plan, the population of "disabled

12    single adults . . . living outside" is "five times the sheltered population."

13    30.    Sonoma County's high rate of homelessness is directly related to the absence of

14    sufficient affordable housing in the community.  According to the National Low Income

15    Housing Coalition's 2017 "Out of Reach" report on housing affordability, a renter in

16    Sonoma County needs to earn nearly $63,000 annually, over $30 an hour, to afford the

17    average two-bedroom rent of $1572. [11]Also in 2017, the California Housing Partnership

18    reported that "[m]edian rent in Sonoma County has increased 16% since 2000 while

19    median renter household income decreased 6%, when adjusted for inflation."[12]  )

20    

---

21    [8] 2016 Sonoma County Homeless Point-In-Time Census & Survey Comprehensive Report (pg.17)
22    http://www.sonoma-county.org/cdc/pdf/2016_Sonoma_County_Homeless_Point-In-Time_Survey_Census.pdf
23    [9] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.13)
     https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/

24    [10] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.43)
25    https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/

     [11] 2017 Out of Reach The High Cost of Housing-National Low Income Housing Coalition (pg.39)
26    http://nlihc.org/sites/default/files/oor/OOR_2017.pdf

27    [12] May 2017 Sonoma County Renters In Crisis: Call for Action (pg. 1)
     https://1p08d91kd0c03rlxhmhtydpr-wpengine.netdna-ssl.com/wp-content/uploads/2017/05/Sonoma-County-2017.pdf
28

31.     Seventy-one percent of homeless people surveyed during the 2017 Homeless Point-In Time Census "cited affordable rent as the primary obstacle to obtaining permanent housing."[13]

32.     The above estimates regarding housing affordability and homelessness in Sonoma County *predate* the October 2017 wildfires, which destroyed 6,600 structures, including 5,130 homes, countywide.  These fires displaced thousands of Sonoma County residents from their homes, and the median rent in Sonoma County rose 36 percent in a weeklong period following the fires, according to online real estate site Zillow.[14]

**The County's Lack of Available Shelter**

33.     Defendants have acknowledged a lack of available shelter for homeless residents. During a November 14, 2017, City Council meeting, Councilwoman Julie Combs acknowledged that there were only 20 shelter beds available to house the unsheltered residents of the City and that there were in excess of 70 people at the Roseland Encampments.

34.     Weeks later, on December 5, 2017, Sonoma County Board of Supervisors Chairwoman Shirley Zane during the Board's regular open meeting confirmed CDC Executive Director Margaret Van Vliet's statement that there were only 20 shelter beds currently available at Sam Jones Hall, the largest shelter in the County, and that number incorporated the winter shelter beds, which are generally not available year-round.

35.     Supervisor Lynda Hopkins during that same meeting acknowledged that shelter beds are not adequate for some people who live at the Roseland Encampments, citing pets and mental health disabilities among the reasons why some encampment residents might not be able to access shelters.[15]

---

[13] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.60) https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/

[14] Santa Rosa Press Democrat Article- October 24, 2017 *Rents rise after Sonoma County fires as luxury vacation homes come on the market* http://www.pressdemocrat.com/business/7559748-181/rents-rise-after-sonoma-county

36.     The County's latest data provided to Plaintiffs for vacancies in shelters and other alternative housing currently available for the County's 1847 unsheltered homeless show the vacancies up to and on March 1, 2018, for emergency shelter beds, transitional housing, family shelter units, and specialty shelter units.  The Night Count for emergency shelter beds, the Night Count for transitional housing, the Family Shelter availability, and the Specialty Shelter availability show a severe shortage of placements to meet the need. According to the shelter and other unit data, as of March 1, 2018 the available shelter and alternative housing units available are only:  a) *zero* family shelter vacancies with 37 families in need of family shelters; 6 transitional housing units for single persons; c) 90 emergency shelter beds; 2 mental health units; 2 non-coordinated entry spaces; 10 respite units; *zero* units for veterans; 12 units for teens/former foster youth.

| Unsheltered | Emerg. Shelter Beds | Family Shelter Rooms | Transitional Housing for Singles | Mental Health Units | Non-Coord. Entry | Respite Units | Veterans Units | Total Avail-able |
|---|---|---|---|---|---|---|---|---|
| **1847** | 90 | 0 | 6 | 2 | 2 | 10 | 0 | **110** |

37.     Further, the majority of the County's approximately 200 winter shelter beds will close on March 30, 2018, and that the remainder of the winter shelter beds will close on April 30, 2018.  Therefore, the homeless residents of the County who currently occupy those beds will also be in need of shelter.

**Defendants' Response to Homelessness and Forcible Removal of Homeless Encampments**

38.     Thirteen percent of Sonoma County's homeless population lives in encampments throughout the County.[16]  In 2017, Defendant City of Santa Rosa estimated that it had 44 homeless encampments of sizes varying from 2 to 75 persons within its City limits.[17]

---

[15] Sonoma County Board of Supervisors meeting of December 5, 2017, Agenda item number 40. Starting at 3:41:27 regarding confirming 20 shelter beds and starting at 3:47:00 regarding Hopkins acknowledgement of disabilities of folks.  http://sonoma-county.granicus.com/MediaPlayer.php?view_id=&clip_id=750&meta_id=233791

[16] 2017 Sonoma County Homeless Census and Survey Comprehensive Report (pg.13) https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/ (last accessed Mar. 27, 2018).

Complaint

39.    In October 2016, the City approved a Community Homeless Assistance Program (CHAP), an extension of a previous pilot program that had existed during the winter of 2015-2016.  The CHAP program allows private "property owners to use their properties or facilities for safe parking, safe camping, the placement and maintenance of portable toilets and access to existing bathroom facilities, provision of temporary overnight shelter, and storage for personal belongings."[18]

40.    In October 2016, the City approved a Community Homeless Assistance Program (CHAP), an extension of a previous pilot program that had existed during the winter of 2015-2016.  The CHAP program allows private "property owners to use their properties or facilities for safe parking, safe camping, the placement and maintenance of portable toilets and access to existing bathroom facilities, provision of temporary overnight shelter, and storage for personal belongings."[19]

41.    However, as of this date, CHAP has generated very few, if any, alternative shelter arrangements.  One church had attempted to secure approval to install campsites or small huts for up to 20 persons on its property, but the proposal was ultimately abandoned. There had been intense opposition to the proposal from the church's neighbors.

42.    Since its declaration of a homeless emergency in 2016, the City has made approximately 50 to 75 new shelter beds available.  However, the addition of these beds is far short of what is necessary to meet the community's need.

43.    At the same time Defendants have failed to provide adequate shelter to their homeless residents, they have increased enforcement against homeless encampments, particularly within the City of Santa Rosa.

44.    The City of Santa Rosa has an "Anti-Camping Ordinance," which makes it illegal

---

[17] City of Santa Rosa Homeless Encampment Cleanup Pilot Program Frequently Asked Questions https://srcity.org/DocumentCenter/View/16366
[18] Press Release, Santa Rosa Approves Community Homeless Assistance Program (CHAP) (Oct. 12, 2016), https://srcity.org/DocumentCenter/View/4145.
[19] Press Release, Santa Rosa Approves Community Homeless Assistance Program (CHAP) (Oct. 12, 2016), https://srcity.org/DocumentCenter/View/4145.

to camp on public property, or to camp on private property without the permission of the owner.

45.    The City's anti-camping ordinance provides as follows:

Chapter 11-22 CAMPING ON PUBLIC STREETS AND PUBLIC PROPERTY
11-22.010 Definitions.
For purposes of this chapter, the following definitions shall apply:
        (A)  "Camp" means to place, pitch or occupy camp facilities:  to live temporarily in a camp facility or outdoors; to use camp paraphernalia.
        (B)  "Camp facilities" include, but are not limited to, tents, huts, vehicles, vehicle camping outfits, or temporary shelters.
        (C)  "Camp paraphernalia" includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment.

11-22.020 Camping on public streets and public property.
        It is unlawful for any person to camp, occupy camping facilities, or use camp paraphernalia in any public park, or on any public street or any other public property.

11-22.030 Camping on private property.
        It is unlawful for any person to camp on any private property without first obtaining written permission of the owner.

46.    In September 2013, the City amended its anti-camping ordinance to broaden the circumstances under which it would be illegal to camp in the City.   The definition of camp facilities was broadened and any authority that previously allowed public camping, was removed.  The ordinance prohibits all forms of camping, including sleeping in vehicles.  The ordinance also prohibits camping on private property.

47.    On information and belief, in the past two years the City has increased its enforcement of the ordinance and related local "quality of life" laws, using it to cite and displace homeless individual living outside in public places or in view of the public. Plaintiffs are aware of homeless individuals receiving citations for alleged violations of: City Code Section 10-12.020:  Obstructing tunnel, overpass by loitering; 10-12.030: Obstructing tunnel or overpass by sitting or lying on a street or sidewalk; 10-08.010: Public Excretion, 9-12.050:  Littering.

48.    While there are legal campgrounds within the County of Sonoma, all of these charge a daily fee, and many are located far away from the City of Santa Rosa, businesses, and social services and are therefore not accessible to homeless persons who lack reliable transportation.  Additionally, most legal campgrounds, including campgrounds at state and county parks, impose limitations on how long campers may stay. As such, the only viable camping option for most homeless people who lack shelter is to camp in "unsanctioned" encampments on public or private land.

49.    In July 11, 2017, the City approved the "Homeless Encampment Assistance Pilot Program" (HEAPP).  HEAPP's stated purpose is, in part, "mitigating the impacts to the surrounding community" of the various encampments and "addressing the health, safety and shelter needs" of the encampment residents.  The program utilizes the Homeless Outreach Services Team (HOST) funded by the City and County, which includes a street outreach team working to engage unsheltered homeless into services and housing. However, the effect of HEAPP has been the City's more aggressive enforcement of its anti-camping and related ordinances, and the forcible displacement of homeless encampments and their residents.

50.    The first encampment targeted by HEAPP was the encampment located at the "Farmers Lane Extension" (aka "Homeless Hill"), which had been at that site for many years.  The Farmers Lane Extension encampment had grown to 50 people as of the summer of 2017.

51.    The residents of the Famers Lane Extension encampment had begun receiving notices to vacate their encampment starting at the end of June 2017.

52.    On July 10, 2017, City staff held a community meeting with the residents of the Farmers Lane Extension encampment in which residents were notified of the pending closure of the encampment and the services available through the Homeless Outreach Services Team (HOST) staffed by Catholic Charities.  A few days later the residents of the encampment received a notice to vacate the encampment set to expire on or about August 13, 2017.

53.    On or about August 13, 2017, the City, through its Police Department, forcibly cleared the Farmers Lane Extension Encampment.  Many of the residents there were unable to remove their personal belongings prior to leaving the premises.  Plaintiffs are informed and believe and thereon allege that, when closing the Farmers Lane Extension, and without a notice and an opportunity for a hearing nor related process, the Santa Rosa Police Department made a general determination that all of the personal property left behind by the residents of the encampment was deemed a health and safety risk, regardless of the nature of the property.[20]  A subcontractor was hired to destroy all of the property left behind.

54.    While the City created new shelter beds (some of the same described in paragraph 42) and placed approximately 28 individuals who had been forced out of the Farmers Lane Extension Encampment in shelters, many people from the Farmers Lane Extension instead moved to existing encampments at a Highway 101 underpass in Santa Rosa.  On information and belief, the encampments under Highway 101 underpasses grew significantly in 2017; that growth occurred in part because of Defendants' sweeps of other encampments, and in part due to the October 2017 wildfires.

55.    The residents of the Highway 101 Underpass encampments received several written Notices to Vacate Illegal Campsite during the course of 2017.  These Notices indicated personal property deemed a health and safety risk would be destroyed and that remaining property would be stored for 90 days during which time it could be retrieved.  According to the notices, if the property was not retrieved it would be deemed abandoned and would be disposed of pursuant to California Civil Code sections. 2080 et. seq.  Due to the different notices provided, the Residents at the encampment were not sure when the actual date of closure would be.

56.    Under HEAPP, the City forcibly cleared the 101 Underpass encampments on or

---

[20] Cleanup at Homeless Hill in Santa Rosa- August 15, 2017-Santa Rosa Press Democrat YouTube Video
https://www.youtube.com/watch?v=EAV_NN0NMzU

about November 15, 2017.   Plaintiffs and other residents of these encampments were not able to arrange to move all of their possessions at the time they vacated the area.  Plaintiffs are informed and believe and thereon allege that the Santa Rosa Police made a general determination that all personal property left behind by the encampment residents was a health and safety risk, regardless of the nature of the property, after which point the property was confiscated and immediately destroyed. The City did not provide the residents with further notice, nor opportunity to be heard, before seizing and destroying their personal property.

57.     While the City provided placements for some of the Highway 101 Underpass residents when it swept their encampments, many of the residents relocated to other encampment locations, including the Roseland Encampments, discussed below.

**The Roseland Encampments**

58.     One of the largest encampment sites in Sonoma County is the "Roseland" site, located at 665 to 883 Sebastopol Road, in Santa Rosa.  Over 100 people, including the individual the Plaintiffs in this matter, currently live at the Roseland site, in two encampments (the Roseland Encampments).

59.     The Roseland site is owned by Defendant CDC, and is located within the territorial boundary of Defendant City of Santa Rosa.  The site was part of an annexation into the City effective November 1, 2017.

60.     Other business and structures occupy the Roseland site, including a Dollar Tree retail store.

61.     The first Roseland encampment located at the Roseland site in November 2015, when approximately 20 people moved to the Roseland site from another encampment within the Santa Rosa city limits.

62.     The CDC indicated in early 2016 that it would assist the encampment residents in

locating a more suitable location for their encampment.[21]  In the two-plus years that have passed since the Roseland Encampments began, the CDC has provided fencing, porta-toilets and water to residents there.  Others have donated fencing and porta-potties. The CDC also allows a security team to patrol the area.

63.     On February 21, 2017, the County of Sonoma approved an extension of the lease for the Dollar Tree store located adjacent to the Roseland Encampments, which would allow the business to continue until July 2018.   In addition, the County also authorized the CDC to approve an additional extension of the lease, if warranted, for a period not to exceed 12 months.

64.     A second encampment formed at the location in November 2017 after the eviction of the Highway 101 Underpass encampments, and others relocated to Roseland following the closure of other, smaller encampments throughout the City.    When the residents of other encampments asked the police where they were supposed to go when their encampments were swept, some were told by the police to go to the Roseland Encampments.

65.     At least 10 individuals sought shelter at the Roseland Encampments after losing their housing in the North Bay Wildfires in October 2017.

66.     As of the date of filing, over 100 people reside at the Roseland Encampments.

67.     As with the homeless population more broadly, Roseland Encampments residents are disproportionately living with disabilities relative to the general population; over 40 percent of Roseland Encampments residents identify as having a physical or mental disability.

68.     As of the date of filing, the CDC has not located or proposed an alternative spot for the residents of the Roseland Encampments to go, as it had promised in 2015.

69.     In the report to the Board of Supervisors on December 5, 2017, the CDC indicated

---

[21] *See* Santa Rosa Press Democrat Article—Feb. 14, 2016—Homeless activists ask county to sanction Roseland camp (available at http://www.pressdemocrat.com/news/5205093-181/homeless-activists-ask-county-to).

there were insufficient shelter or housing resources available to assist all of the persons at the Roseland area encampments.  At that December 5, 2017 meeting, the CDC also cited the need to begin remediation work at the Roseland Encampment site as part of a pending development plan that commendably would include affordable housing.  It was reported by the CDC that this remediation work could continue with the ongoing businesses at the site, but the remaining areas of the site would need to be closed off.  The developer's plans, however, show that there is a large window for doing the remediation work—extending well into 2019. The report was informational only, and the Board of Supervisors took no action at that meeting regarding the Roseland Encampments.

70.    On or about February 21, 2018, the CDC posted a written Notice to Vacate at the Roseland Encampments.  The Notice provided a deadline of March 23, 2018, to vacate the encampments or face possible arrest and prosecution for the violation of California Penal Code Sec. 647(e) (unlawful lodging), Cal. Penal Code Sec. 602(m)(trespass) and Santa Rosa City Ordinance 11-22-.030 (prohibited camping on private property without permission).  The Notice indicated the CDC was revoking any prior authority it may have granted for the occupants to reside at the encampment site.  The Notice goes on to state that other violations to which persons may be subject to arrest and prosecution include "unlawful storage of property", "unlawful refuse disposal", "unlawful failure to restrain an animal" and "unlawful fire."

71.    On or about February 27, 2018, after posting the notice of its intent to sweep the Roseland Encampments the following month, the CDC opened a "Navigation Center (NC)" in an abandoned building near the encampment site.   The NC is run and staffed by the Homeless Outreach and Services Team (HOST) program through Catholic Charities. The NC is open 5 days a week in order to provide assessment services to residents through the encampments to place them in alternative living situations.

72.    On or about March 7, 2018, the CDC posted a new Notice to Vacate, still dated February 21, 2018.  This new Notice to Vacate contains substantially the same language as the previous February 21, 2018 notice, but changes the deadline to vacate to April 3,

2018.  A copy of that Notice is attached to this Complaint as Exhibit A.

73.    In a public meeting on March 12, 2018, CDC staff stated that the CDC plan to use the City police to enforce the Notice to Vacate on April 3, 2018.

74.    According to CDC reports from mid-March, approximately 16 residents from the Roseland Encampments have been assessed by the HOST program staff at the NC and have allegedly accepted shelter placements, and five (5) have been assessed and referred to permanent housing.

75.    However, as of the date of filing, Defendants have not identified adequate alternative placements for all of the residents of the Roseland Encampments.

76.    On information and belief, the primary—and, in some instances, only—placement that Defendants are offering to the Roseland Encampments' residents is a shelter bed in an emergency shelter.  Plaintiffs' experience of these shelters is that they are crowded spaces. Placement in such a shelter is not appropriate for many residents of the Roseland Encampments who are living with mental health disabilities or other disabilities.  For example, many residents have mental health disabilities that cause them to experience fear and anxiety in situations where they are in close quarters with others, or where they must give up their privacy.  As such, it is not possible for them to stay—even for a short time— in a shelter setting.

77.    While Defendants allege that there are sufficient shelter placements for Roseland Encampments residents, and that Defendants will offer placements to all residents on or before April 3, that allegation is inconsistent with the data regarding the County's available shelter beds compared with the County's unmet shelter needs, described in paragraph 36, above.  That allegation is also inconsistent with the experience of Plaintiffs and others at the Roseland Encampments, who have utilized the N C but have not yet received appropriate placements.

78.    Plaintiffs sent letters to Defendants on March 9, 2018, and March 12, 2018, requesting that Defendants temporarily postpone the sweep of the Roseland Encampments until adequate alternative shelter placements, or an alternative encampment site, was

1  available for the residents to be displaced by the sweep and inviting Defendants to enter
2  into a dialogue about possible solutions.

3  79.   Over the next ten days, Defendant CDC and Plaintiffs entered into a dialogue
4  process to discuss the situation.  Defendant CDC provided Plaintiffs documentation it
5  alleged supported its claim it had adequate grounds to close the Roseland Encampments.

6  80.   Plaintiffs also met with the City of Santa Rosa during this time.

7  81.   On March 26, 2018, Plaintiffs requested that Defendants postpone their planned
8  sweep of the Roseland Encampments temporarily, until adequate alternative shelter had
9  been offered to all residents as a reasonable modification under federal and state disability
10 rights laws.

11 82.   While Defendant CDC offered to entertain specific modification requests from
12 individual encampment residents if they could make them by April 3, CDC refused to
13 delay the sweep.

14 83.   On March 28, 2018, Plaintiffs requested that the sweep be temporarily postponed
15 for 14 days to ensure that the Roseland Encampments' residents were not forcibly
16 removed from the site without first having been offered appropriate shelter placements or
17 alternative housing.

18 84.   On March 29, 2018, Defendants responded that they would proceed with the sweep
19 on April 3, as planned.

20 85.   As of the date of filing, Defendants have neither withdrawn the Notice to Vacate,
21 nor postponed the planned sweep of the Roseland Encampments.

22 86.   Based on the City's seizure and destruction of personal property in previous
23 encampment sweeps, Plaintiffs expect that, in addition to forcibly removing Roseland
24 Encampments residents from the site where they have been living, the City will likely
25 seize and destroy their personal property without providing any pre-deprivation hearing,
26 even where such property does not pose a threat to health and safety.

27 **Deborah Drake**

28 87.   Plaintiff DEBORAH DRAKE is 57 years old and has lived in Sonoma County

1  since the age of 13.   Ms. Drake currently resides at the Roseland Encampments, where

2  she has lived since September 2016.

3  88.     Ms. Drake's adult son also lives at the encampment and takes care of Ms. Drake,

4  including help going to the restroom, household chores, escorting her to the Doctor and

5  assisting her when she has health issues.

6  89.     Plaintiff was able to secure her GED at age 32.  She then took some horticulture

7  classes and was able to secure work at nurseries, which she enjoyed.  However, Ms. Drake

8  is now unable to work because of her disabilities.

9  90.     Ms. Drake's physical conditions include Stage 3 ovarian cancer, congestive heart

10  failure and emphysema.

11  91.     Ms. Drake also has depression, and she has post-traumatic stress disorder (PTSD)

12  resulting, in part, from her experience of domestic violence.

13  92.     Ms. Drake became homeless about a year and a half ago after fleeing a violently

14  abusive relationship.

15  93.     Ms. Drake has applied for Section 8 housing assistance and is on the waiting list.

16  Plaintiff has no transportation so it is difficult for her to look for housing or to access

17  services.

18  94.     Ms. Drake cannot stay in a homeless shelter because of her disabilities.  Because of

19  her PTSD in particular, she cannot be in crowded settings, or in settings where she lacks

20  privacy or control of her own space.

21  95.     Ms. Drake feels safer at the encampment, where she has privacy in her own tent,

22  and where her son is nearby to help her with her disability-related needs.

23  96.     Ms. Drake went to the NC to seek assistance shortly after it opened.  After

24  completing an assessment, she was informed that she might be placed in permanent

25  housing.  However, staff at the Navigation Center required her to provide various forms of

26  documentation, including documentation of her income.  Ms. Drake has not yet been able

27  to obtain this documentation because of her disabilities.

28  ///

97.     Ms. Drake has heard nothing further from the NC or HOST since she first met with them.

98.     Ms. Drake has no other place to go at this time and is terrified of what may happen should the encampment be closed.  Plaintiff is concerned that until she is able to locate better shelter, she will not be able to find a place she would be able to reside without possible harassment by the authorities.  She is also concerned that she will lose all her personal possessions that she has with her at the encampment.

**Samantha Jenkins**

99.     Plaintiff SAMANTHA JENKINS is 60 years old and has been living in Sonoma County since 1980.  Plaintiff currently resides at the Roseland Encampments and has been there for about three months.

100.    Ms. Jenkins has an AA Degree from Santa Rosa Junior College in Small Business and she studied to get a BA degree.

101.    Ms. Jenkins is disabled due to problems with her back (spine) and cannot work. She receives benefits based on her disability but cannot afford a place to live in Sonoma County; the median rent for a studio rental unit in Sonoma County is more than the total amount of her monthly income.

102.    Ms. Jenkins has been homeless on and off for many years.  In 2014 after living at a Hotel for several years, she was asked to leave after the Hotel was sold.

103.    After that point, Ms. Jenkins newly homeless, began living at the Farmers Lane Extension Encampment in the City of Santa Rosa, where she stayed until the City swept the encampment in summer of 2017.

104.    When the City swept the Farmers Lane Extension Encampment, Ms. Jenkins lost nearly all of her personal possessions, including a bed, a heater, furniture, books, and family photographs, including a treasured photograph of herself as a child with her father.

105.    In July 2017 Ms. Jenkins went to the City of Santa Rosa's Sam Jones shelter after being placed there by HOST with a promise of further assistance to find permanent housing.  She was not able to bring her possessions with her and there was no means or

offer to store them.  The Sam Jones shelter limits period of time a person may use the shelter.  While at the Sam Jones shelter, Plaintiff received no assistance in locating alternative housing arrangements, nor did any staff person or member of HOST contact her for that purpose until November 2017.  Plaintiff did an assessment at that time, but did not receive further assistance.  When Ms. Jenkins timed out of the shelter after six months and was forced to leave, she had not received any alternative placement, and she began living outside once again.

106.    After timing out of the Sam Jones shelter, Ms. Jenkins went to camp along a trail near where the current Roseland area encampment is located.  After being harassed by the police frequently, Ms. Jenkins decided to move to the nearby Roseland area encampments in December 2017 and has been there to date.

107.    Ms. Jenkins has difficulty being around groups of people, and being in settings where she lacks privacy.  She was not comfortable at the Sam Jones shelter and would struggle if she had to return there.  The current Roseland Encampment provides a more secure living situation for Ms. Jenkins because she has her own tent.  The privacy of her tent combined with the security of the group setting makes her feel safer than she did at the shelter or along the trail.

108.    Ms. Jenkins has sought services at the NC with HOST and would like to be placed in alternative housing.  However, she has not been placed anywhere and does not have information about what the status of her placement is.

109.    Ms. Jenkins has nowhere else to go if Defendants sweep the Roseland Encampments.  She is concerned that she will lose all the personal property she has with her at the encampment.  She is also afraid that, if she is not provided with a safe shelter alternative, she will have to go back to camping somewhere where she is harassed by police.

**Nicholle Vannucci**

110.    Plaintiff NICHOLLE VANNUCCI is 30 years old.

///

-21-

111.    Ms. Vannucci is part-Native American and has lived in Santa Rosa since she was 8 years old.

112.    Ms. Vannucci has lived at the Roseland Encampments for approximately 10 months.

113.    Ms. Vannucci currently has no income but has applied for CalFresh (aka food stamps).

114.    Ms. Vannucci is a survivor of domestic violence.  Because of her experience in a violently abusive relationship, Ms. Vannucci has post-traumatic stress disorder (PTSD).

115.    The symptoms of Ms. Vannucci's PTSD make it extremely difficult for her to be around other people and to secure suitable work.

116.    Ms. Vannucci became homeless in November 2016 after her husband attacked her and she fled her home.  She was on the streets for several weeks spending time in Marin County and Sacramento.

117.    Around April 2017, Ms. Vannucci returned to Sonoma County sought services from Catholic Charities through their Homeless Services Center.  She has received mail at the Homeless Services Center, and has taken an occasional shower there, but she has not received any kind of appropriate housing placement.  Ms. Vannucci continued to live on the streets for several months but eventually moved into the Roseland Encampments.

118.    Things have been better for Ms. Vannucci since arriving at the Roseland Encampments.  Ms. Vannucci feels safer there, and protected from potential harassment by the police. Ms. Vannucci feels her possessions are safer there.  Ms. Vannucci has been able to sleep much better since arriving there.

119.    Ms. Vannucci has been trying to find employment and housing, but the symptoms of her PTSD make it difficult for her to work with other people or in service jobs.  Ms. Vannucci worked at a clothing store from July to December 2017 but is currently unemployed.

120.    During the time Ms. Vannucci was with her abusive husband, she was not able to work, due to his controlling behavior.

121.    Ms. Vannucci does not have reliable transportation, and her credit rating is very low; it is hard for her to search for housing.

122.    Ms. Vannucci sought assistance through the new Navigation Center adjacent to the Roseland Encampments.  Ms. Vannucci completed an assessment with the Navigation Center staff.  The Navigation Center staff offered her a referral to a shelter bed, but Ms. Vannucci cannot be at a shelter because of her PTSD symptoms.

123.    Ms. Vannucci has no other place to go at this time should the encampment be closed.  Ms. Vannucci is concerned that until she is able to locate better shelter, she will not be able to find a place she would be able to reside without possible harassment by the authorities.    She is also concerned she will lose all her personal possessions she has with her at the encampment.

**Steven Robert Singleton**

124.    Plaintiff STEVEN ROBERT SINGLETON has lived in Santa Rosa for all of his 52 years.

125.    Mr. Singleton has physical disabilities caused by injuries to his back, neck, and shoulder

126.    Due to his disabilities, Mr. Singleton has been unable to work for the past two years.  He previously received State Disability income, but he now has no income.  Mr. Singleton's wife works, but their combined income is not enough to afford housing in a market where the average rent for a one-bedroom apartment is $1675 per month.

127.    Mr. Singleton and his wife became homeless two years ago, when Mr. Singleton became disabled.  They stayed in one of the family homeless shelters; but, after experiencing a threatening situation, they decided it was not safe to stay there and left.

128.    For about two years, Mr. Singleton and his wife lived on the street near what became the Highway 101 Underpass encampments in Santa Rosa.  Plaintiff and his wife camped away from the streets whenever possible.

129.    In November 2017 when the 101 Underpass 5th and 9th Street area encampments were closed by the City of Santa Rosa, Mr. Singleton and his wife moved over near what

was already an encampment in the Roseland area, with the assistance of a homeless advocate.   They set up a tent near this encampment and started what became a second adjacent encampment.

130.    During his time on the streets in Santa Rosa, Mr. Singleton was cited numerous times for illegal camping, and blocking the sidewalks.  In June 2016, while reading on the sidewalk near where he was living, Mr. Singleton was arrested for disorderly conduct.

131.    Mr. Singleton has also observed the Santa Rosa Police Department taking homeless people's personal property and throwing it into the street, especially in the area of the Highway 101 Underpass Encampments.

132.    Mr. Singleton and his wife have applied for various housing assistance programs without success.  Plaintiff is presently on the waiting list for Section 8 subsidized housing.

133.    Mr. Singleton has had several contacts with the adjacent NC.  Plaintiff has had an assessment done by the NC staff.  As of this date, the Navigation Center has not offered Mr. Singleton an alternative housing option other than a shelter bed.

134.    Mr. Singleton is not sure where he and his wife would go if the current encampment were to close.  Mr. Singleton is concerned that until he is able to locate better shelter, he will not be able to find a place he would be able to reside without possible harassment by the authorities.    He is also concerned he will lose all of his personal possessions that he has with him at the encampment.

135.    Mr. Singleton is also worried about other encampment residents, for whom he feels a responsibility.   If they are scattered to other locations away from the Roseland site, it will be even harder for them to access services and obtain shelter placements than it is now.

**Ellen Brown**

136.    Plaintiff ELLEN BROWN is 52 years old and is a native of Sonoma County.

137.    Ms. Brown currently resides at the Roseland Encampments and has been residing there since November 2017 with her partner.

138.    Ms. Brown is disabled and unable to work.  She receives some benefits based on

her disability, but this is not enough income for her to afford housing.

139.    Ms. Brown applied many years ago for Section 8 housing assistance, but as of this date has not received the benefit.  Ms. Brown has also tried many times to apply for other types of affordable housing without success.

140.    Ms. Brown was diagnosed with a mental disability at age 20, but was able to work for about 9 years as a Certified Nurse's Assistant.   More recently, she has suffered strokes and how has difficulty communicating because of the strokes' effects.

141.    Ms. Brown has been homeless since 2000.  Ms. Brown lived in the area of the highway 101 Underpasses for about two years before the City forcibly closed that encampment in November 2017.

142.    At one point during the time she lived at the Highway 101 Underpass, Ms. Brown had all of her possessions seized by the police.  The possessions were dumped in a large pile with all the other possessions from the area.  Ms. Brown was not able to retrieve her possessions. The property Ms. Brown lost at that time included, but was not limited to, her identification, her backpack, all of her clothes, her phone and her medications.  Ms. Brown needed to take her medications every day, and so was required to go to the doctor immediately to have her prescriptions refilled.

143.    Ms. Brown received no advance written notice as to the seizure of her possessions at that time.

144.    After the City swept the Highway 101 encampments, Ms. Brown relocated to the Roseland Encampments.

145.    Ms. Brown went to the NC shortly after it opened.  After several attempts, she was able to do an assessment with a staff person at the Center.

146.    Ms. Brown does not want to be split up from her partner, who helps her with tasks that she has difficulty with because of her disability.  She is afraid that, if she went to a shelter, they would not be able to stay together.

147.    Ms. Brown has no other place to go at this time should the encampment be closed. Ms. Brown is concerned that until she is able to locate better shelter, she will not be able

to find a place she would be able to reside without possible harassment by the authorities.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
Violation of Prohibition Against Cruel and Unusual Punishment
Eighth Amendment to the United States Constitution
California Constitution, Article I Section 17
[42 U.S.C. §§ 1983]
(against all Defendants)

148.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

149.    Defendants' Notice to Vacate the Roseland Encampments and City and CDC have threatened to forcibly remove residents and to enforce City's anti-camping ordinance, which declares that it is unlawful for any person to camp, occupy camp facilities, or use camp paraphernalia in the City, with no enumerated exceptions.

150.    The City's anti-camping ordinance specifically prohibits the use of "camp paraphernalia," which includes blankets and sleeping bags, and "camp facilities," defined as "any form of cover or protection from the elements."  By enforcing this law, Defendants will be depriving a portion of its citizens of protection from the rains, floods, and the cold.

151.    The City's anti-camping ordinance broadly defines camping to include using property for living accommodation purposes such as sleeping and includes using tents or living in a parked vehicle.

152.    The emergency beds and shelter housing available in the County for the homeless population are insufficient for the size of the homeless population in Sonoma County. Therefore, a large portion of County's homeless population must sleep outdoors.  By criminalizing camping in this manner, Defendants are preventing their homeless population from carrying out one of the basic functions of survival, sleeping and staying dry and warm while doing so, without breaking the law.

153.    Therefore, the homeless population in the City, including those at the Roseland

Encampments on the CDC land, must choose between sleeping outdoors exposed to the elements, significantly increasing the risk to health, or breaking the law and using "camping" paraphernalia such as blankets or tents to survive.

154.    Defendants' actions and threatened actions are with deliberate indifference to the danger individual Plaintiffs have and will suffer.

155.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
Unreasonable Search and Seizure
Fourth Amendment to the United States Constitution
California Constitution Article 1, Section 13
[42 U.S.C. §§ 1983]
(against all Defendants)

156.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

157.    The individual Plaintiffs possess property that holds both monetary and personal value.  Thus, Plaintiffs have an expectation to be free from meaningful interference with those their property rights, even if their property is stored on public property.

158.    The City's anti-camping ordinance contains no limitations, and provides for no limits on those enforcing the ordinance when determining which property poses a health and safety risk.  The Ordinance, as enforced by Defendants, therefore permits seizure and destruction of private property even if the property poses no threat to public health and does not constitute evidence of a crime.

159.    The written Notice to Vacate provided to Plaintiffs provides authority for officials removing the property to unilaterally determine whether it constitutes a risk to public health and safety and then destroy the property without any form of process or input from the Plaintiffs.

160.    The notice and confirmed plan of action of Defendants is done with specific intent

1    to deprive individual Plaintiffs of their rights to their personal property.

2    161.    Plaintiffs are informed and believe and thereon allege that the acts of the

3    Defendants and their employees and agents in connection with the prior closure of other

4    encampments were intentional in failing to protect and preserve individual Plaintiffs'

5    property and that, at minimum, were deliberately indifferent to the likely consequence that

6    the property would be seized and possibly destroyed unlawfully in view of the fact that the

7    right at issue was well-established at the time.

8    162.    Further, seizure of private property without a warrant or an exception to the warrant

9    requirement constitutes an infringement upon Plaintiffs' Fourth Amendment rights.

10    163.    As of result of Defendants' enforcement of these ordinances, Plaintiffs have and

11    will continue to suffer the loss of their personal property without adequate due process

12    unless enjoined.

13    164.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive,

14    declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and

15    costs.

16

17    **THIRD CAUSE OF ACTION**
Deprivation of Procedural Due Process

18    Fourteenth Amendment of the United States Constitution
[42 U.S.C. § 1983]

19    (against all Defendants)

20    165.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully

21    set forth herein.

22    166.    The City's anti-camping ordinance, as enforced by Defendants, deprives citizens of

23    due process by authorizing the destruction of property without specific notice and an

24    opportunity to be heard.

25    167.    Plaintiffs have had their property seized and destroyed without specific notice and

26    the opportunity to be heard.

27    168.    The City's anti-camping ordinance contains no provisions regarding disposition of

28

property owned by Sonoma County residents who may be cited and arrested for violation of the anti-camping ordinance.  The ordinance fails to provide notice in advance of the seizure of private property or procedures for return of that property post-seizure.  Failure to provide pre- or post-deprivation procedures violates the Fourteenth Amendment.

169.    The Notice to Vacate distributed by the CDC to the residents of the encampments states that "any item that poses a risk to public health or safety will be disposed of promptly."    The notice fails to include a process to challenge collection of the seized property or to challenge the categorization of the property as a risk to public health and safety.  Defendants have not provided any other document to Plaintiffs indicating that such remedies would be available.

170.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
State-Created Danger
Fourteenth Amendment of the United States Constitution
[42 U.S.C. § 1983]
(against all Defendants)

171.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

172.    Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

173.    Defendant CDC has notified Plaintiffs that they will be seeking enforcement of the City's anti-camping ordinance and will seize property.  If the ordinance is enforced, Plaintiffs will lose their possessions, including their only shelter from the elements, without adequate provision of alternative shelter.

174.    Without any other available option for shelter, Plaintiffs will be forced to live

exposed to the elements, including exposure to the cold, wind, and rain.  All Plaintiffs' physical health will be jeopardized if forced to sleep with no protection from the cold, wind, and rain.  Plaintiffs with mental health disabilities are likely to suffer Plaintiffs' disabilities will be aggravated including heightened mental health symptoms and psychological damage.  Without protection, Plaintiffs with physical disabilities will have their health conditions be exacerbated with by exposure to the cold, wet, and wind.

175.   If Defendants refrain from performing the sweep of the Roseland Encampments, Plaintiffs will not be exposed to these highly dangerous situations because have some element of protection through their ability to and privacy living in their encampments. Defendant knows or reasonably should know that its actions will create these threats to Plaintiffs' health and safety.

176.   In knowingly and willfully placing the health and safety of Plaintiffs and other residents of the Roseland Encampments in danger through its actions, Defendants have violated, and will continue to violate, Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.

177.   An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and/or are imminently threatening to violate 42 U.S.C. § 1983.

178.   Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.


**FIFTH CAUSE OF ACTION**
Discriminatory Effect on Persons with Disabilities Under Title II of the Americans with Disabilities Act
(42 U.S.C. § 12131 et seq.)
(against all Defendants)

179.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

180.   Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits

discrimination against people with disabilities by state and local governments and their programs. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

181.    The City, the County, and the CDC are all public entities covered by Title II of the ADA.

182.    The actions of Defendants alleged in this Complaint relate to services, programs, and activities under Title II.

183.    Plaintiffs are "qualified persons with disabilities" as defined under the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

184.    Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (f).

185.    Plaintiffs, the residents of the Roseland Villages encampments, and the homeless population of Sonoma County more broadly, have physical or mental health disabilities at greater rates than the County's population, generally, including mobility impairments, mental health disabilities, respiratory impairments, and cancer. Moreover, in the County's 2017 Homeless Point-In Time Homeless Census and Survey, 41 percent of homeless persons surveyed identified as having a disability.

186.    Defendants' planned closure of the Roseland Encampments will therefore have a disparate impact on people with disabilities, in violation of the ADA. The people whom Defendants intend to forcibly remove from the place where they have been living, to deprive of their personal property, and to threaten with incarceration are disproportionately people with disabilities.

187.    Likewise, Defendant City of Santa Rosa's enforcement of its Anti-Camping Ordinance and related ordinances, more broadly, has a disparate impact on people with

disabilities, as these ordinances criminalize the daily activities of homeless people, who are disproportionately people with disabilities.

188.    Additionally, placement in large, crowded shelters like Sam Jones is, in many cases unsuitable for people with disabilities because of their disability-related impairments. These people with disabilities are effectively excluded from the only shelter options the County is offering—even assuming there are sufficient available shelter beds for everyone at the Roseland Encampments.

189.    Sweeping the encampment without first identifying and offering alternative shelter that meets the disability-related needs of people with disabilities does not serve any compelling governmental interest of the City, the County, or the CDC.

190.    Accordingly, sweeping the encampment as planned will discriminate against people with disabilities in violation of Title II of the ADA.

191.    Plaintiffs are entitled to injunctive and declaratory relief, attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
Failure to Provide Reasonable Modifications Under
Title II of the Americans with Disabilities Act
(42 U.S.C. § 12131 et seq.)
(against all Defendants)

192.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

193.    Defendants' duty to not to discriminate against people with disabilities under Title II of the ADA includes a duty to provide reasonable modifications in otherwise neutral policies or practices "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130 (b)(7)(i).

194.    After Defendants posted notice at the Roseland Encampments of their intent to evict encampment residents and seize their personal property, Plaintiffs asked Defendants

1    to postpone the planned sweep until everyone at the encampments had been assessed for

2    placement and offered alternative shelter that met their disability related needs.

3    195.    Placement in the Sam Jones shelter or other congregate emergency shelter settings

4    is not viable for many of the encampments' residents for reasons related to disabilities.

5    For example, Plaintiffs Nicholle Vannucci and Deborah Drake cannot stay in a shelter

6    because staying in a crowded space will trigger the symptoms of their PTSD.  Plaintiff

7    Ellen Brown fears being separated from her partner, who helps her with activities of daily

8    living.  For such encampment residents, being moved into a place where they lack

9    privacy, where they cannot control their surroundings, or where they may be separated

10    from a partner or companion animal, would greatly exacerbate the symptoms of their

11    disabilities.

12    196.    Similarly, for many people with mental health disabilities who have been living at

13    one of the Roseland Encampments—some of whom came to Roseland Village after

14    having been displaced by sweeps elsewhere—being removed from the encampments

15    without having anywhere else to go would likely make their symptoms much worse.

16    197.    On March 26, 2018, through their counsel, Plaintiffs asked Defendants to provide

17    reasonable modifications by postponing the sweep of the Roseland Encampments

18    temporarily, until all residents with disabilities had been offered placements that met their

19    disability-related needs.

20    198.    However, Defendants did not postpone the sweep, denying Plaintiff's request.

21    199.    A temporary delay of the scheduled sweep until there is somewhere realistic and

22    appropriate for Roseland Village encampment residents to go would not impose a

23    fundamental alteration in Defendants' programs.

24    200.    By refusing to grant such reasonable modifications, Defendants have violated, and

25    continue to violate Title II of the ADA.

26    201.    Plaintiffs are entitled to injunctive and declaratory relief, attorneys' fees and costs.

27    ///

28    ///

### SEVENTH CAUSE OF ACTION
Intentional Discrimination Against Persons with Disabilities Under Title II of the
Americans with Disabilities Act
(42 U.S.C. § 12131 et seq.)

202.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

203.    By forcing the Roseland Encampments' residents to vacate their encampments without offering alternative shelter that meets their disability-related needs, and by refusing to postpone the sweep of the Roseland Encampments as a reasonable modification, Defendants are intentionally discriminating against Plaintiffs on the basis of their disability.

204.    Defendants know that the County's homeless population and the residents of the Roseland Encampments are disproportionately people with disabilities.

205.    Defendants know that many residents of the Roseland Encampments cannot go to a homeless shelter for reasons related to a disability, but Defendants have not provided appropriate placement to these people with disabilities.

206.    Nevertheless, Defendants posted a Notice to Vacate the Roseland Encampments by April 3, 2018, and have refused to postpone enforcement of that Notice.

207.    In doing so, Defendants are administering their programs in a way that discriminates against people with disobliges, including Plaintiffs, on the basis of their disabilities.


### EIGHTH CAUSE OF ACTION
Discrimination Against People with Disabilities in Federally Assisted Programs
(29 U.S.C. § 794)
(against all Defendants)

208.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

209.    Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise

qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.". 29 U.S.C. § 794.

210.    For purposes of Section 504, a "program or activity" includes "a department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives or administers federal funds. 29 U.S.C. § 794 (b)(1)(A).

211.    On information and belief, Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Committee all receive and/or administer federal funds and, as such, are covered by Section 504.

212.    Plaintiffs are qualified individuals with disabilities under Section 504.

213.    Section 504 prohibits covered entities from administering their programs in a way that has a discriminatory effect, or disparate impact, on people with disabilities.  See 24 C.F.R. § 8.4 (b)(4).

214.    Section 504 requires recipients of federal funds to provide people with disabilities with meaningful access to their programs. In order to ensure meaningful access, reasonable modifications may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program. 29 U.S.C. § 749; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

215.    For the reasons described in paragraphs 179 to 207, Defendants' sweep of the Roseland Encampments in the absence of appropriate alternative shelter for its residents will discriminate against people with disabilities in violation of Section 504.

216.    Plaintiffs are entitled to injunctive and declaratory relief, attorneys' fees and costs.

*///*

*///*

*///*

*///*

# NINTH CAUSE OF ACTION
Disability Discrimination
[Gov. Code § 11135]
(against all Defendants)

217.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

218.    California Government Code Section 11135 states in relevant part that:

> No person in the State of California shall, on the basis of . . . mental disability, physical disability, [or] medical condition . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.  Gov't Code § 11135 (a).

219.    On information and belief, Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Committee are all recipients of state funding, and the programs and activities of Defendants described in this Complaint are administered with the use of state funds.  As such, Defendants are subject to section 11135's prohibition against disability discrimination.

220.    Section 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities.  Subsection (b) states:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

221.    Accordingly, all violations of the Title II of the ADA and Section 504 by entities covered by section 11135 are also violations of section 11135.

222.    One area in which section 11135 is more protective is the definition of disability,

which is more expansive under California law than under federal law.  Mental or physical conditions need only "limit" a major life activity to be considered disabilities under California law, whereas a disability under ADA and Section 504 "substantially limits" one or more major life activities.

223.    Plaintiffs are persons with disabilities under section 11135.

224.    Accordingly, by administering their programs in a manner that both intentionally discriminates against people with disabilities and has a discriminatory effect on people with disabilities, and by failing to provide reasonable modifications, Defendants have violated, and continue to violate, section 11135.

225.    Plaintiffs are entitled to injunctive and declaratory relief, attorneys fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1.      For a temporary restraining order permanent restraining order, and preliminary injunction restraining Defendant City from enforcing the Notice to Vacate until such time as the Court determines that Defendants have provided sufficient and appropriate shelter placements to residents of the Roseland Encampments, including placements that meet the disability-related needs of Roseland Encampments residents with disabilities

2.      For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendants City of Santa Rosa and CDC from seizing and disposing of individuals' property in violation of their Fourth and Fourteenth amendment rights

3.      For a temporary restraining order, a preliminary injunction, and a permanent injunction, enjoining and restraining Defendants City and CDC from citing or arresting individuals for violation of the City's anti-camping ordinance.

2.      For a permanent injunction enjoining and restraining Defendant City from citing or arrest individuals for violation of ordinance No. 11-22.030.

4.     For declaratory judgment that Defendant's policies, practices, and conduct as alleged herein violate Plaintiff's' rights under the United States Constitution.

5.     For costs of suit and reasonable attorney's fees as provided by law.

6.     For such other relief as the court deems just and proper.


Dated: March 29, 2018

                                        CALIFORNIA RURAL LEGAL ASSISTANCE

                                        THE PUBLIC INTEREST LAW PROJECT

                                        LAW OFFICE OF ALICIA ROMAN


                                        By:     /s/ Jeffery Hoffman_____
                                                JEFFERY HOFFMAN, Attorneys for Plaintiffs

1    (Additional Counsel continued)

2    Cynthia L. Rice, SBN: 87630
3    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
     1430 Franklin Street, Suite 103
4    Oakland, CA 94612
     Telephone: (510) 267-0762; Fax: (510) 267-0763
5    Email: crice@crla.org

6    Ilene J. Jacobs, SBN: 126812
7    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
     511 D Street / P.O. Box 2600
8    Marysville, CA 95901
     Telephone: (530) 742-7235; Fax: (530) 741-0854
9    Email: ijacobs@crla.org

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint

**Exhibit  A**

**Sonoma County**
**Community Development Commission**
*Sonoma County Housing Authority*

# NOTICE TO VACATE ILLEGAL CAMPSITE/LODGING

**POSTING DATE:** February 21, 2018          **VACATE DATE:** April 3, 2018

**LOCATION:** Property between 779 and 665 Sebastopol Road, Santa Rosa 95407 (Roseland Village)

This Property has been slated for development of affordable housing and requires immediate site remediation. Development CANNOT proceed until the illegal campsite has been vacated to allow remediation to commence. The Community Development Commission, the Owner of the Property, hereby gives all occupants notice that they must immediately vacate the Property.

Any prior permission to occupy the Property, whether express, implied, or perceived, is expressly revoked and terminated by the Owner.

**WARNING:** If you do not vacate the Property by the date above, you may be subject to arrest and possible prosecution for any of the following violations, or for violation of any other applicable state or local law. This Property is within the meaning of Penal Codes 647(e) and 602(m) and SR City Ordinance 11-22.030.

- [ ] California Penal Code section 647 (e) – Unlawful lodging. Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: who lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to possession or in control of it.

- [ ] California Penal Code section 602 – Trespass. Every person who willfully commits a trespass by the following act is guilty of a misdemeanor: (m) Entering and occupying real property or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful possession.

- [ ] Santa Rosa City Code Section 11-22.030 – Camping on private property. It is unlawful for any person to camp on any private property without first obtaining the written permission of the owner.

    **Other State and City Code Violations may include, but are not limited to:**
    Unlawful storage of property, unlawful refuse disposal, unlawful failure to restrain animal, unlawful fire.

**INSTRUCTIONS:**

1. All personal property and debris must be removed immediately or it will be removed by the Community Development Commission on or after _____ April 3, 2018 _____.
2. Any items that pose a risk to public health or safety will be disposed of promptly. All other personal property will be stored by the Community Development Commission for a period of 90 days. If your personal property has been removed by the Commission, you may contact the Commission at (707) 565-7500 for information on retrieval. Failure to claim and retrieve your property may cause it to be considered intentionally abandoned. Unclaimed property may be disposed of after 90 days per California Civil Code Sections 2080 – 2080.10.
3. For information about housing and other services, please visit the Housing Navigation Center at **883 Sebastopol Rd, Santa Rosa, CA 95407** (adjacent to the Roseland Village property), beginning on **February 23, 2018 until April 3, 2018, from 8:00 am – 4:00 pm, Monday – Friday.**