Pages 1 - 180

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

```
DEBORAH DRAKE, et al.,        )
                              )
            Plaintiffs,       )
                              )
  VS.                         )    NO. C 18-01955 VC
                              )
COUNTY OF SONOMA, et al.,     )
                              )
            Defendants.       )
_____)
```

San Francisco, California
Thursday, April 5, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs Deborah Drake, et al.:
Alicia Romãn Law Office
719 Orchard Street
Santa Rosa, CA  95404
(707) 526-4100
(707) 573-1094 (fax)
**BY:  ALICIA ROMÃN**

For Plaintiffs Deborah Drake, et al.:
Public Interest Law Project
449 15th Street, Suite 301
Oakland, CA  94612
(10) 891-9794
(510) 891-9727 (fax)
**BY:  MELISSA ANTOINETTE MORRIS**
**MICHAEL F. RAWSON**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1   **APPEARANCES**:

2   For Plaintiffs Deborah Drake, et al.:
                         California Rural Legal Assistance
3                        1160 N. Dutton Avenue, Suite 105
                         Santa Rosa, CA  95401
4                        (707) 528-9941
                    **BY:  JEFFERY HOFFMAN**
5
    For Defendants County of Sonoma; Sonoma County Community
6   Development Commission:
                         Office of the County Counsel
7                        County of Sonoma
                         575 Administrative Drive, Room 105A
8                        Santa Rosa, CA  95403
                         (707) 565-2421
9                        (707) 565-2624 (fax)
                    **BY:  ALEGRIA GUADALUPE DE LA CRUZ**
10                       **CHRISTOPHER WESLEY MAGAÑA**

11  For Defendant City of Santa Rosa:
                         City of Santa Rosa
12                       Office of the City Attorney
                         100 Santa Rosa Avenue, Room 8
13                       Santa Rosa, CA  95404
                         (707) 543-3040
14                       (707) 543-3055 (fax)
                    **BY:  ROBERT LEAR JACKSON**
15
    Also Present:  Margaret Van Vliet
16

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2

3  Thursday, April  5, 2018 - Volume

4
   **PLAINTIFFS' WITNESSES**                           <u>PAGE</u>  <u>VOL.</u>
5

6  **SINGLETON, STEVEN**
    (SWORN)                                             103   1
7  Direct Examination by Mr. Hoffman                    104   1
   Cross-Examination by Ms. De La Cruz                  108   1
8  Redirect Examination by Mr. Hoffman                  109   1

9

10 **VANNUCCI, NICHOLLE**
    (SWORN)                                             110   1
11 Direct Examination by Mr. Hoffman                    110   1
   Cross-Examination by Ms. De La Cruz                  118   1
12 Redirect Examination by Mr. Hoffman                  124   1

13

14 **DRAKE, DEBORAH**
    (SWORN)                                             125   1
15 Direct Examination by Mr. Hoffman                    125   1
   Cross-Examination by Ms. De La Cruz                  132   1

16

17 **BROWN, ELLEN**
    (SWORN)                                             137   1
18 Direct Examination by Mr. Hoffman                    137   1

19

20 **DEFENDANTS' WITNESSES**                            <u>PAGE</u>  <u>VOL.</u>

21

22 **ABRAMSON, JENNIFER**
    (SWORN)                                               8   1
23 Direct Examination by Ms. De La Cruz                   9   1
   Direct Examination resumed by Ms. De La Cruz          40   1
24 Cross-Examination by Mr. Hoffman                      43   1
   Redirect Examination by Ms. De La Cruz                63   1

25

1                           I N D E X

2     **DEFENDANTS' WITNESSES**                              **PAGE**   **VOL.**

3
      **WICKHAM, BENJAMIN**
4     (SWORN)                                                 65       1
      Direct Examination by Ms. De La Cruz                    65       1
5     Direct Examination resumed by Ms. De La Cruz            79       1
      Cross-Examination by Mr. Rawson                         82       1
6     Cross-Examination resumed by Mr. Rawson                 96       1
      Redirect Examination by Ms. De La Cruz                  96       1
7     Recross-Examination by Mr. Hoffman                     101       1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **Thursday - April  5, 2018**                              **11:02 a.m.**

2                      **P R O C E E D I N G S**

3                            **---oOo---**

4          **THE CLERK:**  Calling Case Number 18-CV-01955, Drake,

5  et al., versus County of Sonoma, et al.  Counsel, please step

6  forward and state your appearances for the Record.

7          **MS. DE LA CRUZ:**  Good morning, Your Honor.

8  Alegria De La Cruz, Chief Deputy County Counsel, representing

9  the Community Development Commission.  And here with me is also

10 Christopher Magaña, who is a Deputy County Counsel.  And from

11 the Commission, Margaret Van Vliet, Executive Director.

12         **THE COURT:**  I'm sorry.  Who did you say?  Margaret

13 who?

14         **MS. DE LA CRUZ:**  Van Vliet.

15         **THE COURT:**  Oh, okay.

16         **MS. DE LA CRUZ:**  She's the Executive Director.

17         **THE COURT:**  There she is.  Great.  Okay.

18     Who are you?

19         **MR. JACKSON:**  Good morning, Your Honor.

20 Robert Jackson, on behalf of the City of Santa Rosa.

21         **THE COURT:**  Good morning.

22         **MR. HOFFMAN:**  Good morning, Your Honor.

23 Jeffery Hoffman, California Rural Legal Assistance, for the

24 plaintiffs.  I have my co-counsel here, Alicia Román;

25 Michael Rawson and Melissa Morris, from the Public Interest Law

PROCEEDINGS

1   Project.

2      Our five individual plaintiffs are here, sitting afront

3   there:  Ms. Nicholle Vannucci, Ellen Brown, Deborah Drake,

4   Samantha Jenkins, and Steven Singleton.

5          **THE COURT:**  Good morning, everyone.

6          **MS. DE LA CRUZ:**  Good morning.

7          **THE COURT:**  And who's our witness on the screen

8   there?

9          **MS. DE LA CRUZ:**  So, Your Honor, we have with us this

10  morning Jenny Abramson, who's is the Homeless and Community

11  Service Manager at the Community Development Commission.  And

12  the other witness that we have available today is

13  Benjamin Wickham, who is the Affordable Housing Program

14  Manager, also from the Commission.  Ben is here in person.

15         **THE COURT:**  Okay.  Okay.  So in terms of how we ought

16  to proceed, I guess maybe I first would like to ask the

17  lawyers:  Do you have any updates as to, like, the facts on the

18  ground?  Start with you.  Any updates from what you've put in

19  the papers?

20         **MR. HOFFMAN:**  Yes, Your Honor.  Well, there are a

21  couple updates.  I can confirm that as of Monday this week,

22  Steven Singleton and Samantha Jenkins had been placed in a

23  Permanent Supportive Housing apartments, if you want to call

24  them that, at the Palms.  And I had mentioned that in my

25  Declaration, but we have now been able to confirm they are

1  physically there, yeah, at the premises there.

2          **THE COURT:**  Okay.

3          **MR. HOFFMAN:**  So that's one update.  I don't know

4  that I have any other updates.

5      The parties met and conferred yesterday to discuss the

6  issues; see if we could try to reach an agreement.

7          **THE COURT:**  Okay.

8          **MR. HOFFMAN:**  And -- but we're here.  And no

9  agreement at this point.

10         **THE COURT:**  Okay.  And any update from you?

11         **MS. DE LA CRUZ:**  Your Honor, yes.  We do have updates

12  Jenny Abramson is best equipped to give updates --

13         **THE COURT:**  Okay.

14         **MS. DE LA CRUZ:**  -- regarding the number of

15  assessments and placements that are current.

16         **THE COURT:**  Perfect.  Perfect.  Okay.  So should we

17  maybe just go straight to testimony, and proceed with

18  Ms. Abramson, or whoever?  I mean, I think maybe since

19  Ms. Abramson is participating by video and has obligations --

20  child-care obligations -- maybe we should hear from her first.

21  Does that make the most sense?

22         **MS. DE LA CRUZ:**  Absolutely, Your Honor.  Pleasure.

23         **THE COURT:**  Okay.  So, by the way, I think that

24  this -- I mean, this is an evidentiary hearing on a TRO

25  application.  I think all of the witnesses who testify should

1  be testifying under oath --

2            **MS. DE LA CRUZ:**  Mm-hm.

3            **THE COURT:**  -- and from the witness stand.  And so I

4  will have Kristen go ahead and administer the oath to

5  Ms. Abramson now.

6       And you all -- you know, you can start, Ms. De La Cruz, by

7  examining her.  And you can cross-examine her.  I will

8  presumably frequently interrupt with questions, as I tend to do

9  in these things; but feel free to conduct your examination.

10       All right.  Kristen.

11            **THE CLERK:**  Please raise your right hand.

12                      **JENNIFER ABRAMSON**,

13  called as a witness for the Defendants, having been duly sworn,

14  testified as follows:

15            **THE WITNESS:**  Yes, I do.

16            **THE CLERK:**  Thank you.  For the record, please state

17  your first and last name, and spell both of them.

18            **THE WITNESS:**  Jennifer Abramson.  Jennifer

19  J-e-n-n-i-f-e-r.  Abramson.  A-b-r-a-m-s-o-n.

20            **MS. DE LA CRUZ:**  Your Honor, if I may, I'm going to

21  move this over to my side.  I understand --

22            **THE COURT:**  You can move that to your side, or you

23  can take that podium to conduct your direct examination.

24  Whatever.  You can turn the podium, if you wish to turn the

25  podium.  Whatever works best.

1          **MS. DE LA CRUZ:**  Thank you.  Thank you, Jeff.

2                    **DIRECT EXAMINATION**

3     BY MS. DE LA CRUZ

4     **Q.**   Hi, Jenny.

5     **A.**   Hi.  Good morning.

6     **Q.**   Good morning.  Can you please let us know what your title

7     is at the Community Development Commission?

8     **A.**   I am the Homeless and Community Services Manager.

9     **Q.**   And are you familiar with the Roseland Village Encampment?

10    **A.**   I certainly am.

11    **Q.**   How are you familiar with the Encampment?

12    **A.**   Well, I have been at the Community Development Commission

13    for four and a half years.  And I was on staff when the initial

14    small camp arrived in November 2015.  So, as the Agency in

15    charge of homeless services planning for the County, I helped

16    with determining what should be done, if anything.

17          The Agency decided not to take enforcement action against

18    this small encampment at the time because the development time

19    line didn't require that kind of action, and also because the

20    size was manageable.

21          We took steps to protect the property.  We added fencing

22    to avoid attracting a nuisance.  We placed portable toilets to

23    support public health, for example.

24          It was really only after many other issues -- the fires

25    last October; the clearing of other camps; our development time

1    line, which -- I'm sure Ben can attest to the increased

2    concerns about health and safety in the camp -- and also

3    impacts on that local community.  This is a Latino, low-income,

4    under-resourced community that was only recently annexed by the

5    City, so it was in no shape to absorb the influx of people that

6    came in at the end of November.  So having a camp grow to seven

7    times its original size really forced us to address the

8    Encampment at this time.

9         And how we chose to engage the Encampment had to do with

10   our understanding/our experience as a homeless-serving agency

11   for the County.

12   Q.   Jenny, what was your --

13   A.   So let me just -- I'm sorry.

14   Q.   Sure.  What was your role in determining, kind of, the

15   next steps after November 2017?

16   A.   We -- we researched the best practices out there, in terms

17   of dealing with or resolving encampments with housing.  That

18   was our goal.

19            THE COURT:  Ms. Abramson, can I --

20            THE WITNESS:  Yes.

21            THE COURT:  Can I interrupt for a second?

22            THE WITNESS:  Sure.

23            THE COURT:  I think maybe Ms. De La Cruz was asking

24   what your specific role was.

25        Am I right, Ms. De La Cruz?

1          **MS. DE LA CRUZ:**  That's correct, Your Honor.

2          **THE COURT:**  So yeah.  So if you could, tell us a

3    little bit more about your specific role and involvement in all

4    of this.

5          **THE WITNESS:**  I helped to design the program of the

6    Navigation Center.  We decided to create an on-site, intensive

7    services program that would do outreach to the people in the

8    Encampment, identify housing options for everybody who wanted

9    them, and also bring all the County's resources to bear.  Every

10   County agency that I spoke to was eager to deliver services in

11   this setting.  So --

12   **BY MS. DE LA CRUZ**

13   **Q.**   Can you describe to us the number of different County

14   departments and other nonprofit partners that you had, kind of,

15   in the Navigation Center?

16   **A.**   Right.  So the project was anchored by Catholic Charities

17   as our contractor for the Homeless Outreach Service Team.  So

18   they were there full time; four staff full time for five weeks.

19        Social Advocates for Youth also went out as one of our

20   nonprofit agencies.

21        Other nonprofits who were on-site included the Brookwood

22   Clinic of the Santa Rosa Health Center, and St. Joseph's Health

23   Centers.

24        We also had County Public Health, County Behavioral Health

25   from the Human Services Department.  We had Adult Protective

1  Services; the Sonoma Works Project; Economic Assistance.  And

2  eventually we also brought Child Support Services, because we

3  identified needs.

4      Other departments were very willing to come, but those

5  were the needs that we received a response that there was

6  interest.

7  **Q.**  So, Jenny, after you designed and developed the homeless

8  Navigation Center concept, and organized the partners to be

9  part of that center, can you talk about what your regular role

10  was in -- in, kind of, continuing the operation of the center?

11  **A.**  With the center in particular, I worked to organize our

12  internal resources; for example, funding that we could bring to

13  bear to house people without having to seek additional

14  authority, because we needed to move quickly.  So we identified

15  some funding sources we could use for Rapid Re-Housing

16  programs, for example.

17      I convened a weekly service-provider meeting in the center

18  for everybody who was working there to share information; to

19  assist each other with client situations; that kind of thing.

20      And then I also was one of the team from our Agency that

21  attended meetings with the City.  Since we've had to

22  collaborate with the City towards enforcement, then we needed

23  to sit down with them on weekly basis to make sure that they

24  had understood everything that we were doing, and that we were

25  meeting our legal responsibilities as the time, kind of, moved

ABRAMSON - DIRECT / DE LA CRUZ

1    on.

2    **Q.**    Thank you, Jenny.  So, Jenny, as you know, the Judge has

3    asked for some specific information.

4         So if Your Honor is amenable, I'm going to cut kind of

5    past the broader background here, and get to those questions.

6         Jenny, are you familiar with Deborah Drake?

7    **A.**    I have not met Ms. Drake.  I am familiar with her from the

8    pleadings, from the briefings or from the documents that have

9    been submitted to the Court.  I am familiar with her also

10   because I have documentation for the purpose of approving

11   funding for permanent housing for her.

12   **Q.**    And do you know --

13   **A.**    We're just waiting for one document.

14   **Q.**    Do you know what housing options are currently available

15   to her?

16   **A.**    I know that there's an anticipated opening for her that

17   they're reserving for her at the Palms Inn.  So this is a

18   104-unit motel in Santa Rosa that has been turned into a

19   Permanent Supportive Housing.  So there are at least three

20   expected vacancies in the coming few weeks in the month of

21   April.  And so one of them is essentially reserved for her;

22   that is, when we receive evidence that her dog has been

23   vaccinated.  That's the only thing we're waiting for to approve

24   funding.

25   **Q.**    Thank you.  Jenny, can you can you describe a little bit

1  about the Palms, or what Permanent Supportive Housing means?

2  **A.**   Permanent Supportive Housing is permanent housing, where

3  supportive services are available for an unlimited period of

4  time.   It's a very intensive model for people who have

5  disabilities.   I think that's the nice, brief way to put it.

6         **THE COURT:**   Could I ask a clarification -- a couple

7  of clarification questions?

8         **THE WITNESS:**   Sure.

9         **THE COURT:**   Maybe.   So the -- you said that there are

10 three expected vacancies?

11        **THE WITNESS:**   Right.

12        **THE COURT:**   So does that mean that there are three

13 units at The Palms that are currently available, or are you

14 waiting for those units to be vacated by somebody else?

15        **THE WITNESS:**   We expect the units to be vacated by

16 somebody else.

17        **THE COURT:**   And is your --

18        **THE WITNESS:**   They have informed that they are moving

19 out.

20        **THE COURT:**   They have informed you that they are

21 moving out?

22        **THE WITNESS:**   Not me directly; our service-provider

23 contractor.

24        **THE COURT:**   Okay.   So they're moving out by choice?

25        **THE WITNESS:**   As I understand it, yes.

```
1              THE COURT:  Okay.  And do you have a time line for
2    that?  Do you have dates?
3              THE WITNESS:  I am told in the month of April.
4              THE COURT:  In the month of April.  Okay.
5              THE WITNESS:  Yes.
6              THE COURT:  So what happens to somebody like
7    Ms. Drake?  Let's say the Encampments are removed.  And today
8    is April -- what is it?
9              THE REPORTER:  Fifth.
10             THE COURT:  April 3rd?
11             THE WITNESS:  Fifth.
12             THE COURT:  April 5th.
13        And we can't get her into these units at The Palms for two
14   reasons, it sounds like.  Right?  One is that the unit hasn't
15   been vacated yet.  And two is that --
16             THE WITNESS:  Correct.
17             THE COURT:  -- you're waiting for paperwork on the
18   vaccination of her dog?
19             THE WITNESS:  Yes.
20             THE COURT:  So putting aside the vaccination for a
21   second --
22             THE WITNESS:  Mm-hm.
23             THE COURT:  -- what happens to Ms. Drake during the
24   interim period?
25             THE WITNESS:  Temporary housing is available.
```

1          THE COURT:  Okay.

2          THE WITNESS:  We have secured -- so they are

3   overwhelmingly shelter beds that have been secured specifically

4   for the use of people coming out of Roseland Village.  There

5   are more than one Agency that have set aside beds for this

6   purpose.

7          THE COURT:  And is --

8          THE WITNESS:  I should say also that, given that what

9   we're putting into this is Rapid Re-Housing, if another unit

10  were identified for Ms. Drake between now and one opening at

11  The Palms, then that unit would also become an option.

12         THE COURT:  Okay.  And so what can you tell me about

13  these shelter beds?  You know, we have, I guess -- I mean, I

14  have a lot of questions about the shelters, but --

15         THE WITNESS:  Mm-hm.

16         THE COURT:  -- I guess one question that immediately

17  pops to mind is that, you know, we often have an image in our

18  minds of homeless shelters.  And it's like a gymnasium-floor

19  type of situation with a hundred cots, you know, strewn about;

20  and no privacy; and safety issues; and, you know, no

21  accommodations for people with disabilities.  I mean, that's

22  sort of the stereotype --

23         THE WITNESS:  Mm-hm.

24         THE COURT:  Right?

25     -- of shelters for homeless folks.

ABRAMSON — DIRECT / DE LA CRUZ

1            THE WITNESS:  Yes.

2            THE COURT:  My understanding in San Francisco, for

3    example, is that that's changing.  Like, the shelters are

4    improving.

5        But what can you tell me about that with respect to the

6    shelters in Sonoma County?

7            THE WITNESS:  In many ways it's similar to what's

8    going on in San Francisco, because we're all under a federal

9    mandate to move to a low-barrier shelter system; a

10   housing-first system, where the shelters are focused on housing

11   people, and also a Coordinated Entry System.  That's how we

12   have to do it in Sonoma County, because we've got this wide

13   expanse, so that there's a single -- it's not a point of

14   access, but a single process for accessing all housing

15   resources in the County that prioritizes people with

16   disabilities with the highest vulnerability and the longest

17   time outside.

18       So our shelters are beginning -- I would say, to be fair,

19   that they are only at the beginning of making this change.

20       Our contractor for the HOST project -- and where 40 beds

21   are currently available for people coming from Roseland

22   Village -- is at the cutting edge of that change in Sonoma

23   County.  They aren't the only ones.  But they have reduced

24   their rules for -- their program rules that people have to sign

25   off on and remember -- from six pages to one page.  They accept

1  pets, which they never did before.  They have ceased testing

2  for drugs and alcohol.  They only require basically community

3  behavior standards.  And the whole staffing structure has moved

4  to focus on getting people into housing as quickly as possible.

5           **MS. DE LA CRUZ:**  Your Honor, if I may --

6           **THE WITNESS:**  This is a massive change, in terms of

7  procedure.

8      And just to speak to the question of privacy, that shelter

9  has some large areas like you described; maybe not cots strewn

10 about, but with bunk beds and partitions between sections of

11 perhaps 20 beds.  There are also rooms with far fewer beds.

12 There are women-only rooms.  There are rooms that can be set up

13 for people who are family from an encampment; that is, you

14 know, "street family."

15     There are lots of ways to make accommodations.  One of the

16 things I learned in discussing this with our provider was that

17 accommodation is not just for disability.  It's for all kinds

18 of needs.  For example, people who have a night job:  An

19 accommodation that allows them to be in a quiet place and sleep

20 during the day.

21     So there are all kinds of accommodations that are made for

22 disabilities.

23     And I'll just say we pulled this data this morning about

24 the --

25           **THE COURT:**  Could I interrupt you quickly before you

1    give me that data --

2              THE WITNESS:  Sure.

3              THE COURT:  -- which I do want to hear?

4         But let me just ask you.  Everything you've just said to

5    me -- you were talking about one particular facility that

6    has --

7              THE WITNESS:  Yes.

8              THE COURT:  You said it has 40 beds available for

9    people coming out of Roseland?

10             THE WITNESS:  Yes.

11             THE COURT:  And what is that facility called, and

12   where is it?

13             THE WITNESS:  It's Samuel Jones Hall in Santa Rosa.

14             THE COURT:  Say it again.  Could you say it one more

15   time?

16             THE WITNESS:  Samuel Jones Hall.

17             THE COURT:  In Santa Rosa?

18             THE WITNESS:  Yes.

19             THE COURT:  Okay.  And who operates that facility?

20             THE WITNESS:  Catholic Charities operates that

21   facility.  They are the largest service provider in Sonoma

22   County, so you're going to hear their name a lot.

23             THE COURT:  Okay.  Thanks.  Go ahead.

24             THE WITNESS:  I was just going to mention that we've

25   pulled the data this morning, and found that 70 percent of the

ABRAMSON - DIRECT / DE LA CRUZ

1  people currently at Sam Jones Hall -- that is 120 out of 172

2  people currently there -- have physical, developmental, or

3  mental health problems.  So we have a very high rate of

4  disability already being served in that shelter, because that

5  shelter has also shifted to prioritizing people with the most

6  vulnerability.

7            **THE COURT:**  And so, like, how much specificity can

8  you give me at this stage about what kind of situation would be

9  available for Ms. Drake at Samuel Jones Hall, based on her

10  needs?

11            **THE WITNESS:**  Well, I do know that the dog would be

12  allowed to come into the shelter with vaccination papers.

13  Also, the providers assist people to get vaccination, but she

14  is apparently -- this is the report I get from my contractor;

15  that she has told them that the dog has been vaccinated.  So

16  we're just waiting.

17      I don't have personal knowledge of her needs in terms of

18  accommodations, but the way that would work is to have a

19  conversation with the service provider where she would raise, *I*

20  *need this.  I need this because of my disability*, or *I need*

21  *that generally*.  And they'd begin a conversation about, *Well,*

22  *we can provide you this kind of accommodation.  We can provide*

23  *you that kind of accommodation.*  And it's a walking through; a

24  conversation about what's actually reasonable and possible on

25  that site.  That's not the only place.

ABRAMSON - DIRECT / DE LA CRUZ

1      But our role -- and the role that I have personal

2   knowledge of -- is we contract with many shelters and

3   Transitional Housing and Permanent Supportive Housing programs

4   throughout the county.  Because we administer federal funds,

5   our contracts all require compliance with the Americans with

6   Disabilities Act; compliance with Title 504.  We provide

7   additional training in that subject during our contract

8   technical assistance.  We monitor for the existence of

9   appropriate policies.

10      So I'm talking a lot about Sam Jones Hall because the beds

11   are set aside there, but this is common.  This is what we do.

12      Does that make sense?

13           **THE COURT:**  Yes.

14           **MS. DE LA CRUZ:**  Thank you, Your Honor.

15   **Q.**   Jenny, let's continue with your testimony about the named

16   plaintiffs here.  Are you familiar with Samantha Jenkins?

17   **A.**   I don't know Ms. Jenkins directly.  I haven't met her.

18      I am aware of her case because I have reviewed paperwork

19   and authorized funding for her to enter the unit that she moved

20   into this week at the Palms Inn.

21   **Q.**   Okay.  Thank you.

22      Are you familiar with Nicholle Vannucci?

23   **A.**   I -- I -- again, I don't know Ms. Vannucci personally.  I

24   have seen her at community meetings.  I know who she is.  I've

25   seen her at Board of Supervisors' chambers.  I've heard her

ABRAMSON - DIRECT / DE LA CRUZ

1   speak there about her situation.  I'm aware of the assessments

2   that have been done by our outreach team.  I'm aware, for

3   example, that she -- she's in a relationship with a veteran who

4   has a V.A. supportive housing voucher, and that they are

5   seeking housing.  I received an updated report on that

6   situation and the efforts that are being made by a series of

7   service providers from the V.A., from VetConnect, which is a

8   veterans-serving one-stop organization, and from the Catholic

9   Charities HOST team.

10      So I'm aware of what's going on, but I don't have personal

11  interactions with Ms. Vannucci.

12  **Q.**   And if Ms. Vannucci is not able to secure permanent

13  housing through her partner's VASH voucher, can you explain

14  what would otherwise be available to her if she were removed

15  from the camp?

16  **A.**   Well, again, the beds are available currently -- the

17  temporary beds.  We have 40 there.  Twenty-four have been

18  committed by Redwood Gospel Mission, which has separate men's

19  and women's shelters, and a winter shelter that won't close

20  until the end of April.

21      She would be certainly applying for one of the units at

22  The Palms, or other Rapid Re-Housing units is a true

23  possibility, working with the housing locators at Catholic

24  Charities.

25      Let's see.  Ms.  -- Ms. Vannucci had stated in her

1   declaration that she thinks she has PTSD.  And that actually

2   isn't a documentation we can use, but we can work with the

3   assessment, which flags possible disabilities.  We can assist

4   her towards getting documentation of her disability.  That can

5   take a little time.

6       When we were in the Navigation Center, it probably could

7   have been done on-site right there; but at this point we can

8   probably facilitate getting the -- you know, some kind of

9   documentation of a disability that would give her access to

10  Permanent Supportive Housing, or would become the basis for an

11  accommodation, saying, *Okay.*  *None of this -- you know, no*

12  *shelter is available.*

13      But then again, Ms. Vannucci would have to engage in a

14  conversation about, *This is what I need.*  *These are the*

15  *conditions I need.*  *These are the circumstances that I need, in*

16  *order to be able to live in a place, wherever it is.*  So that's

17  a conversation she would have to have with a service provider

18  to figure out if they could accommodate her, or if it is not

19  reasonable to accommodate her in that setting.

20      Then motels are an option.

21          **MS. DE LA CRUZ:**  Thank you.

22          **THE COURT:**  Could I ask a couple follow-up questions

23  about that?

24          **THE WITNESS:**  Sure.

25          **THE COURT:**  So what -- if she were offered temporary

1  shelter, let's say, just for example, at Samuel Jones Hall,

2  what opportunity does she have to remain with her partner

3  there?

4         **THE WITNESS:**  Well, it is a co-ed shelter.  I'm not

5  sure that they could provide them privacy as just a couple in

6  one room, with no one else.  I don't think that that shelter

7  has that capacity; but they can certainly be in the same room,

8  the same area, in an area with other people they trust who come

9  from the Encampment.  Those kinds of accommodations are

10  regularly made.

11         **THE COURT:**  Okay.  And --

12         **THE WITNESS:**  Is that --

13         **THE COURT:**  You mentioned a couple of things in

14  passing.  You mentioned that she states that she has PTSD.

15      You also mentioned in passing, I think, if I heard you

16  right, that she has not visited the Navigation Center next to

17  the Encampment.  Is that right?  Did I hear that right?

18         **THE WITNESS:**  No, that's not what I was saying.

19      She did visit, and I saw her there.  I saw her there

20  during community meetings we held there.  I believe and I also

21  heard from staff there that she was there, working with the

22  HOST staff.  So I wouldn't say that she had not visited.

23         **THE COURT:**  Okay so.

24         **THE WITNESS:**  She tried to --

25         **THE COURT:**  So as far as you know, she has engaged

 1  with staff at the Navigation Center to try to get --

 2              THE WITNESS:  Yes.

 3              THE COURT:  -- housing?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Okay.  All right.

 6       And -- but you don't know the details?  Sounds like you

 7  don't know the details of those conversations that she's had

 8  with them?

 9              THE WITNESS:  No.

10              THE COURT:  Okay.  Thank you.

11  BY MS. DE LA CRUZ

12  Q.   Jenny, are you familiar with Steven Singleton?

13  A.   Similar to Ms. Vannucci, I have seen him in community

14  meetings, but I haven't spoken to him directly.  I have -- or

15  spoken -- you know, heard from him directly, other than when

16  he's spoken in those settings.

17  Q.   Do you know he's been --

18  A.   I'm aware --

19  Q.   Do you know if he's been moved to Permanent Supportive

20  Housing?

21  A.   Yes, he was, on Monday, with his wife.

22  Q.   Okay.  Thank you.

23       Are you familiar with Ellen Brown?

24  A.   Not really.  I have only read what's in the legal papers.

25       I did hear from our staff -- from our contract staff --

1   about her situation, from their viewpoint.

2   **Q.**   Do you know what housing options are available to her?

3   **A.**   Well, I understand that she receives SSDI, which means

4   there is documentation of a disability.  We don't need to know

5   what it is.  That's actually very helpful, in terms of

6   qualifying her for Permanent Supportive Housing, for example.

7            **THE COURT:**  Sorry.  Did you say we don't need to know

8   what it is?

9            **THE WITNESS:**  We don't need to know what it is for

10  her to be qualified, because she -- receiving an SSI check or,

11  you know, being qualified for that -- basically, the

12  documentation has already been done by the Social Security

13  Administration.  So that is actually all we need to know to say

14  she is -- she has a documentation of a disability.

15       So we know that she did a transition plan with the HOST

16  team March 13th; actually, not directly with the HOST team, but

17  with an outreach worker from the YWCA, which is our

18  domestic-violence provider in Sonoma County.  I'm not sure that

19  that means anything.  That's just what they do.  And they have

20  an outreach team for victims of crime who are homeless.

21       So she wasn't interested in shelter.  She was looking for

22  possibly a long-term rental or sober living situation with her

23  boyfriend.

24       I understand that the HOST team has continued to try to

25  work with at least her boyfriend, but that Ms. Brown hasn't

1 been in contact with them recently.

2 **BY MS. DE LA CRUZ**

3 **Q.**   Okay.  The other question I have for you, Jenny, is the

4 plaintiffs' moving papers indicate that about half of the

5 people living at the Roseland were not assessed by the

6 Navigation Center.  Is that number correct, to the best of your

7 knowledge?

8 **A.**   Yeah.  We've estimated there were about 130 people there.

9 That estimate has gone up and down.  We understand there are

10 about 100 left now.

11       So we were able to assess 65 people.  We have to remember

12 the Court should hopefully remember that this kind of

13 assessment is voluntary.  Access to services is fully

14 voluntary.  We can't force people to respond to an assessment

15 if they sit in their tents and will not engage with an outreach

16 worker who's there.  We can't force them to.

17 **Q.**   Can you --

18 **A.**   So that is essentially the situation the outreach workers

19 faced.

20 **Q.**   Can you describe the assessment process?

21       **THE COURT:**  Before you -- I do want to hear a

22 description of the assessment process; but before you get

23 there, I want to ask a follow-up.

24       So you said, *This is voluntary process.  If they don't*

25 *want to engage, we can't force them.*  And I think the very last

1  thing you said is, *That is the experience that the outreach*

2  *workers faced in this situation*.  So I want to get a little

3  more specificity from you on that and a little more detail from

4  you on that, to the extent you're able to provide it, to the

5  extent you have knowledge about it.

6            **THE WITNESS:**  Mm-hm.

7            **THE COURT:**  When you say, *That's the situation they*

8  *faced*, what do you mean?  What happened?

9            **THE WITNESS:**  The outreach workers were in the

10  Encampment; not just in the Navigation Center, but in the

11  Encampment on a daily basis, multiple times a day, reaching out

12  to anyone who would speak to them.  They would announce their

13  presence.  They would announce the presence of social workers

14  from other departments, from all the services that we had

15  gathered there.  They would walk them through the Encampment

16  and announce, *We have someone from this agency.  We have*

17  *someone from that agency.  If anyone needs assistance, that*

18  *kind of thing, they are here.  You can meet them here.  You can*

19  *come to the Navigation Center to meet them.*

20       So they would be walking through and engaging with people

21  as they could.  And there were numerous people, they reported,

22  who would remain in their tents and not be willing to open the

23  tent; come speak to them.  That was the experience that was

24  reported to me on a regular basis.

25       We actually -- over the last several weeks it was really

1   quite disappointing to come into the service-provider meetings

2   and hear that no one had walked in the door, despite repeated

3   invitations for a week or more; that one or two more

4   assessments were gained, even with full-time deployment of four

5   outreach workers.  And that was just our HOST team.  Then there

6   were the allied providers, with all of those resources.

7        With all of those people going into the camp and engaging

8   with everybody they could, there was very little interest in

9   engagement.  Yeah.  That's about what I can say about it.

10  **BY MS. DE LA CRUZ**

11  **Q.**  So, Jenny, if you don't mind, could you describe the

12  assessments and the questions asked?

13  **A.**  Sure, sure.  So let's see.  The assessment that we're

14  using is the one that we chose as we had brought in a new

15  federal mandate for --

16       (Reporter requests clarification.)

17           **THE WITNESS:**  -- a Coordinated Entry System; a single

18  process for entering our system of care.

19       There are several features of this, in terms of street

20  encampments, street outreach, outreach in encampments.  There

21  is the full assessment.  There's a housing transition plan

22  that's a one-pager.  And there's a release of information.

23  **BY MS. DE LA CRUZ**

24  **Q.**  Jenny, could you tell me -- could you tell me the function

25  of the assessment?  What does it do?

ABRAMSON - DIRECT / DE LA CRUZ

**A.**    Okay.  The assessment that we use is called the "VISPDAT," which stands for Vulnerability Index Service Prioritization Decision Assistance Tool.

It is designed to identify the health conditions, the disability conditions that lead to people dying on the street. That's what the vulnerability index was for.  And it also identifies levels of functionality, to give an initial sense of whether someone's going to need services in housing; to be in housing at all, for the duration, for as long as they need; or if there might be a more limited response.

So it is a scored on a 20-point scale.  It asks questions about a wide range of health issues, about daily functioning, about substance abuse.  There are six different questions that would flag it:  Mental health, physical disability, trauma, et cetera.

So on that 20-point scale, if people score more than a 10, then that's an initial indicator that this is a person with disabilities who needs ongoing supportive services to be housed.

**Q.**    Jenny, you've mentioned --

That's great.

You've mentioned kind of different levels of assessment. Are there different tools; different kind of questionnaires?

**A.**    There are three documents.

There is the VISPDAT.  It takes about half an hour to

1  complete.

2      There's a release of information that would allow us to

3  enter that data into our Coordinated Entry System, and give the

4  respondent access to all of the beds in our system --

5  whatever's available, and whatever is appropriate to them.

6      And there's a transition plan, which is really a one-page

7  inquiry about what they want in housing.

8  **Q.**  And when you say access to the Coordinated Entry beds

9  available, is that above and beyond kind of the emergency

10  shelter beds that are typically available to folks who are

11  needing to get off the street?

12  **A.**  So there are 64 beds currently that are dedicated to this

13  project; to the people at Roseland Village.

14      But we have a system of care with over a thousand beds.

15  That is about 600 shelter beds, and almost 400 Transitional

16  Housing beds.  Those overwhelmingly take referrals through our

17  Coordinated Entry System.

18      So if a release is signed, then the person's -- the

19  respondent's information can be entered into our system of

20  care, and passed on to another facility, for example, that

21  serves that population.

22      For example, I remember hearing Mr. Singleton talk about,

23  *We have youth*.  *We have elderly*.  *We have veterans*.  There

24  are -- there are specific housing programs for youth and for

25  veterans in our county.  And if we have that information, we

1  would immediately make a referral to a program that serves that

2  population through Coordinated Entry.

3  Q.   And are there beds available in each of those specialized

4  programs to address those kind of specific populations that

5  you've just identified?

6  A.   There are -- there are beds available for youth.

7       For veterans there are a lot of resources, including

8  underutilized VASH vouchers.  And that's really because of the

9  housing market.  And that has backed up -- backed up people in

10  our veterans-serving shelter and Transitional Housing

11  situations.  So there's also Rapid Re-Housing assistance

12  specifically for veterans that can also help get people into a

13  unit.  There -- that's one population where we have a lot of

14  resources, and still we have kind of a bottleneck right now,

15  but that's about our housing market.

16  Q.   Let's see.  So you've talked a little bit about that, but

17  I just want to make sure that I ask the question that the Judge

18  had asked.  So if enforcement of the Notice to Vacate is not

19  enjoined -- essentially, if we're able to enforce the trespass

20  and anti-camping ordinances -- what housing options are

21  available for people who were not assessed?

22  A.   All of those housing options are.  All of the housing

23  options that we had dedicated to this project.  So that's the

24  64 beds.  The -- the 64 beds and dedicated Rapid Re-Housing

25  assistance are available to the people who might still refuse

ABRAMSON - DIRECT / DE LA CRUZ

1   to be assessed.

2       Again, if they're -- if they agreed to be assessed, then

3   we can also give them access to an additional -- our estimate

4   is about 26 beds are open in shelters every day; about 59 beds

5   in Transitional Housing programs.  So there are other beds on a

6   daily basis that we should be able to access for people if they

7   do agree to be assessed; but even if they aren't, we have those

8   dedicated units available.

9       Were you also asking what -- what the day of enforcement

10  would look like?

11  **Q.**   I -- I wasn't --

12          **THE COURT:**  No, but I --

13          **MS. DE LA CRUZ:**  -- but I think that's a --

14          **THE COURT:**  That's a great question you've asked.

15      Why don't you answer it?

16          **THE WITNESS:**  Why don't I answer my own question?

17      It's been very interesting to work with Santa Rosa Police

18  on this, because they describe how they don't want to arrest

19  people.  They are so thrilled for the last three years to have

20  had this homeless outreach team to work with, to ensure that

21  there are services made available or at least offered before

22  they take any action.

23      They've described their process as working with people

24  over days -- not an immediate clearance, but working with

25  people to separate the things they want to keep from the things

1   they don't need to keep, and walking with them.  And as long as

2   they see progress being made towards moving out of the site

3   that needs to be cleared, then they're not going to take

4   action.  They have assured us of that.

5        And if they didn't assure us of that, I'm not sure we

6   could go forward.  You know, we're a homeless-serving agency.

7   We came into this with the goal of getting people, you know,

8   under a roof somehow.  So, you know, I've been assured that the

9   day of is something I could live with.

10             **MS. DE LA CRUZ:**  Jenny.

11             **THE WITNESS:**  I will say that -- yeah.  Well, just --

12  I wanted just to add on that, that the HOST team -- even though

13  we're not -- we don't have the Navigation Center open since

14  Monday, the HOST team is still out there.  They're still going

15  out and interviewing people.  They're still trying to engage

16  people, because that's their job.

17  **BY MS. DE LA CRUZ**

18  **Q.**   Jenny, could you -- could you could you describe a little

19  bit about the storage options that you know about for folks who

20  need to --

21  **A.**   Sure.

22  **Q.**   -- store stuff?

23  **A.**   Sure.  Catholic Charities, as the largest service Agency

24  in the county, and especially in the City of Santa Rosa, has

25  set aside five pods for people coming from encampments,

1    including Roseland Village, but not exclusively.  They are very

2    underutilized.  There are three of them at the homeless service

3    center, which is a day center.  Very easy access downtown for

4    anybody who wants access.  It's staffed daily.

5         And there are two at Sam Jones Hall.  Their requirement is

6    people who have engaged in services -- it doesn't have to be

7    their shelter, but people who have engaged in services can have

8    access.  They can store two bins.

9         And I -- this is what I don't remember, is how long they

10   will allow -- allow it.  I think it's at least 60 days.

11        What we decided is, since we rented the former hardware

12   center at the edge of our property to be the Navigation Center,

13   we still have it.  And that -- our intent is to have that

14   available for at least 90 days for storage of belongings of

15   people from the Encampment.

16   **Q.**   Can you talk about how much --

17   **A.**   Over -- yeah.

18   **Q.**   How much storage is available for people?  Like, how many

19   bins, or what the square footage basically now through Catholic

20   Charities --

21   **A.**   Oh, my God.

22   **Q.**   -- or through the Commission's storage facility?

23   **A.**   I'm not sure what the total capacity is.

24   **Q.**   Okay.  Does 96 --

25   **A.**   I'm sure they can talk about the square footage of the

```
 1   Roseland -- you know, the Navigation Center space that we
 2   rented, and what we envision being able to do there; but it's
 3   certainly more than two bins per person.
 4          MS. DE LA CRUZ:  Thank you.
 5      Your Honor, I have made may way through your questions.
 6   If there's anything else that you would like to address --
 7          THE COURT:  Just a couple very quick questions, I
 8   think.  I think I saw in the papers -- in the legal papers --
 9   that the part of the protocol that the Santa Rosa Police
10   Department has set up is that they'll all be activating their
11   body cameras when they --
12          THE WITNESS:  Mm-hm.
13          THE COURT:  -- when they clear out the Encampments.
14   Is that your understanding, as well?
15          THE WITNESS:  Yes.  That's what they have told us,
16   yes, during the process of separating people's belongings in
17   particular.  Yes.
18          THE COURT:  Okay.  I saw a reference in the papers to
19   Transitional Housing; the term "Transitional Housing."
20          THE WITNESS:  Mm-hm.
21          THE COURT:  I'm not sure.  I apologize if that term
22   came up in your discussion today, I missed it, but I'm not sure
23   it did.  Can you explain to me what Transitional Housing is?
24          THE WITNESS:  Sure.  Transitional Housing -- it's an
25   older model, in terms of homeless services.  It's usually
```

1  facility-based housing that can be available.  It's usually

2  overcrowded, I have to say; but -- because people are living

3  two to a room, or a family to a room, but for up to 24 months.

4      It is not a particularly successful model.  In our county,

5  only about half the people who go through a 24-month period are

6  able to exit to a permanent housing location afterwards.  This

7  is why we are increasingly investing in Rapid Re-Housing, which

8  is also 24-month program, but puts people into permanent

9  housing right away.

10     So when we talk about -- basically, I'm trying to

11  discourage the use of the word "Transitional Housing" in our

12  system of care, because it brings up a lot of assumptions that

13  this is necessary; but it is one of the forms of temporary

14  housing that we have available currently.  This is -- I

15  mentioned earlier that we had about 600 shelter beds and about

16  400 Transitional Housing beds in our system of care.  Those are

17  still considered temporary, and people are still considered

18  homeless when they're in them.

19          THE COURT:  And so -- so that sounds like you're

20  saying there are a total of roughly a thousand beds --

21          THE WITNESS:  Yes.

22          THE COURT:  -- in your system; transitional --

23          THE WITNESS:  Yes.

24          THE COURT:  -- and shelter beds.

25     And how many of those, in total, are available now?

1          THE WITNESS:  Well, at any given time there are about

2  66 --

3     Let me back up a little.  Other than the beds that have

4  been committed to this project, there are about 26 beds

5  available in a given day throughout the system of care.  That's

6  shelter beds, and almost 60 Transitional Housing beds

7  throughout our system of care.

8          THE COURT:  Okay.  And --

9          THE WITNESS:  And these -- I'm just talking about

10  beds for single adults, because we have gotten the families

11  that were the Roseland Encampment out of there.

12          THE COURT:  Okay.  And remind me again how many beds

13  have been committed to people from Roseland.

14          THE WITNESS:  Sixty-four beds are committed, between

15  two shelters.

16          THE COURT:  Between -- and what -- we talked quite a

17  bit about Samuel Jones Hall.  The other shelter's where?

18          THE WITNESS:  Well, actually, it's another agency:

19  Redwood Gospel Mission.  So they actually have a women's

20  shelter, and a men's shelter, and a still-operating winter

21  shelter.  So they've made beds available in all of those.

22          THE COURT:  Okay.  So that's -- so it's 40 at Samuel

23  Jones Hall, and 24 --

24          THE WITNESS:  Yes.

25          THE COURT:  -- at Redwood Gospel?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  And how many -- how many shelters

3    are there?  You talked about the number of beds, but how many

4    shelters are there throughout Sonoma County, and how are they

5    dispersed?

6          THE WITNESS:  Yeah.  I don't have this in front of

7    me, but I -- it's between 12 and 15 shelters, total.  Some of

8    them are teeny, tiny little places that can only hold up to 10

9    people, in places like Cloverdale and Sonoma.  So I'm going to

10   think it out loud.

11         There's one large shelter in Petaluma with a hundred beds.

12         In Santa Rosa there are two large shelters run by Catholic

13   Charities:  Sam Jones Hall, and a Family Support Center, which

14   has also 138 beds.  Redwood Gospel Mission has about 70 beds,

15   between the men's and women's shelter.  There's a small women's

16   shelter, 22 beds.  And there's a domestic violence shelter with

17   27 beds.  So there's this cluster of beds in Santa Rosa which

18   also has about half the homeless population.  I'm having to

19   think about the math.

20         There's a small shelter in Cloverdale.

21         There's a small shelter in Sonoma.

22         And there's only a winter shelter -- a large winter

23   shelter in Guerneville, in West County.  I think I've covered

24   them all.  There are many more Transitional Housing units,

25   because they're mostly small -- six to eight beds -- in houses

1  around the county.

2          **THE COURT:**  Okay.  Do you have anything further?

3          **MS. DE LA CRUZ:**  Yes, Your Honor.

4      Your questions raised one more issue.

5                  **DIRECT EXAMINATION**  (resumed)

6  BY MS. DE LA CRUZ

7  **Q.**  So, Jenny, can -- in your declaration you talk a little

8  bit about the Homeless Management Information System:  HMIS.

9  **A.**  Mm-hm.

10  **Q.**  Can you describe the way HMIS intersects with the system

11  of care use you just described?

12  **A.**  Right.  Sure.  So the Homeless Management Information is

13  another federal mandate that came out in 2004.  So it has to

14  be -- by the federal standards, it has to be a Web-based

15  system.  And that's actually a plus for us, because our system

16  of care is so spread out.

17      About 85 percent of the beds in Sonoma County participate

18  in the HMIS.  Not everyone has to.  We aim to get a

19  hundred percent participation, because it gives us a much

20  better picture; but the faith-based shelters, for example --

21  they have no motivation to participate.  Anyone with public

22  funding is required to participate.  And that's how we get

23  85 percent.

24      The purpose of that system is really to report to Congress

25  on the state of homelessness across the nation.  Locally, we

ABRAMSON - DIRECT / DE LA CRUZ

1  try to get more information for managing programs, for

2  understanding our system of care, for planning, for figuring

3  out how many people are using accessing shelter every year,

4  that kind of thing, so that we can plan for a system that might

5  drive down the number of people who are homeless instead of

6  allowing it to go up.  So we use that data.

7  **Q.**    Jenny, did you use that data --

8  **A.**    Yeah.

9  **Q.**    -- in planning for what housing options would be available

10  --

11  **A.**    Yes.

12  **Q.**    -- if people were cleared from the Roseland Encampments?

13  **A.**    Certainly.  We ran reports.  We have a system

14  administrator at our office who's an expert in our particular

15  software, so he's been able to get out of it things I never

16  imagined possible, truthfully.  So we were able to get a

17  night-by-night tally of all the shelters and all of the

18  Transitional Housing programs that are in the HMIS; how many

19  people were in each of those places.

20      We compared that to the reports we must make to HUD every

21  year about the capacity of each of those, to calculate what our

22  vacancies are.  And so vacancy goes up and down, of course.

23  And we cannot yet get live data -- how many beds are available

24  today -- but we can look back over nine months and say, *Okay.*

25  *The average number of beds that are open is 66.*  That's kind of

1   amazing.  *And we know that 40 of them are at Sam Jones Hall,*

2   *and designated for people coming from encampments.*  So we know

3   that there are 26, on average, available.

4       So it isn't any given day kind of calculation, but it's

5   based on nine months of activity.

6   **Q.**  And after using the HMIS data to plan for housing options

7   to be made available to people relocated from the Roseland

8   Encampments, did you supplement your understanding of what was

9   available throughout the system in any other way?

10  **A.**  Well, because our -- our contractor was reaching out to

11  all partners.  And one of those partners doesn't participate in

12  HMIS.  So it was their agreement with Redwood Gospel Mission,

13  for example.  That was a kind of supplementation I think you're

14  getting at.  Am I right?

15  **Q.**  That is correct?

16  **A.**  So that was an agreement with an agency that doesn't --

17  doesn't provide information in the HMIS.  And they said, *Yeah,*

18  *we can give you this, this, and this.*

19  **Q.**  And, using your best knowledge of the HMIS data as well as

20  supplementing with separate agreements with people who don't

21  participate in that system, was it your determination that

22  there was sufficient capacity in our homeless system of care in

23  order to safely house everybody currently camping at the

24  Roseland Village?

25  **A.**  Yes, it was.  We added together the day-by-day

 1 availability, along with the dedicated beds.  We have well over

 2 150 beds that could be accessed at any given time.

 3          **MS. DE LA CRUZ:**  I have nothing further, Your Honor.

 4          **THE COURT:**  Okay.  Thank you.

 5      I want to have a conversation about whether -- Mr. Hoffman

 6 do you have any cross-examination; and if so, how long do you

 7 anticipate it would last?

 8          **MR. HOFFMAN:**  Yes, I do, Your Honor.  And I'm

 9 thinking maybe 20 minutes.  Twenty-five minutes.

10          **THE COURT:**  If that's the case, Mr. Hoffman --

11      I don't know if you heard that, Ms. Abramson, but

12 Mr. Hoffman said he wants to spend about 20 or 25 minutes with

13 you on cross-examination.  Should we -- would you rather sort

14 of get that out of the way now; or do a lunch break, and then

15 come back to it?

16          **THE WITNESS:**  I would rather do it now.

17          **THE COURT:**  Okay.  Why don't we go ahead and do that

18 now, then?  And then after that, we'll take a lunch break.

19          **MR. HOFFMAN:**  Okay.  Thank you, Your Honor.

20                      <u>**CROSS-EXAMINATION**</u>

21 BY MR. HOFFMAN

22 **Q.**   I guess good afternoon, Ms. Abramson.  I'm Jeff Hoffman.

23 **A.**   Just barely.

24          **MR. HOFFMAN:**  I think I wanted to just make a quick

25 comment.  And I was going to ask Ms. Abramson about --

1   Exhibit 3 to plaintiffs' request for judicial notice is the

2   housing inventory count through the Continuum of Care.  And

3   that does have a list.  I don't know if it has everything --

4   but a pretty extensive list of all of the different types of

5   shelters.

6   **Q.**   Are you familiar with that document, Ms. Abramson?

7   **A.**   Yes.  I've compiled that document or supervised its

8   compilation on an annual basis for more than a decade.

9   **Q.**   Okay.  Thank you.  Now, how often did you go out to the

10  Navigation Center?  You, yourself, go out there?

11  **A.**   I was there on weekly basis.

12  **Q.**   Was that every day, or a couple times a week, or --

13  **A.**   I said weekly.  I was there to lead a weekly

14  service-provider meeting.

15  **Q.**   Okay.  And so you were there once a week for those

16  meetings?

17  **A.**   Yes.

18  **Q.**   Okay.  And then the agencies -- you mentioned a long --

19  **A.**   Yes.

20  **Q.**   -- a list of different agencies that had people out there.

21  Were those agencies there every day, or did they have a

22  schedule certain days?

23  **A.**   There was a schedule, yes, and it was posted on the door.

24  Most of the -- the County agencies were there twice a week.

25       The health clinics were there -- I think it was four days

1  a week.

2       The HOST team's shower trailer was there four days a week.

3       The HOST team was there full time, five days a week.

4  Q.  So the four full-time people were there every day, all

5  day?

6  A.  Yes.

7  Q.  Okay.

8  A.  Yes.

9  Q.  Five days a week?

10 A.  Yes.  And then there were --

11 Q.  Okay.

12 A.  -- these allied providers.  I don't know exactly how long

13 those folks were there, when I mentioned the YWCA; but I know

14 that they were there.

15      That the -- what is it?  The Homeless Outreach Team that's

16 part of the District Attorney's Victim Assistance Program --

17 they were there at every service-provider meeting, so I think

18 they were very, very involved.

19 Q.  Okay.  And they also, you said, went out to the

20 Encampment.  Do you know how often, or was there a set schedule

21 for them to go out to the encampment?  The HOST workers, I'm

22 referring to.

23 A.  Right.  What I understand from speaking to our provider is

24 they were out there several times a day.

25 Q.  Okay.  Now, when they went out there, did the police

1   accompany them when they went out there?

2   **A.**    Most of the time not.

3   **Q.**    But they -- they did some of the time?

4   **A.**    I don't believe that --

5         Well, no.  I understand that this large encampment sprung

6   up; that the number of service calls for the police went way

7   up, but -- and that the police were there regularly; but the

8   HOST team was out there on their own.  They didn't need the

9   police to go in there with them.

10  **Q.**    So it's your testimony -- it's your testimony that it was

11  not the practice to have the police accompanying the HOST team?

12  **A.**    Not all of the team.  Certainly not.

13  **Q.**    But sometimes?

14  **A.**    It is done -- it's done when they need them.  That's the

15  only time that -- that law enforcement goes out with the HOST

16  team.

17  **Q.**    And why would they need them?  Give us some example.

18  **A.**    I have worked with the HOST team when they have worked

19  with encampments where they are regularly threatened; where not

20  only are people not willing to speak to them, but they are

21  threatened, so that they don't feel safe going in there.

22  **Q.**    Okay.

23  **A.**    I have not heard that be the case at -- at the Roseland

24  Village Encampment, but I know that that has happened --

25  **Q.**    Okay.

ABRAMSON - CROSS / HOFFMAN

1   **A.**   -- in the past.

2   **Q.**   Thank you.  And -- and so you mentioned that you had this

3   dynamic that people weren't -- some people are were not wanting

4   to cooperate with the HOST team when they went out there.  And

5   did you have discussions amongst yourselves as to maybe why

6   that was taking place, or what you might do to alleviate that

7   problem?

8   **A.**   Well, one of the things we spoke about with the social

9   workers who came to the Navigation Center was the need for them

10  to go out into the Encampment and announce their presence, and

11  meet with people out there, because so few people were coming

12  in.  Why were people unwilling to speak to them?

13       We heard at community meetings lots of distrust, primarily

14  from advocates, but also from the people who were living in the

15  Encampment.  And I don't blame people for being distrustful,

16  because we are a system of care that's in transition, but I

17  would imagine that that's part of it.

18       The fact that there were people who were not part of the

19  Encampment, but who were supporting them to not participate --

20  I did hear that often, and I saw it in community meetings.

21  **Q.**   Okay.  Are you familiar with some of the advocacy

22  organizations, such as Homeless Action!?

23  **A.**   Certainly.

24  **Q.**   Did the HOST team ever reach out maybe work with them or

25  get their assistance with the outreach?

ABRAMSON - CROSS / HOFFMAN

1  A.   I understand that they met with them weekly.  I'm not sure

2  that they ever reached a productive arrangement to work

3  together.

4  Q.   Okay.  Thank you.  Now, you mentioned that these beds are

5  set aside.  And what you mean, then, is that these beds will be

6  set aside and held for --

7  A.   Yes.

8  Q.   -- the Roseland Encampment folks?

9  A.   Yes.

10  Q.   Is that correct?

11  A.   That is correct.

12  Q.   So I assume that that means they would not be available

13  for other people that are not in the Encampment who might need

14  one of those beds.  Is that correct?

15  A.   That is correct.

16  Q.   Okay.  Now, the Sam Jones Center -- that is for individual

17  adults.  Isn't that correct?

18  A.   Yes.

19  Q.   But you're mentioning that there's couples there, also,

20  sometimes?

21  A.   There have been, yes.

22  Q.   Do you -- there have been on occasion?

23  A.   There have been.

24  Q.   Do you know how many of those types of situations are

25  allowed at a given time there?

1  **A.**   I don't think there's a policy about allowing or not

2  allowing.

3  **Q.**   Okay.

4  **A.**   That's not part of the rules of the agency, and it would

5  be a little research project through our HMIS to identify that.

6  I'm not even sure we could.   We'd probably have to work with

7  the service agency directly.

8  **Q.**   Okay.   And you mentioned some other types of arrangements,

9  like single or more private type arrangements.   So do you know

10  how many of those are allowed at any given time?

11  **A.**   I didn't state that there were individual rooms.   There

12  are small rooms with smaller numbers of people.

13       I have heard -- I visited in December to the shelter.   I

14  have heard from the providers that there are women-only rooms;

15  men-only rooms; spaces that are set aside for people from a

16  specific encampment who want to stay together; that kind of

17  thing.   I can't tell you how many at any given time.   I just

18  know that those accommodations are made.

19  **Q.**   Okay.   And how big are these rooms -- do you know? -- that

20  you're referring to?   You know.   Ten people?   Twenty?   Or

21  thirty?   Or --

22  **A.**   I know that what I understand from the provider is that

23  larger spaces -- the subdivision of the big old gym there --

24  are about 20 people; but there are rooms that can house

25  probably -- I've seen those rooms.   And I remember them having

1  no more than eight.  It could be ten, but it's really not a lot

2  of people.

3  **Q.**   Okay.  Thank you.

4  **A.**   It might feel like a lot of people; but it's not as many

5  as folks are living with in the Encampment.

6  **Q.**   Okay.  Now what we're wondering is how large is the Sam

7  Jones Shelter?  It's fairly large; isn't it?  About over a

8  hundred?

9  **A.**   Yes.  It's -- it has -- I'm adding this up in my head.

10  Hold on a second.  There were 138 beds, 50, and another 25.  So

11  138 and 75.  It's over 200 beds currently.  Some of them are

12  fairly private; others are not.

13  **Q.**   By "fairly private," you mean these rooms where there

14  might be ten people, or something like that?

15  **A.**   You know, part of what I saw in December was they were

16  reworking some rooms that they hadn't had access to before, to

17  add another 25 beds.  And part of that was creating a space

18  that was more of a Transitional Housing kind of space with

19  perhaps only a couple of people per room.

20      So, you know, they were taking over, because that shelter

21  isn't -- they don't -- the shelter is owned by the City of

22  Santa Rosa, and they haven't always had access to every one of

23  the spaces in the building.  Progressively, as this work has

24  gone on, they've been able to get the City's agreement to add

25  this room; that room.

ABRAMSON - CROSS / HOFFMAN

1      So I was in two rooms in December when I visited that were

2  being converted to use that had been offices prior.  They're

3  really quite small.

4  Q.   And so right now, though, there were the three rooms that

5  are available at The Palms.  The others may be sometime in the

6  future -- is what you're saying?  Is that correct?

7  A.   I understand that the current tenants are planning to

8  leave.  And that's why the contractor is talking about three

9  rooms available.

10  Q.   Okay.  And now on the day of the -- let's say the day of,

11  or once -- once you start enforcing the Notice to Vacate, are

12  people going to be getting assessments before they're removed

13  or asked to vacate from the Encampment?

14  A.   If they're willing, yes.

15  Q.   Okay.  So --

16  A.   Our teams will assess people as soon as they're willing.

17  They have done so for three years, as the HOST team, throughout

18  the county.

19  Q.   So no one will --

20  A.   They've done it.  They don't need to be in a center to do

21  it.  That was the addition we did this year.

22  Q.   Okay.  So what you're telling us, then, is that no one

23  will be removed from the Encampment until they've been

24  assessed, or they state they don't want to be assessed?  Is

25  that a correct statement or characterization of what you're

ABRAMSON - CROSS / HOFFMAN

1   saying?

2   A.   Yes.  Yes.  Yes.

3   Q.   Okay.  Now, this Transitional Housing beds -- am I

4   correct, then, that you said there might be up to 60 of those

5   beds available on any given day?

6   A.   Yes.

7   Q.   And can somebody just go directly from the Encampment to

8   one of those beds?  Or -- I understood there was an application

9   and determination process that has to take place before you get

10  one of those beds, so I wondered if you could clarify that.

11  A.   It's certainly just about immediate to get into shelter,

12  because there are no requirements.  There are no income

13  requirements.

14      There -- there are shelters that are going to be included

15  in the count I have given that must go through a certain

16  referral process.  For example, our mental-health shelter --

17  that's not included in the beds I say are available, because I

18  understand from mental-health staff that it takes six weeks to

19  get into that shelter.

20      With Transitional Housing, yes, there is -- it takes a

21  little longer to get people in.  It is possible to get in same

22  day, but they are tuned a bit more to specific populations.

23      So availability has to do with, for example, veteran

24  housing; youth housing.  Youth housing is pretty much

25  available.  There are probation beds; that sort of thing.  And

1  we've tried to access them during this past month and a half.

2  **Q.**   Okay.  So there's a screening process that needs to take

3  place, then, for that type of housing?

4  **A.**   Well, the assessment -- the assessment would indicate

5  whether a Transitional Housing program that is in our inventory

6  is an appropriate referral, and then the referral would be

7  made.  Referral can be made immediately.

8  **Q.**   Okay.  And these beds that are available before at Sam

9  Jones on the 26th -- those are for single adults.  Isn't that

10  correct?

11  **A.**   Yes.

12  **Q.**   Okay.

13  **A.**   That's all I offered, because we had gotten the families

14  out of there.

15       **MR. HOFFMAN:**  Okay.  Sorry, Your Honor.  I'm skipping

16  around a little bit.

17       **THE COURT:**  That's okay.  Could I ask a quick

18  clarification question about that?

19       What's the definition of "single adults"?  Does it just

20  mean you're not married or a registered domestic partner?

21       **THE WITNESS:**  There's no -- there's no definition

22  that requires people to be -- you know, to have a marriage

23  certificate or anything to be a family.

24       HUD has defined a family as at least one adult over the

25  age of 18, with at least one child under the age of 18, trying

1   to pull away from it all of the values.  Right?  So anyone who

2   is 18 or above is considered an adult.  If they are in a family

3   with only adults -- I mean, I have a disabled child, who's one

4   of reasons I couldn't come in today, who is 19.  So we're a

5   family of adults in that context.  Right?  So we would each be

6   considered single adults in that context.

7            THE COURT:  So okay.  So even if you do have a

8   spouse, so long as there's nobody in your family who is under

9   18, you're considered a single adult who would qualify --

10           THE WITNESS:  Yes.

11           THE COURT:  -- for the beds that we've been talking

12  about?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.

15           THE WITNESS:  And there is an effort to accommodate

16  families that come in together in that way.

17           THE COURT:  Okay.

18           THE WITNESS:  And I would get that -- we did hear in

19  the last service-provider meeting that there was a teenager in

20  the Encampment who was a high-school student at the local high

21  school in that neighborhood.  And they hadn't been able to

22  identify a parent.  So we couldn't -- we were trying to work

23  through our youth provider to get access and to try to assist

24  that youth into housing, because we have an excellent youth

25  provider who can do that, but we haven't been able to do that

 1  yet, nor have we been able to identify a parent.

 2       So that's the only family left, in terms of youth under

 3  18.  That was a recent understanding.

 4       But there have been three families with children.  And one

 5  of them is at the Family Shelter.  One of them is in a motel

 6  through our CalWORKS program.  And another one was going to be

 7  put in a motel through the CalWORKS program, and now can't be

 8  found.  So, you know, they would be housed if we could find

 9  them.

10            **THE COURT:**  Okay.  Thank you.

11  **BY MR. HOFFMAN**

12  **Q.**  Okay.  A couple other clarifying questions.  At the Sam

13  Jones Hall, then, you're saying that people may be in there on

14  alcohol or drugs, because they're not screened anymore?  Is

15  that correct?

16  **A.**  That is true.

17  **Q.**  Okay.

18  **A.**  That is true.  At least three of our shelters no longer do

19  drug or alcohol testing.

20  **Q.**  Then you had talked about the VASH vouchers, and this

21  bottleneck.  Could you just explain?  Does that mean that

22  people are not -- it's hard to find housing with those

23  vouchers?  Is that what you mean by the bottleneck?

24  **A.**  It's just hard to find housing, period.  As you know, we

25  had a one to two percent vacancy rate before the fires.  It was

1  very difficult for the last several years to find housing.

2      With assistance, with someone who would be called a

3  "housing locator," typically someone with knowledge of the

4  rental market -- right? -- so a real-estate professional, we

5  have better luck at placing people.  We still have placed a lot

6  of people, even since the fires.  What I've heard from

7  providers is, *It was hard before the fires*.  *It's harder since*

8  *the fires*.  *And we're still managing it*.

9  **Q.**    Okay.

10 **A.**    And on that on that note, since July, 120 people per month

11 have been housed with Rapid Re-Housing in the rental market or

12 in Permanent Supportive Housing.

13 **Q.**    Okay.  Thank you.  These units at the Redwood Gospel --

14 are they seasonal units that you're talking about, or seasonal

15 beds?

16 **A.**    Only a few of them.

17 **Q.**    Thank you.

18 **A.**    What I don't remember off the top of my head what the

19 breakdown is between the year-round shelter beds that were

20 being offered in the men's shelter and the women's shelter.

21 Those are all year-round.

22      They did offer several in the winter shelter, which is

23 going to be open through April.

24 **Q.**    Okay.  That was my next question.

25      So the seasonal beds are going to be going off-line, if

ABRAMSON - CROSS / HOFFMAN

1  you will, pretty --

2  **A.**   It's --

3  **Q.**   -- pretty --

4  **A.**   Otherwise, all the seasonal beds are off-line now.

5  **Q.**   Okay.  And what about the 64 beds?  You're saying those

6  are year-round?  Are any of those --

7  **A.**   Those are year-round.

8  **Q.**   Okay.

9  **A.**   Well, of the 24 Redwood Gospel Mission, no more than 4, if

10  I remember correctly, are in their seasonal shelter that ends

11  April 30th.

12  **Q.**   Okay.  And these Redwood Gospel beds are for single

13  adults.  Correct?

14  **A.**   Yes.

15  **Q.**   And then -- but only a single man in one area --

16  **A.**   Yes.

17  **Q.**   And the single woman -- women in a different area; a

18  different building?

19  **A.**   There are two separate facilities.  Yes.

20  **Q.**   Okay.  So if you're a couple, you would have to split up

21  for those?

22  **A.**   Yes.

23  **Q.**   Okay.

24  **A.**   If they didn't want to come in to Sam Jones.

25  **Q.**   Right.  Okay.  Just a moment.

1        One more question, Your Honor.  Thank you.

2        So why are the people at The Palms leaving?  Do you know?

3   The ones that --

4   **A.**    No.

5   **Q.**    -- you said are moving out?

6   **A.**    I don't know.  I don't know the stories there.

7   **Q.**    Okay.

8   **A.**    People move in and out of Permanent Supportive Housing.

9   **Q.**    Is there a time limit on that?  Is that a two-year

10  program, as well, at The Palms?

11  **A.**    No.  No.  It's a permanent housing program.

12       When we use Rapid Re-Housing dollars, there's a two-year

13  limit on the dollars; but that is a permanent housing facility.

14  People don't have to leave at any particular time.

15  **Q.**    Okay.  Okay.

16  **A.**    Supportive housing is -- well over half the people who

17  leave Permanent Supportive Housing programs are going to more

18  independent housing.

19  **Q.**    Okay.  I've just a couple more really quick questions.

20       For Transitional Housing -- let's say you're saying that

21  you'll do the assessment maybe on the spot, and then it's

22  determined that that's appropriate.  Are they admitted then

23  without any further screening to the Transitional Housing; or

24  is there still -- once it's determined that that's appropriate

25  for them, then there's more screening that has to take place

ABRAMSON - CROSS / HOFFMAN

1  before they're admitted?

2  **A.**     Every program has an intake process.

3       In shelter, people can come in right away without an

4  intake.

5       Most transitional programs, because they are very small,

6  they -- I think they are primarily doing intake in their

7  offices prior to placing someone.  So it could take a couple of

8  days for beds that are actually available right now.

9  **Q.**     Okay.  I had some questions about your

10  reasonable-accommodation assessments.

11       If someone says, *I don't want to go into a shelter*, will

12  you ask them if there might be a disability-related reason why

13  they're declining that they might not self-declare, themselves,

14  but might be behind why they're declining the shelter --

15  shelter bed?

16  **A.**     I'm not sure if that conversation happens in the way that

17  you've described.

18       What we assume -- we assume that -- actually, in the legal

19  papers you quoted from our homeless count data.  And I actually

20  believe that the disability levels are significantly higher

21  than the raw data that was in our count report; for example,

22  that 70 percent of the people at Sam Jones currently have

23  disabilities.

24       We essentially assume that people will have disabilities.

25  We ask them through our assessment about those disabilities.

ABRAMSON - CROSS / HOFFMAN

1  There's ample opportunity for people to identify themselves as

2  having a disability, and asking for whatever accommodations

3  they desire.

4  **Q.**   Is that something -- if you had that kind of situation

5  where you're assessing and getting the disability information,

6  is that something that can be done right on the spot, or

7  doesn't that take time to -- to explore that or get

8  verification?

9  **A.**   Well, the conversation takes time.  Right?  The

10  conversation is -- it's a back and forth.  *Well, we can do*

11  *this*.  *Would that be workable?  Well, we can do that.  Could*

12  *that be workable?*  That kind of conversation does take time.

13      If the assessment suggests it or if we are aware that

14  there is a documented disability -- for example, if someone's

15  living on SSI -- we know the documentation exists.  Then there

16  will be that conversation, but it's not always necessary.

17      What I understand is required is not so much for the --

18  since we all understand that the vast majority of the homeless

19  population has disabilities, it is not necessarily on the

20  provider to say, *How can I make this more easier for you?*  It

21  is on the person who needs the -- who needs the accommodation

22  to say, *I need this accommodation*; not to put it on a provider

23  to require --

24      Now, you all can correct me on that, but that's my

25  understanding of what is in reasonable accommodation, is that

1  the client has to request an accommodation, and that we don't

2  make an assumption.  You know, we don't make an assumption

3  about the accommodation someone's going to need.

4  Q.  Mm-hm.  Okay.

5      Couple of -- just two more questions here.

6      When you're doing an assessment -- can you give me an

7  average length of time that an assessment might take?

8  A.  It takes about half an hour.

9  Q.  Half an hour?

10 A.  Yes.

11 Q.  To do a complete assessment?

12 A.  Well, it is not -- it's not an assessment.  It is a

13 screening tool.

14 Q.  Okay.

15 A.  We've all done assessments.  It's actually based on a much

16 deeper assessment that takes two hours; but the screening that

17 we use for the Coordinated Entry and that captures that kind of

18 disability information we were discussing -- that takes about

19 half an hour.  That's the one we do --

20 Q.  Okay.

21 A.  -- as a standard screening assessment throughout our

22 system of care.

23 Q.  But for instance, with -- with Mr. Singleton, who got

24 placed, how long did that process take to get him placed at The

25 Palms?

ABRAMSON - CROSS / HOFFMAN

1   **A.**   Getting him placed is different from the length of time

2   for an assessment.   The biggest thing that needs to happen for

3   people once the assessment is made is to collect the paperwork

4   that's required to access the housing.   So the funding source

5   that is being used as the subsidy for that housing to allow him

6   to live there requires a certain amount of information about

7   income.

8        The facility requires, for example, vaccination of pets.

9   I don't remember if there's a pet in their case.

10       I'm sorry.   The screen just went blank there.   Excuse me.

11   The screen just went out.

12       So it can take some time to collect the paperwork.   That's

13   why we're still waiting on some paperwork for Ms. Drake.   And,

14   you know, she was assessed right at the beginning of our -- of

15   our effort there.

16         **MR. HOFFMAN:**   Okay.   Thank you very much.

17       That's all I have, Your Honor.

18         **THE COURT:**   Okay.   Thanks.

19       I have one quick follow-up question for you.   Okay.   Let

20   me just ask mine, then you can go ahead and ask yours.   So

21   let's -- if I were to deny the application for a Temporary

22   Restraining Order -- let's say I did that today.

23         **THE WITNESS:**   Mm-hm.

24         **THE COURT:**   When would the process of clearing out

25   the encampments begin?   Do you know?

1          **THE WITNESS:**  I'm not sure I can answer that

2    question.  I think my boss or Ben Wickham, in our conversations

3    with SRPD, would make a plan.

4          **THE COURT:**  Okay.

5          **THE WITNESS:**  And I don't know what the result of

6    that would be.

7          **THE COURT:**  Okay.  And I assume that you are not the

8    person to testify about the development project?

9          **THE WITNESS:**  Correct.

10         **THE COURT:**  Okay.  All right.  Okay.  Go ahead.

11                    <u>**REDIRECT EXAMINATION**</u>

12   **BY MS. DE LA CRUZ**

13   **Q.**   Jennifer, I have a couple of questions.  Is there still

14   vacancy in the homeless shelter system of care, even with the

15   set-asides?

16   **A.**   Yes.

17   **Q.**   And even if someone is under the influence or has drugs or

18   alcohol in their system, a low-barrier shelter model still

19   ensures that there are community standards and security

20   provisions in place.  Correct?

21   **A.**   Correct.

22   **Q.**   Okay.

23   **A.**   Correct.

24   **Q.**   And if, on kind of day of the beginning of the enforcement

25   action, somebody is in the process of being placed in a

1  temporary housing situation or something beyond kind of an

2  emergency shelter bed, as long as there is evidence that they

3  are making progress to provide the information, the

4  documentation, et cetera, that is required by the system to

5  place them, it is our best understanding that our

6  law-enforcement partners will not forcibly remove someone who

7  shows progress.  Is that correct?

8  **A.**   That is correct.  And we have heard this from them many

9  times.

10         **MS. DE LA CRUZ:**  I have nothing further, Your Honor.

11         **THE COURT:**  Okay.  Thank you very much for your time.

12  You can sign off now.

13      And we will take a break for lunch, and resume at quarter

14  after 1:00.

15         **THE CLERK:**  Court is in recess.

16         (Luncheon recess was taken at 12:33 p.m.)

17  **AFTERNOON SESSION**                                    **1:22 p.m.**

18         **THE COURT:**  All right.  Next witness.

19         **MS. DE LA CRUZ:**  Your Honor, the Community

20  Development Commission calls Benjamin Wickham.

21         **THE COURT:**  You can come up.  Step up to the podium

22  and get sworn in.

23         **THE CLERK:**  Please remain standing and raise your

24  right hand.

25

1          **BENJAMIN WICKHAM,**

2    called as a witness for the Defendants, having been duly sworn,

3    testified as follows:

4          **THE WITNESS:**  Yes, I do.

5          **THE CLERK:**  Thank you.  Please be seated.  Go ahead

6    and adjust the microphone so it's directly in front of you.

7    And for the Record, please is state your first and last name,

8    and spell both of them.

9          **THE WITNESS:**  Benjamin Wickham.  B-e-n-j-a-m-i-n

10   W-i-c-k-h-a-m.

11         **THE CLERK:**  Thank you.

12               **DIRECT EXAMINATION**

13   BY MS. DE LA CRUZ

14   **Q.**   Ben, are you familiar with the Roseland Village

15   encampments?

16   **A.**   Yes, I am.

17   **Q.**   And how are you familiar with them?

18   **A.**   I work for the Sonoma County Community Development

19   Commission as an Affordable Housing Program Manager.  So as

20   such, I'm overseeing the redevelopment project at Roseland

21   Village.

22   **Q.**   Okay.  Have you personally visited the camp -- the

23   encampments?

24   **A.**   Yes, I have, on multiple occasions.

25   **Q.**   Do you know approximately how many times you've been

1  there?

2  A.    I've been over to Roseland Village many times during the

3  time the Encampment has been there in its current state.  I've

4  actually been inside the Encampment on four separate occasions.

5  Q.    Thanks.  Can you --

6        Ben, you submitted a declaration in this case.  Correct?

7  A.    Yes.

8  Q.    I'm going to ask you a question.  And if it would be

9  helpful, you can refer to Exhibit A, your Declaration.

10       Counsel, do you have a copy of that?

11            MR. HOFFMAN:  Yes, we have one.

12            MS. DE LA CRUZ:  Okay.

13  Q.    Ben, can you describe the Roseland Village property?

14            THE COURT:  Can you hold on one second?  Let me pull

15  up that Declaration.

16            MS. DE LA CRUZ:  Sure.  I have the Declaration.

17  Let's see if I have the Exhibits.  Yeah.  Okay.

18            THE WITNESS:  So Roseland Village site -- it's about

19  a seven-acre parcel bordering on Sebastopol Road in Santa Rosa.

20  The current features of the site are a building housing a

21  Dollar Tree Store, and a Community Center which has a branch of

22  the Sonoma County Library and also a chapter of the Boys and

23  Girls Club that both occupy that as a tenant.

24  BY MS. DE LA CRUZ

25  Q.    Okay.  And can you tell me, using this map here, where the

1   encampments -- the encampments are?

2   A.   Well, originally there was a very small encampment to the

3   rear of this building, which would be to the north.   And

4   that -- and the footprint of that grew to extend past the

5   footprint of the building, and extends out almost to the edge

6   of a small playground that the CEC built in 2015 on the site.

7   Q.   Okay.   And when you say "this building," you mean the

8   Dollar Tree Store at 777 Sebastopol Road?

9   A.   That is correct.

10  Q.   Okay.   And when you say the original encampment was just

11  to the north of that, that's to the north of that store?

12  A.   Correct.   Yeah.

13  Q.   And then the small playground that you mentioned in your

14  last sentence there is kind of a -- it might be a regular

15  rectangle to the north and to the right of Dollar Tree Store.

16  Is that right?

17  A.   Yes.   It borders the Joe Rodota Trail.

18       (Reporter requests clarification.)

19           THE WITNESS:   It's called Joe Rodota, R-o-d-o-t-a.

20  Yeah.   Mm-hm.

21  BY MS. DE LA CRUZ

22  Q.   And then on the map, the Joe Rodota Trail is called "Bike

23  Trail."   Is that correct?

24  A.   That's right.   Yeah.

25  Q.   Okay.   Ben, you mentioned that you oversee the

1  redevelopment project.  Can you tell me what that means?

2  **A.**    Well, the Development Commission is what's called a

3  "Housing Successor Agency."  And so when redevelopment was

4  dispensed with, the Development Commission became responsible

5  for this site, and has been working on redevelopment plan.

6  That plan will include Affordable Housing and market-rate

7  housing on the north half, and then a library or civic

8  building -- a civic building, and also a public plaza and a

9  retail space.

10      And so my job is to work with a third-party developer and

11  members of my staff to work through the entitlement process and

12  everything else related to getting that development project

13  finished.

14  **Q.**    And are there any upcoming deadlines related to that

15  development project?

16  **A.**    Yeah.  Specifically, the most pressing deadlines relate to

17  environmental remediation on the property.  And this is

18  mandated by the Northwest Regional Water Quality Control Board.

19  **Q.**    Okay.  And do you know -- can you be more specific about

20  what those deadlines are, or what they require?

21  **A.**    It's a fairly complex process, but in January of --

22  January 19th of this year, the Water Quality Control Board had

23  enough information from environmental testing that was done to

24  issue some deadlines for two actions that they required.

25      One is monitoring of existing wells; test wells that are

WICKHAM - DIRECT / DE LA CRUZ

1    on the site.

2         The second one is the development of a Response Plan,

3    which essentially is a plan to clean up the environmental

4    hazard that exists on the property in that location.

5    Q.   And can you be more specific?  What is the environmental

6    hazard that exists on the property?

7    A.   Previously, there was a dry cleaner on this portion of the

8    site, basically, close to where -- behind the Dollar Store

9    building.  And there was a chemical called "PCE" that was

10   leaked into the soil over a period of time; and so testing

11   indicated that there were hazardous levels in the soil and

12   groundwater.  And that was required to be cleaned up by the

13   Water Quality Control Board.

14   Q.   And it's required to be cleaned up as a condition of

15   development, or just on its own?

16   A.   Ah, well, it's -- it's required to be cleaned up on its

17   own.  It's a requirement.  It certainly is intrinsic to the

18   development; but regardless of other activities, there is a

19   schedule for the Development Commission, as the responsible

20   party, to follow the Water Quality Control Board's instructions

21   in remediating the environmental hazard.

22   Q.   And the Community Development Commission purchased this

23   property when the California redevelopment law was kind of

24   alive and well.  Correct?

25   A.   Yes.  They took title in 2011, from my understanding of

1  the records.

2  **Q.**   And is it your understanding that redevelopment law was

3  largely about remediation of contaminated properties in order

4  to spark community development?  Right?

5  **A.**   Absolutely.  It's definitely a key factor in

6  redevelopment.

7  **Q.**   Okay.  Now, Ben, you mentioned that there's, like, this

8  Dollar Tree Store here.  And the original encampment was kind

9  of directly behind it.  Have you -- did you see kind of the --

10  the Encampment prior to its seven-times growth, as described by

11  Ms. Abramson?

12  **A.**   Yes.  When I first started working at the Development

13  Commission in late October of 2017, the Assistant Executive

14  Director took me on a tour of the property, and showed me the

15  location of the homeless encampment at that time.

16  **Q.**   Was there a fence there around that original encampment?

17  **A.**   Yes, there was.

18  **Q.**   And was it visible -- was that original encampment kind of

19  visible to the street?

20  **A.**   No, it was not.

21  **Q.**   Did you see the Encampment --

22       Sorry.  Didn't mean to interrupt.

23       Can you describe on this map, kind of, what happened to

24  that fencing in that original boundary around that original

25  encampment?

1  **A.**    Well, in November of 2017 the Encampment grew to its

2  present size.

3  **Q.**    Mm-hm.

4  **A.**    So that original boundary, essentially, is still in place;

5  but the rest of the camp grew around it.

6  **Q.**    Okay.  So it grew outside of the fence that had originally

7  been placed there --

8  **A.**    Right.

9  **Q.**    -- at the Development Commission.  Correct?

10  **A.**    Correct.

11  **Q.**    Okay.  Can you tell me, Ben, what your involvement, if

12  any, is with compliance with the deadlines related to the

13  environmental remediation required?

14  **A.**    Well, as the Affordable Housing Manager, I'm responsible

15  for overseeing that process.  We currently are working with

16  Mid-Pen Housing.  We have an Exclusive Right to Negotiate

17  Agreement with them to act as our contractor, essentially.

18        They have set up -- they have a proposal from a company

19  called "Geosyntec."  And we have a Memorandum of Understanding

20  to allow Geosyntec to move forward as soon as possible with

21  both monitoring of the existing test wells, and with

22  development of the remediation plan which is going to involve

23  construction of at least three additional wells to test the

24  methods for remediation that are recommended in our Response

25  Plan.

1    Q.    Okay.  And the -- the water board is the enforcing Agency

2    is that right?

3    A.    That is correct.

4    Q.    And what happens if the Community Development Commission

5    is not able to meet the current deadlines set by the regulatory

6    agency?

7    A.    Well, the Water Board has the power to sanction our

8    agency.  It can levy fines.

9         I spoke with a representative of the Water Board several

10   days ago, and he'd indicated that that is certainly something

11   that they can do if they feel that remediation is not following

12   their prescribed time line.

13   Q.    And now you've mentioned some deadlines that are upcoming?

14        THE COURT:  Before you get to that, let me ask a

15   clarification question.  There's no realistic possibility that

16   you're going to get fined if I grant the application for a TRO;

17   is there?

18        THE WITNESS:  I couldn't say.  I mean, it's totally

19   up to the Water Board what they would decide to do.

20        THE COURT:  So the Water Board -- do you have a

21   concern that the Water Board would say, *Well, the Judge has*

22   *ordered that you not clear the Encampment, and therefore we're*

23   *going to fine you for not doing the remediation*?  Have you ever

24   seen the Water Board do anything like that before?

25        THE WITNESS:  I don't really have experience working

1  with this -- with this agency, so I'm kind of new to that

2  arena.

3      So I don't believe, in my conversation with them, that

4  they indicated that they wouldn't be reasonable with us in how

5  they handled the situation.

6          **THE COURT:**  Okay.

7  **BY MS. DE LA CRUZ**

8  **Q.**   Do you know if the water agency is aware of the situation

9  related to the encampments at the site right now?

10 **A.**   Yes, they are.  And they indicated that we -- we have

11 requested in writing a time line extension for both monitoring

12 and development of the Response Plan.  And they indicated that

13 they recognize that we're dealing with some exceptional

14 circumstances right now.  So -- and so they granted those

15 extensions.

16 **Q.**   Okay.  Aside from the Water Board deadlines, are there any

17 other deadlines that impact our ability to develop Roseland

18 Village site?

19 **A.**   Well, yes.  We're working with Mid-Pen Housing, and -- and

20 the -- they are also working with another party called "Urban

21 Mix Development," who'll eventually do the market-rate

22 developer on the property; a market-rate housing developer.

23      So there are certain activities that need to happen.

24 We're in the middle of the entitlement process, which means

25 that we're going to take our plans before the City of

1  Santa Rosa Planning Commission.  To do that, we need to have a

2  tentative map drawn up by the engineering firm BKF, who's

3  contracted to do that work.  And so some utility locating,

4  which involves finding utilities on the site, needs to occur

5  for them to finalize those plans and take that to the

6  development -- excuse me -- the Planning Commission.  That's

7  scheduled at this point to take place in late May.

8  **Q.**   But I wanted to ask you a question about the storage made

9  available to occupants of the Encampments.  Do you have

10  knowledge of those arrangements that have been made by the

11  Community Development Commission?

12  **A.**   Yes, I do.

13  **Q.**   And can you explain to me what -- what arrangements you

14  know of or have been part of with regard to storage for

15  people's belongings at the Roseland Encampments?

16  **A.**   Well, as Jenny Abramson mentioned, for those who choose to

17  access shelter space provided through Catholic Charities,

18  there's a storage provision in that that they handle.

19       The Navigation Center that's been spoken of was housed in

20  what was previously a hardware store.  So the Development

21  Commission leased that space from Mid-Pen Housing, who

22  currently is the titleholder.  It's at least a

23  5,000-square-foot building.  We did furnish it with office

24  furniture during the time the Navigation Center was

25  operational.  That furniture has been removed as of today.  So

PROCEEDINGS

1   that is a completely open space.  And we plan to use that to

2   store personal belongings for any who wish to do that.  That

3   building is secure, and also has a burglar alarm.  So we're

4   intending to use that for storage.

5   **Q.**   Ben, going back to the map in your Exhibit A of your

6   Declaration, can you show me or explain to me here on the map

7   where that -- the former Roseland hardware store Navigation

8   Center/storage space is?

9   **A.**   Okay.  The building 777 Sebastopol Road, where the Dollar

10   Store is housed -- just to the bottom left corner of that is a

11   small square.  That's the location of the hardware store

12   that -- that was formerly the Navigation Center, and that we

13   would intend to use for storage.  So it's just adjacent to the

14   Roseland Village property.

15           **MS. DE LA CRUZ:**  Okay.  Your Honor, I don't have

16   anything else at this moment.

17           **THE COURT:**  Okay.  Let me ask a few other questions.

18       Can you tell me a little bit more about the time line for

19   the development project?  I mean, I assume -- I don't know a

20   lot about development, but I assume you probably have a time

21   line extending all the way out to the completion of the

22   development.  Is that right?

23           **THE WITNESS:**  Generally, that's true, yes.  Some of

24   the time lines, Your Honor, are a little bit flexible.

25       Originally, the agreement to engage with Mid-Pen Housing

PROCEEDINGS

1  was executed back in 2016.  They began working through the

2  entitlement process with the County of Sonoma.

3       Right about the time of fires happened, the City of

4  Santa Rosa also was in the process of annexing the property.

5  So all of that work that was done to entitle and get a use

6  approval for the property with the County sort of had to be

7  repeated with the City.  And so we've been very focused on our

8  engagement with that process ever since November of 2017.

9       So that process is moving well along.  The design has been

10 approved.  And now we're ready to go to the Planning Commission

11 to approve what's called a "tentative map," which maps out all

12 of the utilities and all of the street infrastructure of the

13 property project.

14      From there, we have other work to do, which includes

15 subdividing the property.

16          **THE COURT:**  Sorry.  I want to -- I do want to hear

17 what you were saying, but going -- you said you would have to

18 go to the Planning Commission to get the tentative map

19 approved?

20          **THE WITNESS:**  Correct.

21          **THE COURT:**  That is -- did you say when that was

22 scheduled for?

23          **THE WITNESS:**  Right now it's scheduled for May 24th.

24          **THE COURT:**  Okay.  So that's the Planning Commission

25 meeting; regularly scheduled Planning Commission meeting at

1    which this would be considered?

2                  THE WITNESS:  Right.

3                  THE COURT:  Okay.

4                  THE WITNESS:  So following that, we subdivide the

5    property.  And once that's approved, both the developers -- in

6    this case, the Affordable Housing development and market-rate

7    development -- the first thing that we have to do is build a

8    horizontal infrastructure:  The streets and utilities for the

9    whole site.

10         So as soon as we have the map approved, we begin

11   developing construction drawings, and going out for permit,

12   going out for bids.  And then the actual construction of

13   streets and utilities will begin as soon as that process is

14   done.  Probably it will take us until the end of 2018 to

15   finalize all of those different processes, and get -- and get

16   streets built on the site.

17                  THE COURT:  And then?

18                  THE WITNESS:  Once the -- once the street

19   infrastructure and utilities are built, the market-rate

20   developer will purchase their parcel from the CEC, and begin

21   construction of market-rate housing.  The affordable developer

22   will do the same thing.  And then the next phase after those

23   two projects are under way is to build a library, a civic

24   building, the public plaza, and the retail space.

25                  THE COURT:  And is there a kind of a goal or an end

PROCEEDINGS

1  date for this time line, for when people can start moving into

2  these apartments?

3          THE WITNESS:  Market rate.

4          THE COURT:  Or is it too -- are we too -- is that too

5  far ahead, to be in a position to identify a goal now?

6          THE WITNESS:  Well, generally speaking, market-rate

7  housing could be under construction in early 2020, and housing

8  could be available by the end of 2020.

9          THE COURT:  Okay.

10          THE WITNESS:  The Affordable Housing might take a

11  little bit longer as they assemble the financing.  They're

12  hoping to deliver housing around 2021, as well.  So it's -- the

13  process is a slow one, but that's -- the housing delivery is

14  expected around 2020 to 2021.

15          THE COURT:  Okay.  And remind me what -- the

16  development project calls for how many units to be constructed?

17  Apartment units.

18          THE WITNESS:  Seventy-five Affordable Housing

19  apartments, from three bedrooms to one bedroom.  And then 100

20  market-rate apartments; 1- and 2-bedroom apartments.

21          THE COURT:  And you used the word "Affordable

22  Housing."  What's the definition of Affordable Housing?

23          THE WITNESS:  Well, in this case it's a mix of

24  housing for 60 percent of area median income, 50 percent of

25  area median income, and some 30 percent of area median income.

1   So someone making 50 percent of area median income in the

2   Santa Rosa area -- the rents are set by a schedule that HUD

3   sets up to be affordable to a person making that much money.

4   It shouldn't be more than 30 percent of their income.  So

5   that's how it is done.

6          **THE COURT:**  Okay.  You said the -- you said it's a

7   mix.  The 75 units are a mix of 60 percent, 50 percent, or

8   40 percent.

9          **THE WITNESS:**  Sixty, fifty, and thirty.

10          **THE COURT:**  Sixty, fifty, and thirty percent of

11   median area income in the area of Santa Rosa?  The city of

12   Santa Rosa?

13          **THE WITNESS:**  Correct.  Yeah.

14          **MS. DE LA CRUZ:**  Did you have another question,

15   Your Honor?

16          **THE COURT:**  No.  I think that's all I have.

17          **MS. DE LA CRUZ:**  I have one more that came up.

18              **DIRECT EXAMINATION**  (resumed)

19   BY MS. DE LA CRUZ

20   **Q.**  Ben, as the Affordable Housing Program Manager at the

21   Community Development Commission, is it part of your regular

22   job to manage an encampment?

23   **A.**  No, that would not be part of my job.

24   **Q.**  Can you, since November 2017, give me an idea of what

25   percentage of your time has been diverted from your job of

1  developing Affordable Housing in the County of Sonoma to

2  managing this Encampment?

3  **A.**   Pretty significant.  You know, it's perhaps some weeks

4  maybe 10 percent; other weeks, up to 60 or 70 percent.

5           **THE COURT:**  What about today?

6           **THE WITNESS:**  A hundred percent.

7       You know, especially in the last month or so.  Actually,

8  the last -- since about -- I should say, more accurately, since

9  about the third week of January, when we began to really

10 develop the Navigation Center plan, my responsibility was to

11 identify a space for the Navigation Center; negotiate a lease;

12 make sure that the tenant improvements were completed.

13      Also, working with contractors and our developer in terms

14 of their relationship with the site.  The Dollar Tree Store,

15 which is our commercial tenant, the library, the Boys and Girls

16 Club -- all of them have been heavily impacted by the presence

17 of so many people behind their store and their community space.

18      So, yeah, anywhere from 10 to 60, 70 percent of each week.

19      Also, one of my team -- one of my senior community

20 development specialists -- has been probably spending

21 equivalent amount of time to me in handling issues related to

22 that.

23 **Q.**   Ben, are you aware of any impact to our developers'

24 ability to finance either the market-rate or Affordable Housing

25 development as a result of the Encampment?

WICKHAM - DIRECT / DE LA CRUZ

1   **A.**   Yes.  Well, Urban Mix, the market-rate developer, needs to

2   assemble financing for their project, which will be the first

3   one to -- that's the first developer who purchased one of those

4   parcels from us.  So they need to have lenders and funders

5   visit the site, review the site with them, so that they can

6   begin getting those arrangements locked down.  So they've been

7   unable to do that in the time that the situation had existed at

8   the property.

9   **Q.**   Ben, as your -- as the Affordable Housing Program Manager,

10  is part of your job also to develop and bring into the system

11  housing units that are accessible to homeless people?

12  **A.**   Yes, absolutely.

13  **Q.**   And are there any projects right now that you're currently

14  working on that may bring those units online?

15  **A.**   There's a project, actually, in the Roseland

16  neighborhood -- it's called "Crossroads Development" -- that's

17  getting close to completion.  And it has been funded by the

18  Development Commission in several different ways, including

19  County Fund for Housing loan funds -- home loan funds.

20       And that project has 79 Affordable Housing apartments, 10

21  of which are what are called "SROs" -- Single Room Occupancy

22  apartments -- specifically for Permanent Supportive Housing.

23  Sorry.

24           **MS. DE LA CRUZ:**  Thank you, Ben.

25       I have nothing further, Your Honor.

1      THE COURT:  I think that's it for me for now, as

2  well.

3      Do you have any questions?

4      MR. HOFFMAN:  Yes, Your Honor.  Mr. Rawson.

5      MR. RAWSON:  I do, Your Honor.

6      THE COURT:  Great.

7      MR. RAWSON:  Thank you.

8                    **CROSS-EXAMINATION**

9  BY MR. RAWSON

10 Q.  Mr. Wickham, I'm Michael Rawson, one of the attorneys for

11 the plaintiffs.  I want to ask you a few questions first about

12 the -- the North Coast Water Quality Board, and letters.  And

13 then I also want to go into the development, itself, and what

14 the -- what the needs are of the Mid-Peninsula Housing

15 Development folks and the market-rate developers.

16      THE COURT:  If you're intending to ask questions

17 about the possibility of them getting fined in the event of a

18 TRO --

19      MR. RAWSON:  Yes.

20      THE COURT:  -- you don't need to bother asking those

21 questions.

22      MR. RAWSON:  I crossed that off.

23      THE COURT:  Okay.

24 BY MR. RAWSON

25 Q.  In your Declaration, I believe you said here that you got

1  the letter from the North Coast Water folks on January 19th.

2  **A.**   (Nods.)

3  **Q.**   And that laid out that there needed to be quarterly

4  monitoring of the -- of the pollution, and there also had to be

5  a Response Plan to keen up the dry-cleaner chemicals.  Had you

6  gotten a letter before from them about this?

7  **A.**   Yes.  Yes.  They've been working with the Development

8  Commission for some time on this process.

9  **Q.**   And what precipitated this letter?

10  **A.**   It's a natural progression.  There's -- there was a letter

11  issued by the Water Quality Control Board called "Path to

12  Redevelopment" -- and that was issued in December of 2016 --

13  which laid out steps the Development Commission had to take in

14  order to move the process along.

15      One of those was a soil and -- excuse me -- a soil vapor

16  and water testing.  And so there's a 470-page document from

17  Harris & Lee, environmental consultants, which is a detailed

18  assessment of the conditions of groundwater, and the soils, and

19  the existence of vapors containing PCE.

20      By the end of -- by the end of October, 2017, there was a

21  report produced which then -- this letter was in response to

22  that report, requiring us to take these steps.  So this has

23  been a process that has been following a patterned time line.

24  **Q.**   So is it fair to say you have previous deadlines from the

25  North Coast water-quality folks?

1  A.    There have been requirements that have been followed.

2  That's true.  Yes.

3  Q.    And you've also said in your Declaration that that was --

4  the deadline that was originally given in January of this year

5  has been extended until April 30th.  And it had been extended,

6  I think, two times previous to that.  Is that correct?

7  A.    Actually, what -- what I indicated was that we requested

8  that the monitoring requirement be extended.  And that was the

9  extent until April 30th.  Then independently of that, another

10  request for an extension was an extension of the requirement to

11  submit a Response Plan.  So the original requirement was

12  March 12th.  And that's been extended by 60 days.

13  Q.    Do you have any reason to believe that those deadlines

14  would not be extended again?

15  A.    I couldn't speak for the Water Quality Control Board.

16  Q.    Now, you've also expressed in your Declaration a concern

17  about a sanction.  Have you ever read any of the letters from

18  the North Coast Water Quality Board; been threatened with this

19  particular sanction for not completing the remediation?

20  A.    There's a document called a "California Land Reuse and

21  Redevelopment Act Program Agreement."  That's in draft form,

22  but it's almost finalized.  And it's going to be taken to our

23  board on May 8th.  And that lays out our responsibilities, as

24  the responsible party, and also the Water Board's recourse if

25  we are not -- if we are not in line with this agreement.

1   Q.   What if your board does not act on that?

2   A.   I couldn't speak to that.

3          THE COURT:   I'm not going to consider it a possible

4   harm of the County getting sanctioned for not proceeding with

5   the clean-up as a result of a Temporary Restraining Order.

6   That's not a realistic harm.

7          MR. RAWSON:   Okay.

8          THE COURT:   And so you don't need to ask any more

9   questions about that.

10  BY MR. RAWSON

11  Q.   Okay.  Moving to Mid-Peninsula Housing -- and they're a

12  for-profit developer -- I believe your Declaration says and I

13  believe you just testified that they are in the middle --

14  you're in the middle with them right now of an exclusive

15  negotiating agreement; the NA.  Is that --

16  A.   Yes.

17  Q.   But that exclusive negotiating agreement is just for

18  purposes of negotiations.  There's no development agreement

19  yet; is there?

20  A.   The development disposition agreement is being negotiated,

21  and is slated to be finalized -- there's a meeting on

22  April 18th where we should be able to finalize the terms of

23  that agreement.

24  Q.   So until that happens, it's not even a certainty that

25  there will be a development; is there?

WICKHAM - CROSS / RAWSON

1  **A.**   I wouldn't say that.

2  **Q.**   You wouldn't say what?

3  **A.**   I wouldn't say that there's not a certainty that there

4  will be a development until that agreement is concluded.

5  **Q.**   Are you saying that there's a certainty now that there

6  will be a development?

7  **A.**   I have no question in my mind that there will be a

8  development.

9  **Q.**   You said that the Water Board was aware of the exceptional

10  circumstances on the site.  Are those exceptional circumstances

11  the Encampment?

12  **A.**   Actually, to more accurately quote, now that I'm thinking

13  about it, they said "unique circumstances."

14  **Q.**   Unique circumstances.

15       But is it the Encampment that is the unique circumstance

16  that they are aware of?

17  **A.**   That is correct.

18  **Q.**   For the subdivision that -- subdivision map that will be

19  needed once there is a development agreement for this -- for

20  this certain development, for that subdivision map, how -- how

21  long will that take?  How long will it take to go through --

22  there will have to be an application for a subdivision map.  Is

23  that correct?

24  **A.**   That's true.

25  **Q.**   And then a subdivision happen will have to be developed?

1  **A.**   That's true.

2  **Q.**   And then they'll have to be an adopted tentative

3  subdivision map.  Is that correct?

4  **A.**   I assume so.

5  **Q.**   And then ultimately before the development can go forward,

6  a final subdivision map?

7  **A.**   Correct.  A final map is necessary.

8  **Q.**   And the development can't go forward until all of those

9  things happen.  Is that correct?

10 **A.**   The construction can't go forward until that is concluded.

11 **Q.**   The Dollar Store -- it's my understanding that though the

12 Dollar Store has a lease that's been extended into June, the

13 end of June of 2018 --

14 **A.**   We're in the process of extending that lease again.

15 **Q.**   And it will be extended beyond the June 2018?

16 **A.**   That is most likely.  Yes.

17 **Q.**   And is it possible to do all of the remediation and

18 testing with the Dollar Store still there?

19 **A.**   Yes, it is.

20 **Q.**   Now, the market-rate units are aren't scheduled to come

21 online until 2020, and the -- the subsidized units until after

22 that.  That's -- that's at least two years from now.

23       So how does an extension of the time for these folks to

24 move off the site -- how does that -- it doesn't -- are you

25 saying that that jeopardizes the development?

WICKHAM - CROSS / RAWSON

1  **A.**    Well, I think I've described that in my Declaration.

2  **Q.**    Okay.

3            **THE COURT:**  But you can go ahead and sort of

4  summarize that --

5            **THE WITNESS:**  Okay.

6            **THE COURT:**  -- now, in response to his question.

7            **THE WITNESS:**  Well, again, environmental remediation

8  is intrinsic to the development.  It's not separate from the

9  development.  Although it's required, regardless of the

10 development, it's one of the reasons for redevelopment, in

11 general.

12     So that is part of the time line and part of the process

13 for us to make this site suitable for housing in the future.

14 And so any delay in our moving forward with what's been laid

15 out as requirements from the Water Quality Control Board would

16 have an impact on our ability to deliver housing.  And it seems

17 like a long way off, but if we delay, then instead of 2020, it

18 will be 2021 or 2022, at a time when Sonoma County desperately

19 needs Affordable Housing.

20 **Q.**    Okay.  No argument on that.

21     The housing that will be built, including the subsidized

22 housing, especially the subsidized housing on the site, will be

23 available to folks who are I believe you said at 60 percent of

24 median income?

25 **A.**    Sixty percent, fifty percent, and thirty percent will be

1  included in that development.

2  Q.   And is that -- will any of those units be available to

3  you, or affordable to the persons who are homeless now on the

4  site?

5  A.   It's very possible, especially if they were able to have

6  some kind of housing subsidy, based on rental assistance in the

7  Rapid Re-Housing program.

8  Q.   So they would need some subsidy in order to be able to

9  live in that housing?

10  A.   It would depend on their income.

11  Q.   Are these units financed by the tax credit program?

12  A.   That's the intention.

13  Q.   And in order to get those tax credits, you have to make an

14  application to the State for those, for tax credits.  Isn't

15  that true?

16  A.   That is correct.

17  Q.   To the Tax Credit Allocation Committee, I believe?

18  A.   That is correct.

19  Q.   Has that application been made yet?

20  A.   That application cannot be made until the developer has

21  site control; possession of the site.

22  Q.   And when is site control -- when will the developer have

23  site control of the site?

24  A.   After we finish the horizontal construction, then they

25  will purchase the site, and there will be a transfer of

WICKHAM - CROSS / RAWSON

1   ownership at that time.

2   **Q.**   The horizontal construction is infrastructure?  What --

3   **A.**   Streets and utilities, basically.

4   **Q.**   Streets.

5           **THE COURT:**  Are you saying that --

6       I'm sorry to interrupt.

7       Were you saying that you wouldn't be able to go to the

8   Planning Commission on -- or I don't know if it's you, or the

9   developer, or both wouldn't be able to go to the Planning

10  Commission on May -- was it 24th?

11          **THE WITNESS:**  That's the tentative date.  Yeah.

12          **THE COURT:**  -- without clearing the Encampments?

13          **THE WITNESS:**  Well, I was just saying for the

14  engineers to complete the tentative map, there's certain work

15  that they need to do in locating system utilities before they

16  can finish their map.

17          **THE COURT:**  And that couldn't happen with the

18  Encampments there?

19          **THE WITNESS:**  My understanding is that it will impact

20  their ability to complete that process.  I mean, I'm not an

21  engineer.  That's what I understand from our program, yeah.

22          **THE COURT:**  All right.  Thanks.  Go ahead.

23  **BY MR. RAWSON**

24  **Q.**   Following up on that, couldn't the mapping occur without

25  any of this remediation happening?  This is a site plan.  You

1   map it out.  You put the streets in.  You put the lots in.  Why

2   do you need to have folks off the site for that?

3   **A.**   Because we don't have access to the entire site right now.

4   **Q.**   And so --

5   **A.**   For the engineers to develop their tentative map, we don't

6   have access to the entire site.

7   **Q.**   Okay.

8          **THE COURT:**  No, but his question was -- I think his

9   question was about the remediation.  So I think what you're

10  saying is, *We can't do the mapping without access to the site.*

11         **THE WITNESS:**  Right.

12         **THE COURT:**  But could you do the mapping without

13  doing the remediation?

14      In other words, if you were able to do the mapping, does

15  the remediation have to come first; or could you do the

16  mapping, and go to the Planning Commission and get through the

17  Planning Commission process, and do the remediation later?

18      Was that what you were getting at?

19         **MR. RAWSON:**  Yes.

20         **THE WITNESS:**  So the mapping is not contingent on the

21  remediation; but neither does --

22      They're on "separate tracks," so to speak.  So our

23  requirements and our timing for the remediation is controlled

24  by the Water Board.  Our tentative map and that process and

25  going to the Planning Commission relates to this City of

1    Santa Rosa.  So both of those processes require us to have full

2    access to the site.

3            THE COURT:  And what do you know about how long the

4    remediation would take?

5            THE WITNESS:  The remediation is going to take

6    several years, at least.  Once -- the Response Plan takes six

7    weeks to develop and test the methodology.  And then we will

8    submit a Final Plan to the Water Board.  Once that's approved,

9    then we actually begin the remediation process, which includes

10   extracting vapor from the soil, and measuring the effects of

11   that.  So it could be a process that takes several years.

12           THE COURT:  And are the Encampments actually on the

13   contaminated soil?

14           THE WITNESS:  Yes, they are.

15           THE COURT:  Okay.  How much do you know about the

16   degree of contamination?

17           THE WITNESS:  Well, I read a report that the Water

18   Quality Control Board released, which I referred to in the past

19   redevelopment.  They indicated that the soil, itself -- the

20   surface of the soil -- is not hazardous to human health; but

21   the levels of PCE that are measured in different portions of

22   that area are beyond what the State of California allows, and

23   can be hazardous to drinking water in that respect.

24        So for a person standing on the soil of that site, they're

25   not going to instantly be poisoned, if you want to look at it

1   that way; but the Encampment is directly on top of the

2   contaminated site, and, in fact, is covering several of the

3   monitoring wells that have been installed in that location.

4   **BY MR. RAWSON**

5   **Q.**   I think one last question.  You've said that up until this

6   point, which includes the Encampment being there for a couple

7   of years, and includes the notice from the Water Board about

8   the remediation that's required, and the extensions that have

9   been granted because of -- because of the Water Board granting

10  extensions on those deadlines, and because the camp is there,

11  that, in your mind, it's still a certainty that this

12  development is going to happen, even though there's no ENA -- I

13  mean -- excuse me -- there's no development agreement yet.  And

14  even though there's no financing or tax credits obtained, you

15  think the development is a certainty.  Is that fair to say?

16  **A.**   That was a very long question, but I'll try to see if I

17  can --

18  **Q.**   Sorry about that.

19  **A.**   -- handle that.  I am fully confident that the Development

20  Commission will develop the site as intended.  It is -- it is

21  one of the key projects that I'm assigned to work on.  And I

22  have the support of my Executive Director, and of the Board of

23  Supervisors, and, likewise, the Board of Commissioners; same

24  group overseeing the Commission.  So we are putting all of the

25  resources and energy that we can into completing this project.

1  **Q.**   You found out today that the TRO was going to be extended

2  by another month or two.  And I know the Judge has already

3  asked this question, but would you still -- would this

4  development still be a certainty, in your mind?

5  **A.**   Well, eventually we would -- eventually, we're going to

6  get it done.  It would certainly have an impact on many of the

7  important deliverables that we need to achieve over the next

8  several months.

9        **MR. RAWSON:**  All right.  Thank you.  That's all I

10 have.

11       **THE COURT:**  So just to follow up on that, "would have

12 an impact on a number of the deliverables" is a little bit

13 vague.  I mean, what is your --

14     Let me think of a better way to ask this question.

15     Is there any possibility -- let's say that the Encampments

16 remained for three months, just pulling that time period out of

17 the air.  If the Encampments remained there for three months,

18 do you have any confidence that -- do you think the County

19 would be able to avoid delaying final completion of the

20 project?

21     In other words, could other aspects of the project later

22 on the time line be accelerated to avoid delay; or is it your

23 view that, you know, a three-month delay in removing

24 Encampments would likely result in roughly a three-month delay

25 in completing the project?

 1          **THE WITNESS:**  At the very least, I believe it would

 2    result in that kind of a delay.

 3          And, you know, it's very problematic for both the

 4    affordable developer and the market-rate developer.  They're --

 5    they are expending funds.  They have staff that's working on

 6    this project.  And it's been delayed by the fires.  It's been

 7    delayed by, you know, the events that have occurred around

 8    that.  So, from Mid-Pen Housing's perspective, they're already

 9    way behind schedule.

10          And although I indicated we are confident that this

11    development is going to be completed, you know, it could

12    jeopardize their ability to deploy their staff to work on this

13    project.

14          I think there they're as committed to it as we are, but

15    we're all very concerned about delays, and how that will affect

16    our budget.  We've expended a tremendous amount of money in

17    managing this situation.  That comes directly out of the

18    redevelopment funds that we have dedicated to this property;

19    and those are limited.  So the longer the Encampment were in

20    place, the more those of funds that we would expend, the bigger

21    the budget gap in finally completing the project.  So the

22    impacts of it are both financial, staff, staff time, our

23    development partners, in addition to the other factors I

24    mentioned.

25          **THE COURT:**  Okay.

1          **MR. RAWSON:**  One little last question?

2          **THE COURT:**  Sure.

3          **MR. RAWSON:**  It was just handed to me.  I think it

4    merits consideration.

5                    <u>**CROSS-EXAMINATION**</u>   (resumed)

6    **BY MR. RAWSON**

7    **Q.**   Our understanding is that the wells that needed to be dug

8    to -- to analyze the plume that's underneath there -- likely

9    underneath there -- are where the Encampment is now.  It's a

10   big site.  Is there other places on that site where the

11   Encampment can move to, as an interim step while those wells

12   are dug, that aren't above the plume?

13   **A.**   I don't -- I -- I think I don't know the answer to that.

14   **Q.**   Only if you know.

15   **A.**   (Shakes head from side to side).

16          **THE COURT:**  Okay.

17          **MR. RAWSON:**  Okay.

18          **MS. DE LA CRUZ:**  Your Honor, I -- I have just a few

19   questions for redirect.

20          **THE COURT:**  Sure.

21                    <u>**REDIRECT EXAMINATION**</u>

22   **BY MS. DE LA CRUZ**

23   **Q.**   You've testified that you've been out at the camp a number

24   of days.  Can you tell us a little bit about what your

25   experiences have been?  Can you describe the conditions in the

1  camp?

2  **A.**   Well, we went on February 21st, and we issued the trespass

3  notice.  And so we went and either hand-delivered that to

4  occupants in the Encampment, or attached it to fencing and

5  tents in the area.  At that point the camp conditions were very

6  cluttered and hard to access.

7      Later on -- and I believe it was on March 6th -- I entered

8  the camp with Santa Rosa Fire Department representatives, and

9  Santa Rosa Police Department.  And everyone agreed that camp

10  conditions had deteriorated significantly.  There was a

11  tremendous -- there was a lot more debris, a lot more clutter.

12  It was very difficult to walk through the Encampment.

13      And the Fire Marshal was very concerned about conditions

14  inside; about fire danger.  There were open burning pits,

15  gasoline containers, propane tanks, generators, electrical

16  cords; so a lot of different factors, and fire-egress problems.

17  So there was a lot of concern on their part.

18      We -- we did work with some of the camp leadership to

19  remove some of the fencing that they had installed, to allow

20  for better egress points.

21      But as far as other conditions inside the Encampment --

22  open burning, propane tanks, electrical cords -- we were not

23  really able to -- as the Fire Department said, they're not able

24  to do a code enforcement on a situation that is not -- that is

25  not within the boundaries of -- of legal boundaries of the City

WICKHAM - REDIRECT / DE LA CRUZ

1  of Santa Rosa.

2  Q.    I just want to make sure.  You testified that --

3        (Reporter requests clarification.)

4  BY MS. DE LA CRUZ

5  Q.    So, Ben, I'm trying to clarify.  So, Ben, you testified

6  that -- right now that you had seen fencing that had been

7  installed not by the Community Development Commission, but by

8  the camp.  Can you clarify that?

9  A.    Well, there was original fencing that the Development

10  Commission did put in place around the -- the original small

11  encampment.

12  Q.    Do you know where that fencing was put into place

13  originally?

14  A.    It was put by there by the Commission, to protect our

15  property.

16  Q.    Okay.  So now going to the question about -- what's your

17  understanding about the additional fencing that has been

18  installed on the Commission's property?

19  A.    That fencing was installed by either occupants of the

20  Encampment, or advocates who are supporting them.

21  Q.    So additional trespassers have entered the property and

22  put additional equipment on the property that the Community

23  Development Commission has not been a part of or sanctioned.

24  Is that right?

25  A.    That is correct.

1  Q.   Ben, have you received any letters from tenants or

2  neighbors in the area, expressing concern about the Encampment?

3  A.   I've received multiple e-mails from the Dollar Store

4  corporate headquarters about illegal dumping, about

5  shoplifting, about the negative impact on their clients -- the

6  clients of the store.

7       A tremendous amount of concern from the Boys and Girls

8  Club about conditions in the area that have become unsafe and

9  have deteriorated.  Tremendous problems with litter and garbage

10 accumulation.

11      Complaints from the library, as well.  People entering

12 into that area.  Just recently someone entered in, and there

13 was a theft that occurred.

14      And I've received phone calls -- and also people have

15 spoken up at public meetings who live in the area -- about the

16 increase in petty crime; vandalism, theft, and things like

17 that.

18 Q.   Have you received any threats of litigation from any of

19 the adjacent property owners related to conditions in the

20 Encampment?

21 A.   We just recently received a letter from the -- an attorney

22 representing a Mr. Paulson, who owns the parcel to the east,

23 complaining about an arson fire in their -- in the dumpster on

24 their property, and other impacts on their commercial tenants

25 and their -- their property, itself, because of activity in the

WICKHAM - REDIRECT / DE LA CRUZ

1   Encampment -- "related to the Encampment," I should say.

2   Q.   You testified earlier, Ben.  I think you used the phrase

3   "camp leadership."  Is it -- can you describe your

4   understanding of the leadership of the camp?

5   A.   Well, in the times I've been out, there's been several

6   folks who seem to be acknowledged as -- as taking some kind of

7   leadership role.

8        One of them is a gentleman, Steve, who's here.  Steve and

9   I are acquainted, and have spoken several times.

10       So -- and there's another gentleman who goes by the name

11  "New York," I understand.  And I've spoken to him several

12  times, as well.

13  Q.   Would you characterize that leadership as organized?

14  A.   I'm not really able to comment on that.  I don't know.

15       I know that in working with Steve a little bit, he was

16  able to help us get some of that fencing removed to assist with

17  egress.

18       Other than that, I haven't dealt with sort of issues

19  related to them perhaps having an organized role.

20  Q.   Okay.  Has it been your experience that there has been any

21  change in the unsafe or hazardous conditions identified by

22  Santa Rosa Fire, for example, in talking with camp leadership?

23  A.   I -- I don't believe that, you know, in -- because we have

24  weekly meeting with Santa Rosa Fire and Santa Rosa Police and

25  other City officials on Thursdays, I don't think there's any

1    indication that those conditions have improved in the camp.

2        I was in the camp again on April 3rd with Santa Rosa

3    Police, and those same sorts of hazardous conditions are still

4    in existence there.

5            **MS. DE LA CRUZ:**  Thank you, Ben.

6        Nothing further, Your Honor.

7            **THE COURT:**  Mr. Rawson, do you have any further?

8            **MR. RAWSON:**  Well, Mr. Hoffman, do you?

9            **MR. HOFFMAN:**  Maybe.

10            **THE COURT:**  Sure.  Go ahead.

11                            **RECROSS-EXAMINATION**

12   BY MR. HOFFMAN:

13   **Q.**   Good afternoon.

14   **A.**   Hi.

15   **Q.**   You mentioned there has been an increase in these

16   complaints of different types of things, such as theft; those

17   types of things.  Now, does -- is there any definitive answer

18   as to whether this is attributed to the Encampments?  Are you

19   aware of some -- how this might be attributed to the

20   Encampments?

21   **A.**   Well, the Development Commission has contracted a

22   security-patrol company.  And they've been providing

23   security-patrol services since the increase in size of the

24   Encampment, from about 6:00 a.m. until midnight each day.  So

25   they have several officers who are out there -- patrol officers

1  who are out there exclusively at that site.  So they're very

2  familiar with folks coming in and out of the Encampment.

3      And the anecdotal evidence that they've provided indicates

4  that that's the source of many of these incidents.

5  Q.   "Anecdotal," you said?

6  A.   Mm-hm.

7  Q.   Okay.  And I'm assuming, though, you've been able to work

8  with the camp leadership to try and address whatever issues

9  have come up related to conditions or some of these other

10  things?

11  A.   Well, our service-provider partners have been working

12  within the camp.  We have not had that kind of, like,

13  high-level engagement with camp leaders.

14  Q.   And as far as these fire hazards and other types of

15  things, have there been efforts, again, to try to work with the

16  leadership to maybe get a list of what needs to be cleaned, and

17  removed or taken down, and how that might be able to be done?

18  A.   Santa Rosa Police Department Downtown Enforcement Team and

19  the Santa Rosa Fire Department have both been in the camp, and

20  have engaged with folks in the camp, and strongly encouraged

21  them to correct those issues.

22  Q.   Do you know if there's been progress with that effort?

23  A.   I haven't seen a lot of progress.  Those hazardous

24  conditions are still in existence:  Gasoline cans, propane

25  tanks, electrical cords, burning pits, so forth.

1  Q.   All right.  Do you have experience or authority on knowing

2  what a fire hazard is, or not?

3  A.   I rely on the Santa Rosa Fire Department to tell me that.

4  We do meet with them weekly.

5  Q.   You, yourself, don't have that ability to determine a

6  hazard, or how it should be taken care of.  Correct?

7  A.   Well, I'm not a Fire Marshal --

8  Q.   Exactly.

9  A.   -- but I have extensive experience in property management,

10  so I am somewhat familiar with the situation.

11         MR. HOFFMAN:  Okay.  Okay.  Thank you.

12         THE COURT:  Great.  Thank you.  You can step down.

13         THE WITNESS:  Thank you.

14  (Witness excused.)

15         THE COURT:  Okay.  Do the plaintiffs want to call

16  their first witness?

17         MR. HOFFMAN:  Yes, Your Honor.  The plaintiffs would

18  like to call Mr. Singleton.

19         THE CLERK:  Please remain standing, and raise your

20  right hand.

21               STEVEN   SINGLETON,

22  called as a witness for the Plaintiffs, having been duly sworn,

23  testified as follows:

24         THE WITNESS:  Yes, I do.

25         THE CLERK:  Thank you.  Please be seated.  And for

1   the Record, please state your first and last name, and spell

2   both of them.

3          **THE WITNESS:**  First name is Steven.  Last name is

4   Singleton.  S-t-e-v-e-n S-i-n-g-l-e-t-o-n.

5          **THE CLERK:**  Thank you.

6                        <u>**DIRECT EXAMINATION**</u>

7   **BY MR. HOFFMAN**

8   **Q.**   Okay.  Good afternoon, Mr. Singleton.  Could I ask:  Where

9   do you live presently?

10  **A.**   At The Palms.  At the Palms Inn.

11  **Q.**   Okay.  And how long have you been living there?

12  **A.**   Since Monday.

13  **Q.**   Okay.  And when did you move in?  On Monday?

14  **A.**   On Monday.

15  **Q.**   Okay.  And when did you first find out you were going to

16  move in a there on Monday?

17  **A.**   On Monday morning.

18  **Q.**   Okay.  So what was the process for that?

19  **A.**   The HOST team came to the door told us to pack our stuff;

20  that we were leaving.

21  **Q.**   Okay.  And did they -- how did you get over there?

22  **A.**   By one of the vans.

23  **Q.**   Okay.  Okay.  And, now, had you been to the Navigation

24  Center prior to that point?

25  **A.**   Multiple times.

1    Q.   Okay.  And did you have an assessment done, that you

2    recall?

3    A.   Yeah.  Multiple times.  That was the fourth one.

4    Q.   Okay.  So you would have other assessments done through

5    Catholic Charities?

6    A.   Yes, sir.

7    Q.   Is that -- okay.  And maybe -- when were those?  In a

8    prior time period?

9    A.   Well, within the last --

10   Q.   Year?

11   A.   No.  Two years, since I moved.

12   Q.   Okay.  Now, did anyone -- while you were living --

13        Well, let me ask this.  Where did you live immediately

14   before you moved the The Palms?

15   A.   At Tent City.

16   Q.   Okay.  That's the Encampment in Roseland?

17   A.   Yes, sir.

18   Q.   Now, while you were living there, did you know what was

19   going on in the camp?

20   A.   Of course, I did.

21   Q.   And how were able to know, you know, different things that

22   were going on there every day?

23   A.   I hate the term, but they say I ran the camp; that, you

24   know, I was the mayor, or whatever.  We -- I'm one of the older

25   ones; older people.

1  Q.   So did -- but how would you know that things were going on

2  there?  Did people come to you, or --

3  A.   No.  I was out there every day, checking; doing things

4  with, you know, the Fire Department.  Tried to make sure things

5  got done.

6  Q.   Okay.

7  A.   Tried to keep things civil.

8  Q.   And did you know the people who lived in the Encampment?

9  A.   Every one of them.

10  Q.   You had spoken to a lot of them?

11  A.   Every one of them.

12  Q.   Okay.  At one time or another?

13  A.   Yes, sir.

14  Q.   Now, during the time that you were --

15       Well, when did you first get to the Encampment?

16  A.   November.

17  Q.   Okay.  And where were you before that; immediately before

18  that?

19  A.   The underpasses.

20  Q.   At Highway 101?

21  A.   Yes, sir.

22  Q.   Okay.  So during your time at the Encampment after the

23  Navigation Center opened, did you notice that people from the

24  center would come out to the encampment?

25  A.   Very rarely.

1  Q.   Okay.  Do you know who the workers were at the Navigation

2  Center?

3  A.   Yes, sir.

4  Q.   Could you give me their names?

5  A.   There's Giselle.  And I'm not sure of the young lady's

6  name.  And there's box Stephanie (phonetic) would be there once

7  in a while.

8  Q.   Objection.  So how often was Giselle there, that you know?

9  A.   She was there, in and out.

10  Q.   Okay.

11  A.   I mean, sometimes she'd be at the drop-in center.  And

12  sometimes she'd be there.  Mostly, Lee and the other lady.

13  That was it.

14  Q.   Well, how often would you go to the Navigation Center?

15  A.   At least three times a week, since the day it opened.

16  Q.   Okay.  So did you notice that all four of those people

17  were there every -- every day?

18  A.   No.

19  Q.   As far as -- okay.  How many would you say were there when

20  you went there?

21  A.   At the most, it would be the three:  Giselle, Lee, and the

22  other lady.  But most times, it's two.

23  Q.   Okay.  And so, again -- I'm sorry if I asked this.  I'll

24  ask it again.  How often did you see the HOST folks coming out

25  to the encampment?

1  A.    Hardly ever.

2  Q.    Did they come to your place, at all?

3  A.    One time, last week.

4  Q.    Okay.  Other than that?

5  A.    No, sir.

6           MR. HOFFMAN:  Okay.  Your Honor, that's all I have.

7  The rest, I think, is -- I'm not going to duplicate what's in

8  the Declaration --

9           THE COURT:  Okay.

10          MR. HOFFMAN:  -- unless you feel like you need more

11  clarification, but I'm not -- so --

12          THE COURT:  Okay.

13          MR. HOFFMAN:  Thank you.

14          THE COURT:  Thank you.

15          MS. DE LA CRUZ:  I just have one question,

16  Your Honor.

17                      **CROSS-EXAMINATION**

18  BY MS. DE LA CRUZ

19  Q.    Mr. Singleton, thank you for coming today.  My name is

20  Alegria De La Cruz, and I'm the lawyer for the Community

21  Development Commission.  I just have one question for you.  Is

22  living at The Palms better than living at the camp?

23  A.    Well, of course.  I've been on the streets for a while.

24  Of course, it is, for my wife.  And my wife works.  So, yes,

25  ma'am.

1            MS. DE LA CRUZ:  Thank you.

2            MR. HOFFMAN:  Your Honor, may I?

3                    **REDIRECT EXAMINATION**

4   BY MR. HOFFMAN

5   Q.   And, Mr. Singleton, how would you characterize living in

6   the Encampment, versus maybe living at the underpasses or some

7   of the other places that you've lived?

8   A.   Well, it was safer in ways, I guess.  I mean, I've had

9   people that's been killed next to me, and everything else.  I

10  mean, it was safer in ways; a lot safer in ways.

11           And we weren't being harassed by the Police Department.  I

12  mean, I've watched a lot of things happen out there with Police

13  Department tearing up people's stuff, throwing people's things

14  away --

15  Q.   Mm-hm.

16  A.   -- over the years.  So they -- it's kind of nice.

17  Q.   So did the police come in, to -- I mean give people

18  citations or that kind of thing?

19  A.   At the encampment?

20  Q.   Yeah.

21  A.   No, sir.

22           MR. HOFFMAN:  Okay.  All right.  Thank you.

23           THE COURT:  Okay.  Thank you very much,

24  Mr. Singleton.

25           THE WITNESS:  You're welcome.

1   (Witness excused.)

2           THE COURT:  That happens to every witness.

3           THE WITNESS:  Thank you, Your Honor.

4           MR. HOFFMAN:  We'd like -- plaintiffs would like to

5   call Nicholle Vannucci.

6           THE CLERK:  Please remain standing and raise your

7   right hand.

8                      **NICHOLLE VANNUCCI**,

9   called as a witness for the Plaintiffs, having been duly sworn,

10  testified as follows:

11          THE WITNESS:  I do.

12          THE CLERK:  Thank you.  Please be seated.

13      And for the Record, please state your first and last name,

14  and spell both of them.

15          THE WITNESS:  Okay.  Nicholle Vannucci.  First name

16  N-i-c-h-o-l-l-e.  Vannucci.  V, as in Victor, a-n-n-u-c-c-i.

17          THE CLERK:  Thank you.

18                  **DIRECT EXAMINATION**

19  BY MR. HOFFMAN

20  **Q.**   Okay.  Ms. Vannucci, so where do you live presently?

21  **A.**   I live in Tent City.

22  **Q.**   Okay.  In Roseland Encampment?

23  **A.**   Correct.

24  **Q.**   And how long have you been there?

25  **A.**   I have been there for 11 months, 10 months; 10 or 11

VANNUCCI - DIRECT / HOFFMAN

1  months now.

2  Q.   Okay.  And where were you prior to -- immediately prior to

3  that?

4  A.   Immediately prior to that I was in Sacramento, being

5  homeless.  I've been homeless since November -- not this past

6  November.  The November before.

7  Q.   Okay.  And are you working at present?

8  A.   I am not.

9  Q.   Okay.  So what is your source of income?

10  A.   My -- my -- I have get Food Stamps.  $192 a month in Food

11  Stamps.  And my boyfriend is a veteran, and he gets a stipend

12  of $134 a month from the Veterans.

13  Q.   Okay.  Have you tried to work?  Look for work?

14  A.   I have.  I did work at Fallas -- it's a clothing store

15  down the street -- for two and a half months.  And I found it

16  difficult to work there with my disability, and with -- like,

17  there's separation now, unfortunately, after being homeless for

18  a little over a year to -- with the general public.  I don't

19  fit in.  And it's hard to go to work with dirty nails.

20  Q.   Oh.

21  A.   You know.

22  Q.   Okay.  So what are the disabilities that you declare that

23  you have?

24  A.   Well, I was married for 19 years to a man who abused me in

25  every way possible.

VANNUCCI - DIRECT / HOFFMAN

1    And I have -- I don't -- I have agoraphobia.  I don't --

2    being around people -- this is very, very difficult for me.  I

3    like to hide in my tent.  I don't come outside very often.

4    When I do, I get afraid that people are talking about me;

5    judging me.  I mostly hear my ex's voice in my head, you know,

6    telling me what a piece of garbage I am.  So it's hard.

7    **Q.**   Mm-hm.  Well, so, though -- well, do you live alone at the

8    Encampment?

9    **A.**   I do not.  I live with my boyfriend, who is very sweet to

10   me.

11   **Q.**   Okay.  But now the Encampment, I mean, has a fair number

12   of people that are in close quarters, you know; tents next to

13   each other.  So how do you manage living there, versus, you

14   know, being around people?

15   **A.**   There is a separation when you can zip your tent door

16   shut.  I know that I can hear people; but they can't see me.

17   And it just makes me feel -- it's like my cave, and I feel

18   safe.

19   **Q.**   Okay.  How do you feel in the Encampment?

20   I mean, you said you'd been on the street, living?

21   **A.**   Right.

22   **Q.**   How would you compare being in the Encampment to that?

23   **A.**   When you're just on the street, you're -- you're not

24   allowed to stand still because you're homeless.  You don't get

25   to relax ever.  You're always carrying your stuff with you,

1  which shows everybody that you're homeless.  And so no -- no

2  businesses want you inside.  And no -- nobody really wants to

3  deal with you.

4       With the Encampment, I can leave my stuff there, and I

5  know it's going to be safe.  So I don't -- people don't

6  instantly know that I'm a homeless person, you know, which is

7  nice; but I just -- I don't get out often, anyway, but I'm --

8  I'm sorry.

9  **Q.**   Okay.  That's good.

10 **A.**   Right.

11 **Q.**   So, now, you're familiar with the -- are you familiar with

12 the Navigation Center that --

13 **A.**   Yeah, I am.  I -- I was there half an hour early the day

14 they were supposed to open, waiting; like, waiting.  Yeah.

15 **Q.**   So you went there early on?

16 **A.**   Absolutely.

17 **Q.**   And did you get an assessment done?

18 **A.**   Yes.  My boyfriend and I both did their assessment.  We've

19 done that same assessment when we first came to Santa Rosa,

20 through Catholic Charities, as well.

21 **Q.**   Okay.  And when was that, that you first came to

22 Santa Rosa?  That was after Sacramento, you said?

23 **A.**   Yes, correct.  I don't know.  I don't know exactly --

24 Early.  Early last year.

25 **Q.**   Okay.  And so what is this assessment?  How did that work?

VANNUCCI   DIRECT / HOFFMAN

1  **A.**   They just asked a couple of questions about what -- well,

2  if we had pets, you know; if -- our work history; if we were

3  able to work; and any disabilities that we may have; things of

4  that nature.

5  **Q.**   Okay.  And now, at that time did you explain to them about

6  your disability that you told us about today?

7  **A.**   I did.  I have -- I am Native, so I go to Indian Health.

8  And so month out for any sort of appointment.

9       And it's hard for me to keep appointments, because one day

10 I can feel good and be able to go outside; and most days I

11 cannot.  So the appointment seems to always they fall on a day

12 when I don't feel like I can.  It just brings anxiety, anyway,

13 for me to go anywhere.  So --

14 **Q.**   Okay, but what I was asking is:  Did you explain to them?

15 You mentioned that you don't like to be around other people,

16 and those types of things.  Did you explain that to them --

17 **A.**   Mm-hm.  I did.

18 **Q.**   -- at the Navigation Center?

19 **A.**   I did.

20 **Q.**   Okay.  Now, did they offer you some sort of alternative;

21 somewhere to go after you had done your assessment?

22 **A.**   Yes.  They told me that they can give me a shelter bed.

23 **Q.**   Okay.  And what was your response regarding that?

24 **A.**   Well, I cannot be in a shelter.  Neither can my boyfriend.

25 He did three tours right after 9/11, so he has PTSD pretty,

1    pretty bad.

2    **Q.**    Okay.  He's a veteran, you said?

3    **A.**    He's a veteran.  Yes.  He did three tours.

4    **Q.**    Okay.  Okay.  So how many times, since that first time you

5    went --

6         Did you get an assessment that first day that you went?

7    **A.**    Yes.

8    **Q.**    Okay.  Since that time, how many times have you been back

9    to the Navigation Center?

10   **A.**    I went religiously, three to four times a week.

11   **Q.**    Okay.  Have you been offered any other alternative as of

12   today for a place to go?

13   **A.**    No, I have not.  We did -- they did say that, you know,

14   that since he was a vet, that we can look into the veterans

15   services.  We have been in direct contact with Kim Valdez.  She

16   does the HUD-VASH thing.  And we were in contact with her

17   previously, as well.  We have the list.

18        We have not actually gotten okayed yet.  There are some

19   things that they are waiting for on our end, as far as it goes,

20   to get our IDs and things of that nature.  I did try to go

21   yesterday to the DMV; and every computer -- their system

22   statewide was down.  So that's fun.

23   **Q.**    Okay.

24   **A.**    But yeah.

25   **Q.**    Okay.

1    **A.**   But we have -- I had called every house on that list;

2    every place that they say that --

3    **Q.**   May I approach?

4              **THE COURT:**  Of course.

5              **MR. HOFFMAN:**  Sorry.

6              **THE WITNESS:**  -- every place on the list that they

7    gave me.  And no one's accepting our voucher, not that we have

8    it yet; but I thought I'd be proactive and start making phone

9    calls.

10   **BY MR. HOFFMAN**

11   **Q.**   Okay.

12   **A.**   Kim told us that the best thing to do was to ride around

13   town to any place we saw that had, like, a "For Rent" sign in

14   the window.  Might be a good place because the fact that then

15   it's a private owner, and they may deal with us.  But there's

16   no place that --

17   **Q.**   Okay.

18   **A.**   It's a stigma that -- the voucher is.  And people just

19   don't generally want to deal with you.

20   **Q.**   Do you have an automobile?

21   **A.**   I do not.

22             **THE COURT:**  Could I ask a quick question?

23             **THE WITNESS:**  Yeah.

24             **THE COURT:**  So it sounds like nobody's offered you

25   Permanent Supportive Housing?

VANNUCCI  DIRECT / HOFFMAN

1          THE WITNESS:  Absolutely not.

2          THE COURT:  Have you had a conversation with anybody

3   about that?

4          THE WITNESS:  About the fact that they have not?

5          THE COURT:  Yeah.  Or have you asked about it?  Or

6   have they explained to you why you haven't?

7          THE WITNESS:  They keep telling me that they have

8   their fingers in a lot of pies right now; that they're looking.

9   They're doing their best to find something for us, but that's

10  all I've heard.  And I've heard that the entire time that I've

11  been going to the Navigation Center.

12         THE COURT:  And when's the last time you had a

13  conversation about getting housing with the folks at the

14  Navigation Center, or with the outreach folks?

15         THE WITNESS:  Yesterday.  Yesterday I spoke with

16  Giselle.  I went down to -- the Catholic Charities has a

17  Morgan Street address where we get our mail.  So I went to

18  check on my mail there, and she was there.  And she said that

19  they're working hard on it, but nothing more than that.

20         THE COURT:  Go ahead.

21         MR. HOFFMAN:  Okay.  Thank you.  I think that's all I

22  have.

23         THE COURT:  Okay.  Any cross?

24         MS. DE LA CRUZ:  I just have a couple questions,

25  Your Honor.

1                    **CROSS-EXAMINATION**

2    **BY MS. DE LA CRUZ**

3    **Q.**   Hi, Nicholle.   I'm Alegria.   Nice to see you again.

4    **A.**   Hi.   Good to see you.

5    **Q.**   Thanks for making the trip.

6    **A.**   Yeah.

7    **Q.**   I just have a few questions.

8    **A.**   Okay.

9    **Q.**   You have you received a notice of the time -- Notice to

10   Vacate the Encampment?

11   **A.**   Yes, I received that.

12   **Q.**   And did you see at the bottom of the notice that there was

13   place for folks to leave their stuff or to store their stuff

14   and to access their stuff throughout the time?

15   **A.**   I did see that, yes.   Yes.

16   **Q.**   Okay.   Have you -- have you accessed services through

17   Catholic Charities?   Sounds like you've gone down to the

18   Homeless Service Center.

19   **A.**   Yeah.   I've been there many times.   I do take showers

20   there, you know, on a regular basis.   Yeah.

21   **Q.**   Okay.   When you engaged with folks at the Navigation

22   Center and you told them about, kind of, your specific needs

23   for housing, did they talk to you about being able to

24   accommodate you at the shelters?

25   **A.**   No, they did not.

1   Q.   Have you been down to the shelter to see what it feels
2   like?
3   A.   I have been in the shelter before, when we very first came
4   here.  It was during -- do you remember the big storms, when it
5   rained just, like, terribly for, like, two months?  Like, it
6   just rained and rained and rained.
7   Q.   Mm-hm.
8   A.   Well, we were both newly homeless, and we totally weren't
9   good at it, so we were in the rain a lot.  So we ended up going
10  to the emergency shelter.  They had it open at that point.  And
11  we spent two nights there.  I was -- Brian, my boyfriend, had a
12  horrible time there, anyway, because of all of the people; but
13  I was sexually assaulted there on the second day, so we didn't
14  go back.
15  Q.   I'm sorry.
16          THE COURT:  Where was that shelter?
17          THE WITNESS:  That was -- it was emergency shelter
18  for Catholic Charities.  I don't honestly know the exact
19  location of it, but it was like what you were saying before; a
20  gymnasium.  And we had mats on the ground.
21          THE COURT:  Mm-hm.  And have you gone to check out --
22  what's this -- what is it?  Sam?
23          MS. DE LA CRUZ:  Sam Jones.
24          THE COURT:  Sam Jones?  Have you gone to check out
25  Sam Jones; or has anybody talked to you about Sam Jones?

1     **THE WITNESS:**  I have heard many things about it, but

2  you know how that -- the rumor mill and stuff.  So you know.

3     Not directly, I have not.

4     But unless they can -- unless I have -- unless I can be

5  enclosed in something, I am not -- just not comfortable.  I

6  just won't go.  So I mean, they can offer it, and I can say

7  "Yes," but I won't go there.  I'll still be on the street.

8  **BY MS. DE LA CRUZ**

9  **Q.**  Nicholle, if at a shelter there were kind of partitions

10  around you or a way to make your space more private, would that

11  work for you?

12  **A.**  Again, unless I can close them off completely, unless I

13  know that no one can see me, I don't feel save.  And it's not

14  logical.  I know.  But it's still --

15  **Q.**  That's your experience.  Yeah.

16     **THE COURT:**  But what about --

17     Following up on that question, I mean -- and I don't know

18  how the shelters work, so this may be a dumb question.  But I

19  mean, if they could partition your living space off in way

20  where nobody could see you, would that alleviate your concerns?

21     **THE WITNESS:**  I don't see how they could.

22     And not only that, but with the shelters, don't we have to

23  be out by a certain time in the morning?  That's no longer?

24     **MS. DE LA CRUZ:**  No.  That's only at the some of the

25  winter shelters; and just a really small number of them.  So,

1  like, the Armory, for example, had those not-so-great

2  conditions, where --

3          **THE WITNESS:**  Yeah.

4          **MS. DE LA CRUZ:**  You could only come in at a certain

5  time, and you had to be out at a certain time.

6       So Sam Jones, for example, isn't like that.  You can be

7  there throughout the day.  You can be in that space.  Folks are

8  there.

9          **THE WITNESS:**  I have great concern with the shelter,

10  for the fact that I'm really afraid that this is just going to

11  be their answer for us, you know.

12       I've been promised -- I've been in these talks with the

13  County and the City for a long time now, since I've been at

14  that camp.  And they've been promising all along that they

15  would not move us out of that place, until they had adequate

16  housing for us.  And I just don't -- I'm really afraid that

17  this is all just a dog and pony show, and that we're going to

18  slip right through the cracks yet again.  I don't trust it.

19  **BY MS. DE LA CRUZ**

20  **Q.**  Nicholle, if somebody were to offer you a tour of the

21  shelter, where you would be protected and with somebody as you

22  walked through to imagine a space for you that would work,

23  would you be open to that?

24  **A.**  Again, unless I can be with my boyfriend, who's the only

25  person I feel safe around, the only person that I know finds me

1  normal, I won't stay there.  So --

2  **Q.**   So if you knew that there was a space where you can stay

3  with your boyfriend, and you could have it be kind of yours,

4  and partitioned off --

5  **A.**   What do you mean:  Kind of ours?

6      Like, I would need it to be just us; not other couples, or

7  things, or anybody else in there.

8  **Q.**   So would you be open to taking a tour and doing some

9  imagining of what a space that would work for the two of you

10  would look like?

11  **A.**   I would not be willing to imagine it.  I would want to see

12  it.

13  **Q.**   Right.  So I'm talking about kind of walking into the

14  shelter and saying, *I could imagine this space would work for*

15  *us if there was a partition here, and kind of a sheet that we*

16  *could throw over the partition that would block out the light*

17  *and the people if we could have this corner.*  Would that be

18  something that you would be open to?

19  **A.**   If I could get something in writing that said it was not

20  permanent; that that was not my -- your answer to us.

21  **Q.**   So emergency shelters are just that.  Right?  They're for

22  emergencies.  And folks are limited to how much time they

23  should spend in there, because it's not a forever place.

24  Right?

25  **A.**   Right.

1  **Q.**   And so if you were able to do some of those things with

2  somebody at a shelter -- create your space; have in writing

3  kind of being able to protect that space as yours; and then

4  have a plan to transition out of that space -- would that be

5  something that you would be open to?

6          **MR. HOFFMAN:**   Your Honor, I want to just -- I'm going

7  to object, just to the extent this is kind of speculative.

8          **THE COURT:**   Overruled.   You can sit down, and you can

9  ask questions on redirect if you need to.

10         **MR. HOFFMAN:**   Okay.

11         **THE COURT:**   So do you want to reask your question?

12         **MS. DE LA CRUZ:**   Yeah.   I'm sorry.

13     Could you read back my last question?

14     (Record read.)

15         **THE WITNESS:**   I don't see -- that seems -- that's

16  such a vague question that you want me to answer.   And I think

17  it's leading.   And I think that it's mean.

18  **BY MS. DE LA CRUZ**

19  **Q.**   I'm sorry.

20  **A.**   I'm not trying -- I'm not trying -- I don't want to say

21  "Yes," because that's frightening to me to trust anything that

22  you guys say.

23     And I don't want to say "No," because that -- in some

24  ways, I don't want to look like I won't accept help.

25     So I don't know how to answer that question.   That's my

 1  honest answer to that question.

 2          **MS. DE LA CRUZ:**  I appreciate that.  Thank you for

 3  your honesty.

 4      I don't have anything further, Your Honor.

 5          **THE WITNESS:**  Mm-hm.  We're good?

 6          **THE COURT:**  Any redirect?

 7          **MR. HOFFMAN:**  Just one question, Your Honor.

 8                  **REDIRECT EXAMINATION**

 9  **BY MR. HOFFMAN**

10  **Q.**   Nicholle, while you were at -- well, over the past several

11  weeks did anyone from the HOST team come to your tent to talk

12  to you, or --

13  **A.**   No.  I was actually told a couple of times that they would

14  come, and they never did.

15          **MR. HOFFMAN:**  Okay.  And have --

16      Well, okay.  That's all I have.

17          **THE COURT:**  Thank you very much.  You can step down.

18          **THE WITNESS:**  Thank you.

19  (Witness excused.)

20          **THE COURT:**  Should we take a little break?  I think

21  we've been going for a while.

22          **MR. HOFFMAN:**  Sure.

23          **THE COURT:**  Why don't we take a break?  And we'll

24  resume at five minutes to 3:00.

25          **MR. HOFFMAN:**  Okay.

DRAKE - DIRECT / HOFFMAN

1   (Recess taken from 2:44 p.m. until 2:58 p.m.)

2              THE COURT:  Okay.  All set to resume?

3              MR. HOFFMAN:  Yes, Your Honor.  The plaintiffs would

4   like to call Deborah Drake.

5              THE COURT:  Okay.

6              THE CLERK:  Please raise your right hand.

7                         **DEBORAH DRAKE**,

8   called as a witness for the Plaintiffs, having been duly sworn,

9   testified as follows:

10             THE WITNESS:  I do.

11             THE CLERK:  Thank you.  Please be seated.  And --

12             THE COURT:  Like I said, it happens to -- I mean,

13  it's something we should work on at some point, because

14  literally every trial we have, pretty much every witness who

15  comes to sit in that chair bumps the microphone and startles

16  everybody.  So anyway, I'm sorry.  We'll work on that.

17             THE CLERK:  For the Record, please state your full

18  name and last name, and spell both of them.

19             THE WITNESS:  Deborah Drake.  D-e-b-o-r-a-h.  Drake.

20  D-r-a-k-e.

21             THE CLERK:  Thank you.

22                    **DIRECT EXAMINATION**

23  BY MR. HOFFMAN

24  **Q.**   Okay.  Good afternoon, Ms. Drake.  Let me start by asking:

25  Could you tell us presently where do you live?

DRAKE - DIRECT / HOFFMAN

1  **A.**   I live at the camp in Roseland.  Excuse me.

2  **Q.**   Okay.  And how long have you been living there?

3  **A.**   A year and a half.

4  **Q.**   Okay.  And you've lived there by yourself?

5  **A.**   I have a tent by myself.  My son lives very close to me.

6  He's also there, but he's my caregiver.

7  **Q.**   So your son lives in the Encampment?

8  **A.**   Yes, he does.

9  **Q.**   Okay.  And I'll get back to him in a second.

10       So are you working right now?

11  **A.**   No.  No.  I get SSI.

12  **Q.**   Oh.  Your source of income?  One more time?  Your source

13  of income?

14  **A.**   SSI.

15  **Q.**   Okay.  Now, that SSI benefit -- is that based on

16  disability?

17  **A.**   Yes, it is.

18  **Q.**   Okay.  And could you just briefly tell us:  What is your

19  disability --

20  **A.**   Well, I --

21  **Q.**   -- or your condition?

22  **A.**   I suffer from depression and PTSD.  I have Stage III

23  ovarian cancer, congestive heart failure, and emphysema.

24  **Q.**   Now, does -- what type of things does your son do to help

25  you?

DRAKE - DIRECT / HOFFMAN

1  **A.**    Well, all depending on how I'm feeling.  He helps me

2  with -- you know, around the, you know, tent.  He empties

3  garbage, and brings me water.  Sometimes he has to even walk me

4  to the rest room.  He goes to doctors' appointments with me.

5  So I don't know what I'd do without him.

6  **Q.**    Okay.  Now I wanted to ask you about the Navigation

7  Center.  You're familiar -- are you familiar with it?

8  **A.**    Yes.

9  **Q.**    Okay.  And have you gone there?

10  **A.**    Yes.  I went -- the second day they were open was the

11  first time I went.

12  **Q.**    Okay.  And when you went there that first time, what

13  happened?

14  **A.**    I had an assessment.  Asked me some questions.  You know.

15  Filled out the forms.

16  **Q.**    Okay.  And did they offer you some sort of housing at that

17  point?

18  **A.**    Uh-uh.  No.

19  **Q.**    Okay.  What did they tell you then about that?

20  **A.**    That they would work on it.

21  **Q.**    Okay.  And did they tell you to come back, or did they say

22  they would come get you, or what -- what was going to happen

23  after that?

24  **A.**    Well, I needed to get a couple of documents for them.

25  **Q.**    Okay.  Were you able to get those documents?

1    **A.**   I -- I did finally get those documents.  Yes.

2    **Q.**   There was a delay?

3    **A.**   There was.  I came down with acute bronchitis.  And I

4    just -- I didn't even attempt.  You know.  For the most --

5    **Q.**   So how long did that delay you?

6    **A.**   About a month.

7    **Q.**   Okay.  And so how many times have you been to the

8    Navigation Center?

9    **A.**   I've been -- I've been there two more times.

10   **Q.**   Okay.

11   **A.**   More recently, though.

12   **Q.**   Okay.  Now, has anyone in the Navigation Center ever come

13   to visit you at your tent?

14   **A.**   Yes.  I -- yes.  My -- I'm right by the opening, you know;

15   the entrance.

16   **Q.**   Uh-huh.

17   **A.**   And they know that it's me, so they'll pop their head in

18   my tent and say "Hi."

19   **Q.**   Okay.

20   **A.**   But that's -- you know.

21   **Q.**   They just said -- they said "Hi"?

22   **A.**   Yeah.

23   **Q.**   Did you discuss your case or --

24   **A.**   No.

25   **Q.**   How many times have they done that, where they came in?

1   **A.**   Hm.  Maybe two or three times.

2   **Q.**   Okay.  Have you seen them at the Encampment generally --

3   the HOST team?

4   **A.**   Not generally.  A few times.

5   **Q.**   Okay.  Are you -- do you stay in the Encampment pretty

6   much all day during the day?

7   **A.**   Yes.  I have a small dog that I will walk up and down the

8   trail, if I'm feeling up to it.

9   **Q.**   Okay.  Now, as of today, what have you been offered as far

10  as a placement for housing from the Navigation Center?

11  **A.**   Nothing.  They talked about Sam Jones, but I can't do

12  that.

13  **Q.**   Did you discuss that with them, about Sam Jones?

14  **A.**   Yes, very briefly.

15  **Q.**   Okay.  Now, let me ask, maybe before I ask more about

16  that, did you tell them about your disabilities and conditions?

17  **A.**   That was part of the assessment.  They asked those

18  questions.

19  **Q.**   Okay.  And so did you say that they talked to you about

20  maybe going to the Sam Jones Shelter?

21  **A.**   It was a suggestion; but you know, I just -- I can't do

22  that.

23  **Q.**   Okay.  Could you explain to us why you can't do that?

24  **A.**   Well, I can't --

25       I don't want to be separated from my son -- is a big one;

DRAKE - DIRECT / HOFFMAN

1  a big thing.

2      Not with -- being left with -- you know, out in the open

3  with all -- with everybody.  Especially, you know, if they're

4  allowed to do -- have drugs and alcohol.  And I'll be left out

5  in the open.  No, thank you.  I can't do that.  I just wouldn't

6  do it.

7  **Q.**  Okay.  And so did you talk to them about --

8          **THE COURT:**  I'm sorry.  Could I ask a follow-up

9  question about that?

10         **THE WITNESS:**  Yes.

11         **THE COURT:**  So I had a little bit of difficulty

12 hearing you.  So you said, *If they are allowed to have drugs*

13 *and alcohol out in the open, I can't do that*?

14         **THE WITNESS:**  Well, I don't want to be --

15     No.  If I'm out in the open with them, you know, even a

16 partition isn't going to be a door, you know, for my safety.

17         **THE COURT:**  And so you're saying if you're out in the

18 open with people who are --

19         **THE WITNESS:**  Yeah.

20         **THE COURT:**  -- under the influence of drugs and

21 alcohol --

22         **THE WITNESS:**  Yeah.  I wouldn't -- I wouldn't feel

23 save.

24         **THE COURT:**  Okay.  And why is that?

25         **THE WITNESS:**  That may be something that just goes on

1    in my head -- I don't know -- but I just wouldn't feel safe.

2            THE COURT:  And are there people at the Encampment

3    under the influence of drugs and alcohol?

4            THE WITNESS:  There might be, I'd have to say, but I

5    can go in my tent, when you say "lock the door."  And my son is

6    right there.

7            THE COURT:  Okay.  And how old is your son?

8            THE WITNESS:  Thirty-eight.

9            THE COURT:  Thank you.

10   BY MR. HOFFMAN

11   Q.   So can you explain anything more about how this would

12   affect you to be at the shelter, beyond what you said?

13   A.   I just couldn't do it.  I don't know.  I -- I don't know.

14   Q.   Okay.  Now, you know, at the -- I guess you mentioned you

15   go into your tent; but you know, at the Encampment there are a

16   lot of people around?

17   A.   Yeah.

18   Q.   And some of them might be on drugs?

19   A.   Well --

20   Q.   So what about -- you said you go to your tent?

21   A.   Yeah.

22   Q.   Or what do you do to --

23   A.   I would go to my tent.  That's the best I can do right

24   now.  And my son is right there, you know; but I can go in and

25   just close the door.  And it's, like -- I don't know.  I can --

1    I'm -- I'm hiding.  I know it's just a flimsy little tent, but

2    that's -- that's the best we've got right now.

3    **Q.**   Okay.

4    **A.**   I feel safer.

5    **Q.**   So do you feel secure in the Encampment, then?

6    **A.**   Yes.

7    **Q.**   Now, where were you immediately before the Encampment?

8    **A.**   I was in San Rafael, with the -- I was in a 22-year

9    relationship that unfortunately ended in -- and throughout was

10   domestic violence.  And I got away from it.

11          **MR. HOFFMAN:**  Okay.  And I think you mentioned it in

12   your Declaration.  Let's see.  That's what I have here.

13       I think that's all I have, Your Honor.

14          **THE COURT:**  Okay.  Thank you.  Any cross?

15          **MS. DE LA CRUZ:**  I just have two questions.

16                    **CROSS-EXAMINATION**

17   **BY MS. DE LA CRUZ**

18   **Q.**   Ms. Drake, my name is Alegria De La Cruz.  I'm the

19   attorney for the Community Development.  Thanks for coming here

20   today.  I'm just going to ask you a couple of questions.

21       Did you have receive the notice that the Commission passed

22   out about the last day that people were able to be on the

23   Encampment site?

24   **A.**   The one that they put on the tents?

25   **Q.**   Mm-hm.

DRAKE - CROSS / DE LA CRUZ

1    **A.**    Yes.

2    **Q.**    And did you see at the bottom of that notice information

3    about where people could store their property if they needed to

4    store anything?

5    **A.**    Yeah.

6    **Q.**    The other question that I had is:  When you talked to

7    people at the Navigation Center about the possibility of going

8    to a shelter, was there any conversation that you had with them

9    about what you needed in order to feel safe in a shelter?

10   **A.**    No.

11   **Q.**    I'm sorry.

12   **A.**    No.

13   **Q.**    Have you ever visited the Sam Jones Shelter before?

14   **A.**    No, I have not.

15   **Q.**    Did you know before today that there was an ability to

16   partition off space --

17   **A.**    Yes, I did.

18   **Q.**    -- at the Sam Jones Shelter?

19   **A.**    Mm-hm.

20   **Q.**    How did you know about that?

21   **A.**    My -- probably HOST.  That would be the only -- yeah, it

22   would have to be.

23        But I can't.  I just can't do it.

24   **Q.**    Okay.  Ms. Drake, I understand that you've been living in

25   the Encampment for about a year and a half.  Is that right?

DRAKE – CROSS / DE LA CRUZ

1   **A.**   Yes.

2   **Q.**   So you've seen kind of what it was like before

3   November 2017, and what it's like now?

4   **A.**   Yes.

5   **Q.**   What's your experience been like there at the camp, now

6   that it's grown?

7   **A.**   Well, it -- there -- there's more people.  So there's, you

8   know, going to be, you know, more difficulty.

9        But there's also, you know, a sense of, like, people

10   looked out for each other.  And I was very concerned when they

11   were going to be kicked out of underneath the overpasses.  And

12   I was very glad that they came.  I was very concerned.

13   **Q.**   There's a fence between kind of where you landed when you

14   first got there, and the rest of the camp.  Is that right?

15   **A.**   Yes.  Yes.

16   **Q.**   And you don't do -- do you want that fence taken down?

17   **A.**   It -- the one that separates?  I don't think it would be

18   wise, no.

19   **Q.**   Why?

20   **A.**   At first, anyway, that's what I thought.  I mean, I

21   haven't really thought about it.  But there is a separation of

22   the people that were there first, and then the others, you

23   know; the new people.  But I started out on the inside, and I'm

24   on the outside.  I just don't think it would be wise.  I mean,

25   I don't see that it's a problem at all.  You can't even see

1  it -- the fence.

2  **Q.**   If you were offered Permanent Supportive Housing at The

3  Palms, would you take it instead of staying at the encampment?

4  **A.**   I would.

5           **MS. DE LA CRUZ:**  Okay.  Nothing further.  Thank you.

6           **THE WITNESS:**  Thanks.

7           **THE COURT:**  Could I ask a couple follow-up questions?

8           **THE WITNESS:**  Sure.

9           **THE COURT:**  So my understanding is that they do have

10  space for you at The Palms opening up.  Right?

11           **THE WITNESS:**  Well, I've been told this throughout,

12  you know.  And I was told to get those documents.  The

13  documents that I was told to get, I got.

14           **THE COURT:**  Okay.  And I think that -- I think they

15  said something about waiting for papers relating to

16  vaccinations for your dog?  What's the situation with that?

17           **THE WITNESS:**  Well, this is the first I've heard of

18  that; the very first.

19       But I did take my dog -- there's a mobile pet clinic.  And

20  it was at The Palms, actually.  I took my dog there to get the

21  rabies shot.  And they were supposed to mail the certificate to

22  me, and I have not received it; but I didn't know that that was

23  a problem.  Today is the first day I've heard that.  So I'm

24  sure I can get it.

25           **THE COURT:**  Okay.  And what kind of -- what have they

```
 1  told you about when housing might be available for you --

 2            THE WITNESS:  They haven't.

 3            THE COURT:  -- at The Palms?

 4       They haven't given you a ballpark or anything?

 5            THE WITNESS:  Well, I thought it was just the two

 6  documents that I needed to turn in, which I did.

 7       And, you know, now I don't know.  I haven't heard anything

 8  since.

 9            THE COURT:  Okay.  So you -- I think you were -- you

10  were in the room when Ms. Abramson testified on video.

11            THE WITNESS:  Yeah.

12            THE COURT:  And she said that there would be

13  something available for you in April.  Are you saying that's

14  the first you've heard of that?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay.  Okay.  Great.  Thank you.

17       Does anybody have any follow-ups?

18            MR. HOFFMAN:  No.

19            THE COURT:  Okay.  Thank you very much.  You can step

20  down.

21  (Witness excused.)

22            MR. HOFFMAN:  Plaintiffs would like to call

23  Ellen Brown.

24            THE CLERK:  Please raise your right hand.

25
```

1                    **ELLEN BROWN**,

2   called as a witness for the Plaintiffs, having been duly sworn,

3   testified as follows:

4           **THE WITNESS:**  I do.

5           **THE CLERK:**  Thank you.  For the Record, please state

6   your first and last name.

7           **THE WITNESS:**  Ellen Brown.

8           **THE CLERK:**  And can you spell your first name and

9   your last name, please?

10          **THE WITNESS:**  E-l-l-e-n B-r-o-w-n.

11          **THE CLERK:**  Thank you.

12                    **DIRECT EXAMINATION**

13  BY MR. HOFFMAN

14  **Q.**   Okay.  Ms. Brown.  Let me start out and ask you:  Could

15  you tell us where do you live right now?

16  **A.**   At the Tent Village in Roseland.

17          **THE COURT:**  Ms. Brown, I'm going to pull the

18  microphone a little closer to you here.  Is that okay?

19          **THE WITNESS:**  Yeah.

20  BY MR. HOFFMAN

21  **Q.**   Okay.  And how long have you lived at the Encampment?

22  **A.**   Since November.

23  **Q.**   Since November?

24  **A.**   (Nods.)

25  **Q.**   Okay.  And do you live there alone?

BROWN - DIRECT / HOFFMAN

1   **A.**   No.  I live with my boyfriend.

2   **Q.**   Okay.  Do you both live in the same tent?

3   **A.**   Yes.

4   **Q.**   You live in a tent.  Right?  Is that correct?

5   **A.**   Yes, I do.  Yes.

6   **Q.**   Okay.  And how long have you been -- or did I ask that?

7   Since November, you've been at the camp?

8   **A.**   Yes.

9   **Q.**   Okay.  And where were you immediately before you went to

10  the encampment?

11  **A.**   The underpass.

12  **Q.**   The underpass?

13  **A.**   Yeah.

14          **MR. HOFFMAN:**  Okay.  Can you hear?  Can you hear?

15          **THE COURT:**  Yes.

16  **BY MR. HOFFMAN**

17  **Q.**   Now, are you working right now?

18  **A.**   No, I'm not.

19  **Q.**   Okay.  What is your source of income?

20  **A.**   SSI.

21  **Q.**   Okay.  And is that SSI based on disability?

22  **A.**   Yes.

23  **Q.**   Okay.  Could you explain just briefly what are your

24  disabilities?

25  **A.**   I have -- severely depressed.  And I'm -- I've had several

1  strokes.

2  **Q.**    Okay.  And any other disabilities?

3      You don't want to talk.  Okay.  Maybe we won't.

4          **MR. HOFFMAN:**  It's in her Declaration, Your Honor.  I

5  don't want to --

6          **THE COURT:**  That's fine.

7          **MR. HOFFMAN:**  Okay.  I'm sorry.  Can we take a break

8  for a second?

9          **THE COURT:**  We certainly can.  Why don't we take a

10  five-minute break, and you all can figure out how to proceed.

11  Any way you want to proceed is fine.  I have her Declaration.

12          **MR. HOFFMAN:**  Okay.  Right.  Let me look at her

13  Declaration.  This is going to be upsetting.

14          **THE CLERK:**  Court is in recess.

15  (Recess taken from 3:18 p.m. until 3:24 p.m.)

16          **MR. HOFFMAN:**  Your Honor, I think we are not going to

17  continue.  We'll just submit her statement.  Her Declaration is

18  pretty similar to what she would have been saying.

19          **THE COURT:**  That's perfectly fine.  Please assure her

20  that I have read her Declaration.

21          **MR. HOFFMAN:**  Yeah.  Okay.  And I think we're done

22  with testimony.  Your Honor, plaintiffs are done.

23          **THE COURT:**  Okay.  Okay.  I mean, I have to say I'm

24  not really -- I don't really think I have any questions.  I

25  don't really feel the need to hear much in the way of argument;

PROCEEDINGS

1  but if, you know, you all want to, you know, each take few

2  minutes to make any points that you want to emphasize, I'm

3  happy to hear that now.

4          **MR. HOFFMAN:**  Sure, Your Honor.

5          **THE COURT:**  Go ahead.  Come on up.

6          **MR. HOFFMAN:**  Yes.  Just maybe take a few minutes to

7  just summarize our statements.

8      What the plaintiffs are really seeking here is -- we're

9  not seeking to keep the Encampment there forever.  We do

10  realize --

11      And we support the idea of encampments.  We think they can

12  work; but that's not what we're trying to do here.

13      What we're trying to do is to make sure that everyone who

14  is willing to do it can get a full assessment, can get the type

15  of placement that they're entitled to, before they're asked to

16  leave, before the camp is closed; and that there be enough time

17  to assure that, and something in place -- an Order -- that will

18  assure that this is going to take place in a fair and just

19  fashion, taking into account persons' disabilities and their

20  needs.

21      My sense is that --

22          **THE COURT:**  Can I ask a question about that?

23          **MR. HOFFMAN:**  Yes.

24          **THE COURT:**  How much have you and your colleagues

25  personally assisted in connecting encampment residents to the

1  outreach folks?

2          **MR. HOFFMAN:**  Well, we have been out there -- I won't

3  say daily.

4      And -- and one of the things that didn't get mentioned on

5  the record that I kind of wanted to, although I think it's in

6  the declarations -- they have meetings with the camp residents

7  very regularly.

8          **THE COURT:**  Sorry.  They?  They have meetings?

9          **MR. HOFFMAN:**  The encampments meet.  They have, like,

10  a council, leaders.  They meet.

11      We've been to those meetings to talk about the importance

12  of the Navigation Center, and the need to get everybody

13  assessed; that it will benefit everyone.

14      We -- our Homeless Action! plaintiffs are out there, I

15  think, on a daily basis, at least, or very often; are also

16  encouraging people to be out there, to go to the Navigation

17  Center to get assessed.

18          **THE COURT:**  You mean people who work for Homeless

19  Action!?

20          **MR. HOFFMAN:**  Yes, and other of the advocates.

21      We've been -- I don't know.  We've been trying to

22  interview as many people as we can, and also encourage people,

23  you know, on an individual basis to go out there.  We've

24  interviewed several others, you know, that are not part of this

25  lawsuit, to get a sense of what their situations are.  And

1    we've -- everyone that we've spoken to, we've encouraged to get

2    assessments and to go to the Navigation Center.  And that's

3    really, again, what we would like to see.

4        We -- does that answer your question, or was there more?

5            **THE COURT:**  Yeah.

6            **MR. HOFFMAN:**  Okay.

7            **THE COURT:**  What evidence is there that people from

8    Homeless Action! have been urging encampment residents to get

9    assessed at the Navigation Center?

10           **MR. HOFFMAN:**  Well, I've seen them at the camp

11   meetings that I've gone to doing that; you know, getting up and

12   saying that in front of the group of people.  They told us,

13   themselves, that they're doing that.  And we've told them, in

14   talking to them, that it would be very important for them do

15   that.  Again, we feel that it benefits everyone.  The more

16   assessments that can get done, the better; partly so that we

17   can see what the situation is in a more clear light.

18       From what I'm seeing, you know, there's issues maybe of

19   trust, and other types of issues; that it may --

20       To us, it feels like there needs to be some more time to

21   try to be able to reach more people and get more assessments

22   done.

23       In addition, once you reach someone and do the assessment,

24   I seems fairly clear, from what Mrs. Abramson said and what our

25   clients -- the plaintiffs -- have said, that there could be

1  more time involved after that in getting documentation together

2  and whatnot.

3      I know that, you know, they've talked about the Navigation

4  Center as being a San Francisco-based model; but it is pretty

5  different than what San Francisco does.  And maybe you're

6  familiar with those models, so I don't need to go into that.

7          THE COURT:  No.  It's fine.

8          MR. HOFFMAN:  I mean, that would be nice to have that

9  in Santa Rosa.  I know it's probably expensive, and whatnot;

10  but maybe the County could speak more to that.  And I know that

11  that's not really what we're looking at specifically here in

12  this case.

13      The other concern, which maybe hasn't come up as much in

14  the testimony, but it's in the declarations, is we want to make

15  sure that there's an orderly process as far as possessions are

16  concerned.  I seem to get a sense that maybe someone who takes

17  a placement will have their possessions stored; but what about

18  the people who have to leave that don't have a placement?  And

19  so we need -- we want an orderly process in place to assure

20  that everyone's possessions are taken care of.

21          THE COURT:  What about the process they've

22  established is not orderly?

23          MR. HOFFMAN:  What about it is not orderly?

24          THE COURT:  What is it about the process that they've

25  established that you object to?

PROCEEDINGS

1         **MR. HOFFMAN:**  Well, I heard today in some of the

2    testimony that people who do not take a placement won't -- are

3    not going to have their possessions stored.  And maybe I

4    misunderstood that.

5         **THE COURT:**  I think you've misunderstood that.

6         **MR. HOFFMAN:**  But the other concern we have is -- and

7    again, this -- you know, I know the County is involved here.

8    The track record from before that we've looked at was mainly

9    the City, but we know the City is involved through the police;

10   but we don't feel that it's been as orderly as it maybe will be

11   this time.  And we would like some assurances -- more

12   assurances in place.

13        And as an example, if you look at the arrangement the way

14   it is now, there's nothing in there:  No standards, no

15   procedures as far as this determination of what constitutes a

16   health and safety threat.  At a minimum, it should be an

17   immediate health and safety threat.  But I mean, that's just

18   one example.  And again, that's one part of the --

19        **THE COURT:**  I mean, that's -- seems like it's pretty

20   much the only argument you make on the storage issue, is that

21   law enforcement or -- or government officials have too much

22   discretion to decide what constitutes a threat to health and

23   safety.

24        **MR. HOFFMAN:**  Yeah.

25        **THE COURT:**  But I mean, you know, that doesn't seem

1  like an inappropriate grant of discretion to the people whose

2  responsibility it is to exercise the police power to protect

3  the health and safety of residents of Santa Rosa and Sonoma

4  County.

5          **MR. HOFFMAN:**  Yeah.  I --

6          **THE COURT:**  We're not going to have, like -- you

7  know, we're not going to be coming to court to seek permission

8  to throw something away.  I mean, you know, there has to be a

9  certain amount of discretion that these officials get to -- you

10  know.  I mean, there are any number of things that could be a

11  threat to health and safety.  And they have to have the ability

12  to do their jobs in that regard, I think.

13          **MR. HOFFMAN:**  No.  I understand, Your Honor.

14      And it's not that I'm saying there shouldn't be any

15  discretion.

16      We've just seen, with what's happened before with the

17  police up until this point, that -- that most -- I mean, a lot

18  of the people -- I don't have the exact numbers, but we saw

19  even in the videos and from -- it's in the declarations from

20  people who were plaintiffs who were at the other encampments

21  that, once they left, they weren't able to get their

22  possessions.  They weren't put in storage.  So we're concerned.

23  Again, the County is more involved; but that's what raises our

24  concern.

25      And if it could be defined as, you now, immediate -- if

1  it's a chemical, if it's, you know, propane, you know, we don't

2  have a problem with some of these things that we know are

3  dangerous.  And it's not that we want to interfere with that.

4      But we saw pictures of other types of items being

5  destroyed.

6          THE COURT:  Okay, but it seems like they've got a

7  system in place now where they have the space, you know, to

8  store stuff.  And so the question is:  What incentive does

9  anybody have to throw something away, unless it actually is a

10  threat to health and safety?  I mean, what incentive does

11  anybody have to throw stuff away, when you can put it in

12  storage?  I mean, it sounds like a lot more of a hassle to

13  throw it away, because then you're going to get complaints, and

14  you know you're going to have to justify why you threw it away.

15      I mean, you know, if I were the person responsible for

16  administering the system, I would think that I would have every

17  incentive to err on the side of not throwing stuff away.

18          MR. HOFFMAN:  Well, and that's what we want.  So, I

19  mean, if that's the way it's going to work --

20          THE COURT:  Why doesn't this system give that

21  incentive?

22          MR. HOFFMAN:  Well, I guess we just don't know.  I

23  mean, it's the same system.  It's the same wording that's been

24  in all of the other encampment notices except maybe the first

25  one, but the one on the underpasses was very similar.

1          **THE COURT:**  Could I ask you another question?

2          **MR. HOFFMAN:**  Sure.

3          **THE COURT:**  This is going to the claim that you have

4    that I think is a more serious claim, which is, you know, the

5    Eighth Amendment claim.  And I also wonder if there's -- you

6    know, I've found myself wondering if there -- you know, if

7    there's a Due Process issue similar to the Eighth Amendment

8    issue.  I find myself wondering if there's something in the

9    California Constitution that speaks to this question.

10         And I also -- while I'm listing the things that I find

11   myself wondering, you know, another thing that I've always

12   wondered about these cases -- and actually, it's a thought that

13   crossed my mind somewhat -- not so much in connection with this

14   case, but with the Orange County case, is, you know,

15   homelessness is a statewide problem; arguably, a nationwide

16   problem; but at a minimum, a statewide problem.

17         And, you know, thinking about the Orange County case, you

18   know, and the problems they're having, you know, the county is

19   responsible for -- I can't remember the name of the code

20   section that gives the County responsibility for, you know,

21   sort of taking care of the health of its people.

22         **MR. HOFFMAN:**  17000.

23         **THE COURT:**  Yes.

24         **MR. HOFFMAN:**  Welfare and Institutions Code.

25         **THE COURT:**  Yes.  And then you have --

 1    But it's the cities that are responsible for, like, zoning

 2 and what-have-you, you know; land-use decisions, and stuff.

 3 Right?

 4    And it's the State that's responsible for setting up this

 5 system of governance that is preventing Orange County from, you

 6 know -- part -- that's part of the problem that's preventing

 7 Orange County from resolving this situation.

 8    And so I've wondered -- maybe it's not appropriate here,

 9 but I've wondered in the context of the Orange County case,

10 like, why isn't the State a defendant in the case?  You know, a

11 lot of what's happening down there, it seems to me, is the

12 State's fault; but anyway, that may not be relevant.

13        **MR. HOFFMAN:**  And the County as a jurisdiction is --

14        **THE COURT:**  It's a creature of the State; but anyway,

15 that may not be relevant to this case or this motion.  But --

16        **MR. HOFFMAN:**  Mm-hm.

17        **THE COURT:**  -- my -- so that's a very long wind-up

18 for my question, which is --

19        **MR. HOFFMAN:**  Mm-hm.

20        **THE COURT:**    -- I am of the view that the majority

21 opinion in *Jones* is correct and highly persuasive.  Right?  And

22 I believe that it should be applied.

23    I'm also of the view that, although attempts could be made

24 to distinguish *Jones*, and to say that, you know, the concepts

25 embodied in *Jones* should not apply to the enforcement of an

1   anti-camping ordinance, I disagree with that.  Okay?  I think

2   that those concepts apply equally in the context of, you know,

3   enforcement of anti-camping ordinances.  Right?

4        But -- and so I think it's fair to say that you raise

5   serious questions in this lawsuit.  Right?  I think that if --

6   if the Government does not have shelter available for people,

7   it -- I think it's very likely that the Constitution prevents

8   the Government from enforcing an anti-camping ordinance against

9   homeless people.

10       Further, I think there is an argument that if -- even if

11  there are shelter beds available, they may be inadequate.  And

12  it is possible that a situation in a shelter like the one

13  Ms. Vannucci faced during winter are such that you can't force

14  somebody to leave an encampment to go to that shelter.  So I

15  think, you know, to that extent, I think you've raised serious

16  constitutional questions here; but on this Record -- on this

17  Record -- I really question whether I can grant your

18  application for a TRO.

19       And I think, you know, one reason goes to the merits.

20  Right?  On this Record it appears, at least thus far, that some

21  of the shelter options are adequate, at least based on this

22  Record.  Okay?

23       And so, you know, although you raised serious

24  constitutional questions, I'm not sure you've shown a strong

25  likelihood that clearing the encampments would violate

1   anybody's constitutional rights in this specific context, even

2   though oftentimes I think clearing encampments may constitute a

3   constitutional violation.

4        And then the second point is that, you know -- and again,

5   comparing this case to Orange County, you know, this is land

6   that the County wants to use to build housing, some of which is

7   affordable or below-market rate.  I'm never quite sure if it's

8   right to use the word "affordable" -- but at a minimum,

9   below-market rate.  And so in terms of balancing of the

10  hardships, and the public interest, and all that stuff, it

11  seems like the equation is a little bit different here.

12       So for those two reasons, you know, it feels difficult to

13  grant your motion for a TRO.

14       That is not to say that --

15       You know, there may be circumstances in the future -- in

16  the near future -- where, you know, Sonoma County would -- or

17  Santa Rosa, or whatever, could be precluded from enforcing the

18  anti-camping ordinance, if a better showing is made that the

19  alternatives are inadequate.

20       But the concern with this motion is that you haven't made

21  that showing.

22       So, you know, maybe you could make it on the merits in

23  this case.  Or maybe, you know, if these encampments were

24  cleared, and there was an attempt to enforce the anti-camping

25  ordinance against the people who were dispersed, who, you know,

1  who attempted to, you know, set up an encampment somewhere

2  else, it may be you would be able to make a better showing that

3  the alternatives that the defendants are offering are

4  inadequate to justify enforcement of the anti-camping

5  ordinance.

6      So anyway, those are kind of my thoughts.  And I wanted to

7  give you a chance to respond to that.

8          **MR. HOFFMAN:**  Okay.  Yeah.  Well, thank you.

9      I guess the way I have to approach this is -- I mean, we

10 haven't had a chance to do discovery.  We've been trying to

11 seek information from the County to get a sense of what really

12 is available or not available, and we sought that information

13 from Day One that we got involved.

14     We've received documentation and numbers.  It seems to be

15 changing quite a bit.  Initially, I think 60, then 90, now I

16 think we're back to 60.

17     We've had a concern with that, in terms of -- we don't

18 think we have a really good idea of what is available.

19     And we don't feel that -- while there are -- we're not

20 going to say that there aren't alternatives that are available

21 for some people.  And it hasn't been our statement that -- or

22 our intent or our approach that we say it's -- there's nothing,

23 and completely -- nothing is going to work.

24     But we don't feel that we have a clear enough idea that

25 there is going to be enough beds.

PROCEEDINGS

1        Now, if you look at *Jones*, you know -- and it starts from

2   the global standpoint.  In other words, it looked at all of

3   Los Angeles area in the total, I mean, even though it was

4   focusing on the Skid Row area.  And it started by saying the

5   numbers as a total didn't match up, and therefore then you go

6   and look locally.

7        And that is definite -- I don't think anyone's arguing

8   that is the case here, but the -- in a sense of looking at the

9   whole county, it's 1,800 people on a given day who are without

10  shelter, and approximately 600 or thereabouts beds; at least,

11  according to that HIC report.

12           **THE COURT:**  Yeah, but that's not the state of the

13  evidence.

14       I mean, I have to -- I mean, the state of the evidence is

15  that there are more beds in the county.  And the state of the

16  evidence as we sit here today is that there are beds available.

17  And the state of the evidence is that --

18           **MR. HOFFMAN:**  Well --

19           **THE COURT:**    -- there are beds available that are not

20  the kind of horrific option of, you know, being in a warehouse

21  with 300 cots laid on the floor.

22           **MR. HOFFMAN:**  Mm-hm.

23           **THE COURT:**  Right?  That's the state of the evidence,

24  I think, now, you know.

25       So how can I -- how can I grant your TRO application,

 1  given the state of the evidence now?

 2          MR. HOFFMAN:  Well, we have five plaintiffs.  I mean,

 3  maybe two left.  I mean, three have been placed.  And I don't

 4  think we have a clear idea at this point that at least two of

 5  the plaintiffs are going to be able to be placed.

 6      In addition, there are 60-some-odd other people in the

 7  Encampment -- or maybe 50 -- that we don't really know what

 8  their status is.

 9          THE COURT:  I know, but that Navigation Center -- I

10  understand it not like San Francisco's.  You can't go live

11  there -- right? -- but --

12          MR. HOFFMAN:  Well --

13          THE COURT:  -- but that Navigation Center has been

14  there for a long time.

15          MR. HOFFMAN:  Well, we don't think it's -- from what

16  we're seeing, it's not long enough.  And I guess that's what

17  we're trying to say here; that there needs to be more time to

18  adequately reach everybody and assure that they get the

19  assessments that they're required to get.  We need to do that,

20  because it's clear globally that there aren't the right

21  numbers.

22      A concern we have related to that is the fact of beds

23  being set aside and held only for the Encampment.  That's a

24  concern that we see; that such high numbers are vacant in a

25  situation such as this.  And there's -- in other words, there's

 1   a lot of things that we felt didn't add up that we needed more

 2   investigation on; more time.  And in addition, it's clear that

 3   there's more people that need assessments.

 4        Again, we're very aware of -- and we're supportive of

 5   handing the Affordable Housing there.  And it's not our intent

 6   to try to hold this up forever.  We just want to make sure that

 7   there's a process that takes place that takes everyone into

 8   account.  And we feel like, from what we're seeing, number one,

 9   we're not clear on the numbers; but number two, that it still

10   needs more time.

11        In San Francisco it's available on a year-round basis.

12             THE COURT:  But --

13             MR. HOFFMAN:  And I think for that reason, that it

14   needs more time than a few weeks.

15             THE COURT:  Well, a few weeks.

16        How long has it been there?  How long has it been there?

17             MR. HOFFMAN:  Since February 27th.

18             THE COURT:  That's when the Navigation Center popped

19   up?

20             MR. HOFFMAN:  Yeah.  I heard, say, that it was a few

21   days later that it was more fully up and running; but I think

22   that was the day they first opened it.  So that's really just a

23   few weeks.

24             THE COURT:  Okay.

25             MR. HOFFMAN:  And, you know, it was slow in the

1  beginning.  We started to go out and push people.  And I think

2  they got -- I mean, I think in the beginning it was very few

3  people, although our clients -- I mean, I guess because they

4  were our clients, we encouraged them, of course, to go out as

5  soon as possible.

6      But so I think that's what we're saying, is -- again,

7  related to the -- I'm not going to be belabor the possessions,

8  but related to that, and assessments, there just needs to be

9  some more time to be assured that this can take place.

10      We're not necessarily saying that it's not a good process.

11      What we're saying is it appears to us that it just needs

12  more time, and that we want to just make sure, before people

13  are forced to move, that they have that opportunity, and that

14  we can guarantee that a sufficient effort is being made to do

15  that.  And I don't know how long it -- it maybe needs another

16  month, two months.  I'm not saying a year or longer.

17      I wish there could be --

18          **THE COURT:**  So do you believe that the encampments

19  should be shut down?

20          **MR. HOFFMAN:**  Well, what I believe is -- is that

21  ultimately this encampment will need to be closed.

22          **THE COURT:**  Okay.  So you agree that this encampment

23  needs to be closed?

24          **MR. HOFFMAN:**  Yes.  I mean --

25          **THE COURT:**  You just think it's --

PROCEEDINGS

1          **MR. HOFFMAN:**  We never --

2          **THE COURT:**  You just think it's a question of how

3   much more time the County should take to try to reach out to

4   folks?

5          **MR. HOFFMAN:**  Exactly.

6       And we're worried because of the track record leading up

7   to this.  Again, I know the County hadn't been involved in the

8   other encampment closures, but we were concerned about how

9   those other closures took place.

10          **THE COURT:**  But isn't that a big deal?

11       Like, you've now -- the agency that's presiding over the

12   closure now is the agency that's responsible for serving

13   homeless people.

14          **MR. HOFFMAN:**  (Nods.)

15          **THE COURT:**  That seems like a big difference from

16   having, like, the Santa Rosa Police Department preside over it.

17          **MR. HOFFMAN:**  Well, yes, Your Honor.

18       And -- but we're noticing that the procedure still seems

19   to be the same.  And we -- that the Police Department will be

20   the ones on the ground, you know, that day.  So --

21          **THE COURT:**  Well, I mean, who do you propose should

22   be on the ground when it closes, whether it's tomorrow or

23   whether it's a month from now?

24          **MR. HOFFMAN:**  I'm not --

25          **THE COURT:**  Who do you believe should be on the

1  ground?

2          MR. HOFFMAN:  No, I don't say I don't think the

3  police should do it.

4      I'm just saying that there needs to be, we feel, some more

5  -- some oversight to make sure that everything's done, followed

6  correctly; that everyone can get an assessment; that there's

7  more time -- a little bit more time.  More time.  Again, I

8  can't say how long it will take to -- to get everybody.

9          THE COURT:  So let me just --

10         MR. HOFFMAN:  But not forever.  Not a year.  Not two

11  years.

12     And, yes, we support the idea of encampments, but -- and

13  we would love it if the County would say, *We have another piece*

14  *of land here, if you guys can keep your encampment*.  And we've

15  actually submitted a proposal -- Homeless Action! -- to the

16  County for what we call "transitional villages," with a plan.

17  You know.  It's in the, you know, formative stages, but we

18  would like to see that as an option.  Then we wouldn't have to

19  be worried, you know, about this site, because we are worried

20  about the site.  We don't want to ruin the -- you know, be the

21  ones in posterity that ruined a nice investment, Your Honor; a

22  nice project.

23         THE COURT:  So just I just want to make sure we're

24  clear.  You agree that the encampments should be closed?

25         MR. HOFFMAN:  Well, that eventually they will.  I

1    don't want to say "should be."  I think what I mean is

2    eventually they'll need to be, just because of the situation

3    here.

4            THE COURT:  Okay.  And --

5            MR. HOFFMAN:  But I'm not saying that there

6    shouldn't -- there can't be encampments.  What I'm saying is we

7    would like to have more, because they seem to -- on one level,

8    they seem to work as another step and tool in this whole

9    process, but we're --

10           THE COURT:  And you agree that when this encampment

11   is closed, the Santa Rosa Police Department should be presiding

12   over it; should be executing it?

13           MR. HOFFMAN:  Well, I guess I don't know if that's

14   the most efficient and expeditious way to do it.  It's not that

15   we don't like the police.  We just want to make sure that there

16   are protections in place so that the same things don't happen

17   that have happened before, and that people really do get their

18   possessions stored; they can have access to them; that they

19   don't get moved out, and then everything gets destroyed,

20   which -- I mean, again, there may be -- I know we're not

21   getting into the facts of that, but that's our impression of

22   what's happened up until this point at the other encampments

23   that were closed.

24           THE COURT:  So how much time do you think it would

25   realistically take to reach the people who want to be reached?

PROCEEDINGS

```
 1        I mean, there are some percentage of people in those

 2   encampments who -- if their only option -- number one, I'm sure

 3   there's some percentage of people in these encampments who

 4   simply cannot be reached.  Right?  Even if Permanent --

 5            MR. HOFFMAN:  Yeah.

 6            THE COURT:  -- Supportive Housing is offered to them.

 7        Then there's probably a higher percentage of people in the

 8   encampments who, if the only option is to go to temporary

 9   shelter, then the answer is going to be "No," no matter what.

10   And even if you try to convince them that the conditions are

11   not going to be like the horrible type of shelter that I've

12   been talking about, they're not going to do it.  So there's

13   some percentage of people who are simply not going to do it.

14   So that --

15        And there's another percentage of people who have already

16   done it.  Right?  Who have already agreed to go to, you know,

17   or are already being placed in shelters or in supportive

18   housing.

19        So then you are positing -- I don't know if this is true,

20   but you're positing that there's some sort of middle percentage

21   of people who haven't been adequately reached yet.

22        How long do you think is reasonable to --

23        You know, I'm assuming that you and Homeless Action! will

24   be working like dogs to get these people interacting with --

25            MR. HOFFMAN:  Yes.
```

```
 1              THE COURT:  -- County folks.

 2              MR. HOFFMAN:  Yeah.  We've heard from Homeless

 3   Action!  They said that they're willing to be involved even

 4   more; step up their efforts.

 5              THE COURT:  Right.  And so if that is actually true

 6   -- and, you know, there's no evidence of it.  But assuming it's

 7   true, how much time is appropriate?

 8              MR. HOFFMAN:  Whew!

 9              THE COURT:  I mean, we're not talking about --

10        Again, this is not Orange County.  We're not talking

11   about, like, a 500- or 1,000-person encampment.  Right?

12              MR. HOFFMAN:  No.  I understand.  There is that

13   difference.

14        You know, I just don't know.  That's the part of the

15   problem.  We've felt like the two or three weeks may not -- was

16   not enough time.  And I don't know if we would need to go in

17   increments, or if we could come back after a certain period.

18              THE COURT:  What do you mean, "increments"?  Like, a

19   certain number of people will be required to leave by

20   such-a-and-such a date?

21              MR. HOFFMAN:  Well, we report back.  And at some

22   point you reach a tipping point that enough is enough.  You've

23   got enough people, and if they're not coming out by this

24   point --

25              THE COURT:  Well, what do you think is reasonable?  I
```

1  mean, what -- you know, again, we're not talking about a lot of

2  people.

3          MR. HOFFMAN:  Yeah.

4          THE COURT:  We're talking about --

5          MR. HOFFMAN:  I just --

6          THE COURT:  A lot of efforts have been made, you

7  know, over the last 30 days or, you know, 30-plus days.

8  What -- I mean --

9          MR. HOFFMAN:  Ah, yeah.  I mean, I just feel that

10 what we're saying now is 60 people still have not been reached.

11 So that's about half.  It's hard to put a --

12         THE COURT:  Right, but we have testimony that the

13 Navigation Center was sitting there, empty, for large portions

14 of the time.  You know, I have to think that everybody was

15 aware of the ability to go talk to the folks in the Navigation

16 Center.  I mean, half the community or more was talking to

17 folks in the Navigation Center.  And sounds like it's a

18 community where people are communicating with one another.

19     I mean, I find it hard to believe that, like, nobody was

20 aware of the ability to go talk to folks at the Navigation

21 Center; yet we have testimony that the Navigation Center was

22 sitting there, unused, for a good portion of this 30 days.

23         MR. HOFFMAN:  Yes.  Well, I -- yes, I understand

24 that, Your Honor.  We have testimony that people -- there was

25 some mistrust even from Ms. Abramson; that people weren't sure;

1   didn't want to talk to people.

2       There may be time.  I mean, we don't have forever to build

3   trust, but a little more time to try to do that.

4       Ah, it's hard to put a -- I mean, I don't know if the

5   County can help us with that.  I guess they want everything

6   done right now.  I don't know.  Some thoughts?  I mean, I don't

7   have --

8           **THE COURT:**  It's very hard.  I mean, it's very hard

9   to -- it's very hard to conclude that in good faith you believe

10  that the encampments need to be closed, if you can't come up

11  with a good-faith estimate for how long it would take to

12  communicate with folks, with the understanding that some people

13  can't be reached.

14      I mean, there will be some people who refuse to go to any

15  kind of housing.  And there will be some --

16      Don't you agree with that?

17          **MR. HOFFMAN:**  Yeah.  Well --

18          **THE COURT:**  And don't you agree that there will be

19  some people who -- a larger number of people who'll refuse to

20  go to shelters, without really entertaining, you know, what the

21  shelter is going to be like in comparison to the Encampment?

22  Don't you agree with that?

23          **MR. HOFFMAN:**  Yeah.  No.  I mean, arguably that --

24          **THE COURT:**  Okay.  So we're never going to reach a

25  point where everyone is reached.  Right?  We're not going to

PROCEEDINGS

1  get to that point.

2       **MR. HOFFMAN:**  No.  And I -- I said that before; that

3  it wouldn't -- whatever we would be asking for would not be

4  that.  We don't need -- at some point, I said you reach a

5  tipping point where you just say, *Well, there are 10 more* -- or

6  15, or 20, or something.  And then that's -- that's enough.

7       What we feel like is we're not at that point yet.

8       And I don't know if it's a few months.

9       I mean, when I look and what happened to the plaintiffs,

10  it looked like it would -- for the ones who were not able to go

11  to the shelters, they're still waiting for options that might

12  be available.

13       **THE COURT:**  You know, I realize this is not

14  evidence --

15       **MR. HOFFMAN:**  Yeah.

16       **THE COURT:**  -- in this case, but have you read the

17  articles in the *Chronicle* by Heather Knight about the woman who

18  lived on the street in the Mission?  Older woman?  And

19  Supervisor Hillary Ronen was going to see her every week, and

20  begging her to get into housing.  And she died recently, and

21  she just never went.  She never went to one of the Navigation

22  Centers.  Have you read that?  There was a series of articles

23  about her.

24       **MR. HOFFMAN:**  No, I haven't.  I mean, I'm familiar

25  with that kind of situation, but I haven't really -- I hadn't

PROCEEDINGS

 1  read those articles.

 2          **THE COURT:**  And the question is, like, you know, how

 3  long do we have to wait before acting, you know, with folks

 4  like that?

 5      Your answer so far seems to be "Indefinitely."

 6          **MR. HOFFMAN:**  Well, no, no.  I'm not saying

 7  indefinite.

 8      And, you know, what we anticipated and what we would want

 9  was that there are going to be people that don't want to do

10  this.  If we can establish that, then I don't think they would

11  be entitled to any protection if they have options available to

12  them, but they're just choosing not to take them then.

13      But I don't know if we can say that that's everyone who's

14  left here.

15      So do you want to go ahead?

16          **MR. RAWSON:**  Do you want me to?

17          **MR. HOFFMAN:**  Sure.

18          **MR. RAWSON:**  May I, Your Honor?

19      Our goal is not to stop the camps from closing.  We

20  understand they have to be closed because that's proposed for

21  Affordable Housing, and that has to go forward; but what we

22  want to have happen, though, is that they be closed

23  constitutionally.

24      And at this point, without enough appropriate shelter --

25  and I think on the Record we don't see that there are enough

1  appropriate shelters right now.  There's been a promise that

2  there will be, but every single person who testified was not

3  provided with that when they went to the center.

4      The other thing we have to keep in mind is the Navigation

5  Center's closed now, and -- and that we heard from -- from the

6  witness.

7           **THE COURT:**  And how does that cut?

8           **MR. RAWSON:**  Well, how does it cut is that we heard

9  from -- from Ms. Abramson that -- that the -- that there would

10 not be removal of folks from the campsite unless they had an

11 assessment.  That was her promise on the -- on the TV today.

12     We have not heard that before from them.

13     We have heard what we've heard before.  People could get

14 an assessment, and they would be placed; but that the camp was

15 going to close, regardless; and certainly people would refuse

16 assessments.  What we heard from Ms. Abramson was that

17 everybody would be offered an assessment.

18     And with a population like this, if the population doesn't

19 go to the assessment, maybe the assessment needs to go to them.

20 And maybe there just needs to be more time for it.

21     In San Francisco, the Navigation Centers all over town --

22 they will not force people to move until someone has been

23 through an assessment.  And that's what we're looking for here.

24     Now, if someone is offered an assessment and they don't

25 take it, well, that's a different situation.  And maybe that

1  person has had their constitutional --

2          **THE COURT:**  How long do you think it should take --

3          **MR. RAWSON:**  Well, what if we --

4          **THE COURT:**  -- to offer the remaining 60 people an

5  assessment, assuming, for the sake of argument, that they

6  haven't been offered it yet?

7          **MR. RAWSON:**  What if we had 30 days, and then came

8  back here?

9      Thirty days isn't the kind of TRO you issued on Tuesday

10  that stopped everything.  It starts a process that has

11  standards that have to be applied.

12          **THE COURT:**  Okay.  Ms. De La Cruz.

13          **MS. DE LA CRUZ:**  Thank you, Your Honor.

14      As you mentioned, this is not your typical encampment

15  clearing.  The Community Development Commission, which is not

16  the County -- it's a separate statutory entity.  It is governed

17  by the same five Board of Supervisors, but they make up the

18  Board of Commissioners.  And it has a unique statutory mandate,

19  responsibility, staff, resources, expertise.  All of those

20  things were brought to bear in this process.

21      Before deciding to confront this issue of trespass of a

22  property owner, the Commission needed to take the important

23  step, even prior to putting itself in that place as a property

24  owner, to say first and foremost, *We, as the homeless-serving*

25  *agency in the County, need to enter into a thoughtful process*

1  *that weighed exactly the rights that plaintiffs raise as*

2  *concerns.*  Those are the same rights that we are concerned

3  about.  Those are the same rights that we weighed and insured

4  that we had sufficient housing available for everybody; ability

5  to accommodate people who needed accommodation; storage

6  available for people; and, whatever path they decided to take,

7  transport to those locations.

8      And we did that, also, based on our expertise and our

9  experience as providing wraparound services to people displaced

10  by the wildfires.  So we put into process all of these

11  different things we know because this is what we do every day.

12  And this is exactly what we did here when we moved to act in

13  our interests as a property owner at the same time that we

14  moved to act as the Homeless Servicing Agency for the County of

15  Sonoma.

16      Recent experiences have elevated the concerns of

17  plaintiffs.  They provide clear guidance to local agencies, in

18  terms of what steps they need to take before resolving health

19  and safety issues raised by encampments.

20      And the Commission did that.  They did that in a legally

21  justifiable way.  They did that in a way that was humane,

22  sensitive, and centered or serving people.

23      We've also shown that there is sufficient capacity in our

24  system to house all of the people at the encampments in

25  Roseland.  And the data presented here to you, Your Honor,

1   isn't within the context of the hours of time the Commission

2   staff spent with plaintiffs' counsel, explaining the ways in

3   which the HMIS system is not sufficient to capture all

4   available housing available throughout our system of care, and

5   to highlight the ways in which additional supplemental

6   information was provided to plaintiffs outside of the HMIS

7   system to make that showing, and to provide those assurances

8   about the multiplicity of housing options outside from

9   emergency shelter that is available to people who are camping

10   at the Roseland.

11       Your Honor has already, I think, discussed at length the

12   public interest balancing that needs to take place here.

13           **THE COURT:**  What do you think about their argument

14   that more time is needed to make sure that everyone we can get

15   to is gotten to?  Thirty days -- you know, with people who are

16   in, you know, the kind of condition that a lot of these folks

17   are in -- right? -- there's understandable fear.  There's

18   understandable mistrust.  There is -- there have been bad

19   experiences at shelters in the past.

20       Maybe 30 days of working hard is not enough to get

21   everybody who can be gotten.  What do you say to that?

22           **MS. DE LA CRUZ:**  Your Honor, we've been working hard

23   for over 30 days.  I last week asked plaintiffs' counsel.  They

24   raised specific concerns about disability accommodation for

25   specific of their clients; specific numbers of their clients.

PROCEEDINGS

```
 1        I said, Please give me those names, so that we can
 2   identify with particularity those people.  I can send out HOST
 3   team members to speak directly with those folks.  Please give
 4   me their names.  Let me know what their concerns are.  And
 5   we'll go do that.  We want to fix these concerns that you
 6   raised.  We want to share in the knowledge that you have of
 7   your clients, that we can house those people.  That's our job.
 8        I received no answer.  I received no names to share with
 9   the people that have been going hard for over 30 days in their
10   Navigation Center, and for the past three years in the HOST
11   program.  So I don't have right now --
12           THE COURT:  The past three years?  You mean the
13   efforts --
14           MS. DE LA CRUZ:  District team outreach with the HOST
15   people that popped up late 2014, early 2015.  So I think if
16   policy changed, if systems change, it's desired, but --
17   which -- it sounds like that's what plaintiffs' counsel is
18   getting at, is a model that allows for small sanctioned
19   encampments to be supported by the Community Development
20   Commission.  Then engagement is required.  And unfortunately,
21   we've spent more time and energy engaged in this process
22   instead of housing the folks who came up here to give
23   testimony, and instead of engaging with the people in the field
24   to get them housed.
25        And I'm sorry if I'm emotional or frustrated, but that was
```

1   hard for me, knowing that we've got folks in the field who are

2   working and wanting to how's these people.  And here we are,

3   trying to figure out how to get testimony out of these people,

4   instead of getting them housed.

5       So I don't think it's going to be more time that will get

6   people in places that are safer, healthier, more appropriate

7   for housing.  I think what is required is a commitment from

8   plaintiffs and their counsel to engage in the process.

9       Assessments will happen.  Assessments will happen in the

10  field.  Assessments will definitely happen if people walk

11  through the front door of the shelter.  Full assessments will

12  happen when people are able to walk through, see what is

13  possible, what's available, and engage in that process to

14  accommodate -- whether it's a documented disability, a

15  preference, a desire -- to stay with, you know, members of the

16  camp.  That's all in the Record.

17      We have the capacity in our system to do that.  The

18  shelter that we are -- the larger shelter that we are engaged

19  with in this process is, as you heard from Jenny Abramson, on

20  the cutting edge of making those changes possible.  We

21  recognize that people have had negative experiences in the

22  system in the past.  That's what we carry with us.  That's our

23  responsibility:  To make sure that people also have the ability

24  to trust and see something different.

25      And I think we've heard that today; that there is a

1  different system in place; that there are changes; that there

2  are recognition of what people have gone through in the past,

3  and that that's not acceptable anymore.  That's -- we don't

4  want to put people in a gym on 300 cots.  That's not a humane

5  way to treat people who are experiencing homelessness.  And

6  it's certainly not going to get them back into housing in way

7  that's faster.  Transitioning our whole system into a

8  housing-first model is where we are.

9        **THE COURT:**  Let me ask you this question -- or I'll

10  preface it with this statement.  And my statement is that I'm

11  somewhat skeptical of the assertion that Homeless Action! has

12  been helping you all assess people; get people assessed; and

13  doing a good job of encouraging people to get in to the system.

14  Okay?

15      Now, what if I got an ironclad commitment from Homeless

16  Action! and their counsel to engage 100 percent in trying to

17  get at those remaining 60 people, on pain of sanctions by a

18  Federal Court.

19      If they don't do an adequate job, or if they undermine it,

20  on pain of sanctions -- to work with you really hard for the

21  next 15 days, 30 days, whatever, to try to get at those

22  remaining 60 people.

23      How big a deal would it be to hold off on clearing the

24  Encampment for that short a period of time?  How big a deal

25  would it be to have a delay of that short a period of time, if

1   you got had that kind of commitment?

2        **MS. DE LA CRUZ:**  I think with some dedicated

3   resources and some people engaged in this effort with us, we

4   could do it in seven, Your Honor.

5        I think that we've got the people on the ground; the

6   resources available now.  And we need -- and I think what I've

7   heard from people that are at the encampment as having some

8   uncertainty about what the future looks like, and some ability

9   to understand when they've got to go.  That needs to be clear.

10  There needs to be a date.

11       **THE COURT:**  I agree with you that there needs to be a

12  date, but you know -- and there needs to be a commitment from

13  them.  And I'll say again, like, I'm not convinced that -- you

14  know, I'm not convinced that this really is their --

15  necessarily their primary mission in this case, so I don't know

16  if it's worth it.

17       But what's the harm?

18       I mean, you see who you're dealing with now.  Right?

19       What's the harm in giving -- given who you're dealing

20  with, what's the harm in giving it 21 more days, with a firm

21  commitment from them to help you get these people assessed?

22  Like, they'll bring them to you.

23       **MS. DE LA CRUZ:**  Well, we've got the HOST team out

24  there.  Are they accompanying the HOST team?  Here are some of

25  the concerns that I understand about understanding this

1  proposal.  It's been my experience with certain folks that

2  there are advocates.  I'm not sure that if they're Homeless

3  Action! advocates.  We also understood there's another

4  community organization out there called the "Community Action

5  Coalition":  CAC.  It wasn't clear to us that there was a

6  distinction between those two groups.

7      There are folks in the encampment who feel scared to go

8  against their advocates.

9      There are folks who don't want to do the assessment

10 standing next to somebody that they may not know or trust, even

11 if that person is called their "advocate."

12     The assessment system is designed in a way to protect

13 people's personal health information.

14         **THE COURT:**  So let me -- I mean, I hear what you're

15 saying, but the nature of the agreement would be something like

16 this.

17     We'll give you 21 more days to deliver these people to us.

18 We've been working really hard for years to try to reach these

19 people.  You say you think there is more time.  And you say

20 that you're committed to trying to get these people delivered

21 to us.  We'll give you 21 more days to deliver these people to

22 us.  And that is almost certainly all of the time you're going

23 to have.

24     How big of a deal would that be?

25         **MS. DE LA CRUZ:**  So what we know, Your Honor, is that

1  every person who has vacated the encampment to an alternative

2  housing location --

3       (Reporter requests clarification.)

4       **MS. DE LA CRUZ:**  I'm sorry.  I talk fast.

5       What we understand is that every person who has exited the

6  camp for alternative housing -- their tent has been filled with

7  a new person.  And so some certainty about, you know, the folks

8  who were actually in the Encampment on February 21st when that

9  notice was first distributed to everybody is who we -- who we

10  are able to target and kind of reach here.

11       There are a series of new people who see the Encampment as

12  an attractive location for them; that they are going to get an

13  increased amount of services.  That's not going to stop, you

14  know, the Encampment from continuing to grow.  It's not going

15  to provide, kind of, some certainty.  And this isn't an option

16  for you.  This isn't an appropriate place for people to live.

17       And so my concern about continuing to extend this date is

18  related to the way in which the community, as a whole, will

19  understand that ruling, and the ways in which we lack the

20  control to stop that population from continuing to come to this

21  camp.

22       We'd love do everything we can to clear those folks off

23  the Encampment.  More there received the notice.  And our

24  experience so far has been that every open tent is suddenly

25  another place for somebody new to come and try to live at the

1   Encampment; and that's not appropriate.

2          THE COURT:  Okay.  Oh, and my last question for you

3   is:  So I take it -- well, I have two more questions.  One is:

4   I take it you're not prepared to voluntarily agree to a 21-day

5   stand-down, or whatever?

6          MS. DE LA CRUZ:  I think probably the best way to say

7   that is I may not have the authority to do that right here now,

8   Your Honor, without checking with my client, and confirming our

9   ability, capacity, and resources to do that.

10          THE COURT:  Okay.  You want to get back us on that

11   tomorrow morning?

12          MS. DE LA CRUZ:  Absolutely.

13          THE COURT:  Why don't you get back to us on that

14   tomorrow morning by 10:00 a.m.?  And think about it.  I mean,

15   it may be a goofy idea.  Right?  It may well be something that

16   is not workable, for reasons that you understand better than I

17   do; but if you could, just file a letter brief by 10:00 a.m.

18   tomorrow.

19          MS. DE LA CRUZ:  Can you -- sorry.

20          THE COURT:  Sorry.

21          MS. DE LA CRUZ:  Can you give me clarity on kind of

22   what exactly you'd like me to take back to my client?  Is it 21

23   days?  Is it:  How many days would you be able to provide these

24   intensive services to the HOST team, without a Navigation

25   Center open?  What are kind of the terms here?

 1           THE COURT:  It would basically be --

 2      I mean, I hope I'm answering your question.  Feel free to

 3  tell me if I'm not adequately answering your question; but the

 4  upshot of it would be -- and, you know, the details -- you

 5  could fill in some of the details, but the upshot of it would

 6  be they are saying, *We need more time to reach these 60 people*.

 7           And so we are going to give them 21 days to deliver these

 8  people to us, and to sort of test their commitment to getting

 9  these -- delivering these people to us, so that we can get them

10  into --

11           You know, I mean, it's primarily going to be Samuel Jones.

12  Right?

13           That's sort of -- I mean, maybe that's sort of a

14  bare-bones proposal, but that's sort of what I'm thinking.

15           Do you have any -- is there any other sort of clarity you

16  need?  Can't guarantee you I can provide it, but --

17           MS. DE LA CRUZ:  I'm going to try.  So "to deliver

18  these people" equals "conduct an assessment"?

19           THE COURT:  Yeah.  For them to assist you in

20  conducting an assessment; or in other words, for them to, you

21  know --

22           MS. DE LA CRUZ:  To get them to the front door of

23  that portal of services?

24           THE COURT:  Yeah.  Yeah.

25           MS. DE LA CRUZ:  Okay.  That's clear, Your Honor.

 1   Thank you.

 2         **THE COURT:**  And so at a minimum, I'm going to extend

 3   the TRO for one day.  Right?  Until, you know --

 4       I assume there will be -- nothing will happen on the

 5   weekend?

 6         **MS. DE LA CRUZ:**  (Shakes head from side to side.)

 7         **THE COURT:**  So should I just extend it to, you

 8   know -- well, I'll extend it to Friday at 5:00 p.m. for now.

 9       And then the other question I had for you is -- and I

10   will -- you know, I will get a ruling out very quickly.  I

11   mean, I may need to give myself another very short extension,

12   but I'll get a ruling out quickly.

13       The other question I had for you is:  If I did decide to

14   deny the TRO application, like, how soon would the process

15   begin for clearing encampments?

16         **MS. DE LA CRUZ:**  So this is a multi-jurisdictional

17   kind of multiagency effort.  I know that what my client had the

18   ability to do is request an enforcement action from the

19   Santa Rosa Police Department, at which point we engaged in

20   some, again, multi-jurisdictional planning and negotiation

21   about how exactly that will be done, depending on staffing

22   levels.

23       And I think you've heard today in testimony that even

24   though there may be a day of -- like, the last day that

25   somebody's allowed to be in the camp, enforcement is a process

1  over a period of days.  My understanding on the underpass is

2  that it took about a week for SRPD to work with people to sort

3  through their stuff, figure out what they were taking, when

4  they were going to leave.  So I don't -- I don't have a kind of

5  a exact date for you as to when exactly that would happen.

6      What I can tell you is that essentially, whenever that end

7  of -- you know, whenever that date to vacate is, is when the

8  process starts; is when SRPD and the Community Development

9  Commission and the City sit down with our nonprofit partners

10 and figure out what resources we need to bring to bear to make

11 this happen in a way that fits our mission.

12      **THE COURT:**  So the upshot is you'll get together.

13 You'll figure out a date.  You'll give people notice of the

14 date.  And that -- it will take a little bit of time.  So if

15 there's a 21-day delay, then --

16      So, I mean, here.  Couple more thoughts about my

17 potentially goofy 21-day idea, which is:  You know, you could

18 structure it in a way that people would be notified that, you

19 know, the date is 21 days from now.  Right?  So you're not even

20 really talking about a 21-day delay, because there's already

21 going to -- I'm guessing it's going to take you -- even if the

22 TRO -- you know, if the TRO were denied tomorrow, I'm getting

23 it would take you at least a week, maybe more, to begin

24 clearing out the encampments.  So we're actually not talking

25 about that long of a delay.  That's number one.

PROCEEDINGS

1      The other thought I had is I assume that one benefit of

2   the delay is that Ms. Drake will be in Permanent Supportive

3   Housing by the time the clearing -- the process begins; and

4   she's not right now.   Right?

5           **MS. DE LA CRUZ:**  That is correct.

6           **THE COURT:**   Okay.   Because apparently, there are

7   three units coming vacant in April.   Right?   And so we'll be --

8   you know, on my proposal the clearing would, you know, absent

9   some remarkable revelation -- would begin, you know, 21 days

10  from now.   And Ms. Drake is comfortably in her unit.   Right?

11          **MS. DE LA CRUZ:**   On the ground we have a Thursday

12  meeting, which is kind of our tripartite CDC, nonprofit

13  partners, SRPD, City -- sorry.   That's definitely more than

14  three people -- planning meeting.   So Thursdays are typically

15  when we are able to kind of plan for next steps related to

16  whatever actions is to be taken by the parties during the

17  clearing of an encampment.   So I would imagine that by next

18  Friday we could have a plan to begin the process.

19      If the day -- the last day that people are allowed to be

20  at the camp would be next Monday, that would be -- kind of a

21  process would start on that Monday where folks would start

22  getting ready, going out with hosts, doing the, you know,

23  in-person assessments; assisting people to sort through their

24  stuff; store it.

25      So I don't know if 21 days is needed for us to be able to

PROCEEDINGS

1  plan.  Certainly, we feel like we have sufficiently complied

2  with notice requirements.

3         **THE COURT:**  But my only point was that if you agreed

4  to this 21-day period that I'm floating, it wouldn't actually

5  be a 21-day delay.  Right?  It sounds like, from what you're

6  saying, it would be an 11-day delay, or something like that.

7  Right?

8         **MS. DE LA CRUZ:**  Okay.

9         **THE COURT:**  Okay.  So why don't you let us know by

10  10:00 a.m. tomorrow?  And meanwhile, I'll go back and ponder

11  this further.  Thank you.

12         **MS. DE LA CRUZ:**  Thank you, Your Honor.

13         **THE CLERK:**  Court is adjourned.

14     (At 4:25 p.m. the proceedings were adjourned.)

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-entitled matter.

17

18  *Lydia Zinn*

19  _____  April 13, 2018
    Signature of Court Reporter/Transcriber   Date

20  Lydia Zinn

21

22

23

24

25