Jeffery Hoffman, SBN: 118768
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941; Fax: (707) 528-0125
Email:  jhoffmn@crla.org

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA  94612
Telephone: (510) 891-9794; Fax: (510) 891-9727
Email: mmorris@pilpca.org
        mrawson@pilpca.org

Alicia Roman, SBN:  260101
LAW OFFICE OF ALICIA ROMAN
719 Orchard Street
Santa Rosa, CA  95404
Telephone: (707) 526-4100; Fax: (707) 573-1094
Email: aliciaromanlaw@yahoo.com

Attorneys for Plaintiffs

Additional Counsel on last page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Deborah Drake, Samantha Jenkins, Nicholle Vannucci, Steven Robert Singleton, and Ellen Brown *individuals*; and Homeless Action!, *an unincorporated association*, <br> Plaintiffs, <br> v. <br><br> County of Sonoma, Sonoma County Community Development Commission, City of Santa Rosa, Does 1 to 10, <br><br> Defendants. | Case No.:  3:18-cv-01955-VC <br><br> **VERIFIED AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      Plaintiffs, five homeless individuals living in an encampment at the Roseland site in Santa Rosa, California, and a local unincorporated association providing advocacy on behalf of, and assistance to, persons who are homeless in Sonoma County California, brought this action to enjoin the scheduled enforcement of the closure of the encampment ("Roseland Village") on April 3, 2018, as well as the enforcement of Defendants' anti-camping and related ordinances which effectively punish them due to their status as homeless persons.

2.      Sonoma County has a severe shortage of affordable housing, a shortage that was exacerbated by the October 2017 wildfires that destroyed a significant percentage of the County's housing stock.

3.      Related to the shortage of affordable housing, the County has a large homeless population, and a disproportionately large number of the County's homeless residents are living with physical disabilities, mental health disabilities, or both.

4.      While the County has a variety of homeless shelters and services, which are accessed through a County-wide Coordinated Entry System to place homeless individuals in temporary and longer-term housing, there are insufficient shelter beds to adequately shelter the County's entire homeless population.

5.      Additionally, many of the shelter options that exist in the County are inappropriate and inaccessible to certain individuals with disabilities, including people with post-traumatic stress disorder or other mental health disabilities, whose disability symptoms are triggered and exacerbated by being in large, crowded settings where they lack control over their physical environment.

6.      Thus, Sonoma County residents who have no other option but to live outside have, formed encampments of various sizes throughout the County, including two encampments at the Roseland site in Santa Rosa.

7.      In the past year, the City has been systematically closing the homeless encampments in its jurisdiction, causing the illegal confiscation and destruction of personal property and the shifting of persons from one encampment to another.

8.      As of March 30, 2018, the date of filing, approximately 120 people lived at the Roseland Encampments; many had moved there after being displaced from other encampments throughout Santa Rosa and the County by law enforcement.

9.      The Sonoma County Community Development Commission (CDC) is a County entity and the successor agency of the former redevelopment agency of the County; CDC is trustee of the Roseland site.

10.     CDC posted a Notice to Vacate the site with a stated expiration of April 3, 2018.

11.     CDC made efforts to refer Roseland Encampments residents to local homeless shelters, but CDC's system of referral and placement does not adequately assess or respond to the disability-related needs of many encampment residents.

12.     The shelter placements offered by Defendants as alternatives to living in an encampment are not appropriate for many of the Roseland Encampments residents.

13.     Without adequate, viable shelter alternatives, the sweep of the encampments violates residents' constitutional and statutory civil rights.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132 and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

15.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

16.     Venue is proper in the Northern District of California because the events and conduct complained of herein all occurred in Sonoma County.

**PLAINTIFFS**

17.    Plaintiffs Deborah Drake, Samantha Jenkins, Nicholle Vannucci, Steven Robert Singleton, and Ellen Brown are former residents of the now closed Roseland Encampments, homeless encampments located on the Roseland site located within the City of Santa Rosa.  As of March 30, 2018, Ms. Drake, Ms. Jenkins, Ms. Vannucci, Mr. Singleton, and Ms. Brown were homeless in Santa Rosa, California, living at the Roseland Encampments.

18.    Ms. Drake's, Ms. Jenkins's, Ms. Vannucci's, Mr. Singleton's, and Ms. Brown's interest in Defendants' sweep of the Roseland Encampments, enforcement of the City of Santa Rosa's Anti-Camping Ordinance, and administration of the Sonoma County Coordinated Entry System extends beyond a personal interest in their own housing, safety, and wellbeing; they have a beneficial interest in ensuring that the constitutional and statutory rights of other Roseland Encampments residents, who are their friends and their community, are also protected.

19.    Plaintiff HOMELESS ACTION! (hereinafter HA), an unincorporated association, is a group of grassroots activists in Northern California working towards ending the suffering of people who do not have a home. HA works with and for homeless people in Sonoma County.

20.    The members of HA include students, church members, people who are homeless or have been homeless, and concerned individuals working to obtain housing and better conditions for people without homes.  HA has helped create the safe parking program, held events, protests, and marches, educated the public, done emergency response work, lobbied county and city official, and published articles in local papers.

21.    HA is beneficially interested in ensuring that Defendants' treatment of homeless individuals and administration of the Coordinated Entry System are consistent with Defendants' obligations under state and federal law.

## DEFENDANTS

22.     Defendant CDC is in part an agency of Sonoma County and is also the independent successor agency to the County's redevelopment agency.  It is a government entity with the capacity to sue and be sued.

23.     The CDC "houses the Sonoma County Housing Authority and administers all affordable housing finance programs for the unincorporated County of Sonoma. The Commission also hosts and staffs the Sonoma County Continuum of Care and is the largest funder of homeless services county-wide," including the administration of federal housing funds.

24.     CDC, together with its contract agencies, including Catholic Charities, is responsible for administering the County's Coordinated Entry System, a Countywide, multi-agency centralized intake system for individuals experiencing homelessness whose purpose is increasing "the efficiency of local crisis response systems and improving fairness and ease of access to resources, including mainstream resources."  Coordinated Entry is the system by which homeless individuals access the County's shelter system and other services, including housing placement.

25.     CDC holds the Roseland site in trust pursuant to the California Dissolution Law that dissolved California redevelopment agencies and placed much of the real property owned by the agencies in the Community Redevelopment Property Trust Fund administered by the successor agency to the former redevelopment agency.  (California Health & Safety Code § 34191.4.)

26.     CDC posted the Notice to Vacate the Roseland Encampment site.

27.     CDC requested that the police department of Defendant City of Santa Rosa remove the Roseland Encampments' residents and their belongings from the Roseland site if those residents have not vacated by April 3, 2018.

28.     CDC, its employees and agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful

conduct and harm suffered or that will be suffered by the Plaintiffs.  The acts complained of herein constitute policies, practices and customs of the CDC.

29.     Defendant Sonoma County (County) is a government entity organized under the laws of the State of California with the capacity to sue and be sued.  It is the larger government entity affiliated with Defendant CDC.

30.     Defendant City of Santa Rosa (hereinafter City) is a municipal corporation organized under the laws of the state of California and the Santa Rosa City Charter, with the capacity to sue and be sued.  The Departments of the City include the Department of Housing and Community Services and the Police Department.

31.     The Santa Rosa Police Department, together with CDC staff and contractors, was the agency responsible for performing the eviction of the Roseland Encampments.

32.     Defendant City of Santa Rosa is a recipient of federal funds, including Community Development Block Grant Funds.

33.     Defendant City of Santa Rosa participates in the Sonoma County Continuum of Care and has a representative on the Continuum of Care board.  The City, the CDC and the City of Petaluma, the three HUD entitlement jurisdictions in Sonoma County, jointly fund the Continuum of Care and have designated seats on its governing body.

34.     The City, its employees, and its agents participated in the unlawful conduct challenged herein.  To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs.  The acts complained of herein constitute policies, practices and customs of the City.

## STATEMENT OF FACTS[1]

**Homelessness in Sonoma County**

35.     In recent years, the problem of homelessness in Sonoma County, as in many parts of the state and the country, has become more visible and has reached crisis proportions. The 2014 update to the 10-Year Homeless Action Plan for the County of Sonoma states that the regional rate of homelessness for Sonoma County is almost four times the national rate.[2]  As the problem has become more acute and visible, the City and County have taken more restrictive actions to enforce their anti-camping and related ordinances.[3]

36.     According to the 2014 update to the County's 10-Year Homeless Action Plan, there are shelter beds and housing available for fewer than 1 in 4 homeless persons.[4]

37.     On August 9, 2016, the Santa Rosa City Council declared that "there exists within the territorial limits of the City of Santa Rosa conditions of extreme peril to the safety of persons and property caused by homelessness and the lack of available affordable housing, which conditions are likely to be beyond the control of the services, personnel, equipment and facilities of the City and require the combined forces of other political

---

[1] The facts alleged in this section occurred prior to the filing of this action but do not include facts that occurred after March 30, 2018.  The sweep of the Roseland Encampments occurred on April 19, 2018, after the filing of the initial Complaint. Plaintiffs anticipate filing a motion in accordance with Rule 15(d), Fed. Rules Civ. Proc., seeking leave of the Court to file supplemental pleadings that will allege post-filing facts.

[2] Sonoma County Continuum of Care 10- Year Homeless Action Plan 2014 Plan Update (pg. 7) http://www.sonoma-county.org/cdc/pdf/cofctenyearactionplan.pdf.

[3] Santa Rosa Press Democrat Article- August 9, 2017-Santa Rosa to take stronger stance on nuisance crimes associated with homeless population, https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=newssearch&cd=1&cad=rja&uact=8&ved=0ahUKEwidp9ylk5LaAhUUH2MKHevGBkwQqQIIJigAMAA&url=http%3A%2F%2Fwww.pressdemocrat.com%2Fnews%2F7283835-181%2Fsanta-rosa-to-take-stronger&usg=AOvVaw3ZIRMuvj1-JcDJyqluGRj9.

[4] Sonoma County Continuum of Care 10- Year Homeless Action Plan 2014 Plan Update (pg. 2), http://www.sonoma-county.org/cdc/pdf/cofctenyearactionplan.pdf.

1    subdivisions to combat."  Based on that declaration, the City proclaimed "a state of local

2    homeless emergency within the City of Santa Rosa."

3    38.    The emergency declaration further states that "a significant number of persons

4    within the jurisdiction of Santa Rosa are without the ability to obtain shelter, and that the

5    situation has resulted in a threat to the health and safety of those persons."  In its

6    declaration, the City acknowledged that, "there is a shortage of available and affordable

7    housing units in Santa Rosa due to the very low rental vacancy rate (approximately one

8    percent) . . . ."[5]

9    39.    In its declaration, the City noted that, pursuant to Sonoma County's 2016 point-in-

10   time homeless count, on a given night there were 2,906 homeless persons in the County,

11   66% of whom were unsheltered.[6]  Of that count, 63 percent of the total homeless persons

12   were in the central area of the City, including its unincorporated areas, and 65 percent of

13   those the homeless persons within the City were unsheltered.[7]

14   40.    The City has continued to extend its declaration of a homeless emergency to the

15   present date.

16   41.    The 2017 Sonoma County Homeless Point-In-Time Census & Survey, conducted

17   in January 2017, identified 2,835 homeless individuals living in Sonoma County.  Of

18   those, 1847—65 percent—were unsheltered.[8]

19   42.    People with disabilities are disproportionately homeless in Sonoma County, and

20   homeless individuals with disabilities are more likely to live outside than to be sheltered.

---

21
22   [5] City of Santa Rosa Resolution Number 28838 – http://santa-rosa.granicus.com/DocumentViewer.php?file=santa-rosa_cc41ae53c890fc32b88b1234997568c6.pdf&view=1

23
24   [6] 2016 Sonoma County Homeless Point-In-Time Census & Survey Comprehensive Report (pg.16)  http://www.sonoma-county.org/cdc/pdf/2016_Sonoma_County_Homeless_Point-In-Time_Survey_Census.pdf

25
26   [7] 2016 Sonoma County Homeless Point-In-Time Census & Survey Comprehensive Report (pg.17).

27   [8] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.13)  https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/

28

Per the County's 2017 Homeless Point-In Time Census, 41 percent of the homeless individuals surveyed identified as having a physical or mental disability.[9]  Moreover, according to the County's Homeless Action Plan, the population of "disabled single adults . . . living outside" is "five times the sheltered population."

43.     Sonoma County's high rate of homelessness is directly related to the absence of sufficient affordable housing in the community.  According to the National Low Income Housing Coalition's 2017 "Out of Reach" report on housing affordability, a renter in Sonoma County needs to earn nearly $63,000 annually, over $30 an hour, to afford the average two-bedroom rent of $1572.[10]  Also in 2017, the California Housing Partnership reported that "[m]edian rent in Sonoma County has increased 16% since 2000 while median renter household income decreased 6%, when adjusted for inflation."[11])]

44.     Seventy-one percent of homeless people surveyed during the 2017 Homeless Point-In Time Census "cited affordable rent as the primary obstacle to obtaining permanent housing."[12]

45.     The above estimates regarding housing affordability and homelessness in Sonoma County predate the October 2017 wildfires, which destroyed 6,600 structures, including 5,130 homes, countywide.  These fires displaced thousands of Sonoma County residents from their homes, and the median rent in Sonoma County rose 36 percent in a weeklong period following the fires, according to online real estate site Zillow.[13]

---

[9] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.43).

[10] 2017 Out of Reach The High Cost of Housing-National Low Income Housing Coalition (pg.39) http://nlihc.org/sites/default/files/oor/OOR_2017.pdf

[11] May 2017 Sonoma County Renters In Crisis: Call for Action (pg. 1) https://1p08d91kd0c03rlxhmhtydpr-wpengine.netdna-ssl.com/wp-content/uploads/2017/05/Sonoma-County-2017.pdf

[12] 2017 Sonoma County Homeless Census & Survey Comprehensive Report (pg.60).
[13] Santa Rosa Press Democrat Article- October 24, 2017 *Rents rise after Sonoma County fires as luxury vacation homes come on the market* http://www.pressdemocrat.com/business/7559748-181/rents-rise-after-sonoma-county

**The County's Lack of Available Shelter**

46.     Sonoma County lacks sufficient accessible, appropriate shelter options to meet the needs of its approximately 3,000 homeless residents.

47.     In the Sonoma County Continuum of Care's 2017 report to the federal Department of Housing and Urban Development (HUD) it reported the existence of 936 total year-round beds for "emergency, transitional, and safe-haven" shelter, less than a third of the total number of homeless individuals identified in 2017's point-time-census.

48.     The dearth of shelter to meet the community's need is longstanding, and local policymakers have acknowledged that the County's shelter system lacks sufficient capacity to accommodate residents of the Roseland Encampments.

49.     During a November 14, 2017, City Council meeting, Santa Rosa City Councilmember Julie Combs acknowledged that there were only 20 shelter beds available to house the unsheltered residents of the City and that there were more than 70 people at the Roseland Encampments.

50.     Weeks later, on December 5, 2017, Sonoma County Board of Supervisors Chairperson Shirley Zane during the Board's regular open meeting confirmed CDC Director Margaret Van Vliet's statement that there were only 20 shelter beds currently available at Samuel Jones Hall, the largest shelter in the County, and that number incorporated the winter shelter beds, which are not available year-round.

51.     Supervisor Lynda Hopkins during that same meeting acknowledged that shelter beds are not adequate for some people who live at the Roseland Encampments, citing pets and mental health disabilities among the reasons why some encampment residents might not be able to access shelters.[14]

---

[14] Sonoma County Board of Supervisors meeting of December 5, 2017, Agenda item number 40. Starting at 3:41:27 regarding confirming 20 shelter beds and starting at 3:47:00 regarding Hopkins acknowledgement of disabilities of folks.  http://sonoma-county.granicus.com/MediaPlayer.php?view_id=&clip_id=750&meta_id=233791

52.     According to the County's shelter and other unit data as of March 1, 2018, the available shelter and alternative housing units available were:  a) zero family shelter vacancies with 37 families in need of family shelters; 6 transitional housing units for single persons; c) 90 emergency shelter beds; 2 mental health units; 2 non-coordinated entry spaces; 10 respite units; zero units for veterans; 12 units for teens/former foster youth.

| **Unsheltered** | Emerg. Shelter Beds | Family Shelter Rooms | Transitional Housing for Singles | Mental Health Units | Non-Coord Entry | Respite Units | Units for Vets | **Total Avail-able** |
|---|---|---|---|---|---|---|---|---|
| **1847** | 90 | 0 | 6 | 2 | 2 | 10 | 0 | **110** |

53.     Further, on information and belief, the majority of the County's approximately 200 winter shelter beds closed on March 30, 2018, and that the remainder of the winter shelter beds were scheduled to close on April 30, 2018, adding to the population of homeless persons in need of shelter.

**Sonoma County's Coordinated Entry System and Its Inaccessibility to People with Disabilities**

54.     Sonoma County's Coordinated Entry System includes intake, assessment, and placement for homeless individuals.  The primary assessment tool is the VI-SPDAT (Vulnerability Index - Service Prioritization Decision Assistance Tool) a survey of standardized questions that is designed to be administered in 7 minutes or less and, upon completion, can be used to generate a numerical score that is intended to reflect a particular individual's level of "vulnerability".

55.     The Coordinated Entry System uses the VI-SPDAT to determine whether an individual will be placed on the waitlist for emergency shelter and/or transitional housing, for rapid rehousing services, or for permanent supportive housing.

56.     The Coordinated Entry System provides for individuals to be referred directly to emergency shelter or other stabilization services while they await longer-term placement.

57.     However, while the VI-SPDAT includes questions about disability, the Sonoma County's Coordinated Entry assessment process is not designed to identify, evaluate, or

-11-

accommodate individuals' disability-related needs with respect to emergency shelter placement.

58.     CDC and its contract agencies have a policy and practice of referring unsheltered homeless individuals to emergency shelters, primarily Samuel Jones Hall in Santa Rosa, without inquiring as to whether individuals have disability-related symptoms or impairments that would make such a referral inappropriate for them.

59.     According to the Continuum of Care's 2017 report to HUD, Samuel Jones Hall is a 170-bed co-ed homeless emergency shelter for individual adults operated by Catholic Charities in Santa Rosa.  Samuel Jones Hall is a project of the City of Santa Rosa, the County of Sonoma, and the Community Foundation Sonoma County and is the largest full service shelter in northern California for individuals or couples without children.  Samuel Jones Hall consists of two co-ed dormitories, two women-only dormitories, and two men-only dormitories.  Except for some "Nightingale" beds that are set aside for individuals referred by local hospitals, nearly all the beds at Samuel Jones Hall are bunk beds. On information and belief, as of March 30, 2018, Samuel Jones Hall did not have a means of erecting individualized partitions between residents; and it had not established any other method for accommodating individuals who, for disability-related reasons, need to have a private space that is physically separate from other residents and staff.

60.     CDC and its contract agencies categorize many individuals who do not accept placement at Samuel Jones Hall as "rejecting placement" or "not cooperating with placement", regardless of whether those individuals have disabilities that make Samuel Jones Hall, and other large, crowded shelters inaccessible to them.

61.     Individuals who have experienced severe or sustained trauma often have flashbacks, panic attacks, or other mental health symptoms triggered by crowded, loud environments.  Similarly, many individuals who are homeless have agoraphobia, anxiety, or certain other mental health impairments that make staying at shelters like Samuel Jones Hall impossible for them.

62.     There is a strong correlation among trauma, the lifelong effects of trauma, disability, and homelessness.  According to one study, 92% of homeless women surveyed experienced severe physical and / or sexual assault at some point in their lives—60% of whom experienced the assault by the age of 12.  This childhood trauma often contributes to their experience of mental health disabilities, and causes severe mental health symptoms throughout their lives.[15]

63.     Plaintiff Nicholle Vannucci and several other former residents of the Roseland Encampments, have experienced sexual assault or other traumas at shelters in the past; staying at—or even visiting—a shelter can cause them to experience that trauma again.

64.     As such, while a shelter like Samuel Jones Hall may be a viable temporary shelter option for some homeless individuals, it is not accessible for many individuals who have certain physical or mental health disablists.

65.     The Sonoma County Continuum of Care Coordinated Entry Policies and Procedures references participating agencies' duty to provide reasonable accommodations to individuals with disabilities, but only with respect to communication "such as assisted listening devices, etc."

66.     CDC and its contract agencies are aware that many homeless individuals, including individuals living in encampments like the Roseland Encampments, have severe mental health disabilities, and that that many of mental health impairments are initially "invisible." They are also aware that many homeless individuals have developed distrust of CDC, its contract agencies, and homeless-serving systems in general based on their experience of interacting with these systems over years—and sometimes decades—of homelessness.

---

[15] A. Browne, SS. Bassuk, Intimate Violence in the Lives of Homeless and Poor Housed Women: Prevalence and Patterns in an Ethnically Diverse Sample, Am. J. Orthopsychiatry 67(2): 261–278 (1997); Health Care for the Homeless Clinicians' Network, National Health Care for the Homeless Council, Trauma and Homelessness at 1 (1999).

67.     Nevertheless, CDC does not have a policy or practice of advising people with disabilities participating in Coordinated Entry of their right to reasonable accommodations in its policies or procedures, including policies and procedures with respect to placement.

68.     Rather, the current Coordinated Entry System requires individuals to accept a shelter placement, without knowing whether it will be appropriate for them, prior to evaluating the individual's need for a reasonable accommodation.  In the placement process, the burden is generally on the individual to request an accommodation only after accepting a placement in a shelter, without assurance that the shelter will accommodate the individual's disability-related needs.

69.     As such, CDC and its contract agencies actually or effectively deny adequate, appropriate shelter placements to many individuals with disabilities living in encampments who go through the Coordinated Entry intake process on the basis of those individuals' disabilities.

**Defendants' Response to Homelessness and Forcible Removal of Homeless Encampments**

70.     Thirteen percent of Sonoma County's homeless population lives in encampments throughout the County.[16]  In 2017, Defendant City of Santa Rosa estimated that it had 44 homeless encampments of sizes varying from 2 to 75 persons within its City limits.[17]

71.     In October 2016, the City approved a Community Homeless Assistance Program (CHAP), an extension of a previous pilot program that had existed during the winter of 2015-2016.  CHAP allows private "property owners to use their properties or facilities for safe parking, safe camping, the placement and maintenance of portable toilets and access

---

[16] 2017 Sonoma County Homeless Census and Survey Comprehensive Report (pg.13) https://sonomacounty.ca.gov/CDC/News/2017-Homeless-Census-and-Survey/ (last accessed Mar. 27, 2018).

[17] City of Santa Rosa Homeless Encampment Cleanup Pilot Program Frequently Asked Questions https://srcity.org/DocumentCenter/View/16346

to existing bathroom facilities, provision of temporary overnight shelter, and storage for personal belongings."[18]

72.     However, CHAP has generated very few, if any, alternative shelter arrangements. One church had attempted to secure approval to install campsites or small huts for up to 20 persons on its property, but the proposal was ultimately abandoned following intense opposition to the proposal from the church's neighbors.

73.     Since its declaration of a homeless emergency in 2016, the City has made approximately 50 to 75 new shelter beds available.  However, the addition of these beds is far short of what is necessary to meet the community's need.

74.     At the same time, Defendants have failed to provide adequate appropriate shelter to their homeless residents, they have increased enforcement against homeless encampments, particularly within the City of Santa Rosa.

75.     The City of Santa Rosa has an "Anti-Camping Ordinance," which makes it illegal to camp on public property, or to camp on private property without the permission of the property owner.

76.     The City's anti-camping ordinance provides as follows:

Chapter 11-22 CAMPING ON PUBLIC STREETS AND PUBLIC PROPERTY
11-22.010 Definitions.

For purposes of this chapter, the following definitions shall apply:

(A) "Camp" means to place, pitch or occupy camp facilities:  to live temporarily in a camp facility or outdoors; to use camp paraphernalia.

(B) "Camp facilities" include, but are not limited to, tents, huts, vehicles, vehicle camping outfits, or temporary shelters.

---

[18] Press Release, Santa Rosa Approves Community Homeless Assistance Program (CHAP) (Oct. 12, 2016), https://srcity.org/DocumentCenter/View/4145.

(C) "Camp paraphernalia" includes, but is not limited to, bedrolls, tarpaulins, cots, beds, sleeping bags, hammocks or cooking facilities and similar equipment.

11-22.020 Camping on public streets and public property.

It is unlawful for any person to camp, occupy camping facilities, or use camp paraphernalia in any public park, or on any public street or any other public property.

11-22.030 Camping on private property.

It is unlawful for any person to camp on any private property without first obtaining written permission of the owner.

77.     In September 2013, the City amended its anti-camping ordinance to broaden the circumstances under which it would illegal to camp in the City.  The City broadened the definition of camp facilities under the ordinance, and eliminated its discretion to allow for public camping.  The ordinance prohibits all forms of camping, including sleeping in vehicles.  The ordinance also prohibits camping on private property.

78.     On information and belief, in the past two years the City has increased its enforcement of the ordinance and related local "quality of life" laws, using these laws to cite and displace homeless individuals living outside in public places or in view of the public.  Plaintiffs are aware of homeless individuals receiving citations for alleged violations of:  City Code Section 10-12.020:  Obstructing tunnel, overpass by loitering; 10-12.030:  Obstructing tunnel or overpass by sitting or lying on a street or sidewalk; 10-08.010:  Public Excretion; and 9-12.050:  Littering.

79.     The County of Sonoma also has an "anti-camping ordinance which makes it illegal to camp on public property or to camp on private property without the permission of the property owner.

80.     The County's anti-camping ordinance provides as follows:

Sec. 19-15. – Camping prohibited on public property, etc.

(a) Definition of "Camping.",  For the purposes of this section, the term "camping" means residing in the outdoors for living accommodation purposes, including sleeping or making preparations to sleep (such as laying down bedding for the purpose of sleeping), storing personal belongings (including but not limited to closing, sleeping bags, bedrolls, blankets, luggage, backpacks, kitchen utensils, cookware and similar items), cooking or consuming meals, pitching a tent or other temporary shelter; includes the verb to "camp".

(b) Camping on Public Property Prohibited.  It shall be unlawful for any person or persons to camp in any public park, on any public street or on any other public property, except in a designated public campground or by authority of a written permit issued by the county.

(c) Camping on Private Property Prohibited Absent Owner Permission.  It shall be unlawful for any person or persons to camp on any private property without first obtaining the written permission of the owner or other person(s) in lawful possession of the property.

(d)  Exceptions.  Notwithstanding the prohibition against camping on public or private property, it is not the intent of this section to prohibit persons, when necessary for their safety or the safety of others, to pull off the public road and sleep, whether inside or outside their vehicles.

(e) Penalty for Violation.  Any person who violates this section is guilty of a misdemeanor.  Except where other penalties are specified, each offense may be punished by a fine of not less than one hundred dollars ($100.00) nor more than five hundred dollars ($500.00), or by the imprisonment in the county jail not to exceed sixty (60) days, or by both such fine and imprisonment.

81.     In February 2014, the County amended its anti-camping ordinance to broaden the definition of unlawful camping to include "residing in the outdoors for living accommodation purposes" and the storing of personal belongings.

82.     While there are legal campgrounds within Sonoma County, all of these charge a daily fee, and many are located far away from the City of Santa Rosa, businesses, and social services and are therefore not accessible to homeless persons who lack reliable transportation.  Additionally, most legal campgrounds, including campgrounds at state and county parks, impose limitations on how long campers may stay. As such, the only viable camping option for most homeless people who lack shelter is to camp in "unsanctioned" encampments on public or private land.

83.     In July 11, 2017, the City approved the "Homeless Encampment Assistance Pilot Program" (HEAPP).  HEAPP's stated purpose is, in part, "mitigating the impacts to the surrounding community" of the various encampments and "addressing the health, safety and shelter needs" of the encampment residents.  The program utilizes the Homeless Outreach Services Team (HOST) funded by the City and County, which includes a street outreach team working to engage unsheltered homeless into services and housing.  However, the effect of HEAPP has been the City's more aggressive enforcement of its anti-camping and related ordinances, and the forcible displacement of homeless encampments and their residents.

84.     The first encampment targeted by HEAPP was the encampment located at the "Farmers Lane Extension" (aka "Homeless Hill"), which had been at that site for many years.  The Farmers Lane Extension encampment had grown to 50 people as of the summer of 2017.

85.     The residents of the Famers Lane Extension encampment had begun receiving notices to vacate their encampment starting at the end of June 2017.

86.     On July 10, 2017, City staff held a community meeting with the residents of the Farmers Lane Extension encampment in which residents were notified of the pending closure of the encampment and the services available through the Homeless Outreach

Services Team (HOST) staffed by Catholic Charities.  A few days later, the residents of the encampment received a notice to vacate the encampment set to expire on or about August 13, 2017.

87.     On or about August 13, 2017, the City, through its Police Department, forcibly cleared the Farmers Lane Extension Encampment.  Many of the residents there were unable to remove their personal belongings prior to leaving the premises.  Plaintiffs are informed and believe and thereon allege that, when closing the Farmers Lane Extension, and without a notice and an opportunity for a hearing nor related process, the Santa Rosa Police Department made a general determination that all the personal property left behind by the residents of the encampment was deemed a health and safety risk, regardless of the nature of the property.[19]  A subcontractor was hired to destroy all the property left behind.

88.     While the City created new shelter beds (some of the same described in paragraph73) and placed approximately 28 individuals who had been forced out of the Farmers Lane Extension Encampment in shelters, many people from the Farmers Lane Extension instead moved to existing encampments at a Highway 101 underpass in Santa Rosa.  On information and belief, the encampments under Highway 101 underpasses grew significantly in 2017; that growth occurred in part because of Defendants' sweeps of other encampments, and in part due to the October 2017 wildfires.

89.     The residents of the Highway 101 Underpass encampments received several written Notices to Vacate Illegal Campsite during the course of 2017.  These Notices indicated personal property deemed a health and safety risk would be destroyed and that remaining property would be stored for 90 days during which time it could be retrieved.  According to the notices, if the property was not retrieved it would be deemed abandoned and would be disposed of pursuant to California Civil Code sections. 2080 et. seq.  Due to

---

[19] Cleanup at Homeless Hill in Santa Rosa- August 15, 2017-Santa Rosa Press Democrat YouTube Video
https://www.youtube.com/watch?v=EAV_NN0NMzU

1    the different notices provided, the Residents at the encampment were not sure when the
2    actual date of closure would be.

3    90.    Under HEAPP, the City forcibly cleared the 101 Underpass encampments on or
4    about November 15, 2017.   Plaintiffs and other residents of these encampments were not
5    able to arrange to move all of their possessions at the time they vacated the area.  Plaintiffs
6    are informed and believe and thereon allege that the Santa Rosa Police made a general
7    determination that all personal property left behind by the encampment residents was a
8    health and safety risk, regardless of the nature of the property, after which point the
9    property was confiscated and immediately destroyed. The City did not provide the
10   residents with further notice, nor opportunity to be heard, before seizing and destroying
11   their personal property.

12   91.    While the City provided placements for some of the Highway 101 Underpass
13   residents when it swept their encampments, many of the residents relocated to other
14   encampment locations, including the Roseland Encampments, discussed below.

15   **The Roseland Encampments**

16   92.    The two encampments at "Roseland" site, located at 665 to 883 Sebastopol Road,
17   in Santa Rosa, were among the largest encampments in the County at the time of filing.
18   Over 100 people, including the individual the Plaintiffs in this matter, lived at the
19   Roseland site, in two encampments (the Roseland Encampments).

20   93.    The Roseland site is held by Defendant CDC, and is located Santa Rosa.  The City
21   annexed the site on November 1, 2017.

22   94.    Other businesses and structures occupy the Roseland site, including a Dollar Tree
23   retail store.

24   95.    The first Roseland encampment located at the Roseland site in November 2015,
25   when approximately 20 people moved to the Roseland site from another encampment
26   within the Santa Rosa city limits.

27

28

96.     CDC indicated in early 2016 that it would assist the encampment residents in locating a more suitable location for their encampment.[20]  In the two-plus years that have passed since the Roseland Encampments began, the CDC provided fencing, porta-toilets and water to residents there, and other community members have also donated fencing and porta-potties. The CDC also allowed a security team to patrol the area.

97.     On February 21, 2017, the County approved an extension of the lease for the Dollar Tree store located adjacent to the Roseland Encampments, which would allow the business to continue until July 2018.   In addition, the County also authorized the CDC to approve an additional extension of the lease, if warranted, for up to 12 months.

98.     A second encampment formed at the location in November 2017 after the eviction of the Highway 101 Underpass encampments, and others have relocated to Roseland following the closure of other, smaller encampments throughout the City.  When the residents of other encampments asked the police where they were supposed to go when their encampments were swept, the police told some to go to the Roseland Encampments.

99.     At least 10 individuals sought shelter at the Roseland Encampments after losing their housing in the North Bay Wildfires in October 2017.

100.    As with the homeless population more broadly, Roseland Encampments residents were disproportionately living with disabilities relative to the general population.

101.    As of the date of filing, the CDC had not located or proposed an alternative spot for the residents of the Roseland Encampments to go, as it had promised in 2015.

102.    In the report to the Board of Supervisors on December 5, 2017, the CDC indicated there were insufficient shelter or housing resources available to assist all of the persons at the Roseland area encampments.  At that December 5, 2017, meeting, the CDC also cited the need to begin remediation work at the Roseland Encampment site as part of a pending development plan that commendably would include affordable housing.  CDC reported

---

[20] *See* Santa Rosa Press Democrat Article—Feb. 14, 2016—Homeless activists ask county to sanction Roseland camp (available at http://www.pressdemocrat.com/news/5205093-181/homeless-activists-ask-county-to).

1    that this remediation work could continue with the ongoing businesses at the site, but the

2    remaining areas of the site would need to be closed off.  The developer's plans, however,

3    show that there is a large window for doing the remediation work—extending well into

4    2019, and that the affordable housing units are not scheduled to be completed until the

5    period of 2020-2022. The report was informational only, and the Board of Supervisors

6    took no action at that meeting regarding the Roseland Encampments.

7    103.    On or about February 21, 2018, the CDC posted a written Notice to Vacate at the

8    Roseland Encampments.  The Notice provided a deadline of March 23, 2018, to vacate the

9    encampments or face possible arrest and prosecution for the violation of California Penal

10   Code Sec. 647(e) (unlawful lodging), Cal. Penal Code Sec. 602(m)(trespass) and Santa

11   Rosa City Ordinance 11-22-.030 (prohibited camping on private property without

12   permission).  The Notice indicated the CDC was revoking any prior authority it may have

13   granted for the occupants to reside at the encampment site.  The Notice goes on to state

14   that other violations to which persons may be subject to arrest and prosecution include

15   "unlawful storage of property", "unlawful refuse disposal", "unlawful failure to restrain an

16   animal" and "unlawful fire."

17   104.    On or about February 27, 2018, after posting the notice of its intent to sweep the

18   Roseland Encampments, the CDC opened a "Navigation Center (NC)" in an unoccupied

19   building near the encampment site.  The NC was run and staffed by the Homeless

20   Outreach and Services Team (HOST) program through Catholic Charities.  The NC was

21   open 5 days a week in order to provide assessment services to residents through the

22   encampments to place them in alternative living situations.

23   105.    On or about March 7, 2018, the CDC posted a new Notice to Vacate, still dated

24   February 21, 2018.  This new Notice to Vacate contained substantially the same language

25   as the previous February 21, 2018, notice, but changed the deadline to vacate to April 3,

26   2018.  A copy of that Notice is attached to this Complaint as Exhibit A.

27   106.    In a public meeting on March 12, 2018, CDC staff stated that the CDC planned to

28   use the City police to enforce the Notice to Vacate on April 3, 2018.

107.    According to CDC reports from mid-March, approximately 16 residents from the Roseland Encampments had been assessed by the HOST program staff at the Navigation Center and had accepted shelter placements, and five have been assessed and referred to permanent housing.

108.    However, as of March 30, 2018, Defendants had not identified adequate alternative placements for all of the residents of the Roseland Encampments.

109.    The primary—and, in some instances, only—placement that Defendants offered to the Roseland Encampments' residents is a shelter bed in an emergency shelter.  Placement in such a shelter is not appropriate for many residents of the Roseland Encampments who are living with mental health disabilities or other disabilities that limit their ability to live in a crowded shelter setting.  For example, many residents have mental health disabilities that cause them to experience fear and anxiety in situations where they are in close quarters with others, or where they must give up their privacy.  As such, it is not possible for them to stay—even for a short time—in a shelter setting.

110.    Plaintiffs sent letters to Defendants on March 9, 2018, and March 12, 2018, requesting that Defendants temporarily postpone the sweep of the Roseland Encampments until adequate alternative shelter placements, or an alternative encampment site, was available for the residents to be displaced by the sweep and inviting Defendants to enter into a dialogue about possible solutions.

111.    Over the next ten days, Defendant CDC and Plaintiffs entered into a dialogue process to discuss the situation.  Defendant CDC provided Plaintiffs documentation it alleged supported its claim it had adequate grounds to close the Roseland Encampments.

112.    Plaintiffs also met with the City of Santa Rosa during this time.

113.    On March 26, 2018, Plaintiffs requested that Defendants postpone their planned sweep of the Roseland Encampments temporarily, until adequate alternative shelter had

been offered to all residents as a reasonable accommodation[21] under federal and state disability rights laws.

114.   While Defendant CDC offered to entertain specific accommodation requests from individual encampment residents if they could make them by April 3, CDC refused to delay the sweep.

115.   On March 28, 2018, Plaintiffs requested that the sweep be temporarily postponed for 14 days to ensure that the Roseland Encampments' residents were not forcibly removed from the site without first having been offered appropriate shelter placements or alternative housing.

116.   However, on March 29, 2018, Defendants responded that they would proceed with the sweep on April 3, as planned.

117.   As of the date of the filing of this action, Defendants had not withdrawn the Notice to Vacate, nor postponed the planned sweep of the Roseland Encampments.

118.   Based on the City's seizure and destruction of personal property in previous encampment sweeps, Plaintiffs expected that, in addition to forcibly removing Roseland Encampments residents from the site where they have been living, the City would likely seize and destroy their personal property without providing any pre-deprivation hearing, even where such property does not pose a threat to health and safety.

**Deborah Drake**

119.   Plaintiff DEBORAH DRAKE is 57 years old and has lived in Sonoma County since the age of 13.  As of the filing of this action, Ms. Drake resided at the Roseland Encampments, where she had lived since September 2016.

120.   Ms. Drake's adult son also lived at the Roseland Encampment and took care of Ms. Drake, including assisting her with going to the restroom, assistance with household

---

[21] The Americans with Disabilities Act uses the term "reasonable modification" with respect to necessary changes in government policies or programs rather than the term "reasonable accommodation", which appears in other statutes, such as the Fair Housing Act.  However, courts have recognized that these terms create identical standards.  *See McGary v. City of Portland,* 386 F.3d 1259, 1266, fn. 3 (9th Cir. 2004).

chores, escorting her to medical appointments, and assisting her when she had health issues.

121.    Ms. Drake earned her GED at age 32.  She then took some horticulture classes and was able to secure work at nurseries, which she enjoyed.  However, Ms. Drake is now unable to work because of her disabilities.

122.    Ms. Drake's physical conditions include Stage 3 ovarian cancer, congestive heart failure and emphysema.

123.    Ms. Drake also has depression, and she has post-traumatic stress disorder (PTSD) resulting, in part, from her experience of domestic violence.

124.    Ms. Drake became homeless about a year and a half ago after fleeing a violently abusive relationship.

125.    Ms. Drake has applied for Section 8 housing assistance and is on the waiting list. Plaintiff has no transportation so it is difficult for her to look for housing or to access services.

126.    Ms. Drake cannot stay in a homeless shelter because of her disabilities.  Because of her PTSD in particular, she cannot be in crowded settings, or in settings where she lacks privacy or control of her own space.

127.    Ms. Drake feels safer at the encampment, where she has privacy in her own tent, and where her son is nearby to help her with her disability-related needs.

128.    Ms. Drake went to the Navigation Center to seek assistance shortly after it opened. After completing an assessment, HOST staff told her that she might be placed in permanent housing.  However, staff at the Navigation Center required her to provide various forms of documentation, including documentation of her income.  Ms. Drake was not able to obtain this documentation because of her disabilities.

129.    At the time this action was filed, Ms. Drake had not heard anything further from the Navigation Center or HOST.

130.    Defendants' posting of the Notice to Vacate and refusal to postpone the sweep to effectuate appropriate placements for Ms. Drake and other Roseland Encampments

-25-

residents caused Ms. Drake to feel a great deal of anxiety, exacerbating the symptoms of her disabilities.

**Samantha Jenkins**

131.    Plaintiff SAMANTHA JENKINS is 60 years old and has been living in Sonoma County since 1980.  As of the date of filing, Ms. Jenkins resided at the Roseland Encampments and had been there for about three months.

132.    Ms. Jenkins has an AA Degree from Santa Rosa Junior College in Small Business and she studied to get a BA degree.

133.    Ms. Jenkins had been homeless on and off for many years.  In 2014 after living at a hotel for several years, she was asked to leave after the hotel was sold.  Ms. Jenkins is disabled due to problems with her back and cannot work.  She receives benefits based on her disability but cannot afford a place to live in Sonoma County; the median rent for a studio rental unit in Sonoma County is more than the total amount of her monthly income.

134.    After becoming homeless, Ms. Jenkins began living at the Farmers Lane Extension Encampment in the City of Santa Rosa, where she stayed until the City swept the encampment in summer of 2017.

135.    When the City swept the Farmers Lane Extension Encampment, Ms. Jenkins lost nearly all of her personal possessions, including a bed, a heater, furniture, books, and family photographs, including a treasured photograph of herself as a child with her father.

136.    In July 2017 Ms. Jenkins then went to Samuel Jones Hall after being placed there by HOST with the promise of further assistance to find permanent housing.  She was not able to bring her possessions with her, and neither HOST nor the shelter provided her with any way to store her possessions.  At that time, Samuel Jones Hall limited the period of time a person may use the shelter to six months; after six months, the person had to leave the shelter.

137.    While at Samuel Jones Hall, Ms. Jenkins received no assistance in locating alternative housing arrangements, nor did any staff person or member of HOST contact her for that purpose until November 2017, approximately four months into her stay there.

Ms. Jenkins did an assessment at that time but did not receive further assistance. When Ms. Jenkins timed out of the shelter after six months and was forced to leave, she had not received any alternative placement, and she began living outside once again.

138.   After timing out of Samuel Jones Hall, Ms. Jenkins went to camp along a trail near Roseland site. After being harassed by the police frequently, Ms. Jenkins decided to move to the nearby Roseland Encampments in December 2017.

139.   Ms. Jenkins has difficulty being around groups of people, and being in settings where she lacks privacy. She was not comfortable at Samuel Jones Hall and would struggle if she had to return there. The Roseland Encampments provided a more secure living situation for Ms. Jenkins because she had her own tent. The privacy of her tent combined with the security of the group setting made her feel safer than she did at the shelter or along the trail.

140.   Ms. Jenkins sought services at the NC with HOST. However, as of the date of filing, she had not been placed anywhere and did not have information about what the status of her placement was.

141.   Defendants' posting of the Notice to Vacate and refusal to postpone the sweep to effectuate appropriate placements for Ms. Jenkins and other Roseland Encampments residents caused Ms. Jenkins to experience a great deal of anxiety, exacerbating the symptoms of her disabilities.

**Nicholle Vannucci**

142.   Plaintiff NICHOLLE VANNUCCI is 30 years old.

143.   Ms. Vannucci is part-Native American and has lived in Santa Rosa since she was eight years old.

144.   As of the date of filing, Ms. Vannucci had lived at the Roseland Encampments for approximately 10 months.

145.   As of the date of filing, Ms. Vannucci had no income but had applied for CalFresh (aka Food Stamps).

146.    Ms. Vannucci is a survivor of domestic violence.  Because of her experience in a violently abusive relationship, Ms. Vannucci has post-traumatic stress disorder (PTSD).

147.    The symptoms of Ms. Vannucci's PTSD make it extremely difficult for her to be around other people and to secure suitable work.

148.    Ms. Vannucci became homeless in November 2016 after her husband attacked her and she fled her home.  She was on the streets for several weeks, spending time in Marin County and Sacramento.

149.    Around April 2017, Ms. Vannucci returned to Sonoma County and sought services from Catholic Charities through their Homeless Services Center.  She has received mail at the Homeless Services Center, and has taken an occasional shower there, but she did not receive an appropriate temporary or permanent housing placement from the Homeless Services Center.  Ms. Vannucci continued to live on the streets for several months but eventually moved into the Roseland Encampments.

150.    Living at the Roseland Encampments provided Ms. Vannucci with a sense of safety and stability that she had not been able to find elsewhere while she had been homeless. Having her own tent, which she shared with her partner, made her feel secure and gave her a place where she could find some degree of peace when she was experiencing extreme symptoms of PTSD.  Having the ability to zip up her tent and be alone made her feel more secure than she had felt in other settings, including homeless shelters.  She felt her possessions were safe at the Roseland Encampments, and she slept better there than she had slept in many months.

151.    Ms. Vannucci previously tried to stay at a homeless shelter, but, after being sexually assaulted during her first night there, she left.  Because of this experience, her past history of abuse, and the symptoms of her mental health disability, Ms. Vannucci does not feel safe at homeless shelters.

152.    As of March 30, 2018, Ms. Vannucci was unemployed.  She had worked some service jobs in Sonoma County, but the symptoms of her PTSD made it hard to stay in a job, especially a job where she had to interact with other people.

153.    During the time Ms. Vannucci was with her abusive husband, she was not able to work, due to his controlling behavior.

154.    Ms. Vannucci does not have reliable transportation, and her credit rating is very low; it is hard for her to search for housing.

155.    Ms. Vannucci sought assistance through the Navigation Center adjacent to the Roseland Encampments several weeks prior to the scheduled eviction of the encampments.  Ms. Vannucci completed an assessment with the Navigation Center staff.  At the time she did her assessment, Ms. Vannucci informed HOST as to the nature of disabilities and her needs regarding a shelter placement.  The Navigation Center staff offered her a referral to a shelter bed at Sam Jones Hall, but Ms. Vannucci declined that offer as she cannot stay at a shelter due to her PTSD symptoms.

156.    As of the date of filing this lawsuit, neither Defendants nor their agents had offered Ms. Vannucci a placement that met her disability-related needs.

157.    Ms. Vannucci has no other place to go at this time.  Ms. Vannucci is concerned that, until she is able to locate better shelter, she will not be able to find a place she would be able to reside without possible harassment by the authorities.  She is also concerned about the well-being of the other encampment residents.  If they are scattered to other locations, they will face additional hardship and difficulty in accessing services and obtain shelter placements.

**Steven Robert Singleton**

158.    Plaintiff STEVEN ROBERT SINGLETON has lived in Santa Rosa for all of his 52 years.

159.    Mr. Singleton has physical disabilities caused by injuries to his back, neck, and shoulder.

160.    Due to his disabilities, Mr. Singleton has been unable to work for the past two years.  He previously received State Disability income, but he now has no income.  Mr. Singleton's wife works, but their combined income is not enough to afford housing in a market where the average rent for a one-bedroom apartment is $1675 per month.

161.   Mr. Singleton and his wife became homeless two years ago, when Mr. Singleton became disabled.  They stayed in one of the family homeless shelters; but, after experiencing a threatening situation, they decided it was not safe to stay there and left.

162.   For about two years, Mr. Singleton and his wife lived on the street near what became the Highway 101 Underpass encampments in Santa Rosa.  Plaintiff and his wife camped away from the streets whenever possible.

163.   In November 2017, when the 101 Underpass 5th and 9th Street area encampments were closed by the City of Santa Rosa, Mr. Singleton and his wife moved over near what was already an encampment in the Roseland area, with the assistance of a homeless advocate.   They set up a tent near this encampment and started what became a second adjacent encampment.

164.   During his time on the streets in Santa Rosa, Mr. Singleton was cited numerous times for illegal camping, and blocking the sidewalks.  In June 2016, while reading on the sidewalk near where he was living, Mr. Singleton was arrested for disorderly conduct.

165.   Mr. Singleton has also observed the Santa Rosa Police Department taking homeless people's personal property and throwing it into the street, especially in the area of the Highway 101 Underpass Encampments.

166.   Mr. Singleton and his wife have applied for various housing assistance programs. Mr. Singleton is on the waiting list for Section 8 subsidized housing.

167.   Mr. Singleton had several contacts with the adjacent NC prior to March 30, 2018, and did an assessment with the NC staff.  As of the filing of this complaint, the NC had not offered Mr. Singleton an alternative housing option other than a shelter bed.

168.   Mr. Singleton was worried about other encampment residents, for whom he felt a responsibility.   If they were to be scattered to other locations away from the Roseland site, it will be even harder for them to access services and obtain shelter placements.

**Ellen Brown**

169.   Plaintiff ELLEN BROWN is 52 years old and is a native of Sonoma County.

170.   As of March 30, 2018, Ms. Brown resided at the Roseland Encampments, where she had been living since November 2017 with her partner Jacoby.

171.   Ms. Brown unable to work due to physical and mental disabilities.  She receives some benefits based on her disability, but does not have enough income to afford housing.

172.   Ms. Brown applied many years ago for Section 8 housing assistance, but has not received the benefit.  Ms. Brown has also tried many times to apply for other types of affordable housing without success.

173.   Ms. Brown was diagnosed with a mental disability at age 20 but was able to work for about 9 years as a Certified Nurse's Assistant.   More recently, she has suffered strokes and how has difficulty communicating because of the strokes' effects.

174.   Ms. Brown has been homeless since 2000.  Ms. Brown lived in the area of the Highway 101 Underpasses for about two years before the City forcibly closed that encampment in November 2017.

175.   At one point during the time she lived at the Highway 101 Underpass, Ms. Brown had all her possessions seized by the police.  The possessions were dumped in a large pile with all the other possessions from the area.  Ms. Brown was not able to retrieve her possessions.

176.   The property Ms. Brown lost at that time included, but was not limited to, her identification, her purse, all her clothes, her phone and her medications.  Ms. Brown needed to take her medications every day, and so was required to go to the doctor immediately to have her prescriptions refilled.

177.   Ms. Brown received no advance written notice as to the seizure of her possessions at that time.

178.   After the City swept the Highway 101 encampments, Ms. Brown relocated to the Roseland Encampments.

179.   Ms. Brown went to the NC shortly after it opened.  After several attempts, she was able to do an assessment with a staff person at the Center.

180.    Ms. Brown did not want to be split up from her partner, who helps her with tasks that she has difficulty with because of her disability.  One of her fears about going to a shelter is the fear of being separated from her partner.

181.    Defendants' decision to shut down the Roseland Encampments and evict all the encampment residents exacerbated the symptoms of Ms. Brown's disabilities, causing her to feel a great deal of anxiety and depression related to uncertainty about where she would go next, and whether she would be harassed by police if she had to find another location to camp.

**Homeless Action!**

182.    Ensuring that homeless residents of Sonoma County are not forcibly removed from the encampments without alternative shelter, that their personal possessions are not seized and destroyed without pre-deprivation process of law, and that residents with disabilities are offered referrals appropriate to their disability-related needs is consistent with the mission and purpose of HA.  Defendants' actions and omissions described in this Complaint frustrate that mission.

183.    Additionally, responding to the proposed sweep of the Roseland site has caused HA to divert considerable resources away from its efforts to address homelessness in other parts of Sonoma County and Northern California more broadly.

184.    Starting in November 2017 (when the second encampment at the Roseland site began to form) and continuing through the filing of this action, HA has focused at least 70 percent of its time and financial resources in supporting the Roseland Encampments residents.

185.    These efforts have included attending weekly meetings with residents at the encampments, attending meetings with local officials to discuss logistics and issues related to the encampments, and holding weekly meetings with members of Catholic Charities regarding support and available shelter resources for encampment residents.

186.    HA and its members have also performed various tasks to support individual encampment residents, such as assisting residents in accessing assessments and

placements through the Navigation Center, making arrangements for storage of Roseland Encampments residents' personal property to prevent or mitigate the destruction of residents' property by Defendants, and arranging for a volunteer Registered Nurse to visit, examine and assist individual encampment residents.

187.   HA has also devoted the majority its own regular meeting time to the issue of support for the Roseland Encampment residents since November 2017.

188.   During this same time, HA has expended over 50% of its financial resources towards the support of the Roseland Encampment residents, including the funding of a portable toilet, trash disposal, and transportation costs for assistance of individual residents; HA has also expended funds on fliers and other office supplies related to the proposed eviction of the Roseland Encampments.

189.   Starting in November 2017, in order to focus its limited resources on supporting Roseland Encampments residents and addressing the impending sweep of the encampments, HA significantly reduced its participation in other efforts related to its mission.  It stopped participating in a local County-wide coalition of housing advocates working on various County-wide housing issues and suspended its work on an ongoing collaborative local outreach project involving focus group discussions to gather information on homelessness throughout the County.

**CAUSES OF ACTION**
**FIRST CAUSE OF ACTION**
Violation of Prohibition Against Cruel and Unusual Punishment
Eighth Amendment to the United States Constitution
California Constitution, Article I Section 17
[42 U.S.C. §§ 1983; Cal. Const. art. XI, § 9]
(against all Defendants)

190.   Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

191.   Both the United States and California Constitutions protect individuals from being subjected to cruel and unusual punishment.

192.     Defendants' Notice to Vacate the Roseland Encampments and City and CDC threatened to forcibly remove residents and to enforce City's anti-camping ordinance, which declares that it is unlawful for any person to camp, occupy camp facilities, or use camp paraphernalia in the City, with no enumerated exceptions.

193.     The City's anti-camping ordinance specifically prohibits the use of "camp paraphernalia," which includes blankets and sleeping bags, and "camp facilities," defined as "any form of cover or protection from the elements."  By enforcing this law, Defendants will be depriving a portion of its citizens of protection from the rains, floods, and the cold.

194.     The City's anti-camping ordinance broadly defines camping to include using property for living accommodation purposes such as sleeping and includes using tents or living in a parked vehicle.

195.     The emergency beds and shelter housing available in the County for the homeless population are insufficient for the size of the homeless population in Sonoma County. Therefore, a large portion of County's homeless population must sleep outdoors.  By criminalizing camping in this manner, Defendants are preventing their homeless population from carrying out one of the basic functions of survival, sleeping and staying dry and warm while doing so, without breaking the law.

196.     Additionally, of the shelter beds that are available, many are not appropriate for or accessible to certain individuals with disabilities, including Plaintiffs Nicholle Vannucci, Ellen Brown, Samantha Jenkins, and Deborah Drake, who are unable to stay in a large, crowded shelter due to disability-related mental health symptoms.

197.     The homeless population in the City and County, including those who lived at the Roseland Encampments on CDC land, must choose between sleeping outdoors exposed to the elements, significantly increasing the risk to health, or breaking the law and using "camping" paraphernalia such as blankets or tents to survive.

198.     Defendants' actions and threatened actions are with deliberate indifference to the danger individual Plaintiffs have and will suffer.

199.    An actual controversy exists between Plaintiffs and Defendants as to whether

Defendants have violated and/or are imminently threatening to violate the law.

200.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive,

declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and

costs.

### SECOND CAUSE OF ACTION
Unreasonable Search and Seizure
Fourth Amendment to the United States Constitution
California Constitution Article 1, Section 13
[42 U.S.C. §§ 1983; Cal. Const. art. XI, § 9]
(against all Defendants)

201.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully

set forth herein.

202.    The individual Plaintiffs possess property that holds both monetary and personal

value.  Thus, Plaintiffs have an expectation to be free from meaningful interference with

those their property rights, even if their property is stored on public property.

203.    The City's anti-camping ordinance contains no limitations, and provides for no

limits on those enforcing the ordinance when determining which property poses a health

and safety risk.  The Ordinance, as enforced by Defendants, therefore permits seizure and

destruction of private property even if the property poses no threat to public health and

does not constitute evidence of a crime.

204.    The written Notice to Vacate provided to Plaintiffs provides authority for officials

removing the property to unilaterally determine whether it constitutes a risk to public

health and safety and then destroy the property without any form of process or input from

the Plaintiffs.

205.    The Notice was issued with specific intent to deprive individual Plaintiffs of their

rights to their personal property.

206.     Plaintiffs are informed and believe and thereon allege that the acts of the

Defendants and their employees and agents in connection with the prior closure of other

encampments were intentional in failing to protect and preserve individual Plaintiffs'

-35-

property and that, at minimum, were deliberately indifferent to the likely consequence that the property would be seized and possibly destroyed unlawfully since the right at issue was well-established at the time.

207.    Further, seizure of private property without a warrant or an exception to the warrant requirement constitutes an infringement upon Plaintiffs' Fourth Amendment rights.

208.    As of result of Defendants' enforcement of these ordinances, Plaintiffs have suffered and will continue to suffer the loss of their personal property without adequate due process unless enjoined.

209.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

210.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
Deprivation of Procedural Due Process
Fourteenth Amendment of the United States Constitution
[42 U.S.C. § 1983]
(against all Defendants)

211.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

212.    The City's anti-camping ordinance, as enforced by Defendants, deprives citizens of due process by authorizing the destruction of property without specific notice and an opportunity to be heard.

213.    Plaintiffs have had their property seized and destroyed without specific notice and the opportunity to be heard.

214.    The City's anti-camping ordinance contains no provisions regarding disposition of property owned by individuals who may be cited and arrested for violation of the anti-camping ordinance.  The ordinance fails to provide notice in advance of the seizure of

private property or procedures for return of that property post-seizure.  Failure to provide pre- or post-deprivation procedures violates the Fourteenth Amendment.

215.    The Notice to Vacate distributed by the CDC to the residents of the encampments stated that "any item that poses a risk to public health or safety will be disposed of promptly."  The notice failed to include a process to challenge collection of the seized property or to challenge the categorization of the property as a risk to public health and safety.

216.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

217.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive, declaratory, and other equitable relief.  Plaintiffs are also entitled to attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
State-Created Danger
Fourteenth Amendment of the United States Constitution
[42 U.S.C. § 1983]
(against all Defendants)

218.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

219.    Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger. *Wood v. Ostrander*, 875 F. 2d 578, 583 (9th Cir. 1989).

220.    Defendant CDC has notified Plaintiffs that they will be seeking enforcement of the City's anti-camping ordinance and will seize property.  Seizure of homeless individuals' property in this context causes them to lose their possessions, including their only shelter from the elements, without adequate provision of appropriate and accessible alternative shelter.

221.    Without any other available option for shelter, Plaintiffs will be forced to live exposed to the elements, including exposure to the cold, wind, and rain. Plaintiffs'

physical health will be jeopardized if forced to sleep with no protection from the cold, wind, and rain.  Plaintiffs with mental health disabilities are likely to suffer aggravated and heightened mental health symptoms and psychological damage.  Without protection, Plaintiffs with physical disabilities health will be jeopardized and their disabilities exacerbated by exposure to the cold, wet, and wind.

222.    Defendants' decision to evict the residents of the Roseland Encampments and, potentially, to destroy the personal belongings necessary to provide them with shelter, safety, sustenance and privacy, without providing viable and accessible alternatives to Defendants, places them in unnecessary danger.  Defendants know that its actions endanger Plaintiffs' and others' health and safety.

223.    In knowingly and willfully placing the health and safety of Plaintiffs and other residents of the Roseland Encampments in danger through its actions, Defendants have violated, and will continue to violate, Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.

224.    An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and/or are imminently threatening to violate the law.

225.    Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
Discriminatory Effect on Persons with Disabilities
[42 U.S.C. § 12131 et seq.]
(against all Defendants)

226.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

227.    Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits discrimination against people with disabilities by state and local governments and their programs.  Title II provides that "no qualified individual with a disability shall, by reason

of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

228.    The City, the County, and CDC are all public entities covered by Title II of the ADA.

229.    The actions of Defendants alleged in this Complaint relate to services, programs, and activities under Title II.

230.    Individual Plaintiffs are "qualified persons with disabilities" as defined under the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

231.    Likewise, many of the homeless individuals with and on whose behalf Plaintiff HA advocates, including HA members, are people with disabilities.

232.    Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (f).

233.    Plaintiffs, the former residents of the Roseland Encampments, and the homeless population of Sonoma County more broadly have physical or mental health disabilities at greater rates than the County's population, generally, including mobility impairments, mental health disabilities, respiratory ailments, and cancer.  Moreover, in the County's 2017 Homeless Point-In Time Homeless Census and Survey, 41 percent of homeless persons surveyed identified as having a disability.

234.    Defendants' closure of the Roseland Encampments had a disparate impact on people with disabilities.  The people whom Defendants threatened to forcibly remove from the place where they had been living, threatened to deprive of their personal property, and caused to be in fear of imminent incarceration are disproportionately people with disabilities compared to the general population of the City and the County.

235.    Likewise, Defendant City of Santa Rosa's enforcement of its Anti-Camping Ordinance and related ordinances, more broadly, has a disparate impact on people with

disabilities, as these ordinances criminalize the daily activities of homeless people, who are disproportionately people with disabilities.

236.    Defendants practice of placing encampment residents at large emergency shelters like Samuel Jones Hall is not appropriate for many individuals with disabilities.  The Coordinated Entry System's reliance on such shelters as the primary—sometimes only— alternative to living at an encampment has a disparate impact on encampment residents with disabilities.

237.    Sweeping the encampment without first identifying and offering alternative shelter that meets the individualized needs of people with disabilities did not serve any sufficiently compelling or bona fide and legitimate interest of Defendants.

238.    Accordingly, the sweep of the Roseland Encampments discriminates against people with disabilities in violation of Title II of the ADA.

239.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

240.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

241.     Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore are entitled to injunctive and declaratory relief, attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
Failure to Provide Reasonable Accommodations
[42 U.S.C. § 12131 et seq.]
(against all Defendants)

242.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

243.    Defendants' duty to not to discriminate against people with disabilities under Title II of the ADA includes a duty to provide reasonable accommodations, i.e., modifications in otherwise neutral policies or practices "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that

making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130 (b)(7)(i).

244.    After Defendants posted notice at the Roseland Encampments of their intent to evict encampment residents and seize their personal property, Plaintiffs asked Defendants to postpone the planned sweep until everyone at the encampments had been assessed for placement and offered alternative shelter that met their disability related needs.

245.    Placement in the Samuel Jones Hall or other congregate emergency shelter settings is not viable for many of the encampments' residents for reasons related to disabilities.

246.    For example, Plaintiffs Nicholle Vannucci and Deborah Drake cannot stay in a shelter because staying in a crowded space will trigger the symptoms of their PTSD.  For these Plaintiffs and other encampment residents who have similar symptoms, being moved into a place where they lack privacy, where they cannot control their surroundings, or where they may be separated from a partner or companion animal, would greatly exacerbate the symptoms of their disabilities.

247.    Similarly, the traumatic experience of eviction, including eviction from a homeless encampment, can greatly exacerbate the symptoms of an individual's mental health disability.  The sweep of the Roseland Encampments, including the fear caused by posting the Notice to Vacate, had such an effect on Plaintiffs and many other residents.

248.    On March 26, 2018, through their counsel, Plaintiffs asked Defendants to provide reasonable accommodations by postponing the sweep of the Roseland Encampments temporarily, until all residents with disabilities had been offered placements that met their disability-related needs.

249.    However, Defendants did not postpone the sweep, denying Plaintiff's request.

250.    A temporary delay of the scheduled sweep until there is somewhere realistic and appropriate for Roseland Village encampment residents to go would not have imposed an undue burden on Defendants or a fundamental alteration in Defendants' programs.

251.    By refusing to grant reasonable accommodations Defendants violated the ADA.

252.    Furthermore, and as discussed above, Defendants have a policy and practice of not offering or providing reasonable accommodations in shelter placements for individuals who participate in intake and assessment through Coordinated Entry.

253.    Defendants' denial of Plaintiffs' individual and collective requests for reasonable accommodations, coupled with their failure to adopt and implement a policy of providing legally required reasonable accommodations, discriminates against individuals with disabilities, in violation of the ADA.

254.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

255.    An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and/or are imminently threatening to violate the law.

256.    Plaintiffs have no adequate remedy at law for these violations and therefore are entitled to injunctive and declaratory relief, attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
Intentional Discrimination Against Persons with Disabilities
[42 U.S.C. § 12131 et seq.]
(against all Defendants)

257.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

258.    By forcing the Roseland Encampments' residents to vacate the encampments without first offering alternative shelter that meets their disability-related needs, and by refusing to postpone the sweep of the Roseland Encampments as a reasonable modification, Defendants have intentionally discriminated against Plaintiffs on the basis of their disabilities in violation of the ADA.

259.    Defendants knew that the County's homeless population and the residents of the Roseland Encampments are disproportionately people with disabilities.

260.    Defendants knew that many residents of the Roseland Encampments cannot go to a homeless shelter for reasons related to a disability, but Defendants did not provide appropriate placement to these people with disabilities.

261.    Nevertheless, Defendants posted a Notice to Vacate the Roseland Encampments by April 3, 2018, and refused to postpone enforcement of that Notice.

262.    In doing so, Defendants have administered their programs in a way that discriminates against people with disabilities on the basis of their disabilities.

263.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

264.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

265.    Plaintiffs have no adequate remedy at law for these violations and therefore have no adequate remedy at law for these violations and therefore are entitled to injunctive and declaratory relief, attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION
Discrimination Against People with Disabilities in Federally Assisted Programs
(29 U.S.C. § 794)
(against all Defendants)

266.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

267.    Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

268.    For purposes of Section 504, a "program or activity" includes "a department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives or administers federal funds. 29 U.S.C. § 794 (b)(1)(A).

269.    On information and belief, Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Committee all receive and/or administer federal funds and, as such, are covered by Section 504.

270.    Individual Plaintiffs are qualified individuals with disabilities under Section 504.

-43-

271.    Likewise, many of the other homeless individuals with and on whose behalf Plaintiff HA! advocates are people with disabilities.

272.    Section 504 prohibits covered entities from administering their programs in a way that has a discriminatory effect, or disparate impact, on people with disabilities.  See 24 C.F.R. § 8.4 (b)(4).

273.    Section 504 requires recipients of federal funds to provide people with disabilities with meaningful access to their programs. To ensure meaningful access, reasonable accommodations may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program. 29 U.S.C. § 749; *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

274.    For the reasons described above, Defendants' sweep of the Roseland Encampments in the absence of appropriate alternative shelter for its residents will discriminate against people with disabilities in violation of Section 504.

275.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

276.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

277.    Plaintiffs have no adequate remedy at law for these violations and therefore are entitled to injunctive and declaratory relief, attorneys' fees and costs.

## NINTH CAUSE OF ACTION
Violation of the Fair Housing Act
[36 U.S.C. § 3604]
(against all Defendants)

278.    Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

279.    The Fair Housing Act (FHA) makes it illegal to discriminate against people with disabilities in the provision of housing-related services.

280.    Such discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to

afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

281.    Emergency shelters, motels, and other housing placements are "dwellings" for purposes of the Fair Housing Act, and Defendants' and their contract agencies' activities with respect to assessment, prioritization, and placement of homeless individuals are housing-related services for purposes of the FHA.

282.    By administering the County's Coordinated Entry System in a manner that fails to take into account the disability-related needs of homeless individuals, by limiting placement options to options that are inaccessible to those individuals, and by their systematic failure to provide reasonable accommodations, Defendants and their contract agencies are discriminating against people with disabilities in violation of the FHA.

283.    Individual Plaintiffs are persons with disabilities as defined by the FHA, as are a significant number of the individuals with and on whose behalf Plaintiff HA works.

284.    Plaintiffs are aggrieved persons as defined by the Fair Housing Act because they have been injured by Defendants' discriminatory housing actions. 42 U.S.C. § 3602(i).

285.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

286.   Based on the foregoing, Plaintiffs have no adequate remedy at law for these violations and are entitled to injunctive and declaratory relief, attorneys' fees, and costs.

### TENTH CAUSE OF ACTION
Writ of Mandate Compelling Defendants to Comply with Their Duty
Not to Discriminate on the Basis of Disability
[Cal. Code Civ. Pro. § 1085; Cal. Gov't Code § 11135]
(against all Defendants)

287.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

288.    California Government Code Section 11135 states in relevant part that:

No person in the State of California shall, on the basis of . . . mental disability, physical disability, [or] medical condition . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to

-45-
First Amended Verified Complaint; Case No. 3:18-cv-01955-VC

discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.  Gov't Code § 11135 (a).

289.    On information and belief, Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Committee are all recipients of state funding, and the programs and activities of Defendants described in this Complaint are administered with the use of state funds.  As such, Defendants are subject to section 11135's prohibition against disability discrimination.

290.    Section 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities.  Subsection (b) states:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

291.    Accordingly, all violations of the Title II of the ADA and Section 504 by entities covered by section 11135 are also violations of section 11135.

292.    One area in which section 11135 is more protective is the definition of disability, which is more expansive under California law than under federal law.  Mental or physical conditions need only "limit" a major life activity to be considered disabilities under California law, whereas a disability under ADA and Section 504 "substantially limits" one or more major life activities.

293.    Individual Plaintiffs are persons with disabilities under section 11135, as are a significant number of the individuals with and on whose behalf Plaintiff HA works.

294.    Accordingly, by administering their programs in a manner that both intentionally discriminates against people with disabilities and has a discriminatory effect on people

-46-

with disabilities, and by failing to provide reasonable modifications, Defendants have violated, and continue to violate, section 11135.

295.   Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

296.   An actual controversy exists between Plaintiffs and Defendant as to whether Defendant has violated and/or are imminently threatening to violate the law.

297.   Plaintiffs are directly and beneficially interested in having Defendants comply with all applicable provisions of law and their legal duties, as set forth herein.

298.   Plaintiffs are without adequate remedy at law and unless compelled by this Court to refrain from acts as required by law, Defendants will continue to refuse to perform said duties and continue to violate the law, and Plaintiffs will be injured as a result.

299.   Plaintiffs are entitled to a writ of mandate compelling Defendants not to discriminate against people with disabilities in the administration of their programs.

300.   Based on the foregoing, Plaintiffs are also entitled to injunctive and declaratory relief, attorneys' fees, and costs.

## ELEVENTH CAUSE OF ACTION
### Violation of the California Fair Employment and Housing Act
### [Gov't Code § 12955]
(against all Defendants)

301.   Plaintiffs hereby reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

302.   The California Fair Employment and Housing Act (FEHA), like the FHA, makes it illegal to discriminate against individuals with disabilities in the administration of housing-related services.

303.   Acts and omissions that constitute discrimination under the FHA likewise constitute discrimination under FEHA.

304.   And, as with Gov't Code § 11135, FEHA is more protective and applies more broadly than its federal counterpart and includes a broader, more inclusive definition of disability.

-47-

305.    Individual Plaintiffs are individuals with disabilities for purposes of FEHA, as are many of the individuals with and for whom Plaintiff HA works.

306.    By administering the County's coordinated entry system in a manner that fails to consider the disability-related needs of homeless individuals, by limiting placement options to options that are inaccessible to those individuals, and by their systematic failure to provide reasonable accommodations, Defendants and their agencies it contracts to administer the coordinated entry system have discriminated against persons with disabilities in violation of FEHA.

307.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

308.    Accordingly, Plaintiffs are without adequate remedy at law and are entitled to injunctive and declaratory relief, as well as attorneys' fees and costs.

**TWELFTH CAUSE OF ACTION**
Failure to Affirmatively Further Fair Housing
[42 U.S.C. §§ 1983, 3608]
(against all Defendants)

309.    Plaintiffs reallege and incorporate by reference all the preceding paragraphs as if fully set forth herein.

310.    The FHA requires local government entities that receive and administer federal housing funds to operate "in a manner affirmatively to further fair housing."  42 U.S.C. § 3608(e)(5).

311.    All Defendants receive and administer federal housing funds, including the Community Development Block Grant and Emergency Services Grant funds, and are therefore subject to the FHA's requirement to affirmatively further fair housing.

312.    Defendants, by administering their Coordinated Entry System in a manner that discriminates against people with disabilities, as discussed above, constitutes a breach of their obligations to affirmatively further fair housing.

313.    Defendants are therefore liable to Plaintiffs under 42 U.S.C. § 1983, which provides a private cause of action to any person who is deprived of rights, privileges, or immunities under the color of law.

314.    Defendants' breach of these obligations has damaged and will continue to damage Plaintiffs, including HA members and homeless individuals with disabilities with and on whose behalf Plaintiff HA advocates.

315.    Plaintiffs are informed and believe, and based thereon allege, that Defendants' discriminatory acts against Plaintiffs and individuals with and on whose behalf HA works were malicious, intentional, and recklessly and callously indifferent to Plaintiffs' protected rights.

316.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

317.    Accordingly, Plaintiffs have no adequate remedy at law for these violations and therefore are entitled to injunctive and declaratory relief, as well as attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1.      For a preliminary and permanent injunction, enjoining and restraining Defendants City of Santa Rosa and CDC from seizing and disposing of individuals' property in violation of their Fourth and Fourteenth amendment rights.

2.      For a preliminary and permanent injunction, enjoining and restraining Defendants from citing or arresting individuals for violation of the City's anti-camping ordinance.

3.      For a preliminary permanent injunction ordering Defendants and their agents to cease actions which discriminate against people with disabilities in the administration of their programs, and to offer and provide reasonable accommodations in

the Sonoma County Continuum of Care's coordinated entry process, including reasonable accommodations with respect to emergency shelter placements.

4.     For declaratory judgment that Defendant's policies, practices, and conduct as alleged herein violate Plaintiffs' rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, section 11135 of the California Government Code, the Fair Housing Act, the California Fair Employment Housing Act, and the Constitutions of the United States and California.

5.     For a peremptory writ of mandate commanding Defendants to cease actions which discriminate against people with disabilities in the administration of their programs.

6.     For costs of suit and reasonable attorney's fees as provided by law.

7.     For such other relief as the court deems just and proper.


Dated: June 1, 2018          CALIFORNIA RURAL LEGAL ASSISTANCE

                             THE PUBLIC INTEREST LAW PROJECT

                             LAW OFFICE OF ALICIA ROMAN



                             By:     /s/Jeffery Hoffman_____
                                     JEFFERY HOFFMAN, Attorneys for Plaintiffs

## VERIFICATION OF STEVEN ROBERT SINGLETON

I, Steven Robert Singleton, am one of the Plaintiffs in the above-entitled action. I am aware of the nature of the First Amended Verified Complaint being filed on my behalf, the legal bases for the Complaint, and the relief being sought. To the extent that the Petition is based upon facts known to me, including the facts stated in paragraphs 17 to 18 and 158 to 168, I verify them to be true, and otherwise, I am informed and believe that all facts herein are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this ⏐ day of June, 2018 in Santa Rosa, California.


STEVEN ROBERT SINGLETON

1

**VERIFICATION OF ADRIENNE LAUBY**

2

3      I, Adrienne Lauby, am a member of Homeless Action!, one of the Plaintiffs in the

4    above-entitled action and am authorized to make this verification on its behalf.  I am

5    aware of the nature of the First Amended Verified Complaint being filed on behalf of

6    Homeless Action!, the legal bases for the Complaint, and the relief being sought.  To the

7    extent that the Petition is based upon facts known to me, including the facts stated in

8    paragraphs 19 to 21 and 182 to 189, I verify them to be true, and otherwise, I am informed

9    and believe that all facts herein are true.

10      I declare under penalty of perjury under the laws of the State of California that the

11   foregoing is true and correct.

12

13      Executed this __ day of June, 2018 in Santa Rosa, California.

14

15

16

17                      ADRIENNE LAUBY

18

19

20

21

22

23

24

25

26

27

28

-52-

1    (Additional Counsel continued)

2
     Cynthia L. Rice, SBN: 87630
3    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
     1430 Franklin Street, Suite 103
4    Oakland, CA 94612
5    Telephone: (510) 267-0762; Fax: (510) 267-0763
     Email: crice@crla.org
6
     Ilene J. Jacobs, SBN: 126812
7    CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
8    511 D Street / P.O. Box 2600
     Marysville, CA 95901
9    Telephone: (530) 742-7235; Fax: (530) 741-0854
10   Email: ijacobs@crla.org

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Verified Complaint; Case No. 3:18-cv-01955-VC

# **<u>EXHIBIT A</u>**

# **<u>EXHIBIT A</u>**

**Sonoma County**
**Community Development Commission**
*Sonoma County Housing Authority*

# NOTICE TO VACATE ILLEGAL CAMPSITE/LODGING

**POSTING DATE:** ___February 21, 2018___    **VACATE DATE:** ___April 3, 2018___

**LOCATION:** Property between 779 and 665 Sebastopol Road, Santa Rosa 95407 (Roseland Village)

This Property has been slated for development of affordable housing and requires immediate site remediation. Development CANNOT proceed until the illegal campsite has been vacated to allow remediation to commence. The Community Development Commission, the Owner of the Property, hereby gives all occupants notice that they must immediately vacate the Property.

Any prior permission to occupy the Property, whether express, implied, or perceived, is expressly revoked and terminated by the Owner.

**WARNING**: If you do not vacate the Property by the date above, you may be subject to arrest and possible prosecution for any of the following violations, or for violation of any other applicable state or local law. This Property is within the meaning of Penal Codes 647(e) and 602(m) and SR City Ordinance 11-22.030.

☐ California Penal Code section 647 (e) – Unlawful lodging. Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: who lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to possession or in control of it.

☐ California Penal Code section 602 – Trespass. Every person who willfully commits a trespass by the following act is guilty of a misdemeanor: (m) Entering and occupying real property or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful possession.

☐ Santa Rosa City Code Section 11-22.030 – Camping on private property. It is unlawful for any person to camp on any private property without first obtaining the written permission of the owner.

**Other State and City Code Violations may include, but are not limited to:**
Unlawful storage of property, unlawful refuse disposal, unlawful failure to restrain animal, unlawful fire.

**INSTRUCTIONS:**

1. All personal property and debris must be removed immediately or it will be removed by the Community Development Commission on or after _____April 3, 2018_____.
2. Any items that pose a risk to public health or safety will be disposed of promptly. All other personal property will be stored by the Community Development Commission for a period of 90 days. If your personal property has been removed by the Commission, you may contact the Commission at (707) 565-7500 for information on retrieval. Failure to claim and retrieve your property may cause it to be considered intentionally abandoned. Unclaimed property may be disposed of after 90 days per California Civil Code Sections 2080 – 2080.10.
3. For information about housing and other services, please visit the Housing Navigation Center at **883 Sebastopol Rd, Santa Rosa, CA 95407** (adjacent to the Roseland Village property), beginning on **February 23, 2018 until April 3, 2018, from 8:00 am – 4:00 pm, Monday – Friday.**