Jeffery Hoffman, SBN: 118768
Alicia Roman, SBN: 260101
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941; Fax: (707) 528-0125
Email: jhoffman@crla.org,
aroman@crla.org

Attorneys for Plaintiffs
(Counsel for Plaintiffs continued on last page.)

SUE A. GALLAGHER, City Attorney
(SBN 121469)
ROBERT L. JACKSON, Assistant City
Attorney (SBN 101770)
City of Santa Rosa
100 Santa Rosa Avenue, Room 8
Santa Rosa, California 95404
Tel: (707) 543-3040; Fax: (707) 543-3055

Attorneys for Defendant City of Santa Rosa

BRUCE D. GOLDSTEIN #135970
County Counsel
ALEGRÍA G. DE LA CRUZ # 229713
Alegria.DeLaCruz@sonoma-county.org
Chief Deputy County Counsel
MATTHEW R. LILLIGREN #246991
matthew.lilligren@sonoma-county.org
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421; Fax: (707) 565-2624

Attorneys for Defendants
SONOMA COUNTY; SONOMA
COUNTY COMMUNITY
DEVELOPMENT COMMISSION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NICHOLLE VANNUCCI, ELLEN BROWN, and SHANNON HALL, individuals; and HOMELESS ACTION!, an unincorporated association,<br><br>              Plaintiffs,<br><br>vs.<br><br>COUNTY OF SONOMA, SONOMA COUNTY COMMUNITY DEVELOPMENT COMMISSION, CITY OF SANTA ROSA, Does 1 to 10, et al.,<br><br>              Defendants. | Case No. 18-CV-01955-VC<br><br><br>**JOINT CASE STATUS STATEMENT**<br><br><br>Judge:    Hon. Vince Chhabria<br><br>Case Status Conference: March 9, 2020<br>                                    10:00 a.m. |

—1—

Plaintiffs NICHOLLE VANNUCCI, ELLEN BROWN, and SHANNON HALL, as individuals, and HOMELESS ACTION!, an unincorporated association (Plaintiffs) and Defendants COUNTY OF SONOMA, SONOMA COUNTY COMMUNITY DEVELOPMENT COMMISSION, and CITY OF SANTA ROSA (Defendants) submit this Joint Case Status Statement to report on the status of implementation of the Stipulated Preliminary Injunction, which was entered by the Court on July 12, 2019, and went into effect on August 12, 2019.

**Plaintiffs' Status and Activities**

Plaintiff Nicholle Vannucci and her partner have moved into a unit at the Palms Inn, a permanent supportive housing development in Santa Rosa. Plaintiff Ellen Brown remains housed in Santa Rosa.

Plaintiff Shannon Hall continues to reside on the streets at various locations in Santa Rosa. She continues to actively seek a permanent housing, but so far has been unsuccessful. She has not yet been offered a housing or shelter placement that meets her disability-related needs. The Santa Rosa Police Department cited Ms. Hall for an alleged violation of Santa Rosa City Code section 10.12.020 (loitering in a tunnel) in the 6th Street/Highway 101 Underpass on October 28, 2019. On or about December 9, 2019, while Ms. Hall was residing at the 9th Street/Highway 101 underpass, Santa Rosa Police Department served Ms. Hall with a "Notice of Planned Property Removal" with an expiration of the date of the following day. In January 2020, Santa Rosa Police Department threatened Ms. Hall with arrest if she did not leave the 9th Street/Highway 101 underpass. Following emails and calls from Plaintiffs' counsel, the City Attorney instructed police to refrain from enforcement action against Ms. Hall, but, by that time, Ms. Hall had already left for another location under threat of arrest.  Ms. Hall returned to 9th Street/101 underpass, and last week Santa Rosa Police Department officers ordered Ms. Hall to move immediately from the 9th Street/Highway 101 underpass.

Plaintiff Homeless Action! (HA!) has designated two new litigation liaisons, Kathryn Jurik and Gail Simons.  HA! continues to advocate on behalf of unhoused persons.

Since October 30, 2019, CRLA has represented approximately 20 homeless individuals who are not parties to the lawsuit with various issues relating to enforcement actions being taken against them, including requests for reasonable accommodations with respect to shelter placement and complaints regarding seizure of personal property.

JOINT CASE STATUS STATEMENT
CASE NO. 18-CV-01955-VC

**Joe Rodota Trail Encampment Clearance**

On January 27, 2020, Plaintiffs filed a request for immediate relief from the Court regarding the County's planned closure of the Joe Rodota Trail encampment, which was scheduled to be completed by January 31, 2020. The Court denied Plaintiffs' request, and the County cleared all of the 200+ residents of the Joe Rodota Trail encampment by January 31. Plaintiffs' counsel are aware of at least 20 persons who underwent assessment for Coordinated Entry but who were not offered adequate shelter placements when the Joe Rodota Trail encampment was closed on January 31. Sonoma County park rangers and Santa Rosa police told those remaining on the trail on January 31, approximately 25 people, that they had to leave encampment area; police and park rangers told them to wait in an area off the Joe Rodota Trail— in a private parking lot at the Food Max Grocery Store—for further instructions regarding shelter placement.  Many waited for hours after having been forced off the Joe Rodota Trail for shelter placements but did not receive such placements; around 5:00 p.m. the County offered several individuals a placement at The Nomadic Shelter at the Redwood Gospel Mission, which is not open 24 hours and provides only mats on the floor.

Between 30 and 40 displaced Joe Rodota Trail encampment residents moved to a location near West Robles Street in unincorporated Sonoma County just outside the Santa Rosa city limits, and the Sheriff cleared that encampment on February 10, 2020.  Many of these displaced individuals then moved to three smaller encampments on public property in the City of Santa Rosa, which then were closed by the City, the last one on February 25, 2020.

Plaintiffs estimate that at least 35 individuals who resided at Joe Rodota Trail and/or subsequent encampments on City or County property were forced by Defendants to move their dwellings without receiving adequate shelter placements. Some had requested reasonable accommodations in shelter placement at the Joe Rodota Trail; some had requested reasonable accommodations at the West Robles encampment; some had requested reasonable accommodations while residing on City property; and some had requested reasonable accommodations in shelter placement at multiple times in multiple locations, without receiving a clear response or an offer of shelter that met their needs. Plaintiffs' counsel continue to interview former Joe Rodota Trail encampment residents to better understand how many people were forced off the trail without first being offered adequate shelter and/or an opportunity for assessment, and what happened in each of their individual situations.

—3—

Plaintiffs' counsel contest the City's accusations of "bad faith" with respect to their communications with the City on behalf of their individual clients regarding issues with the Santa Rosa Police Department.  The City Attorney asked Plaintiffs' counsel not to contact the Santa Rosa Police Department regarding compliance with the preliminary injunction and to direct all comments to the City Attorney.  Plaintiffs' counsel have made efforts to raise potential violations of the Injunction with the City attorney when they arise, and to request the City's prompt attention to and resolution of any issues.

### Anticipated Motion to Enforce and Clarify the Injunction

In communicating with the City of Santa Rosa regarding individual clients' issues, Plaintiffs' counsel have identified two significant disagreements between Plaintiffs and the City regarding the meaning of certain terms of the Injunction. Plaintiffs have met and conferred with Defendants regarding these issues and anticipate bringing a noticed motion or motions pursuant to paragraph 13 to enforce and clarify the terms at issue and the Injunction, in order to prevent further violations from occurring. Specifically:

1. A dispute has arisen about whether a law enforcement officer verbally ordering someone to move constitutes enforcement action for purposes of paragraph 2(c). The City's and County's position is that it does not—that enforcement action only occurs when a person is actually cited or arrested, or when their belongings are physically seized. Plaintiffs' position is that "closing or moving a dwelling or encampment" in paragraph 2(c)(3) includes situations in which law enforcement officers order a person to move, especially when there is an express or implied threat of arrest.

2. A dispute has arisen about the significance of a person's "individual circumstances" in determining whether shelter is adequate pursuant to paragraph 2(e). The question arose in the context of an individual with an emotional support animal—a cat; the only shelter placement she was offered would not accept the cat. The individual and her partner then were both cited and arrested for living in a public park. Plaintiffs' position is that a shelter placement that would require someone to abandon their service animal, emotional support animal, or pet is not adequate; just as a shelter placement that would be contrary to a person's religious and ethical convictions or to accept a single gender placement that is contrary to their gender identity would not be adequate.

—4—

Plaintiffs would like to discuss at the Case Status Conference the timing and logistics for a motion or motions regarding these issues.

**Additional Issues**

Finally, Plaintiffs have identified other potential systemic issues regarding implementation of the Injunction. Plaintiffs' counsel have raised them with Defendants and anticipate that they may become ripe for consideration by the Court if the parties are not unable to resolve them through meeting and conferring.

1. California Rural Legal Assistance (CRLA) currently represents 10 individuals who have outstanding reasonable accommodation requests relating to their shelter placement, and who have been forced to move their dwellings both the City and County, without adequate shelter placement. CRLA continues to experience challenges to facilitating assessment and placement for individual clients, and in getting clear answers regarding requests for reasonable accommodation in shelter placement. HOST and Catholic Charities do not respond to correspondence or requests for reasonable accommodation. When CRLA requests reasonable accommodations in shelter placement for their clients, they do not receive clear responses as to whether the request was granted or denied. Additionally, the City has demanded that reasonable accommodation requests be made on particular forms and has also requested information about individuals' diagnoses, treatment, and medical histories—these inquiries are not allowed under the law. See 2 C.C.R. §§ 12176, 12178. These issues implicate paragraphs 2(e) and 3 of the Injunction.

2. Plaintiffs' counsel are investigating allegations that, during the Joe Rodota sweep on January 31, 2020, and again on February 19, 2020, and February 21, 2020, homeless individuals lost personal property because they were forced to move by law enforcement or risk being cited or arrested without adequate time to collect their belongings. Plaintiffs have received reports that property that individuals were unable to take while residing on City public property in the time allowed was ordered destroyed by SRPD. Plaintiffs have also received reports that SRPD seized individuals' food and refused to return it. These potential issues implicate paragraph 5 of the injunction.

3. The City posted new No Parking signs that prohibit parking from 10:00 p.m. to 6:00 a.m. in multiple locations in the City, targeting locations where homeless individuals reside in cars or RVs. Plaintiffs are concerned that the City is creating new no-overnight parking

—5—

zones to undermine the requirements of paragraph 3 of the Injunction by creating new restrictions on vehicle dwellings that are not expressly contemplated by paragraph 2(c). Plaintiffs' counsel and the City Attorney have corresponded regarding these concerns.

**Defendants' Response**

**City of Santa Rosa**

### Joe Rodota Trail Encampment Closure

Under an agreement with the County, the role of the Santa Rosa Police Department in the closure of the Joe Rodota Trail was limited to providing security to park rangers and County outreach workers in the event of imminent violence and, in the unlikely event of an arrest, providing transportation only to the County Jail. Santa Rosa Police were not involved in posting notice, outreach work, issuance of citations, making arrests, taking individuals into custody, preparation of arrest reports, or booking into County Jail. These tasks, to the extent they were necessary, were conducted entirely by the Sonoma County Regional Park Rangers.

### Plaintiffs' Bad Faith Use of so called "Citizen Complaints"

Beginning in late November, counsel for plaintiffs began a letter writing campaign alleging violations by the Santa Rosa Police Department of the Preliminary Injunction and included in each letter a demand that the letter be considered a "citizen's complaint." These so-called "citizen's complaints" were not lodged by the individuals themselves; rather they were second-hand accounts relayed by plaintiffs' counsel Ms. Roman sometimes on behalf of unidentified individuals, sometimes on behalf of individuals for whom she shared no proof of her authority to speak on their behalf. Often, they began with or "I am informed that . . ." or "several individuals informed me that . . . "

The City has received over twenty so called "citizen complaints" from Ms. Roman and, because they are labeled as formal complaints directed against individual officers, the Police Department has been compelled to devote considerable time to investigate the allegations, interview the officers in question, review body worn camera video, when available, prepare an internal investigation report,  all culminating in command staff reaching a formal determination of whether the accusations merit officer discipline or are unfounded.

Here are just a few examples of the nature of the "complaints" and what in fact happened:

- Ms. Roman claimed that unnamed campers on the Joe Rodota Trail claimed that on October 23 SRPD officers *"using a loudspeaker told them their tents had to come down and that they couldn't camp there without first giving a written notice of any kind or an offer of adequate shelter prior to being told to close or move their dwelling"*.  IN FACT, it was the day of the outbreak of the Kinkaid Fire and two officers, concerned for the welfare of the inhabitants and knowing how much time relocation required for individuals without a car, drove along the trail, advised people of the fire and encouraged them to relocate as soon as possible to an area outside the evacuation zone. In her "citizen complaint" counsel neglected to mention the emergency, failed to mention no enforcement action was taken, and failed to mention that many campers expressed appreciation to the officers for alerting them to the danger the fire posed.

- An unnamed individual complained that on September 16, 2019, he was told to move his RV without providing prior written notice or offering adequate shelter. IN FACT, the individual admitted on body worn camera video that he had been warned he was in violation of the law a month before, was explicitly asked by the officer if he would like to go to a shelter, explicitly stated "I am not going to a shelter", and was in fact never cited and never arrested.

- A woman who was warned on three prior occasions she was in violation of the Fish and Game Code by littering and defecating near the creek complained that after her arrest on the fourth occasion, the police had not stored her personal property and had given her a receipt not technically in compliance with the injunction. IN FACT, body worn camera video shows she was explicitly reminded by the officer not to leave her backpack behind, asked if she had any other valuables she wanted to safekeep, and declined. She was given a receipt with instructions on how to retrieve her backpack and in fact did so.  As she was arrested for a Fish and Game Code violation, the injunction protocols, including the storage protocols, did not apply.

- In one complaint, Mr. Roman complained that an officer had "aggressively banged" on the window of an RV, breaking the glass, leaving the inhabitants cold and their two small dogs at risk from the "dangerous glass particles." Ms. Roman neglected to include that the officer told the occupants it was an accident, asked them to call him to file a claim for their damage, returned later to explain the claim procedure, and provided them  with a

—7—

claim form and the contact information for Risk Management. She also neglected to mention that the contact did not involve a violation of the injunction as the RV was illegally parked and unregistered.

- In one complaint, Ms. Roman alleged "I have received information" that the previous day, December 30, 2019 at 8:30 a.m. Officer Barrett, accompanied by Officer Thompson, yelled at an individual in Fremont Park that he "had ten minutes to get the fuck out of here." IN FACT, time records show Officer Thompson did not work that day and the body worn camera video of Officer Barrett show no such encounter at that time, and no footage in Fremont Park at all that day.

In past conversations with Victoria Yanez, another attorney for Homeless Action!, we have been told that it is the practice of Homeless Action! to keep officers "off the streets" by compelling them to write reports or testify in court, so that they cannot devote time to patrol and engage in what Homeless Action! considers harassment of their clients.

We bring this to the Court's attention as we are informed and believe that this pattern of papering the Police Department with unfounded "citizen complaints" is a bad faith continuation of such a practice to "keep officers off the streets." We do not wish to inhibit, and would never presume to discourage, citizens from lodging complaints; however, we would ask the Court to remind plaintiff's counsel of their obligations under the Preliminary Injunction to act in good faith and refrain from complaints premised on uncorroborated second-hand accounts without adequate investigation.

### Parking

Plaintiffs apparently intend to challenge City implementation of "no overnight parking zones" as a violation of the injunction or the law. We have outlined for plaintiffs' counsel why we disagree. Our position is based on the following points, upon which we will be happy to elaborate should the plaintiffs decide to seek judicial intervention:

- The facts giving rise to this lawsuit which serve as the foundation for the Preliminary Injunction did not involve vehicles and the language of the Preliminary Injunction does not prohibit parking restrictions.

- At no time was it discussed during the negotiations leading up to the Preliminary Injunction that the County or City would be enjoined from enactment of parking

—8—

ordinances nor the City Traffic Engineer enjoined from exercising his lawful authority to impose parking restrictions where and when necessary.

- The holding in *Martin v. City of Boise* was, by the Court of Appeal's own reminder, "a narrow one" which addressed only the Constitutionality of a camping ordinance when applied to individuals "sitting, lying or sleeping on public property." It did not address vehicles or parking restrictions.

- The plaintiffs have not cited, nor is the City aware of any case law which prohibits enactment of parking restrictions. Thus far, there is no reported decision applying the 8th Amendment cruel and unusual punishment analysis to homeless individuals in RVs. Neither *Martin v. City of Boise* nor *Jones v. City of Los Angeles* involved vehicles or RVs and were limited to camping ordinances, not Vehicle Code or local parking ordinances.

- Cities throughout the State, and particularly here in the North Bay, have invoked parking restrictions. Santa Rosa finds itself at the north end of a steady progression of City and County parking laws and, we have reason to believe, a "flight" of RV's from such ordinances. (Novato 2017, San Rafael 2017, San Francisco 2019, Berkeley 2019, Mountain View 2019, Rohnert Park 2019)

The City has found a rapid growth of RVs and trailers near parks and in business parks. Many vehicles are not properly registered. Some are not operational. Some have been "dropped off" by well-intended people who, no longer wishing to maintain an old RV or trailer, simply abandon it as a "donation to the homeless."

One such location was on the streets bordering Martin Luther King Park. This is a gathering place for families in the South Park neighborhood of Santa Rosa. These are residents who are not well-off and who rely on a municipal park as a low-cost site for socializing and recreation. Vehicles parked around the park for prolonged periods posed traffic safety concerns such as line-of-sight hazards for motorists, cyclists, and pedestrians, reduced parking availability, and presented public health concerns associated with excessive litter, garbage and debris, sanitary sewage discharge and leakage, unleashed pets, noise from generators. Neighbors of MLK Park lodged numerous complaints; many expressed concern for the safety of their children using the park. The youth and adult soccer leagues that once used the park for games complained

—9—

and some stopped using the park altogether. They found it difficult to find a parking space and were concerned that needles may injure the children.

The City is well aware of the challenges faced by individuals experiencing homelessness who have elected to live in an RV. That is why the City continues to explore expansion of its safe parking program. The City is currently evaluating what public parking might be suitable and with what degree of services offered. That said, when circumstances such as at Martin Luther King Park occur, the City owes an obligation to those who enjoy the park to act for their safety and well-being.

### Anticipated Plaintiffs' Motion to Enforce and Clarify Injunction

Plaintiffs apparently intend to bring a motion seeking clarification of terms of the Injunction. While the City does not object to scheduling of such a motion, and is prepared to oppose it, the issues requiring clarification would seem suitable to resolve at this Case Management Conference.

### 1. Is a police officer's request or order to relocate an enforcement action?

Defendants are prepared to address in more detail the discussions which culminated in the language of the Preliminary Injunction defining "enforcement action"; suffice it to say that the inclusion of "direction to relocate" was explicitly proposed, rejected and excised from the definition of an "enforcement action." Neither the language of the Preliminary Injunction nor the intent of the parties was so broad as to include it.

The practice of the Santa Rosa Police has been to engage in a gradually escalating series of steps in which warnings preface enforcement. Each case is different, but customarily an officer, observing what appears to be an ongoing violation of a camping ordinance by an individual who identifies him or herself as experiencing homelessness may, by way of a request, or even a direction, advise an individual to relocate. That often takes the form of an officer cautioning the individual that if the officer returns at a later specified time, the individual may be cited. This is intended as an informal admonition.

The City views this as akin to an officer who observes an individual speeding, stopping that individual, and giving him a "warning." No enforcement is undertaken at that juncture; no citation is issued; no arrest is made. The individual is left, just as a speeding motorist might be left in their car, with a warning, and the hope and expectation that they will not violate the law in the future and enforcement will not be necessary.

—10—

The City's general practice is that if an officer returns, usually a day or several days later, to find that an individual has ignored or disregarded the officer's warning and continues to violate the camping ordinance, and it appears enforcement will in fact be necessary, the officer will then engage in the protocols required by the Preliminary Injunction, including service of written notice, written admonition of the individual's rights, engagement with a HOST outreach worker, exploring assessment and suitable housing. Typically, the individual is then given additional time, usually no less than a day, and if they do not voluntarily relocate, and assuming assessment has taken place and suitable housing to meet the individual's disability is available, then and only then will the officer first issue a citation. If, after receiving a citation, and after additional time is afforded to relocate, typically no less than a day, the officer will return and make an arrest.

Part of the reason for this gradually escalating practice is to facilitate the time necessary for successful outreach. In our experience, it is the prospect of imminent enforcement that often prompts a reluctant individual to engage in the outreach process necessary to start them on the path toward housing. A verbal warning often accompanies an invitation to participate in outreach and serves to start that dialogue.

The whole idea of the pre-enforcement protocols was that before a citation or arrest could occur an officer must first provide notice, opportunity for assessment, and an opportunity for shelter. It is the citation and/or arrest that is the "criminalization of homelessness" on which the Ninth Circuit premised the holding in the *Boise* decision. Neither *Boise*, nor our injunction, nor other case law require exhaustion of the enforcement protocol before a simple request or direction to relocate is made. It is only before a criminal sanction (i.e. a citation or arrest) is leveled, that 8th Amendment protections require the protocols agreed upon.

## 2. Cats

Based solely on an isolated case in which a woman was told that she could not bring her cat to Sam Jones Hall, plaintiffs wish to create a blackletter test by which to measure suitability of housing for all individuals with pets.

Very briefly, these are the facts: two individuals, who were hostile and combative with both the police and HOST workers, who repeatedly ignored efforts to assist them into housing, who failed, despite the assistance of Ms. Roman, and despite the fact they were eligible, to follow up on rapid rehousing, and who demonstrated a pattern of noncooperation, sought to

—11—

invoke their cat, as a reason why Sam Jones Hall was unsuitable and therefore enforcement could not go forward against them. Without any factual support, other than their own characterization that the cat is an "emotional support animal" they claimed this circumstance was determinative. When the City suggested that Sam Jones, like all other shelters, does not view a cat as "an emotional support animal", when the City asked for some expert substantiation of the claim that it was an "emotional support animal", when the City tried to explain that Sam Jones, like all shelters of which we are aware, has found the presence of cats to be disruptive to other individuals in the shelter, especially when there are dogs present, when the City suggested overnight care elsewhere for the cat, perhaps at an animal shelter, these suggestions  fell on deaf ears. Given the totality of the circumstances of that unique case, the City found that  the individual's cat did not render Samuel Jones unsuitable.

The City may be wrong. Should plaintiffs wish to litigate this individual case, the Court can decide and the City will of course accept the Court's judgment.  But this is an isolated case. Plaintiffs can cite to no other individual who claims, because they own a cat, Sam Jones Hall is not suitable.

Given that this is an isolated case, the "case of the  cat" should not a rule make. As the Court reminded all counsel during the discussions leading toward the Preliminary Injunction, the Court did not propose to anticipate every situation with a bright line rule, (2) did not intend to micromanage, (3) intended to give some amount of discretion, and (4) expected the parties to act in a "reasonable" manner.

On the subject of pets, and more particularly cats, a "reasonable" resolution may well depend on the circumstances presented. Situations may differ and require different outcomes. On one end of the spectrum might be an emotionally disturbed individual who has a history that she has owned a cat for years which helps her cope with a documented emotional condition. That would be much different from an individual who having never owned a cat, but heard that Sam Jones does not allow cats, acquires a cat the day before, so as to tell the police officers "you can't make me move now."

The Court wisely crafted the Injunction to include both "mays" and "musts" in determining the suitability of shelter.  The "mays" are considerations such as an individual's circumstances, including many things, one of which may be possession of a service animal or pet. The "musts" include those things spelled out in Paragraph 2(e) such as whether the shelter is

—12—

available for 30 days, open at day and night, offers beds, not merely mats on a floor, offers placement with a spouse or partner, etc. The possession of a pet is a factor to be considered, but it is only a factor to be considered among many and is not, in and of itself, determinative.

The injunction was not intended to exempt enforcement against those who by the totality of their actions are simply refusing shelter. Were the Court to create a bright line rule that anyone with a cat is exempt from enforcement, word will spread quickly throughout the homeless population. Individuals will attempt to "game the system" by playing "the cat card" and, for no other reason than to prevent enforcement, simply say they own a cat.  This was not the intent of *Boise* or the Preliminary Injunction.

### Production of Forms and Policies

The City has provided to plaintiffs' counsel copies of forms and policies which have been adopted in the wake of the injunction.

**Sonoma County & Sonoma County Community Development Commission**

### Joe Rodota Trail

Between December, 2019 and the end of January, 2020, the County allocated over $12 million and expended thousands of staff hours to create and deliver new resources to address homelessness, largely directed at assisting those individuals occupying the Joe Rodota Trial.

On January 31, 2020, the County closed the Joe Rodota Trail to address the multiple public health and safety hazards to both people occupying the Trail and the surrounding community.  Part of the County's outreach efforts included assessing at least 258 people occupying the Joe Rodota Trail, housing 104 people who chose services and a housing placement (including housing 60 of the most vulnerable people choosing shelter at Los Guilicos Village), where there are 60 new individual, one-room shelters with supportive services, meals, a warm community space, a dog run, a storage facility, hot showers, bathrooms, and transportation to and from Santa Rosa. During the outreach efforts, an opportunity for assessment was offered to countless others, with at least 249 documented instances where people occupying the Trail refused to engage with County housing assessment and service provider staff. As part of the effort to relocate people off the Trail, 22 people accepted storage for their belongings, and a steady flow of people have accessed their property since that time. No citations or arrests were made during the closure of the Joe Rodota Trail.

—13—

On February 10, 2020, approximately 25 to 30 occupants camping on the paved portion of a Sonoma County road were removed for encroachment in the right of way after receiving a notice to vacate. While this encampment did not fall under the jurisdiction of the Injunction (County-owned road in the unincorporated County), nor under the general protections of *Martin* (as the encampment encroached onto the road and right of way), the County still provided assessment opportunities, offers of shelter placement, and storage opportunities before requiring the individuals to relocate from the area. Approximately 18 people utilized the storage opportunities provided by the County.

Los Guilicos Village, where operations began on January 27, 2020, has been a successful pilot to provide a temporary shelter for individuals exiting homelessness.  The Navigation Center which operates there supports residents to connect to resources and to identify permanent housing. Upcoming developments to the homeless system of care include the addition of additional shared housing options in single-family and multi-unit houses for residents exiting Los Guilicos to enter into permanent supportive housing, as well as the development of additional indoor-outdoor shelters throughout the County.

The County and CDC have not received any requests from Plaintiffs' counsel to meet and confer regarding their allegations of "other potential systemic issues regarding implementation of the Injunction," including claims for the loss of personal property as referenced above.  It is unclear which, if any, of these claims are directed to the County and CDC.  The County and CDC will meet and confer with Plaintiffs' counsel if and when a request is made.

### Production of Forms and Policies

The County has provided to Plaintiffs' counsel copies of forms and policies which were used during the relocation of individuals from the Joe Rodota Trail.

### Plaintiffs' Motion to Enforce and Clarify the Injunction

The alleged violations raised by Plaintiffs in their prior meet and confer efforts are directed to matters involving the City of Santa Rosa; however, the County and CDC are prepared to respond to Plaintiffs' request for clarification to the extent that it relates to the general interpretation of the Injunction.  Largely, the County and CDC agree with the City's description of the circumstances surrounding the negotiation of the Injunction, the removal of a "direction to relocate" language from the definition of an enforcement action, and the practical necessities of

—14—

any pre-enforcement efforts within the legal framework of *Martin*.  The County and CDC will wait for further direction from the Court as how it would like the parties to proceed.


Date: March 4, 2020                     CALIFORNIA RURAL LEGAL
                                        ASSISTANCE, INC.

                                        By: ___/s/_____

                                        JEFFERY HOFFMAN
                                        Attorneys for Plaintiffs



Date: March 4, 2020                     BRUCE D. GOLDSTEIN, County Counsel

                                        By:_____/s/_____

                                        MATTHEW R. LILLIGREN
                                        Attorneys for Defendants
                                        County of Sonoma; Sonoma County
                                        Community Development Commission


Date: March 4, 2020                     SUE A. GALLAGHER, City Attorney

                                        By:_____/s/_____

                                        ROBERT L. JACKSON
                                        Attorneys for City of Santa Rosa


—15—

(Additional Counsel for Plaintiffs continued)

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
Tel: (510) 891-9794; Fax: (510) 891-9727
Email: mmorris@pilpca.org
        mrawson@pilpca.org

Ilene J. Jacobs, SBN: 126812
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
511 D Street / P.O. Box 2600
Marysville, CA 95901
Telephone: (530) 742-7235; Fax: (530) 741-0854
Email: ijacobs@crla.org

Attorneys for Plaintiffs

JOINT CASE STATUS STATEMENT
CASE NO. 18-CV-01955-VC

ECF ATTESTATION

In accordance with Civil Local Rule 5-1(i)(3), I, Matthew R. Lilligren, attest that I have obtained concurrence in the filing of this document from the other signatories to this document.

JOINT CASE STATUS STATEMENT
CASE NO. 18-CV-01955-VC