Jeffery Hoffman, SBN: 118768
Alicia Roman, SBN: 260101
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941
Fax: (707) 528-0125
Email: jhoffman@crla.org
          aroman@crla.org

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
Telephone: (510) 891-9794
Fax: (510) 891-9727
Email: mmorris@pilpca.org
mrawson@pilpca.org

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nicholle Vannucci, Ellen Brown, and Shannon Hall, *individuals*; and Homeless Action!, *an unincorporated association*,<br>           Plaintiffs,<br>    v.<br><br>County of Sonoma, Sonoma County Community Development Commission, City of Santa Rosa, Does 1 to 10,<br><br>           Defendants. | Case No.: 3:18-cv-01955-VC<br><br>**PLAINTIFFS' MOTION TO ENFORCE AND CLARIFY PRELIMINARY STIPULATED INJUNCTION**<br><br>**Proposed Hearing Date: December 3, 2020** |

(Additional Counsel for Plaintiffs continued)

Cynthia L. Rice, SBN: 87630
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1430 Franklin Street, Suite 103
Oakland, CA 94612
Telephone: (510) 267-0762; Fax: (510) 267-0763
Email: crice@crla.org

Ilene J. Jacobs, SBN: 126812
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
511 D Street / P.O. Box 2600
Marysville, CA 95901
Telephone: (530) 742-7235; Fax: (530) 741-0854
Email: ijacobs@crla.org

Attorneys for Plaintiffs

**TABLE OF CONTENTS**

Page

I. Introduction ...................................................................................................................... 5
II. Factual and Procedural Background ................................................................................. 6
   A. Stipulated Preliminary Injunction ............................................................................. 6
   B. Pre-COVID-19 Enforcement Actions by the City and County ................................. 7
   C. COVID-19 and Homelessness .................................................................................. 7
   D. The City's Systematic Resumption of Enforcement Actions, Despite COVID-19 ..... 9
      1. Doyle Park, May 2020 ....................................................................................... 9
      2. Highway 101 Underpasses, June 24 and 25, 2020 ........................................... 10
      3. Corporate Center Parkway, July 9, 2020 ........................................................... 6
      4. Fremont Park aka Cancer Park, July 29, 2020, September 1, 2020 .................. 12
      5. Other Enforcement Actions ............................................................................. 13
   E. Plaintiffs' Efforts to Meet and Confer Before Bringing this Motion ........................ 14
III. Argument ........................................................................................................................ 14
   A. The City's Practices Violate the Injunction ............................................................ 14
      1. Violations of Paragraph 3(a)—Notice of Rights and Adequate Shelter ............. 14
      2. Violations of Paragraph 4(a)—Notice of Enforcement and Notice of Rights .... 15
      3. Violations of Paragraph 4(b)—Post-Removal Notice ....................................... 16
      4. Violations of Paragraph 5—Personal Property ................................................. 16
   B. Clarification of the Injunction Is Necessary to Prevent Future Violations ............... 16
      1. Clarification of "Enforcement Action" ............................................................. 16
      2. Clarification of "Immediate Hazard or Obstruction" ........................................ 17
      3. Clarification that Written Notice Is Required, Even in Cases of Immediate Hazard or Obstruction, Unless Providing Such Notice Would Be Impracticable ..... 18
IV. Conclusion and Request for Relief .................................................................................. 19

## TABLE OF AUTHORITIES

**Page**

*Regal Knitwear Co. v. N.L.R.B.*
    (1945) 324 U.S 9 .................................................................................................................. 6

## I.     Introduction

The Centers for Disease Control and Prevention (CDC) and other public health experts recommend that, while the COVID-19 pandemic is ongoing, local governments do not clear homeless encampments unless they can provide individual housing units to encampment residents. CDC, Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials (updated 8/6/20) (Hoffman Decl., Ex. 36) (CDC Guidance).[1] Defendant City of Santa Rosa temporarily reduced its enforcement activities against unhoused people on public property. However, since late May, it has conducted at least six large-scale sweeps and several other enforcement actions against unhoused people, contravening the public health expert recommendations and violating the Preliminary Stipulated Injunction (Injunction) in this action. The City has forced unhoused people to leave public property without first providing adequate shelter, often ignoring reasonable accommodation requests made by people with disabilities. It has taken enforcement action without providing advance written notice of enforcement, without providing notice of rights, or both. It has failed to preserve and store homeless individuals' personal property and has not provided post-removal notices. And it has invoked the Injunction's immediate hazard exception in ways that undermine the Injunction. These violations point to a critical need for the Court to clarify the Injunction to ensure Defendants' future compliance. Accordingly, Plaintiffs bring this motion pursuant to paragraph 13(c) and (d) of the Injunction to seek the Court's enforcement and clarification of the Injunction's terms.

---

[1]Also available at: https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html#facility-encampments.

## II.      Factual and Procedural Background

### A. Stipulated Preliminary Injunction

Plaintiffs[2] initially brought this action in March 2018 in response to the planned clearance of a homeless encampment on land owned by Defendant Sonoma County Community Development Commission within the City of Santa Rosa. ECF No. 1 at 68. The parties stipulated to, and the Court entered, the Injunction on July 12, 2019; it is currently in effect through December 31, 2020. ECF No. 109-1; ECF No. 132. The Court retained jurisdiction "to enforce . . . and/or clarify the terms of the Injunction," and any party may bring a motion to enforce or clarify the Injunction if, after meeting and conferring with the opposing party, "the parties have been unable to resolve the dispute." ECF No. 109-1, ¶¶ 13(c)-(d); *see also Regal Knitwear Co. v. N.L.R.B.,* (1945) 324 U.S 9, 15 (noting the court's authority both to clarify and to modify its own order).

Compliance and interpretation of three paragraphs of the Injunction are at issue in this Motion. Paragraph 3 prohibits Defendants from taking "enforcement action" against unhoused persons who have dwellings on public property within the City of Santa Rosa unless those individuals have first been (1) provided an opportunity to be placed in adequate shelter, (2) provided an opportunity for Coordinated Entry assessment, and (3) provided notice of rights; paragraph 3 includes an exception for "immediate hazard or obstruction". ECF No. 109-1 at ¶ 3. Paragraph 4 requires Defendants to provide reasonable written advance notice of enforcement actions, as well as notice of individuals' rights under the Injunction and federal law, before taking enforcement action. Paragraph 5 provides for preservation and storage of unhoused

---

[2] The original Plaintiffs in this action were Deborah Drake, Samantha Jenkins, Steve Singleton, Nicholle Vannucci, and Homeless Action!. The current Plaintiffs are Nicholle Vannucci, Ellen Brown, Shannon Hall, and Homeless Action!

individuals' personal property and requires post-removal notice following the removal of unhoused people's belongings from public property.

### B. Pre-COVID-19 Enforcement Actions by the City and County

In late January 2020, the County of Sonoma cleared an encampment of approximately 200 people from the Joe Rodota Trail (JRT) after the Court had declined to grant Plaintiffs' request for emergency relief. *See* ECF No. 115; ECF No. 120; ECF No. 122 at 3, 13. Around 20 or 30 people left the JRT without having been offered adequate shelter. Ramirez Decl. ¶ 7; Jackson Decl. ¶ 8; *see also* Naughton Decl. ¶ 7.

In February and March, the City cleared encampments at A Place to Play Park, Olive Park, South Davis Park, and Fremont Park (aka Cancer Survivors Park or Cancer Park). Naughton Decl. ¶¶ 13-18; Roman Decl. ¶¶ 3-4, Ex. 21, 22. It took enforcement actions in other locations as well, including the arrests of Valerie Neils and John Baldwin and the citation of Kiana Pishgar. Neils Decl. ¶¶ 13, 26, 27; Pishgar Decl. ¶ 12; Baldwin Decl. ¶ 9. In response, Plaintiffs contemplated filing a motion to enforce and clarify the injunction during the spring, but COVID-19 intervened. *See* ECF No. 126, pp. 3-4.

### C. COVID-19 and Homelessness

Sonoma County issued a shelter-in-place order on March 17, 2020, in response to COVID-19. Hoffman Decl., Ex. 37.[3] The order recognizes that unhoused people are unable to shelter at home but indicates that they are ". . . strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation)."

---

[3]Also available at https://socoemergency.org/order-of-the-health-officer-shelter-in-place/

*Id.* at 2.

People experiencing homelessness are disproportionately vulnerable to COVID-19. They are both at higher risk of contracting COVID-19 than the general population and more likely to experience severe symptoms and/or die if they become ill. *See* Muldoon Decl. ¶¶ 6, 8. Unhoused people tend to be older, and to have higher rates of respiratory and cardiovascular disease, than the general population. Colette Auerswald, et al., *For the Good of Us All: Addressing the Needs of our Unhoused Neighbors During the COVID-19 Pandemic*, Berkeley Public Health (April 2020), 18, https://publichealth.berkeley.edu/wp-content/uploads/2020/04/For-the-Good-of-Us-All-Report.pdf; *see also* Muldoon Decl. ¶ 6. Living in congregate shelter or unsheltered without access to adequate hygiene facilities also increases the risk of infection. Muldoon Decl. ¶¶ 8, 10; Auerswald, *supra*, at 19-20.

The CDC's Interim Guidance regarding COVID-19 and unsheltered homelessness recommends:

- If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are.
- Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.
- Encourage those staying in encampments to set up their tents/sleeping quarters with at least 12 feet x 12 feet of space per individual.
- If an encampment is not able to provide sufficient space for each person, allow people to remain where they are but help decompress the encampment by linking those at increased risk for severe illness to individual rooms or safe shelter.
- Work together with community coalition members to improve sanitation in encampments.
- Ensure nearby restroom facilities have functional water taps, are stocked with hand hygiene materials (soap, drying materials) and bath tissue, and remain open to people experiencing homelessness 24 hours per day.
- If toilets or handwashing facilities are not available nearby, assist with providing access to portable latrines with handwashing facilities for encampments of more than 10 people. These facilities should be equipped with hand sanitizer (containing at least 60% alcohol).

CDC Guidance, *supra*; *see also* Hoffman Decl., Ex. 35, 36. The California Department of Public Health has endorsed the CDC Guidance, and Sonoma County's June 18, 22020, public health order also cites the CDC's admonition that local governments should supply adequate bathroom, handwashing, and hygiene facilities to encampments. State of California, Recommended Strategic Approaches for COVID-19 Response for Individuals Experiencing Homelessness (March 2020), 1 (Hoffman Decl., Ex. 38)[4]; Sonoma County Order of the Health Officer C19-15 (6/18/20) ¶ 26 (Hoffman Decl., Ex. 39)[5]. Accordingly, to slow the spread of COVID-19, local governments should not clear homeless encampments unless individual housing units are available, and they should ensure that people living outdoors have access to bathrooms, handwashing facilities. Muldoon Decl. ¶¶ 7-14; *see also UNHCR WASH MANUAL: Practical Guidance for Refugee Settings* (Jan. 2020) (Hoffman Decl. Ex. 40)[6](minimum standards for refugee settings).

**D. The City's Systematic Resumption of Enforcement Actions, Despite COVID-19**

**1. Doyle Park, May 2020**

Contrary to the CDC guidance, the City, on May 26, 2020, posted a Notice of Planned Removal of Property at Doyle Park, a public park in Santa Rosa where approximately 50 unhoused people were living. Catoe Decl. ¶ 24, Ex. 2; Jackson Decl. ¶ 10. The Notice, which

---

[4] Also available at: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Protocols-Homeless-Pop.pdf

[5] Also available at: https://socoemergency.org/order-of-the-health-officer-c19-15-stay-well-sonoma-county/.

[6] Also available at: https://cms.emergency.unhcr.org/documents/11982/39897/UNHCR+WASH+Manual+-+7th+Edition+%28UNHCR%2C+2020%29+%281%29/95f8ef54-22b9-42db-bc4a-cd7548ac22c6

expired the same day, did not include, and the City did not provide, notice of rights. Catoe Decl. ¶ 22. Over a few days at the end of May, Santa Rosa Police Department (SRPD) officers forced everyone out of Doyle Park. Catoe Decl. ¶¶ 24, 25; Jackson Decl. ¶ 9.

Some Doyle Park residents, like the Catoe family, were forced to leave without having been offered adequate shelter. Catoe Decl. ¶ 25. Members of the Catoe family are at high risk for severe illness or death if they contract COVID-19, including Ms. Catoe's mother-in-law, who is elderly and has lung cancer. Catoe Decl. ¶ 20. Before being forced out of Doyle Park on May 28, 2020, they had only been offered shelter options in settings where the family would have to split up. Catoe Decl. ¶ 11; *see also* ECF No. 109-1 at ¶ 2(e)(v). The County placed the Catoe family in a room at Sonoma State University only *after* SRPD had forced them to leave Doyle Park. Catoe Decl. ¶ 28.

In the same week that the City cleared Doyle Park, it announced the systematic resumption of encampment sweeps, alluding to plans to clear encampments at the 101 underpasses (an area where 3rd, 4th, 5th, 6th, and 9th Streets pass under Highway 101) and Corporate Center Parkway in the upcoming weeks. Hoffman Decl. ¶ 9, Ex. 26, Ex. 27. The announcement acknowledged the CDC Guidance but stated that the City planned to clear the encampments because "[h]ealth and safety concerns within these encampments amid the COVID-19 emergency has reached a tipping point". *See* Hoffman Decl., Ex. 27, p. 3.

### 2. Highway 101 Underpasses, June 24 and 25, 2020

Over the course of the spring, an encampment grew at the 101 underpasses, but the City failed to provide adequate porta-potties, handwashing stations, and trash receptacles. *See* Ramirez Decl. ¶ 11; Jackson Decl. ¶ 12. And, beginning in April 2020, rather than adding more hygiene and sanitation facilities, the City started taking them away. Beckman Decl. ¶ 7; Ramirez

Decl. ¶ 11; Jackson Decl. ¶ 12.

SRPD posted a Notice of Planned Property Removal at the 101 underpasses on or about May 28, 2020; the Notice expired that same day. Baldwin Decl. ¶ 10. The City may have also served another Notice to Vacate the area on or about June 4. Ramirez Decl. ¶ 10. The City did not serve any enforcement notices with the actual enforcement date, and it did not serve a notice of rights at the 101 underpasses. Beckman Decl. ¶ 10; Naughton Decl. ¶ 24; Hance Decl. ¶ 12.

SRPD cleared the 101 underpasses on June 24 and 25, 2020. Beckman Decl. ¶¶ 8-18; Jackson Decl. ¶¶ 14-21; Hance Decl. ¶ 13; Naughton Decl. ¶ 26. On June 24, SRPD told encampment residents that, if they did not leave that day, they would be arrested. Beckman Decl. ¶ 14; Jackson Decl. ¶ 17. Many had not been offered adequate shelter, and the City was not offering everyone shelter before forcing them to leave. Beckman Decl. ¶ 14; *see also* Naughton Decl. ¶ 26; Baldwin Decl. ¶ 10; Jackson Decl. ¶¶ 18, 21. The police were telling people to leave, shaking tents, and going through people's things. Beckman Decl. ¶ 11; *see also* Hance Decl. ¶ 12; Jackson Decl. ¶ 17. While they were clearing the encampments, SRPD and HOST told some people that, if they wanted shelter, they needed to go to the Homeless Service Center on Morgan Street—leaving their belongings behind at the same time City workers were clearing out the area—to sign up for shelter. Ramirez Decl. ¶ 12; Jackson Decl. ¶ 18. SRPD did not give people whose tents were blocking the sidewalk the option to reposition their tents to mitigate the obstruction; SRPD also forced people whose tents were not causing any obstruction to leave. Jackson Decl. ¶ 20-21. And, because the City had never provided any written notice with the actual deadline to vacate the 101 underpasses, some residents were not able arrange to move their possessions by June 24, 2020, and had to leave them behind. Hance Decl. ¶ 13; Baldwin Decl. ¶ 12. The City did not offer storage or "bag and tag" people's belongings, instead loading

items into trucks or bulldozing them. Baldwin Decl. ¶ 12; *see also* Ramirez Decl. ¶ 14; Hance Decl. ¶ 13; Jackson Decl. ¶ 19. The City did not post any notices that indicated where people could claim their belongings after the sweep. Baldwin Decl. ¶ 12. Many people whom SRPD forced from the 101 underpasses moved to encampments at Corporate Center Parkway and Fremont Park, causing those encampments to grow significantly. Beckman Decl. ¶¶ 19-20, 22.

### 3. Corporate Center Parkway, July 9, 2020

Corporate Center Parkway is a public street in an industrial area of Santa Rosa. Throughout the spring of 2020, an encampment grew there that was comprised mostly of people living in RVs, trailers, cars, or other vehicles; after the 101 underpasses sweep, the encampment grew significantly, and more tents and tarps appeared. Beckman Decl. ¶ 20. In early July there were approximately 90 people living there but only three porta-potties and two handwashing stations, not enough for the number of people living there. Jackson Decl. ¶ 43. On July 9, 2020, SRPD forced everyone at Corporate Center Parkway to leave without having provided advance written notice of enforcement or notice of rights. Ramirez Decl. ¶ 32. Some, like Jerome Coleman, were forced out without any offer of adequate shelter. Coleman Decl. ¶¶ 10-11.

### 4. Fremont Park aka Cancer Park, July 29, 2020, and September 1, 2020

An existing encampment at Fremont Park grew from 15-20 people to 60-70 people when the City cleared the 101 underpasses. Beckman Decl. ¶ 22; Ramirez Decl. ¶ 15; Jackson Decl. ¶ 22; Naughton Decl. ¶¶ 26-27. The only bathroom facility at the park was a single porta-potty, even after advocates asked the City to add more. Jackson Decl. ¶ 25; Beckman Decl. ¶ 22; Ramirez Decl. ¶ 17; Hance Decl. ¶ 16. There were no dumpsters and no handwashing stations. Ramirez Decl. ¶¶ 16-17; Jackson Decl. ¶ 24-25. Volunteer organizations provided trash bags and pickups because the City failed to do so. Ramirez Decl. ¶ 16; Jackson Decl. ¶ 23. By late July, about 100

people were living at the park, but the City still had not provided dumpsters, handwashing facilities, or additional toilets. Jackson Decl. ¶¶ 22, 24-25.

On July 28, 2020, SRPD officers verbally told Fremont Park residents that SRPD would return to clear the western side of the park the following morning at 7:00 a.m. because of an alleged fire hazard. Jackson Decl. ¶ 27; Naughton Decl. ¶ 28. They did not provide advance written notice of the sweep nor any notice of rights. Jackson Decl. ¶ 27; Naughton Decl. ¶ 28.

On July 29, 2020, SRPD cleared the western half of the park. Jackson Decl. ¶ 28; Ramirez Decl. ¶ 18; Naughton Decl. ¶ 28. Park residents rushed to relocate, and many lost their belongings; the City did not bag and tag personal property. Ramirez Decl. ¶ 19; Jackson Decl. ¶¶ 28-30. Most displaced encampment residents relocated to the eastern side of the park, which the City had left open, greatly increasing the density of tents and people on that side of the park.[7] Ramirez Decl. ¶¶ 19-20; Jackson Decl. ¶ 29; Naughton Decl. ¶ 28. On August 28, 2020 the City issued written notices to vacate the rest of the park by September 1, 2020. Beckman Decl. ¶ 24, Ex. 7. SRPD forced everyone to leave the park on September 1, 2020. Some park residents, like John Baldwin and Tracy Hance, were forced to leave without an offer of adequate shelter. Baldwin Decl. ¶ 14; Hance Decl. ¶ 18. The City again seized or destroyed belongings, not bagging and tagging, and not providing post-removal notice. Ramirez Decl. ¶¶ 25-28. Baldwin Decl. ¶ 14.

### 5. Other Enforcement Actions

The City has also taken enforcement actions against unhoused individuals at other locations during the ongoing pandemic without complying with the Injunction. Some of these actions are

---

[7] The City did finally add two more porta-potties, a handwashing station, and a dumpster after it cleared the western side of the park. Jackson Decl. ¶ 31.

described in the declarations of Kiana Pishgar (¶¶ 14-18), John Vincent (¶¶ 7-12), Khemvanh Souvannhoxay (¶¶ 6-8), Heather Jackson (¶¶ 47-53), and Miles Sarvis-Wilburn (¶ 15).

### E. Plaintiffs' Efforts to Meet and Confer Before Bringing this Motion

The parties have exchanged several rounds of written correspondence regarding the issues described in this Motion, Hoffman Decl. ¶¶ 3, 7, 10, 12-17, 20-22, Ex. 29, 30, 31, 32, 33, 34; Roman Decl. ¶¶ 4-5, Ex. 23, 24. The Parties also conferred by phone on June 15, 2020, September 9, 2020, and September 30, 2020. Hoffman Decl. ¶¶ 11, 18, 19, 21; Roman Decl. ¶¶ 7, 8. The Parties disagree about whether the City has violated the Injunction but have discussed the possibility of stipulating to clarification language. Hoffman Decl. ¶¶ 18, 20, Ex. 33. However, the Parties have not agreed to clarification language, and the Court's intervention is necessary in light of the urgent and ongoing nature of the issues raised in this Motion. *See* Hoffman Decl. ¶ 22, Ex. 34.

## III.   Argument

### A. The City's Practices Violate the Injunction

#### 1. Violations of Paragraph 3(a)—Notice of Rights and Adequate Shelter

Paragraph 3(a) of the Injunction requires:

> Except in the event of an immediate hazard or obstruction . . . no enforcement action shall be taken against a person on public property who identifies him or herself as experiencing homelessness without first:
> i. Providing the person with written notice of their applicable rights as established by law and this injunction;
> ii. Providing an opportunity for assessment by trained outreach staff through Sonoma County's Coordinated Entry Program;
> iii. Providing an opportunity to be placed in adequate shelter reasonably suitable to the disability-related needs of the person; and
> iv. If the offer of adequate shelter is refused, and the person does not otherwise have access to temporary housing, providing the person with a reasonable opportunity to relocate.

Paragraph 2(c) defines "enforcement action" as "(1) issuance of a citation to a homeless person; (2) an arrest by County and/or City personnel of a homeless person; (3) *closing or moving a dwelling or encampment;* and/or (4) seizing property from a dwelling or encampment pursuant to [specified] statutes or ordinances." (Emphasis added.) The City violated paragraph (3)(a)(i) by not providing any written notice of rights before clearing, under the threat of arrest or citation, the encampments Doyle Park, the 101 underpasses, or Corporate Center Parkway, or before its July 29, 2020, partial clearance of Fremont Park.

As described above and in the attached declarations, the City also has repeatedly taken enforcement actions against homeless individuals who have not yet been offered adequate shelter, including the Catoe family, described above, and Devin Naughton, who requested a reasonable accommodation in shelter placement and has been swept multiple times without offer of shelter or housing that meets his disability-related needs. *See* Naughton Decl. ¶ 5, 12-32.

### 2. Violations of Paragraph 4(a)—Notice of Enforcement and Notice of Rights

Paragraph 4(a) requires Defendants to provide advance *written* notice of any enforcement action, "given at a reasonable time and in a reasonable manner to give people sufficient time to collect and move their items"; the notice must include or be accompanied by the notice of rights described above. Unlike paragraph 3, paragraph 4 is not qualified by an immediate hazard exception. *See* ECF No. 109-1 at ¶¶ 3(c), 4. The City did not provide advance written notice of the July 9, 2020, Corporate Center sweep or the July 29, 2020, partial clearance of Fremont Park, even though the City had announced its plans to clear these encampments months before. And, while the City provided written enforcement notices at the 101 underpasses during late May and early June, residents did not receive written notice of the actual vacate date. The City also did not provide notice of rights before any of these enforcement actions or at Doyle Park, as discussed

above and in the accompanying declarations.

### 3. Violations of Paragraph 4(b)—Post-Removal Notice

Paragraph 4(b) requires: "After removal of unattended property, Defendants shall place a post-removal notice in the area from which the items were removed advising the owner of where the property is stored and how it can be claimed." Paragraph 4(b) also is not qualified by 3(c)'s immediate hazard exception. The City, however, did not provide post-removal notices after removing unhoused people's personal property from the 101 underpasses or Fremont Park.

### 4. Violations of Paragraph 5—Personal Property

Paragraph 5 sets forth requirements for the disposition of unhoused people's personal property, including requirements for storage, and for providing unhoused people with enough time to collect and move their belongings during enforcement actions. These requirements also are not subject to 3(c)'s immediate hazard exception. However, as described above and in the attached declarations, the City has violated these requirements by pressuring people to leave their belongings during encampment clearances, by failing to secure and store belongings, and by destroying belongings.

### B. Clarification of the Injunction Is Necessary to Prevent Future Violations

### 1. Clarification of "Enforcement Action"

As the Parties and the Court have previously discussed, the Parties disagree about the scope of "enforcement action" in the Injunction. *See* ECF No. 122 at 4, 10-11. SRPD's practice[8] is to tell unhoused people to leave public property—sometimes under threat of citation or arrest—before offering them adequate shelter, and without advising them of their rights under the

---

[8] Plaintiffs have requested the City's current policy from the City but have not yet received it. See Hoffman Decl. ¶ 6, Ex. 25.

Injunction. *See* Catoe Decl. ¶¶ 12, 17, 24-28; Baldwin Decl. ¶¶ 8-9; Pishgar Decl. ¶¶ 14-19; Coleman Dec ¶ 10; Souvannhoxay Decl. ¶ 7; Vincent Decl. ¶¶ 6-8, 10-11; But the Injunction's definition of "enforcement action" is not limited to citations and arrests; it also includes "closing or moving a dwelling or encampment" Injunction, ¶ 3(c)(i)(3). SRPD orders to move often cause individuals to flee for fear of being cited or arrested, which in turn prevent them from accessing shelter and services. *See* Naughton Decl. ¶¶ 13, 26, 31; Coleman Decl. ¶ 10; Hance Dec ¶ 9, ; Jackson Decl. ¶¶ 17, 35, 55. Accordingly, Plaintiffs seek an order clarifying that "enforcement action" includes situations where a law enforcement officer commands an unhoused person to leave public property, and that any order to relocate must comply with the terms of the Injunction—i.e., that Defendants must provide adequate notice, an advisement of rights, an offer of adequate shelter, and an opportunity for Coordinated Entry assessment before forcing unhoused individuals to move from public property.

### 2. Clarification of "Immediate Hazard or Obstruction"

The City will likely argue that it was justified in taking some or all of the above enforcement actions in the manner it did because of the presence of an immediate hazard or obstruction. Paragraph 3(c)'s immediate hazard exception allows a Defendant to take enforcement action without first complying with ¶ 3(a) and 3(b)'s requirements . . .

> . . . where the homeless individual is at risk of imminent injury or death or their presence (1) creates a risk of imminent injury or death to others, (2) creates a risk of damage to the property of others, or (3) interferes with access to or use of public facilities. Examples include camping on highway shoulders, off ramps, areas exposed to moving vehicles, areas prone to flash floods, areas that bar the passage of pedestrians or cause pedestrians [including pedestrians who use wheelchairs] to detour into a street and/or camping that presents a risk of fire or other public health hazard.

Injunction, ¶ 3(c)(i). While this provision affords Defendants discretion to act in cases of immediate hazards and obstructions, it cannot be an exception that swallows the rule. It should

be used to allow swift action where the hazard or obstruction is so urgent that it necessitates an immediate response. It should not be invoked to avoid compliance with the Injunction in every situation where Defendants perceive a hazard. The City had planned the enforcement actions at 101, Corporate Center, and Fremont Park for months, and, pursuant to the Injunction, it should have ensured that residents of those encampments received advance written notice, notice of rights, and offers of adequate shelter before forcing them out. Clarification to this effect is necessary to prevent future violations.

Additionally, whether a hazard or obstruction justifies application of the exception must depend on careful and objective consideration of the circumstances, including the availability of mitigation measures, the Defendant's role in creating the alleged hazard, and the countervailing risks, including in particular the risk of COVID-19 spread. *See* ECF Nol. 109-1, ¶ 3(c)(ii) ("[L]aw enforcement shall consider requiring occupants to eliminate or mitigate the hazard as an alternative to closing the dwelling or encampment."). The encampments at Corporate Center Parkway and Fremont Park grew as a direct result of the City's enforcement action the 101 underpasses. And both the City's failure to provide adequate hygiene facilities and its enforcement actions against unsheltered people in the absence of available individual housing contravene public health recommendations regarding COVID-19 and homelessness. *See* CDC Guidance, *supra*; Muldoon Decl. ¶¶ 7-14. Clarification to ensure that Defendants consider the totality of the circumstances when making immediate hazard determinations is necessary.

> **3. Clarification that Written Notice Is Required, Even in Cases of Immediate Hazard or Obstruction, Unless Providing Such Notice Would Be Impracticable**

As discussed above, paragraph 3(c)'s immediate hazard exception applies only to the requirements of paragraphs 3(a) and (b). It does not excuse the City from complying with

paragraph 4's notice requirements or paragraph 5's property storage requirements, especially in situations where the hazard is not so imminent as to preclude compliance. *See* ECF No. 109-1, ¶ 3(c), including ¶ 3(c)(ii) ("Even in the event of an immediate hazard or obstruction, law enforcement shall nonetheless attempt, whenever possible, to provide advance notice to dwelling occupants of the intent to clear the dwelling or encampment."). But the City did not provide notice of rights at Doyle Park, the 101 underpasses, Corporate Center Parkway, or the July Fremont Park sweep. It did not provide advance written notice of the enforcement actions for Corporate Center Parkway or the July Fremont Park sweep; and the notice provided at the 101 underpasses was not reasonable. The City seized unattended personal property at the 101 underpasses and Fremont Park, and it did not provide post-removal notice. Accordingly, Plaintiffs seek an order confirming that paragraph 4's notice requirements are not qualified by paragraph 3(c)'s immediate hazard exception, and that the Injunction requires Defendants to provide reasonable advance written notice of enforcement and notice of rights prior to enforcement, even in instances of immediate hazard, unless circumstances render the provision of such notice impracticable.

## IV.     Conclusion and Request for Relief

Plaintiffs bring this motion primarily to prevent future systematic violations of the Injunction; as such they seek an order enforcing and clarifying the Injunction pursuant to paragraphs 13(c) and (d). Plaintiffs respectfully request the Court issue an order enjoining the City from continuing to engage in the violations described above and clarifying the Injunction as described in section III.B., above.

Respectfully submitted:

Date: October 22, 2020          CALIFORNIA RURAL LEGAL ASSISTANCE, INC.

By: \s\ JEFFERY HOFFMAN

Attorneys for the Plaintiffs