1 SUE A. GALLAGHER, City Attorney (SBN 121469)
  ROBERT L. JACKSON, Assistant City Attorney (SBN 101770)
2 City of Santa Rosa
  100 Santa Rosa Avenue, Room 8
3 Santa Rosa, California 95404
  Telephone:  (707) 543-3040
4 Facsimile:    (707) 543-3055

5 Attorney for Defendants City of Santa Rosa

6

7

8                    UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA - San Francisco Division

10

11 NICHOLLE VANNUCI, ELLEN BROWN,            Case No.  3:18-CV-01955-VC
   and SHANNON HALL, individuals; and
12 HOMELESS ACTION!, an unincorporated       **CITY OF SANTA ROSA'S
   association,                              MEMORANDUM OF POINTS AND
13                                           AUTHORITIES IN OPPOSITION TO
                  Plaintiffs,                PLAINTIFFS' MOTION TO ENFORCE
14                                           AND CLARIFY PRELIMINARY
                                             INJUNCTION**
15           v.

16 COUNTY OF SONOMA, SONOMA
   COUNTY COMMUNITY
17 DEVELOPMENT COMMISSION, CITY
   OF SANTA ROSA,  and DOES I to XX,        Date:   December 3, 2020
18                                          Time:   10:00 a.m.
                  Defendants.               Dept:   4, 17th Floor
19 _____ /      Judge: The Hon. Vince Chhabria

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2   A.    FACTS................................................................1

3        1.    Doyle Park...................................................1

4        2.    101 Underpasses..............................................3

5        3.    Corporate Center Parkway......................................4

6        4.    Fremont Park.................................................5

7   B.    LEGAL DISCUSSION...................................................9

8        1.    Per the terms of the Preliminary Injunction, the Court is "restricted to
9               interpreting and applying" the injunction, not expanding obligations
               beyond those agreed upon............................................9

10       2.    SRPD has refrained from citation or arrest for camping violations
11               except in very limited circumstances...................................11

12       3.    An order to relocate is not, nor should it be going forward, a violation
               of the Injunction....................................................11

13       4.    The City has not engaged in a "systemtic resumption of enforcement"
14               but has been compelled to respond for the health and safety of all
               Citizens, including the camp residents, to close encampments where the
15               fire, safety and health hazards outweigh the COVID hazards that might
               come with closure..................................................14

16       5.    The City Continues to Explore Means by which to End the Cycle............15

17       6.    Enforcement and Closures of Encampments are Undertaken with
18               Careful Consideration and Consultation with the City Attorney's
               Office............................................................18

19       7.    Notice, when required, was given.....................................18

20       8.    The City has Complied with the Seizure and Storage Protocals
21               Of the Injunction..................................................20

22   C.    CONCLUSION......................................................21

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

3  **Federal Cases**

4

5  *Aitken v. City of Aberdeen,*
   393 F.Supp.3d 1075 (WD Wash. 2019).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

6  *Butcher v. City of Marysville,*
   2019 WL 918203 ( E.D.Cal.2/25/19).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7

8  *Le Van Hung v. Schaaf,*
   No. 19-CV-01436-CRB, 2019 WL 1779584 (N.D. Cal. Apr. 23, 2019).. . . . . . . . . . . . . . . . . 13

9  *Martin v. City of Boise,*
   920 F.3d 584 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,11,12,13

10

11  *Miralle v. City of Oakland,*
    2018 WL 6199929 (Nov.28, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12  *Shipp v. Schaaf,*
    379 F.Supp.3d 1033 (ND Cal 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13

14  *Young v. City of Los Angeles,*
    No. 20-cv-709-JFW-RAO, 2020 WL 616363 (C.D. Cal. Feb. 10, 2020). . . . . . . . . . . . . . . . . . 13

15  **State Statutes**

16

17  Fish & Game Code §5652. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,4,14

18  Fish & Game Code §89.1.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

19  Health & Safety Code §117555.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,14

20  Penal Code §647(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21  Streets & Highways Code §104.30(e)(2).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

22  Vehicle Code §22651(o) and §22669. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

23  Water Code §13050(e).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

24

25

26

27

28

## A.    Facts

The facts concerning police encounters with the individuals named in plaintiffs' motion can be found in the declarations filed herewith and will be the subject of testimony should the Court wish to conduct an evidentiary hearing. However, it may be helpful to provide a brief overview of each of the encampment closures which underlie plaintiffs' motion.

### 1.    Doyle Park

Doyle Park is an old community park in central Santa Rosa which is framed by Matanzas Creek and Spring Creek. An elementary school borders the park on the north.

In the aftermath of the closure of the Joe Rodota Trail by the County in late January, the homeless population rapidly expanded at Doyle Park. Human waste, needles, rotting food and the accumulation of refuse began to pollute the creeks. The City received increasing reports of criminal activity including drug use, fights and threatening behavior. Park goers and neighbors encountered people smoking in violation of the law, aggressive dogs off leash, shelters made with use of children's play structures, all of which made parts of the park increasingly inaccessible to the public. (Declaration of Jonathan Wolf)

As the situation grew worse, the North Coast Regional Water Quality Control Board wrote to the Water Department at the City of Santa Rosa enclosing a citizen complaint and adding its voice to a rising chorus of complaints by neighbors, the adjacent school, and park users regarding the deposit of litter and human waste in or near the creeks.[1] (Declaration of Sean McNeal) Because the park lies at the juncture of the two creeks, virtually all of the park, particularly the picnic areas where homeless individuals congregated, rests within the 150' envelope covered by Fish & Game Code §5652. (See Exhibit A to Declaration of Aaron Nunez)

California Fish & Game Code §5652 states:

> "It is unlawful to deposit, permit to pass into, or place where it can
> pass into the waters of the state, or to abandon, dispose of, or throw

---

[1]Camps have a significant impact on water quality, given the associated trash, erosion to creek banks causing sedimentation as well as increased turbidity, destruction of habitat, and depositing of biohazards such as feces and hypodermic needles. In 2019 the Storm Water & Creeks Team removed 721.95 cubic yards of trash related to homeless encampments in City waterways. This is equivalent to just over 24 fully compacted Recology garbage trucks. With that, 3,053 hypodermic needles, 717 tires, 1,537 batteries, 131 paint containers, and 165 fuel containers were also removed.

1          away, within 150 feet of the high water mark of the waters of the state
      . . . litter, refuse, waste . . . "

2

3          Section 89.1 of the Fish&Game Code and §13050(e) of the Water Code define "waters

4    of the state" as "any surface water or groundwater . . . within the boundaries of the state."

5          To add to the health and safety concerns, many of the homeless residents were not social

6    distancing and were not wearing masks. The City reached out to the County for guidance on

7    how best to proceed in light of CDC guidelines which discouraged closure of homeless

8    encampments. The City was advised through the County Counsel's Office that the County

9    Counsel, County Health Officer and County Public Health Department believed that

10   enforcement was consistent with the Public Health Order re COVID and that they had no

11   objection to the City escalating enforcement in light of the rapidly deteriorating circumstances.

12   (Declaration of Sue Gallagher)

13         SRPD then engaged in a gradual escalation of enforcement so as to encourage residents

14   to take advantage of the social distancing site at the Finley Center  and address the developing

15   heath and safety crisis in the park.  This gradual escalation was purposely designed to afford

16   residents ample warning and time to relocate.

17   •    On Thursday, May 14 SRPD began efforts when they  made two  warrant arrests. One

18         inoperable vehicle  was towed. One unlicensed driver was cited. Two individuals

19         arranged for shelter beds and numerous warnings were given for Fish & Game Code

20         violations and various city ordinances.

21   •    At 8:00 a.m. and again at 1:00 p.m. Tuesday, May 26 verbal notice was given and vacant

22         tents were posted with notices of planned removal of property. That same day HOST

23         teams arrived and were available for those seeking shelter and other services.

24   •    On Wednesday, May 27 SRPD conducted further outreach and verbal notice again at

25         8:00 a.m and 1:00 p.m. and HOST teams were on site.

26   •    Final clearance and clean up occurred on Thursday, May 28.

27         No arrests were made nor anyone cited for ordinances covered by the Injunction.

28   (Declaration of Jonathan Wolf)

2.      **101 Underpasses**

Encampments under Highway 101 also began to grow following the closing of the Joe Rodota Trail. These were located at College Avenue, 9th Street, 6th Street and in a City parking lot beneath the freeway which the City leases from CalTrans. As the Court will note from the photographs attached as Exhibit A to G of the Declaration of Kim Nadeau tents, belongings and debris obstructed sidewalks making many places impassable. The parking lot south of 6th Street was also obstructed. . In June, as the COVID restrictions began to ease, many local stores and businesses whose employees and customers used that parking lot began to reopen. With increased vehicular traffic the safety of the inhabitants and drivers was endangered especially at night when visibility was poor. (Declaration of Kim Nadeau) Criminal activity increased as witnessed by the fact that SRPD recovered five iPads and 6 Chromebooks stolen from nearby Biela Elementary School during the closure. Social distancing was not observed and masks were not being worn.'(Declaration of Jonathan Wolf)  The City became concerned that CalTrans would find the City in breach of its airspace lease beneath the freeway pursuant to Streets & Highways Code §104.30(e)(2)

As at Doyle Park the City determined that the health and safety hazards presented by the underpass encampments had reached a tipping point. The Finley Center Social Distancing Site was operational and the City hoped to encourage service resistant individuals to take advantage of it, as many had at Doyle Park. On May 28 SRPD officers began to post Notices of Planned Removal of Property. However, on the nights of May 30 and May 31 peaceful protests following the tragic death of George Floyd turned into looting, violence, vandalism and riots which resulted in a Declaration of Emergency and imposition of city wide curfews.

On June 4 SRPD again posted notices and  HOST workers resumed outreach efforts in the underpasses. HOST was on site for several weeks.

Closure was originally scheduled for mid June; however, shortly before, County Health advised the City that individuals who had recently spent time in the 101 encampments had tested positive for COVID 19. Upon learning of this news, and at the request of the County Health Officer, the City paused closure efforts to allow for the County to conduct testing. That

1    testing proved negative, and SRPD recommended closure efforts without objection from the

2    County Health Officer.

3          On June 24 sixteen arrests were made for outstanding warrants, probation violations, a

4    parole hold and drug related charges. (Declaration of Jonathan Wolf)  Three individuals were

5    booked for violation of Penal Code 647(e), but all appropriate protocols were undertaken prior

6    to their arrest.  Four vehicles were towed, three cars and one trailer for violation of Vehicle

7    Code §22651(o) and §22669, none of which are covered under the Injunction. HOST contacted

8    approximately 95 people, 30 of whom accepted placement, 4 at Sam Jones and 26 at the Finley

9    Center safe distancing site. (Declaration of Jennielynn Holmes)

10         **3.    Corporate Center Parkway**

11         Corporate Center Parkway is in a business park in southwest Santa Rosa. Historically, it

12   has been a recurring location for people in RVs to park overnight and to leave or abandon

13   inoperable vehicles or trailers which are not road worthy. The City has witnessed an increase in

14   RVs parked on city streets as Santa Rosa,, unlike many communities in the North Bay, has  not

15   as yet enacted a city wide ordinance limiting parking. Many owners of old and dilapidated RVs

16   and trailers, often with registrations expired for many years, often inoperable, have "donated"

17   their vehicles to help the homeless. Often such "gifted" trailers are towed to and simply left on

18   the side of the road without a tow vehicle attached. One local group has solicited "donation" of

19   such vehicles and gives them to those experiencing homelessness. Frequently, the occupant of a

20   RV or trailer is not the registered owner. (Declaration of Kyle Duggin)

21         Paragraph 2(a) of the injunction includes "vehicles" within the definition of a

22   "dwelling", but paragraph 2(c)(i)(3) limits enforcement to citation, arrest, closure or seizure of a

23   vehicle pursuant to only one ordinance, Santa Rosa City Code §11-20.100 which prohibits

24   parking for more than 72 hours. Paragraph 2(c)(ii)(3) exempts from the Injunction protocols

25   "various sections of the Vehicle Code" including other parking violations,  vehicle licensing and

26   registration, inoperable vehicles, abandonment, as well as Fish & Game Code §5652 which

27   applies not simply to creeks but, by statute "any surface water or groundwater."  Paragraph

28   3(c)(i) also exempts from the protocols where one places a dwelling (including an RV)  on a

1  highway shoulder or area exposed to moving vehicles or where the dwelling interferes with
2  access to or use of public facilities.

3       On July 9 after notice and outreach efforts were undertaken, closure commenced. A
4  number of individuals were offered services. Of the individuals that HOST contacted, nine
5  individuals initially accepted services at the Samuel Jones Hall Homeless Shelter or the Safe
6  Social Distancing Program in the parking lot of Finley Community Center. (Declaration of
7  Jennielynn Holmes) During the cleanup, the Police Department made arrests for warrants and
8  facilitated the towing of RVs/vehicles for vehicle code violations. No arrests were made for
9  unlawful camping. The City's Public Works crews removed more than 104 yards of debris,
10  including paint, oil, and tires.

11       Occupants in RVs at Corporate Center Parkway were instructed frequently to move, but
12  few if any were cited  for violation of the 72 hour ordinance and no vehicle was impounded for
13  that violation. Most citations were for registration violations, inoperable or not roadworthy
14  condition,  or gray water disposal into the storm drains.

15       **4.    Fremont Park**

16       Fremont Park, sometimes referred to as Cancer Survivors Park,  is a small city park
17  located in downtown Santa Rosa. It is made up of lawn surrounding a central fountain and is
18  bordered on the west side by yew and redwood trees.

19       In the late Spring and early summer the homeless population at Fremont Park grew
20  rapidly and began to present a fire danger. On Friday, July 24th, the Santa Rosa Fire Department
21  conducted an assessment of Fremont Park. (Declaration of Paul Lowenthal) They found that:

22  •     The west and northwest corner of the park contains mature redwoods  that had created a
23        continuous canopy and that numerous mature yews grew in two established rows, both
24        of  which would likely act as two continuous fuel beds.  The yew trees in particular
25        posed a fire danger as they  promote the spread of fire and ember cast.
26  •     There were a significant number of encampments showing evidence of cooking both in
27        contained and uncontained locations, immediately adjacent and under trees.
28  •     The volume of belongings contained in individual encampments which would fuel a fire

1      was significant.

2          The Fire Department concluded that a fire established under the redwood grove posed an

3 immediate and eminent threat to the homeless residents and the neighboring structure(s) west of

4 the park  and requested that action be taken to remove encampments from the western two thirds

5 of the park.

6          On Monday, July 27, a follow up assessment was conducted by the Fire Department. The

7 purpose of the follow up assessment was to better establish a defined perimeter for the western

8 two thirds of Fremont Park. During the site visit, there were signs of discarded ash and burned

9 materials that had been discarded in dry dead grass in at least two different locations in the

10 western two thirds of the park.  There was also numerous electrical cords being used to supply at

11 least a dozen encampments from a single source. The cords were not protected, were subject to

12 damage and presented a reasonable risk of an electrical hazard and or fire. (Declaration of Paul

13 Lowenthal)

14          This was late July, the start of the "fire season." We needn't remind the Court of the

15 recent history of devastating fires in Sonoma County and Santa Rosa:  the Tubbs Fire of 2017

16 the Kincaide fire of 2019, and the Glass fire of 2020 that have destroyed so much property and

17 shattered many family's lives. As one might imagine, all of Santa Rosa is acutely sensitive to

18 the risk of another catastrophic fire and understandably demand that the City government do

19 everything necessary to prevent a fire from recurring.

20          Regrettably, the Santa Rosa Fire Department has had to respond to numerous fires

21 originating in homeless encampments. (Declaration of Paul Lowenthal) These include:

22   •        On March 5 a  homeless encampment fire spread to a commercial building and destroyed
           the auto repair business on Frazier Ave. resulting in a half a million dollar loss.

23

24   •        On April 20 a homeless encampment fire spread to a unoccupied commercial property
           immediately adjacent to St. Eugene Church on Montgomery Drive.

25   •        On April 29 a homeless encampment fire spread to a multi-unit commercial building
           causing an estimated $50,000 in damage, destroyed the electrical service and forced the

26            shut down of businesses until repairs could be made.

27   •        On June 14 a homeless encampment fire spread to the vegetation near homes at A Place
           2 Play on West 3rd Street.

28

1

2
- On July 12, a homeless encampment cooking fire spread to vegetation on Round Barn Blvd. and another encampment fire spread to the exterior of a commercial building on Cleveland Avenue.

3

4
- On July 13 a homeless encampment fire destroyed one unoccupied structure, burned 3.3 acres and damaged several fences of homes.

5
- On July 16, homeless encampment fire spread to the vegetation on Marlow Road.

6
- On July 19 a homeless individual set her own belongings/encampment on fire on Old Redwood Highway which spread to the wild land burning approximately an acre.

7

8
- On August 13 an RV occupied by homeless individuals was fully engulfed in fire on Bellvue Avenue.

9
- In the Spring and again September 8 a fire occurred near McMinn Park when a fire at a homeless encampment was left unattended.

10
- On September 15 a fire was suppressed by neighbors when it erupted in the A Place to Play park from a homeless encampment.

11

12
- On September 21 a fire was suppressed at a vacant undeveloped lot in which a homeless individual occupying an RV was located.

13

14
- As recently as October 15 at Youth Community Park and again on October 26, 2020 at Howarth Park and on October 31 at the Fairgrounds, the Fire Department responded to fires which originated in homeless encampments.

15      So, with the threat of fire from homeless encampments real and recent, the City was

16   faced with a decision: close Fremont Park entirely or close only that portion which presented an

17   immediate fire risk. As the public safety justification at that time only extended to a portion of

18   the park, the City elected to limit the closure and on July 29 closed the west half with the hope

19   that HOST workers might persuade the park residents in that area to take advantage of the

20   Finley Center social distancing site or other housing options. Instead, and not surprisingly, many

21   simply moved to the east half of the park. (Declaration of Dave Gouin)

22      Over the course of the next month health and safety conditions degenerated further in the

23   park. (Declarations of Paul Lowenthal and Jonathan Wolf)

24

25

26
- Even after closure of the east half of the park for fire reasons, during inspections the Fire Department found a seven gallon propane tank, BBQs, a discarded pile of burned debris, a significant number of electrical extension cords connected to park lighting which, given the volume and the manner in which they are being used, presented a fire hazard;

27

28
- Tents were not socially distanced and were often only two feet apart; seldom if ever did residents wear facial protective coverings;

- On one occasion a group of nine people were observed passing a

methamphetamine pipe and two  were actively shooting what appeared to be heroin;

• On several occasions there was a smell of feces and urine on the west side of the park behind the line of tents, despite the provision of sanitary facilities. Residents were urinating and defecating in the park;

• or dumping their "buckets' in the grass. HOST workers found an abundance of needle caps in the grass and a total of 9 needles just laying randomly in the park;

• On August 18 HOST workers observed only nine people wearing masks, open drug use, 22 needles on the ground outside of tents, and visible needles laying inside tents. A fight was actively in progress as HOST arrived. Tents had not been socially distanced, and with the influx of new tents some were wall to wall;

• Rat infestation grew. Neighbors reported seeing rats crossing the street in broad daylight coming in and out of the park and into their backyard;

• Neighbors reported seeing a group of 3 people jump the fence on the closed section of the park and engage in a knife throwing contest where they were throwing large knives into the redwood trees.  Many times the knives bounced off the trees and flew into the neighbors front yard and struck their house When confronted by the neighbors, the knife throwers became aggressive;

• Neighbors reported multiple fights in the middle of the night.  Screaming and fighting was a nightly occurrence (not to mention the constant music).  The arguing escalated until someone screamed for help; and

• Neighbors reported the need to keep their children inside, of being accosted by park residents and on one occasion a resident pointing a gun at multiple people.

Given these rapidly escalating health and safety concerns, the City concluded the provisions of Section 3(c) of the Preliminary Injunction applied and compliance with the protocols was not required; nevertheless, on August 28 the City issued written notices to vacate. HOST workers had been engaged in outreach for weeks.  The City endeavored to process requests for accommodations and provide formal responses.

On September 1 closure began. The police made two arrests: one for possession of drug paraphernalia and the other for possession of heroin, meth, violation of probation and felon in possession of pepper spray. Nobody was cited or arrested for camping. (Declaration of Jonathan Wolf)  HOST reported that 41 people were engaged; 26 people refused engagement beyond a cordial greeting;  4 placements were made at Sam Jones Hall;  11 placements were made  at the Finley Social Distancing Site;  3 people wait-listed for the Sandman; 2 people made appointments with HOST for resources and housing search; and one person made a housing

1   appointment and received a housing voucher. (Declaration of Jennielynn Holmes)

2   **B.    Legal Discussion**

3           **1.    Per the terms of the Preliminary Injunction, the Court is "restricted to
                    interpreting and applying" the  injunction, not expanding obligations
4                   beyond those agreed upon.**

5           It is important to note what  the plaintiffs seek. Although they allege "violations"

6   throughout their motion, plaintiffs do not seek a finding that Santa Rosa Police acted in either

7   criminal or civil contempt of the Preliminary Injunction. Nor do plaintiffs seek to modify the

8   injunction under paragraph 13(e). They have not invoked that paragraph.

9           Rather, plaintiffs invoke paragraphs 13(c) and (d) asking the Court  to first clarify what

10  the Injunction means and, second, direct the City's compliance with such clarified terms going

11  forward (Doc. 134, p. 5 and p.19).[2] This has two foundational ramifications for how the Court

12  should address this motion.

13          First, as modification is not sought, and the motion is limited to "clarification" of the

14  original terms of the Injunction, plaintiffs' discussion of whether the City has complied or must

15  comply with CDC "guidelines" and County Health Officers "orders" with respect to the COVID

16  pandemic  is not properly before the Court.  Neither the Preliminary Injunction, nor *Martin v.*

17  *City of Boise*, nor any statute or case law mandates that the defendants provide porta-potties or

18  hand washing stations to homeless encampments. Nor does the Preliminary Injunction or any

19  law mandate that defendants must refrain from closure of an encampment because of the

20  COVID pandemic.[3]

21          The question of "public health" appears in two provisions of the Preliminary Injunction:

22  paragraph 2(e) which provides that when determining the  "adequacy of shelter" the "conditions

23  of the facility", including "health or safety risks" may be considered; and paragraph 3(c) which

24

25          [2] This was confirmed in a gracious e mail from plaintiffs' counsel on October 28 in which she
    clarified "Plaintiffs are seeking an order clarifying the Injunction and directing the City's compliance with
26  the Injunction, as clarified." This is echoed at the conclusion of their motion where they state, "Plaintiffs
    bring this motion primarily to prevent future systematic violations of the injunction." (Doc.134, p.19)
27

28          [3]As evidenced by the Declaration of Kelli Kuykendall and David Gouin, the City  has endeavored
    to assist the homeless during the pandemic. But that is not before the Court in this motion.

1   exempts from the enforcement protocols camping that presents a "public health hazard." Neither

2   paragraph mandates porta-potties at encampments or prohibits closure of an encampment in a

3   pandemic.

4        The declaration of Dr. Tim Muldoon is a dramatic overreach. It is, in essence, an

5   invitation to modify, not clarify, the Injunction to bar outright any closure of encampments

6   during the pandemic. That goes far beyond the facts which gave rise to this lawsuit, far beyond

7   the pleadings, far beyond the central  issue in this lawsuit (i.e. under what circumstances may an

8   individual be cited or arrested for violation of camping ordinances), and far beyond the terms of

9   the Preliminary Injunction agreed upon by the parties. Such a debate would require amendment

10  of the pleadings,  considerable discovery, exchange of expert opinions, subpoena and testimony

11  of independent witnesses, and a prolonged evidentiary hearing for the Court to make an

12  informed decision.

13       Second, as plaintiffs do not seek to modify the injunction under paragraph 13(e), and

14  seek only "clarification",  the question before the Court is really one of interpretation of the

15  language of the Injunction.  In that regard,  Paragraph 13(c) explicitly provides, "Such

16  determinations shall be restricted to ***interpreting and applying*** the preliminary injunction." This

17  is important.

18       Given the unusual circumstances which led to the Preliminary Injunction, interpretation

19  of the language is more akin to contract interpretation than statutory interpretation. The

20  Preliminary Injunction was not the product of a contested hearing, but of settlement

21  negotiations. Those settlement discussions were first undertaken with the intent of resolving the

22  lawsuit in its entirety and later, at the suggestion of the Court, converted  into a stipulated "trial

23  run" injunction when it appeared a global resolution was not yet possible.  There is no

24  evidentiary record from which the Court might revisit the basis of its order.

25        Defendants respectfully submit that the Court's role is therefore limited.  Plaintiffs  may

26  not, in the guise  of seeking  "clarification"  and  without benefit of further agreement or a

27  contested hearing, expand the obligations of the defendants  beyond those contemplated by the

28  parties and agreed upon. Rather,  the Court's focus must be limited to ascertaining the meaning

1   to be given to the expression of the parties at the time they stipulated to the Preliminary

2   Injunction.

3         **2.      SRPD has refrained from citation or arrest for camping violations except in
                     very limited circumstances.**

4

5          Plaintiffs rely on the declarations of nine homeless  individuals who contend their rights

6   under the Injunction have been violated.  Of those nine  individuals, four (Catoe, Naughton,

7   Coleman, Hance) were neither cited nor arrested by SRPD. Three were cited for violations not

8   covered by the Injunction. ( Pishgar-- a two hour parking limit (Santa Rosa City Code 11-28-

9   030) Vincent-- Health & Safety Code 117555 (gray water contamination);  Souvannhoxay-- no

10  parking zone. Only two (Baldwin, Neils) were cited and arrested for camping violations, Neils

11  in January and Baldwin in March.

12         The Injunction went into effect in August of 2019. In the sixteen months since then,

13  plaintiffs can cite to only two citations or arrests for violation of an ordinance covered by the

14  Injunction. This can hardly be characterized as systemic violation of the injunction or the spirit

15  of *Martin.* On the contrary, SRPD has, both before the Injunction and after the Injunction,

16  respected and abided by the holding in *Martin* and, in all but a very few cases, refrained from

17  citations or arrests.

18        **3.      An order to relocate is not, nor should it be going forward,  a violation of
                    the Injunction.**

19

20              **A.      The parties did not agree that an order to relocate is an" enforcement
                          action."**

21         Plaintiffs contend that an order  to relocate  is an "enforcement action" as defined

22  by paragraph 2(c)(3). They argue such an order  is the same as  "closing or moving a dwelling or

23  encampment."

24         Defendants contest this interpretation saying " . . . no. . .  ***closing or moving*** a dwelling

25  or encampment means what it says, '***closing or moving***..." It means picking up a tent or towing a

26  vehicle. That is the plain meaning of those words.

27          Moreover, defendants would  remind the Court of the undisputed fact that, in the

28  negotiations leading to the stipulated injunction, the phrase "direction to relocate" , which had

1   been in earlier drafts of the proposed stipulation, was at the insistence of the County removed.

2   Defendants clearly communicated that they would not agree to a stipulated injunction that

3   required enforcement protocols be exhausted before a police officer told a homeless individual

4   to leave. Defendants made it clear that the *Martin* decision did not go that far and that they were

5   not prepared to stipulate to an obligation so far outside what the law required..  Plaintiffs  agreed

6   to the stipulated injunction knowing a direction to relocate did not rise to the level of an

7   enforcement action.

8        Plaintiffs may wish to revisit that issue. But the issue now before the Court is one of

9   interpretation not modification. i.e.  what was the intent of the parties as expressed at the time

10  the language of the injunction was agreed upon?  Not what plaintiffs would now want. Whether

11  the City violated the injunction cannot be adjudged on how plaintiffs now would want the

12  injunction to provide, but what was the intent of the parties as expressed in the stipulated

13  injunction at the time it was signed.

14            **B.     The law does not hold that an order to relocate is an enforcement
                action raising 8th Amendment implications**.

15

16        In *Martin v. City of Boise* the 9th Circuit struck down the "criminalization" of the status

17  of homelessness. It was based on facts where individuals were cited with infractions of an anti-

18  camping ordinance. The Court held that 'the  Eighth Amendment prohibits ***the imposition of***

19  ***criminal penalties*** for  sitting, sleeping, or lying outside on  public property for homeless

20  individuals who cannot obtain shelter. (Emphasis added)" (*Martin v. City of Boise*, 920 F.3d

21  584, 616 (9th Cir. 2019)

22        The 9th Circuit wrestled with whether the 8th Amendment was implicated without a

23  conviction and a sentence or sanction. However, the court held  that a conviction was not

24  necessary so long as there was "initiation of the criminal process" by way of a citation or arrest.

25  (*Martin v. City of Boise*, at p. 614)

26        The Court in *Martin* did not address and did not hold that actions prior to initiation of

27  criminal process by way of  a citation or arrest were actionable. That is not the law. In fact,

28  several courts have recently held that *Martin* does not apply to orders of relocation or closure of

1    encampments where there is no actual commencement of criminal prosecution.

2    •    In *Young v. City of Los Angeles*, No. 20-cv-709-JFW-RAO, 2020 WL 616363 (C.D. Cal.
         Feb. 10, 2020) the court granted a motion to dismiss where plaintiff challenged his
3        forced relocation from a homeless encampment stating " the Eighth Amendment only
         bars the City from criminally prosecuting Plaintiff . . .  Plaintiff's allegation that the City
4        has not permitted him to stay at one encampment for the past three years fails to state an
         Eighth Amendment claim [because]("*Martin* does not limit the [c]ity's ability to evict
5        homeless individuals from particular public places."

6    •    In *Aitken v. City of Aberdeen*, 393 F.Supp.3d 1075 (WD Wash. 2019) the plaintiff sued
         to enjoin the closure of a homeless encampment and sought a preliminary injunction in
7        part premised on 8th Amendment grounds. The court denied injunctive relief finding that
         eviction without criminal prosecution did not violate *Martin* and plaintiff was therefore
8        unlikely to prevail on the merits.

9    •    In *Miralle v. City of Oakland*, 2018 WL 6199929 (Nov.28, 2018) the plaintiff sued to
         enjoin Oakland from evicting her from a homeless encampment. The court denied
10       plaintiff's motion for a preliminary injunction holding "plaintiffs are not faced with
         punishment" and  "*Martin* does not establish a constitutional right to occupy public
11       property."

12   •    In *Butcher v. City of Marysville*  2019 WL 918203 ( E.D.Cal.2/25/19)  the court
         dismissed an 8th Amendment claim brought by a homeless individuals holding that,
13       because they had not alleged their "arrest was imminent" the requisite showing of
         initiation of the criminal process had not been met.
14
     •    In *Le Van Hung v. Schaaf*, No. 19-CV-01436-CRB, 2019 WL 1779584 (N.D. Cal. Apr.
15       23, 2019) the court held that a "clear and clean" operation did not implicate *Martin* since
         it did not require arrest of plaintiffs. The court reasoned, " . . .while *Martin* limits
16       localities' ability to arrest their homeless residents for the act of living in the streets when
         there is nowhere else for them to go, it does not create a right for homeless residents to
17       occupy indefinitely any public space of their choosing."

18   •    In *Shipp v. Schaaf* 379 F.Supp.3d 1033 (ND Cal 2019) the court held that remaining at
         an encampment is not conduct protected by *Martin* because temporary closure of an
19       encampment does not implicate any criminal sanctions.

20   •    In *Frank v. City of St. Louis*, 458 F.Supp.1090, 1094 the court held that St. Louis could
         close an encampment in part because there was no indication that the homeless plaintiff
21       "faces a genuine threat of criminal punishment" and the  City's intent was "to ensure that
         individuals move from the encampment to safer options"
22

23                  **C.      Even plaintiffs must agree, an order to relocate because of an
                             ordinance *not* covered by the Injunction is not a violation.**
24

25           Setting aside for a moment that the parties did not agree and the law does not hold that

26   an order to relocate is an enforcement action raising 8th Amendment implications, and assuming

27   for the sake of argument that an order to relocate itself must be prefaced by compliance with

28   Injunction protocols, surely SRPD need not comply with the Injunction protocols when an

1   individual is ordered to leave for violation of an ordinance not covered by the injunction.

2          If Ms. Catoe was told to leave Doyle Park because she was camping near a creek in

3   violation of Fish & Game Code §5652, that is not a violation. If Ms. Pishgar was told to leave

4   Sebastopol Road because she was in violation of a two hour parking ordinance, that is not a

5   violation. If Mr. Vincent was told to leave Corporate Center Parkway because he was in

6   violation of signs prohibiting overnight parking or because his vehicle was leaking gray water in

7   violation of Health & Safety Code §117555, that is not a violation. If all of the people crowding

8   the sidewalks, streets and parking lots beneath the Highway 101 overpasses including Mr.

9   Baldwin, Mr. Naughton, and Ms. Hance were told to leave because the placement of their tents

10  were dangerous to pedestrians and motorists, that is not a violation. And if all of the people who

11  were using camp stoves or overloading electrical boxes with daisy chained appliances so as to

12  create a fire hazard at Fremont Park were told to leave, that is not a violation.

13         **4.     The City has not engaged in a "systematic resumption of enforcement", but
               has been compelled to respond for the health and safety of all citizens,
14             including the camp residents,  to close encampments where the fire, safety
               and health hazards outweigh the COVID hazards that might come with
15             closure.**

16         The Injunction specifically provides in paragraph 3(c)  that an enforcement action may

17  be taken without following the protocols where "camping . . . presents a risk of fire or other

18  public health hazard." This Court has expressed that it is very reluctant to interfere with safety

19  and health measures taken in good faith.

20         Plaintiffs contend that the City has abused this exception and, pointing to Doyle Park,

21  the 101 underpasses, Corporate Center Parkway, and Fremont Park, argue that the exception has

22  swallowed the rule. Plaintiffs further argue, incredibly, that the City itself is to blame for

23  "creating the hazard" which it then uses to justify closure. This argument takes some chutzpah.

24         The simple truth is this: with the advent of the COVID pandemic the City finds itself in

25  a repeating "damned if you do/damned if you don't" loop. A large homeless encampment is

26  closed. Say, for example, the Joe Rodota Trail. Despite the best efforts of outreach workers,

27  many individuals, resistant to service for both legitimate and illegitimate reasons, gradually

28  begin to congregate at another encampment. Cognizant of CDC Guidelines that discourage

1   closure of homeless encampments, and because initially no countervailing safety or health risk

2   is presented, the City must refrain  from efforts to close the new encampment. That encampment

3   grows, often rapidly. With the growth of the encampment, safety and health risks mount. These

4   include increased criminal behavior., obstructions of sidewalks, parking lots, roadways,

5   restricted use of a city property  by other citizens, fire risks with open fires, gas camp stoves,

6   and available electrical boxes are overloaded with multiple appliances.  Health risks grow as

7   sanitation is not maintained, rats and vermin multiply. Social distancing is not observed and

8   masks are not worn so that the risk of COVID transmission becomes greater within the camp

9   than were it dispersed.

10          As the fire, public safety and health risks escalate, the City reaches a Hobson's choice:

11   do the accumulation of safety and health risks which come with camp growth now outweigh the

12   risk of COVID transmission that might come with a closure?  The City turns to the County

13   Health Officer to assess if COVID is present in the encampment.  Barring objection from the

14   County Health Officer, the City undertakes a measured approach.  Though compliance with

15   protocols is not technically required  because there is a fire, safety and health risk under

16   paragraph 3(c), the City will endeavor to give notice, will conduct HOST outreach, will secure

17   adequate alternative housing at Samuel Jones Hall, or the City's Finley social distancing

18   campsite, or the Sandman hotel, and will give warning to relocate. Eventually, the encampment

19   will be closed. And, regrettably, the process repeats itself.

20          What the plaintiffs refer to as a "systematic resumption of enforcement actions" is not a

21   sinister escalation of force, but reluctant decisions necessitated when the real and imminent

22   dangers presented by refraining from closure outweigh the chance of  risks caused by closure.

23          **5.      The City Continues to Explore Means by which to End the Cycle.**

24          What then, the Court may ask, is the City doing to end this cycle? This is difficult.

25          Santa Rosa finds itself hampered by restraints from several directions unique to our time.

26   Annual near catastrophic fires  require constant vigilance and aggressive  preventative measures.

27   COVID and the CDC Guidelines discourage camp closures until such time that the camp is a

28   greater risk intact than dispersed. COVID and the fires are anticipated to result in growth of the

1  homeless population, yet fiscal experts anticipate that public revenues will dramatically shrink

2  because of COVID and the fires. This makes it difficult to expand programs. Superimpose that

3  bleak prospect on a City which is blessed with a mild climate, cursed with inadequate affordable

4  housing, and is (though plaintiffs may disagree) generally regarded as a community more

5  accommodating than others to the challenges facing those experiencing homelessness, and

6  policy options become challenging.

7        That said, here is what Santa Rosa is doing (Declaration of David Gouin):

8        •      The City expends approximately $3.4 million annually on homeless related

9               programs and from March to December the estimated expense for the City's

10              COVID response will be an additional $7.3 million;

11       •       Contrary to the plaintiffs' allegations the City has endeavored to provide

12              hygienic facilities at encampments. These included two units at Prince

13              Memorial Greenway, three units at Corporate Center Parkway, one unit at the

14              Bennett Valley Senior Center, two units in the City Hall parking lot, two near

15              Apollo Way, two in the Highway 101 underpasses, one near the Old Orchard

16              Supply Store on Cleveland Avenue, one at the site of the old Bennett Valley

17              Senior Center, one near the College Avenue underpass, one at West Steele Lane

18              and Guerneville Road, one at South A Street and Earle, one in the 6th Street

19              underpass, two units at the Homeless Services Center and one at Fremont Park,

20              later supplemented with two more.

21       These sites were chosen after staff and police canvassed the City to identify pockets of

22  homelessness most in need.

23       •      In March the City acted to help protect residents at Samuel Jones Hall from

24              COVID-19 by relocating some individuals out of the facility to hotels so that

25              required social distancing measures could be implemented. This resulted in a

26              loss of 56 beds. In their place, the city is now constructing an emergency shelter

27              expansion to restore available bed capacity back to pre-COVID-19 occupancy,

28              while maintaining social distancing requirements. The emergency expansion

1   plans include  a new 8,000 square foot prefabricated "sprung up" building to be

2   placed in the parking lot, adjacent to the current shelter building. It will house up

3   to 60 individuals and restore shelter bed capacity to pre-COVID-19 levels.

4   •   In May the City  established a Safe Social Distancing Program (SSDP) in a

5   section of the City-owned parking lot at Finley Community Center for temporary

6   use by vulnerable unsheltered individuals amid the coronavirus pandemic. The

7   SSDP consisted of 68 tents, with each tent accommodating an individual or

8   couple. In addition to safe temporary shelter, program participants were provided

9   with access to essential services such as portable toilets and handwashing

10  stations, refuse containers, mobile shower unit, laundry service, and meals, plus

11  linkage to countywide shelter and services via Coordinated Entry assessment and

12  enrollment, service and housing navigation, on-site medical services, and

13  referrals for alcohol and other drug (AOD) treatment and behavioral health

14  services. Between May and September, the SSDP served 154 individuals.

15  (Declaration of Jennielynn Holmes)

16  •   On July 7 city staff made a presentation to the City Council on options for a safe

17  parking program. (Declaration of Kelli Kuykendall) Staff looked at 108 city

18  owned properties and made recommendations regarding location of sites in as

19  many of the seven City Council districts as possible. Staff presented three

20  options: (1) a basic option at an estimated cost of $136,500, a program operator

21  option at an estimated cost of $270,000, and a housing focused option at a cost of

22  $530,000. Such a program may be joined with a parking restriction ordinance.

23  Further discussion is awaiting the study and approval of a new City Council to

24  include three new council members.

25  •   A revised contract with Catholic Charities in now under consideration to expand

26  services for the new sprung up structure.

27

28  //

1

**6.   Enforcement and Closures of Encampments are Undertaken with Careful Consideration and Consultation with the City Attorney's Office**

2

3      The City undertakes all enforcement actions and the closure of encampments with

4  careful consideration and consultation with the City Attorney's Office.  An Assistant City

5  Attorney is available for consultation twenty four hours per day and his cell phone number has

6  been distributed to members of the Police Downtown Enforcement Team should advice be

7  helpful or necessary. Since the Injunction went into effect, and whenever possible, officers are

8  encouraged to refrain from citations or arrests for violations covered by the Injunction until first

9  consulting with the Assistant City Attorney. (Declaration of Robert Jackson)

10      Both the City Attorney and the Assistant City Attorney attend weekly meetings of  the

11  Homeless Encampment Assistance Program (HEAP). HEAP is a multi-disciplinary team

12  focused on a compassionate approach to address the health, safety, and shelter needs of persons

13  living in encampments and to ease impacts to surrounding communities. The team is chaired by

14  the Director of the Housing and Community Services Department and the Department's

15  Manager of Homeless Services and  is comprised of representatives from various City

16  departments and Catholic Charities' HOST team, including police command staff, the police

17  Downtown Enforcement Team, Fire, Parks, Water, and Public Works. The City prioritizes

18  encampments  based on the following criteria: the number of individuals estimated at the site

19  and an assessment of their vulnerability due to living outdoors, associated health, safety, and fire

20  risks, and property ownership. HEAP  meets every week to discuss known encampments,

21  prioritize which to address and how best to do so. Closure of a large encampment is first

22  discussed at HEAP where the City Attorney and/or Assistant City Attorney will provide counsel

23  regarding compliance with the terms of the Injunction if applicable. (Declaration of Kelli

24  Kuykendall)

25      **7.   Notice, when required, was given.**

26      Plaintiffs allege the City has failed to comply with written notice protocols.  This

27  misconstrues the language of the Injunction, is not factually accurate, and elevates form over

28  substance.

1          **A.    Plaintiffs misconstrue the clear language of the Injunction regarding notice protocols**.

2

3          Relying on the fact that paragraph 4(a) does not, itself, have an emergency exception,

4 plaintiffs contend written notice requirements must be met whenever an order to relocate is

5 made, regardless of the infraction underlying the order, and regardless of whether a public

6 health, safety or fire hazard exists.  This ignores the clear  language of paragraph 4(a) and

7 3(a)(I).

8          First, paragraph 4(a) begins "*Before an enforcement action is taken . . .*" The term

9 "enforcement action" is defined in paragraph 2(c).  Paragraph 2(c) does not include orders to

10 relocate and is limited to citations, arrests, closing an encampment or seizing property pursuant

11 to specified ordinances. Therefore, since an order to relocate is not within the definition of

12 "enforcement action" no written  notice must be given in advance of such an order.

13          Second, an "enforcement action" is defined as an arrest, citation or closure "*pursuant to*"

14 specified city ordinances.  If a citation, arrest, or closure is for violation of an ordinance not

15 covered by paragraph 2(c), advanced written notice is not required. So, for example, individuals

16 at Doyle Park who were  camping near or littering within 150' of the two creeks that frame the

17 park need not, under the language of the Injunction,  have been given written notice of their

18 rights. An individual whose tent obstructed a sidewalk in a Highway 101 underpass need not be

19 given written notice of their rights or a planned date for closure. An RV on Corporate Center

20 Parkway in violation of a two hour parking restriction or depositing gray water into storm drains

21 in violation of Vehicle Codes or Health & Safety Codes need not, under the language of the

22 injunction, have been given written notice.

23          Third, paragraph 4(a) does not stand alone. In the second sentence it specifically

24 references the notice protocol in paragraph 3(a)(i). Paragraph 3(a)(i) begins with the qualifier

25 "except in the event" and then references paragraph 3(c)(i). So, advanced written notice is not

26 required, even for a closure pursuant to a covered ordinance if there is a public health, fire or

27 safety reason to act. Plaintiffs object that advanced written notice was not given before the July

28 29 initial closure of the western half of Fremont Park, but given the fire hazard presented, the

1   language of the Injunction did not require it.

2   **B.   The City has provided advanced written notice when required**.

3   Following the issuance of the Injunction, the City created two written notices to be used

4   prior to closures of encampments for violation of camping ordinances: the "Notice of Legal

5   Rights and Opportunity to Relocate", and the "Notice to Vacate Illegal Encampment on Public

6   Property." (See Declaration of Robert Jackson, Exhibits A and B) The "Notice of Legal Rights"

7   was recently modified after negotiations with plaintiffs' counsel. (See Declaration of Robert

8   Jackson, Exhibit C )Such notices have been given when required under the Injunction.

9   **8.   The City has Complied with the Seizure and Storage Protocols of the**
    **Injunction.**

10

11   Paragraph 5 of the Injunction governs the seizure and storage of personal property.

12   Officers in the SRPD, and in particular the officers who comprise the Downtown Enforcement

13   Team who conduct encampment closures are well versed in the  rules and exceptions contained

14   in paragraph 5. (Declarations of Jonathan Wolf and Jeff Travers)

15   Closure of the encampments at issue here were all prefaced by repeated verbal warnings

16   so that residents would have sufficient time to gather their belongings. Written notice was given.

17   Customarily residents would have several days to more than a week's notice that enforcement

18   was coming. Police and HOST outreach workers were on site repeatedly advising of an

19   approaching closure. No one was pressured to abandon property.

20   Property deemed abandoned was discarded as permitted under the Injunction. Items that

21   presented health or safety risks were discarded, as were infested items, furniture, mattresses and

22   bulky items, perishable items, and trash, garbage and debris.  Discard of property deemed

23   abandoned or not appropriate for bag and tag and storage was documented in body worn camera

24   videos. Property was not destroyed that was not properly deemed abandoned or exempt from

25   storage obligations. (Declarations of Jonathan Wolf and Jeff Travers)

26   **C.   Conclusion**

27   Defendant City respectfully requests that the motion be denied in its entirety on grounds

28   (1) it is an improper request for modification and expansion of the obligations the parties

1  agreed to in stipulating to the  Preliminary Injunction and beyond the power of the Court to

2  order without further agreement or presentation of evidence; (2) it seeks to enlarge the definition

3  of an enforcement action beyond what was specifically agreed to and beyond what the law

4  requires; (3) the purported facts  on which it relies are controverted and, even if accepted as true,

5  do not show a systematic disregard of the letter or intent of the Injunction to warrant the relief

6  requested.

7         When plaintiffs counsel expressed their intent to file  a motion to clarify and enforce

8  earlier this year, the Court advised the parties that it would likely require an evidentiary hearing.

9  Defendant City has attempted in the brief period of time alloted to respond to this motion to

10  present evidence by way of the declarations attached; however, should the Court require

11  additional evidence, and should the Court wish to review body worn camera video depicting

12  some of the events and police encounters mentioned, this will require  additional time to prepare

13  and present and may require protective orders by the Court regarding issues of privacy of those

14  depicted.

15         Defendant City welcomes the opportunity to  proceed in whatever manner the Court

16  finds necessary to its decision.

17

18  DATED: November 5, 2020                    Respectfully submitted,

19

20                                             */s/ Robert L. Jackson*
                                             _____
21                                             ROBERT L. JACKSON
                                             Assistant City Attorney
22                                             Attorney for Defendant City of Santa Rosa

23

24

25

26

27

28