SUE A. GALLAGHER, City Attorney (SBN 121469)
ROBERT L. JACKSON, Assistant City Attorney (SBN 101770)
City of Santa Rosa
100 Santa Rosa Avenue, Room 8
Santa Rosa, California 95404
Telephone: (707) 543-3040
Facsimile: (707) 543-3055

Attorneys for Defendant City of Santa Rosa

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA - San Francisco Division

| | |
|---|---|
| NICHOLLE VANNUCCI, ELLEN BROWN and DEBORAH DRAKE, individuals; and HOMELESS ACTION!, an unincorporated association,<br><br>　　　　　　　Plaintiffs,<br><br>　　v.<br><br>COUNTY OF SONOMA, SONOMA COUNTY COMMUNITY DEVELOPMENT COMMISSION, CITY OF SANTA ROSA, and DOES I to XX,<br><br>　　　　　　　Defendants.<br>_____/ | CASE NO. 3:18-CV-01955-VC<br><br>**DECLARATION OF JEFFREY TRAVERS IN OPPOSITION TO MOTION TO ENFORCE AND CLARIFY PRELIMINARY STIPULATED INJUNCTION**<br><br>Date:　December 3, 2020<br>Time:　10:00 a.m.<br>Ctrm:　4, 17th Floor<br>Judge: The Hon. Vince Chhabria |

I, Jeffrey Travers, declare as follows:

1. I am a police officer employed by the City of Santa Rosa. I have personal knowledge of the set forth in this declaration and if called as a witness, could and would testify competently thereto.

2. I am a member of the Downtown Enforcement Team ("DET"). The DET consists of several officers, all of whom report to Sgt. Jonathan Wolf. The DET was originally formed as a beat unit patrolling the downtown business section of Santa Rosa; however, with time and our frequent encounter with individuals experiencing homelessness, our focus has shifted to

1

1  interacting with Santa Rosa's homeless population. I, Sgt. Wolf, and the other members of the
2  DET team interact with the homeless on a daily basis. The bulk of our calls for service are
3  homeless related. We have interacted with many homeless individuals on a recurring basis and
4  know many by name.  We are very familiar with those in the homeless population that are
5  adverse to assistance. We know those who are dealing with alcohol or drug dependency or
6  mental health issues. We are familiar with locations where those experiencing homelessness are
7  frequently found, where encampments tend to occur and grow. We encounter and interact with
8  homeless advocates and their attorneys routinely. We work closely with the members of the
9  Homeless Outreach Street Team (HOST).

10  3.  I regularly attend meetings of the Homeless Encampment Assistance program
11  where my observations, experience with the homeless population, and counsel is often sought.

12  4.  When encampments such as those at Doyle Park, the 101 Underpasses, and
13  Fremont Park  are contemplated for closure, the DET, myself included, are generally assigned to
14  provide assistance.  We are involved in the planning and execution of an encampment closure
15  working along side HOST outreach workers in the days, sometimes weeks, before a planned
16  closure.

17  5.  The objective  of the DET is not to cite or arrest. We view citation or arrest as a
18  measure of last resort.  We know first hand that many experiencing homelessness are struggling
19  to overcome drug or alcohol dependency and/or mental illness. Our goal is to, whenever possible,
20  encourage those experiencing homelessness to consider and hopefully take affirmative steps
21  toward obtaining housing. I frequently will make appointments for individuals at the Homeless
22  Services Center. I often will secure a bed for individuals at the Samuel Jones shelter or the Palms
23  Inn. When an individual fails to make an appointment I have looked for them, I will often return
24  to where I last encountered them to remind them and encourage them.

25  6.  The DET has  a close working relationship with the City Attorney's Office. We
26  have frequent contact with Rob Jackson, the Assistant City Attorney assigned to homeless
27  matters and will consult with him on compliance with the Injunction and all applicable laws. We
28  have his personal cell phone number and his instructions that we are free to call or text whenever

1 necessary. With few exceptions, we do not make an arrest or issue a citation for violation of a camping ordinance unless and until we have discussed the situation with the City Attorney's Office.

7. Working closely with the City Attorney's Office, we are familiar with the holding of *Martin v. Boise*. The Department's policy, of which we are all very much aware, is that the status of homelessness is not a crime; that residents of the community who find themselves homeless shall be treated with dignity and respect; that for a homeless individual who does not have access to temporary shelter the acts of sitting, sleeping or lying outside on public property in such a way so as not to obstruct passage or harm the safety and health of others are universal and unavoidable consequences of being human; and that a homeless individual must not be subjected to enforcement of a City ordinances or State law merely as a pretext to criminalize his or her status as homeless.

8. We have been trained on the terms of the Preliminary Injunction. We understand that, unless enforcement is for an ordinance not covered by the Injunction, or unless enforcement is necessitated by an emergency, including one of public health or safety, before issuing a citation or making an arrest for a camping violation we must first provide an individual with written notice of their rights, provide the individual with an opportunity for assessment by trained outreach staff, provide an opportunity to be placed in adequate shelter reasonably suitable to the disability related needs of the individual, and provide the individual with a reasonable opportunity to relocate.

9. We also have been trained on the terms of the Injunction pertaining to seizure and storage of personal property. In each of the closures involved here, Doyle Park, the 101 Underpasses, and Fremont Park, we seized and discarded only property deemed abandoned, presents health or safety risks, and items exempted from bagging and tagging such as infested items, furniture, mattresses and bulky items, perishable items, and trash, garbage and debris. When we do seize and destroy property we endeavor to document it with our body worn cameras. Property is not destroyed that is not deemed abandoned or exempt from storage obligations.

10. Prior to each of the closures involved here, Doyle Park, the 101 Underpasses and

3

Fremont Park, we made repeated visits to the encampments, gave repeated verbal warnings, and posted written notices on tents and belongings so that residents would have sufficient time to gather their belongings. Customarily residents would have several days to more than a week's notice that enforcement was coming. We do not pressure anyone to abandon property that is not trash, garbage or debris.

11. I have reviewed the Declaration of Jonathan Baldwin and my body worn camera video of our encounters on March 9 and March 11, 2020. When I encountered him on the 5th Street Underpass, his tent was clearly obstructing the sidewalk. Mr. Baldwin stated he needed to discuss his shelter options with his girlfriend. He did not claim a disability. I called for him and secured a bed at Sam Jones. I advised him that if I returned he would be cited. I returned on March 11 to find him in an encampment and I cited him for disorderly conduct. He initially claimed he was not camping. He did not claim a disability and admitted that he never went to seek the bed I had secured for him on March 9. He further stated that his girlfriend Shannon Hall was being resistive to services and that he was trying to get her to accept housing. I left the contact by telling him I would contact Catholic Charities and try to obtain a room for him at the Palms Inn. I advocated for him over many phone calls with the Palms Inn in order to get Shannon in the room at the Palms. I believe a room was made available because of my efforts in that regard.

12. I have also reviewed the Declaration of Valerie Neils. Here are the facts:
- At 11:08 a.m on October 30, 2019 I contacted Ms. Neils and Mr. Crowley at Triangle Park and gave them notices of an illegal encampment, notice of property removal and notice of their homeless rights. I was accompanied by Officer Robert.
- At 10:50 a.m. the following day, October 31 I and Officer Robert observed from across the street at the far southeast corner of Tans Donuts as Ms. Neils and Mr. Crowley were contacted by HOST team members. After a brief contact, the HOST team worker called me on my cell phone and reported that Ms. Neils and Mr. Crowley have over $2000 per month in income and can qualify for rapid rehousing. I observed and the HOST team worker confirmed that Mr. Crowley was aggressive, verbally assaulted the HOST team

4

1     worker, and abruptly terminated their interview.

2 •   At 11:05 Officer Todd and I contacted Ms. Neils and Mr. Crowley and cited them for
3     violation of Penal Code 647(e). As they were cited, Mr. Crowley complained that the
4     HOST team worker had given him "an attitude" and that is why he refused services from
5     HOST. I offered to speak with the HOST supervisor and let Mr. Crowley deal directly
6     with her. I made the phone call and the supervisor agreed to deal directly with Mr.
7     Crowley and Ms. Neils.

8 •   In the month of November, I had vacation, motorcycle update school and a week of
9     Conferences. I did not have any contact with Mr. Crowley or Ms. Neils in the month of
10    November. I was aware they were camping at Fremont Park. I learned from Catholic
11    Charities they had made no effort to contact them for assistance.

12 •   At 9:54 a.m. on December 2, 2019 I contacted Mr. Crowley and Ms. Neils at Fremont
13    Park. I confronted Mr. Crowley about not making any attempt to reach out to Catholic
14    Charities, specifically the supervisor I had arranged to deal with them directly. Mr.
15    Crowley claimed that his lawyer had made arrangements for Jennielynne Holmes and the
16    supervisor to visit them at the site. I later spoke with both Ms. Holmes and the supervisor
17    and discovered this was not true.

18 •   At 8:28 a.m. on December 3 I followed up with the HOST Supervisor who told me that
19    she had not been contacted by either Mr. Crowley or Ms. Neils

20 •   At 10:28 a.m. I spoke with Mr. Crowley and Ms. Neils and they told me they did go to
21    the Homeless Services Center and had made an appointment with Lee for December 9th.
22    That struck me as odd as usually the HSC only needs a day or two to get someone in for
23    an appointment. I called the HOST supervisor; she was unable to reach Lee to confirm,
24    but told me it was possible they came and made an appointment with Lee and it slipped
25    by her. I decided to give them the benefit of the doubt and left with no enforcement or
26    threat of enforcement action.

27 •   At 8:00 a.m. on December 5 I spoke with HOST (as I do at the beginning of most of my
28    shifts) and learned that Ms. Neils and Mr. Crowley did not have an appointment for the

5

9th, but they had an appointment with Lee on the 4th at 2:00 PM. Lee stated they failed to show up for the appointment. I arranged for another appointment at 2:00 PM that day, the 5th. HOST agreed to hold the appointment for them.

- At 11:01 a.m. I made contact with Mr. Crowley and Ms. Neils and gave them notices to vacate, notice of planned property removal and homeless rights sheet. I advised them that they had missed their appointment with Lee. Mr. Crowley then claimed his appointment was scheduled for the 8th( not the 9th as previously claimed). I advised Mr. Crowley that I made him a new appointment for that day, the 5th at 2:00 PM. He was not interested in discussing services during the contact, only looking to argue and make excuses. It was during this contact that Mr. Crowley told me that I was not to contact him legally because Mr. Roman had filed a complaint.
- At 11:20 a.m. on December 8 I asked HOST to meet me at Fremont Park to contact Mr. Crowley and Ms. Neils. Officer Robert and I stayed inside our patrol vehicle parked across the street near Big O Tires. Mr. Crowley was confrontational with HOST and sent them away. The HOST staff told me that Mr. Crowley used the exact phrase "I am refusing your services"
- At 11: 25 I contacted Mr. Crowley and Ms. Neils and advised them we were going to proceed with citation in light of the fact that they had been repeatedly offered services and refused.  Mr. Crowley stated his lawyer had called HSC and when she had spoke with Lee, he stated there were never any appointments for Mr. Crowley and Ms. Neils.  I told him this was not true. Again, I was forced to argue with Crowley to engage with HOST reminding him they wanted to help him find housing. I re-contacted HOST and they agreed to come back over and speak with Mr. Crowley and Ms. Neils. Mr. Crowley again stated that the only reason he missed his last appointment at HSC was because his lawyer told him not to go. She told him there was no appointment for him.
- At 11:30 a.m. HOST re-engaged with Mr. Crowley and Ms. Neils and Officer Robert and I walked away. HOST advised us they made an appointment for them at HSC at 3:30 p.m. We disengaged and left with no enforcement action taken.

- At 11:41 a.m. on December 16 I again contacted Mr. Crowley and Ms. Neils. Ms. Neils claimed she and her lawyer were making calls but had made no appointments for housing. Mr. told me that his lawyer had made calls for them and left messages. He went on to say they would continue to make calls on their own. I told them that I was willing to give them more time before we started looking at enforcement actions, but advised they could be subject to enforcement if they kept dragging their feet. I encouraged them to use HOST staff to help find housing.
- At 10:48 on January 9, 2020 I contacted Mr. Crowley and Ms. Neils at their encampment. They were cited for 647(e)PC and told if they continue to stay at the location they could be subject to arrest and booking at Sonoma County Jail
- At 10:51 on January 13 I encountered Mr. Crowley and Ms. Neils in their encampment and I placed them under arrest for 647(e) PC. The encampment was broken down by Officer Cadaret and myself. All property not soiled or covered in mold was bagged up and taken for safekeeping. We also called animal control to take custody of "Ninja". They were provided contact information to pick up ninja after they get out of county jail.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 5, 2020, Santa Rosa, California.

*/s/ Jeffrey Travers*

JEFFREY TRAVERS