Jeffery Hoffman, SBN: 118768
Alicia Roman, SBN: 260101
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941
Fax: (707) 528-0125
Email: jhoffman@crla.org
aroman@crla.org

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
Telephone: (510) 891-9794
Fax: (510) 891-9727
Email: mmorris@pilpca.org
mrawson@pilpca.org

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nicholle Vannucci, Ellen Brown, and Shannon Hall, *individuals*; and Homeless Action!, *an unincorporated association*, <br> Plaintiffs, <br> v. <br><br> County of Sonoma, Sonoma County Community Development Commission, City of Santa Rosa, Does 1 to 10, <br><br> Defendants. | Case No.: 3:18-cv-01955-VC <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENFORCE AND CLARIFY THE STIPULATED PRELIMINARY INJUNCTION** <br><br> **Hearing Date: December 3, 2020** |

-1-

Plaintiffs' Reply in Support of Motion to Enforce and Clarify the Stipulated Preliminary Injunction; Case No. 3:18-cv-01955-VC

(Additional Counsel for Plaintiffs continued)

Cynthia L. Rice, SBN: 87630
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1430 Franklin Street, Suite 103
Oakland, CA 94612
Telephone: (510) 267-0762; Fax: (510) 267-0763
Email: crice@crla.org

Ilene J. Jacobs, SBN: 126812
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
511 D Street / P.O. Box 2600
Marysville, CA 95901
Telephone: (530) 742-7235; Fax: (530) 741-0854
Email: ijacobs@crla.org

Attorneys for Plaintiffs

## TABLE OF CONTENTS

**Page**

I.   Introduction...................................................................................................5

II.  Summary of Critical Facts Not in Dispute......................................................5

III. Argument .....................................................................................................7

    A.  Clarification of the Injunction is Appropriate and Necessary. ...................7

    B.  Defendants' Narrow Interpretations of "Enforcement Action" Are Inconsistent with the Purpose and Language of the Injunction..................................................7

        1.    Enforcement action includes "closing or moving a dwelling". .........................8

        2.    Defendants' reliance on *Martin* and other Eighth Amendment cases is misplaced. ...............................................................10

        3.    The City's use of other statutes and ordinances to force unhoused people to stop living on public property undermines the purposes of the Injunction.......11

    C.  The City Invokes an Overbroad Interpretation of "Immediate Hazard" to Justify Its Systematic Circumvention of the Injunction's Terms. ..............................................12

    D.  Pre- and Post-Enforcement Notices Are Essential Requirements of the Injunction. . 13

IV. Conclusion ..................................................................................................13

Plaintiffs' Reply in Support of Motion to Enforce and Clarify the Stipulated Preliminary Injunction; Case No. 3:18-cv-01955-VC

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Martin v. City of Boise*
  920 F.3d 584 (9th Cir. 2019) ............................................................................................ 10,11

*Super 7 Motel Associates v. Wang*
  20 Cal.Rptr.2d 193 (Ct. App. 1993)..................................................................................... 9

*Winet v. Price*
  6 Cal.Rptr.2d 554 (Ct. App. 1992)........................................................................................ 8


**STATUTES**

Fish and Game Code

§ 5652..................................................................................................................................... 11,12

## I.       Introduction

The central issues in this Motion are not factual disputes but questions of interpretation—what do key terms of the Injunction mean, and how should they be read together to effectuate the Injunction's stated purposes? Clarification is therefore essential both to ensure future compliance and to lay the groundwork for this litigation's future beyond the Injunction's current December 31, 2020, expiration date.

## II.      Summary of Critical Facts Not in Dispute

While the City contests some of the facts alleged in Plaintiff's Motion, many of the critical facts supporting Plaintiffs' request for relief are not in dispute. The City does not dispute that it has removed unhoused people and their dwellings from each of the encampments described in the Motion. Regardless of whether the City issued citations or made arrests, the purpose and effect of its actions were to move people from public spaces where they had established dwellings, and to make those spaces unavailable for continued habitation. *See* ECF No. 138 (City Opp'n), 5-11.[1] The City acknowledges that it planned these removals over the course of weeks or months, and that it carried them out pursuant to City plans and protocols—*i.e.*, systematically. *Ibid.* The City also acknowledges the CDC's recommendation not to disperse homeless encampments during the ongoing pandemic unless individual housing units are available. *Id.* at 17-18.

Further, the City does not dispute:

1)  That it did not provide written **notice of rights** at Doyle Park, at the 101 underpasses, at Corporate Center Parkway, or at the July partial clearance of Fremont Park (arguing

---

[1] Page references for filed documents are to the ECF page numbers.

instead, generally, that"[n]otice, when required, was given"). *See* City Opp'n, 4-11, 21-23; ECF No. 144 (Wolf Decl.) ¶ 14; ECF No. 134 (Motion), 10-13.

2) That it did not provide advance written **notice of enforcement** at Corporate Center Parkway or for the July partial clearance of Fremont Park. Opp'n, 7-10; Motion, 12-13.

3) That notices of enforcement provided at the 101 underpasses did not communicate the date of enforcement. *See* City Opp'n, 6-7; Wolf Decl., ¶ 10; Motion, 11.

4) That it did not "bag and tag" property or provide post-removal notice when it cleared the 101 underpasses and Fremont Park. *See* City Opp'n, 23; ECF No. 138-6 (Travers Decl.) ¶ 9; Motion, 12-13.

5) That it forced unhoused individuals, including Tracy Hance and Devin Naughton to move multiple times from multiple public spaces without making determinations on their requests for reasonable accommodation in shelter placement. ECF No. 134-14 (Naughton Decl.) ¶¶ 11-32; ECF No. 134-56 (Hance Decl.) ¶¶ 5-18.

The City also acknowledges that people were cleared from Fremont Park without offers of adequate shelter that was immediately available. City Opp'n, 11; Holmes Decl. ¶ 4; ECF No. 134-27 (H. Jackson Decl. ¶ 37).

That so many key facts are not in dispute points to the critical need for clarification of the Injunction's terms. In many cases, the City does not present evidence to contradict Plaintiffs' account of events; rather, it argues—incorrectly—that its actions were permitted under the Injunction. The City argues that, when it cleared encampments without pre-enforcement notice, notice of rights, or both, such notice was not required. City Opp'n, 21-23. It argues that it could displace Ms. Hance, Mr. Naughton, and others without offers of adequate shelter because the

immediate hazard exception applied. City Opp'n, 17. And it argues that actions to move

unhoused people from public property were not enforcement actions because they did not

involve citation or arrest, or because the City invoked other laws and ordinances to circumvent

the Injunction's requirements. City Opp'n, 14-17, 22. Therefore, the central questions in this

Motion are not of fact, but of interpreting the Injunction's requirements.

### III.    Argument

#### A.  Clarification of the Injunction is Appropriate and Necessary.

The Court may enforce, clarify, and/or modify the Injunction's terms. ECF 109-1

(Injunction), ¶¶ 13(c)-(e). The Injunction contemplates both enforcement and clarification as

remedies where a party "is systematically undermining or failing reasonably to abide by [its

terms]." *Id* . at 13(d). As highlighted by Defendants' opposition briefs, the parties disagree

significantly about key terms of the Injunction, including the scope and meaning of "enforcement

action," when and how the "immediate hazard or obstruction" exception applies, and the extent

of the notice requirements. Clarification is an appropriate and necessary remedy. Plaintiffs also

seek the Court's aid in enforcing the Injunction, not in the form of sanctions, but in orders

instructing the City's future compliance, consistent with the Injunction's terms as clarified.

The City argues that some of Plaintiffs' requested clarifications would amount to

modifications.  City Opp'n, 15, 23-24. If the Court finds that is the case, the briefing and

evidence demonstrate good cause for such modification. *See* Injunction, ¶ 13(e).

#### B.  Defendants' Narrow Interpretations of "Enforcement Action" Are Inconsistent with the Purpose and Language of the Injunction.

Both the City and County argue that their removal of unhoused individuals from public

property via orders by law enforcement—as opposed to removal via arrest—does not constitute

-7-

Plaintiffs' Reply in Support of Motion to Enforce and Clarify the Stipulated Preliminary
Injunction; Case No. 3:18-cv-01955-VC

"enforcement action" for purposes of the Injunction and that, therefore, Defendants need not comply with the Injunction's terms before they order an unhoused person to leave public property. *See* City Opp'n, 14-16; ECF No. 145 (County Opp'n), 3-6. However, that interpretation is inconsistent with both the language and the purpose of the Injunction.

Defendants rely primarily on the history of negotiations and their respective intentions in stipulating to the Injunction. City Opp'n, 14-15; County Opp'n, 4-5. As discussed below, the term "enforcement action" is not "reasonably susceptible" to Defendants' interpretations, limiting both the relevance and admissibility of the settlement discussions. *See Winet v. Price*, 6 Cal.Rptr.2d 554, 557 (Ct. App. 1992). Further, the history of negotiations does not support Defendants' interpretations; Plaintiffs address this issue in their Supplemental Reply, filed under seal consistent with the Court's instructions at the March 9, 2020, Case Status Conference.

### 1. Enforcement action includes "closing or moving a dwelling".

The Injunction's definition of "enforcement action" favors Plaintiff's broader interpretation because it includes citation, arrest, seizure of property *and* "closing or moving a dwelling or encampment." Injunction, ¶ 2(c)(i). A dwelling is "a shelter, tent, vehicle or other structure where a homeless person sleeps, stores property, and/or regularly engages in other life sustaining activities," and an encampment is a collection of five or more dwellings. *Id.* at ¶ 2(a)-(b). The City's orders to relocate, which are often coupled with threats of citation or arrest, have caused unhoused people and their dwellings to be moved involuntarily from public property, and the City's actions at Doyle Park, the 101 underpasses, Corporate Center Parkway, and Fremont Park closed encampments. *See* Catoe Decl.¶¶ 13, 25; Baldwin Decl. ¶¶ 12 - 14; Naughton Decl. ¶¶ 21, 26, 31; Coleman Decl.¶¶ 10-11; Hance Decl.¶¶ 9, 13, 17-18.

The Injunction, which effectuates an agreement among the parties, "must be interpreted as a whole, with each clause aiding the interpretation in the attempt to give purpose to every part, and the interpretation should, where possible, give effect to every part so that no clause is redundant." *Super 7 Motel Associates v. Wang,* 20 Cal.Rptr.2d 193, 197 (Ct. App. 1993). But Defendants' proffered interpretations would render the Injunction's language redundant, internally inconsistent, or both.

The City argues that "closing or moving a dwelling or encampment" is limited to "picking up a tent or towing a vehicle." City Opp'n, 14. The County similarly argues: "The plain meaning of 'closing or moving a dwelling or encampment' means the physical act itself. This could be accomplished by fencing off an area and prohibiting access to an encampment[2] or physically picking up ones [sic] belongings and moving them to another location." County Opp'n, 4-5. Arbitrarily limiting "closing or moving a dwelling" to "the physical act itself" would be both inconsistent with the Injunction's purposes and unsupported by the Injunction's language. A construction limiting "closing or moving a dwelling" to the physical removal of property would make it redundant with paragraph 2(c)(i)(4), "seizing property from a dwelling or encampment". And the City's construction would render the terms "closing" and "encampment" meaningless in this phrase. Closing a dwelling or encampment involves ordering the occupants to leave and forbidding their return; an encampment cannot be picked up or towed.

The County's analogy to this Court's denial of Plaintiffs' January 2020 Request for Emergency Relief is likewise unavailing. County Opp'n, 6. At that time, the County had provided pre-enforcement notice to Joe Rodota Trail (JRT) encampment residents, but the

---

[2] The City fenced off Fremont Park, first partially, then entirely. *See* H. Jackson Decl. ¶¶ 28, 37.

-9-

Plaintiffs' Reply in Support of Motion to Enforce and Clarify the Stipulated Preliminary Injunction; Case No. 3:18-cv-01955-VC

notices had not expired, and the County had not yet forced the encampment residents to leave the trail. *See* ECF No. 115 (Request for Immediate Relief), 2-3. The Court declined to grant immediate relief, in part, because the County stated it planned to offer adequate shelter to each JRT resident before forcing them to leave the trail. ECF No. 120 (Order Denying Immediate Relief), 2. The Court did not indicate that the County could avoid compliance with the Injunction's terms by forcing people to leave the JRT by threats and orders, rather than by citation and arrest. *Id.*

Finally, paragraph 2(c)(iii) provides that an enforcement action "shall not include, and this injunction shall not apply to a direction to relocate . . . rom private property," implying that a direction to relocate from *public property* could constitute an enforcement action.

### 2. Defendants' reliance on *Martin* and other Eighth Amendment cases is misplaced.

Defendants, after emphasizing the Injunction's status as a voluntary agreement among the parties, paradoxically argue that the Injunction cannot require anything more of them than the minimum necessary to comply with the Ninth Circuit's holding in *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). City Opp'n, 15-16; County Opp'n, 5. But this Motion is not about the application of *Martin*'s holding to the City's actions; it is about the application of the Injunction. Regardless of the City's and County's narrow readings of *Martin* and related Eighth Amendment cases (with which Plaintiffs do not fully agree), nothing in those cases limits the ability of the parties to agree to protections and protocols that go beyond the barest prohibitions of the Eighth Amendment. Further, as detailed in the Injunction's recitals, both the allegations in this lawsuit and the issues that the Injunction sought to address extend beyond the Eight Amendment's prohibition against cruel and unusual punishment to include Fourth Amendment rights,

Fourteenth Amendment rights, and the rights of people with disabilities to access government services and housing free from discrimination. Injunction, pp. 1-2. Both the lawsuit and the Injunction exist at the intersection of these issues, and Defendants' argument that this Court's interpretation Injunction is constrained by other courts' application of the Eighth Amendment in other cases is unavailing.

> ### 3. The City's use of other statutes and ordinances to force unhoused people to stop living on public property undermines the purposes of the Injunction.

Just as the City argues that it can avoid the Injunction's requirements by moving unhoused people from public property by means other than citation and arrest, it also argues that it can circumvent the Injunction's requirements by relying on other statutes and ordinances, such as provisions of the Fish and Game Code, the Vehicle Code, and local parking restrictions, to remove unhoused people and their dwellings from public property. City Opp'n, 16-17. But, although the Injunction identifies these categories of statutory violations as not constituting enforcement actions, the limitation is narrow and constrained to "closing a dwelling and/or encampment, issuing a citation, and/or arresting a homeless person on conduct that would be unlawful *regardless of someone's homeless status* . . . ." Injunction, ¶ 2(c)(ii)(emphasis added). But the City is targeting people for enforcement under these other laws based on their homeless status. For example, the City indicates that its clearance of Doyle Park was based in part on alleged violations of Fish and Game Code section 5652, which prohibits littering within 150 feet of the high watermark of a state waterway. Opp'n, 4. It notes that "virtually all of the park, particularly the picnic areas . . ." is within 150 feet of the high watermark of a creek. *Ibid.* I.e., the picnic areas, which are used by both housed and unhoused people, are near the creek, so, anyone using the picnic areas could be in violation of Fish and Game Code section 5652, as

Plaintiffs' Reply in Support of Motion to Enforce and Clarify the Stipulated Preliminary Injunction; Case No. 3:18-cv-01955-VC

interpreted by the City. But the City is specifically using it as a rationale for clearing unhoused people from the park. City Opp'n, 4-5.

### C. The City Invokes an Overbroad Interpretation of "Immediate Hazard" to Justify Its Systematic Circumvention of the Injunction's Terms.

Similarly, the City applies paragraph 3(c)'s "immediate hazard or obstruction" exception in a broad range of circumstances, treating it as an exception that swallows the rule. For example, the City relied on alleged obstructions of sidewalks and parking lots to justify clearing the 101 underpasses without first offering all encampment residents adequate shelter. City Opp'n, 5-6, 17. But it did not limit its enforcement action to people whose tents were blocking sidewalks and parking lots; it cleared everyone from the area regardless of whether their dwellings were causing obstructions, and without providing opportunities to mitigate. *See* H. Jackson Decl. ¶¶ 20-21.

The importance of mitigating hazards and obstructions is especially pronounced during the ongoing COVID-19 pandemic, both because public health experts recommend against clearing encampments in the absence of individual housing options, and because mitigation measures like installation of adequate bathrooms and handwashing facilities can help to prevent the spread of COVID-19. *See* ECF No. 134-2 (Muldoon Decl.) ¶¶ 6-9. While the Injunction, executed before the pandemic, did not contemplate COVID-19, any enforcement action based on an immediate hazard must take into account the countervailing health risks of clearing the encampment. And, although the Injunction does not explicitly require the City to provide porta-potties, handwashing stations, or garbage service to encampments, provision of such services can help to prevent and mitigate the types of hazards that the City has used to justify encampment closures. *See* City Opp'n, 12-13.

-12-

### D.  Pre- and Post-Enforcement Notices Are Essential Requirements of the Injunction.

The City glibly argues that Plaintiff's position regarding the provision of written notice "elevates form over substance." City Opp'n, 21. But written notice is explicitly required by several provisions of the Injunction, and failure to provide such notices causes harm to unhoused people faced with enforcement action. *See* Injunction, ¶¶ 3-5; Baldwin Decl. ¶¶ 10-12; Hance Decl. ¶ 12; Beckman Decl. ¶ 10; Naughton Decl. ¶ 24. The parties disagree, not about whether notice was or was not given in certain circumstances, but about whether such notice was required, based on large part on differing views on how paragraphs 3 (Limitation on Enforcement Action) and 4 (Notice) of the Injunction interact with each other. Motion, 17-19; City Opp'n, 22; County Opp'n, 7-8. The Parties would therefore benefit from the Court's clarification.

## IV.    Conclusion

Accordingly, Plaintiffs request that the Court clarify the Injunction as follows and order the City's ongoing compliance with the Injunction's terms, as clarified:

1)  An order by law enforcement to relocate from public property constitutes "closing or moving a dwelling or encampment" pursuant to paragraph 2(c)(i)(3). Accordingly, except in cases of immediate hazard or obstruction, such an order must be preceded or accompanied by written notice of enforcement, written notice of rights, offer of adequate shelter, and opportunity for Coordinated Entry assessment.

2)  Paragraph 3(c)'s immediate hazard exception can be used to justify compliance with paragraphs 3(a) and 3(b) only in situations where the nature and imminence of the threat creates a need for swift action, rendering compliance with 3(a) and 3(b) impracticable. Determination of whether an immediate hazard exists must take into account any hazards

that will be created or exacerbated by the enforcement action, including the risk of COVID-19 spread.

3) Paragraph 3(c)'s immediate hazard exception does not excuse compliance with paragraphs 4 (Notice) and 5 (Seizure and Storage of Personal Property), even in cases of immediate hazard or obstruction. Defendants must provide advance written notice of the enforcement action and notice of rights unless circumstances make it impracticable to give such advance notice. Defendants must also comply with paragraphs 4(b)'s and 5's requirements regarding post-removal notice and storage of personal property.

Respectfully submitted:

Date: November 12, 2020          CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
                                 PUBLIC INTEREST LAW PROJECT


                         By:     \s\ JEFFERY HOFFMAN
                                 Attorneys for the Plaintiffs