Jeffery Hoffman, SBN: 118768
Alicia Roman, SBN: 260101
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1160 N. Dutton Avenue, Suite 105
Santa Rosa, CA 95401
Telephone: (707) 528-9941; Fax: (707) 528-0125
Email: jhoffman@crla.org
        aroman@crla.org

Melissa A. Morris, SBN: 233393
Michael Rawson, SBN: 95868
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
Telephone: (510) 891-9794; Fax: (510) 891-9727
Email: mmorris@pilpca.org
        mrawson@pilpca.org

Attorneys for Plaintiffs

Additional Counsel on last page

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nicholle Vannucci, Juanita Butterfly, and Stephanie Somersall, *individuals*; and Homeless Action!, *an unincorporated association*,<br><br>             Plaintiffs,<br><br>    v.<br><br>County of Sonoma, Sonoma County Community Development Commission, City of Santa Rosa, Does 1 to 10,<br><br>             Defendants. | Case No.: 3:18-cv-01955-VC<br><br>~~[PROPOSED]~~ **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.      Plaintiffs[1]  brought this lawsuit in March 2018 to prevent Defendants County of Sonoma, Sonoma County Community Development Commission (Commission), and City of Santa Rosa, from clearing the Roseland Encampments, a set of homeless encampments on property owned by the Commission and located in the City of Santa Rosa, until the encampments' 100-plus residents had each been provided an adequate alternative place to go, and to enjoin the enforcement of Defendants' anti-camping and similar ordinances against unhoused people living on public property in the absence of adequate available shelter and housing to meet individuals' needs, including disability-related needs.

2.      After the Court denied Plaintiffs' request for a Temporary Restraining Order to prevent the closure of the Roseland Encampments, Defendants cleared the Encampments.

3.      Much has happened in the four years since Plaintiffs first filed their lawsuit and Defendants displaced the residents of the Roseland Encampments. The Parties agreed to, and the Court entered, a Preliminary Injunction regarding enforcement actions against unhoused people living on public property and the disposition of unhoused people's personal property; that Injunction that expired, after multiple extensions, on December 31, 2021. The COVID-19 pandemic began and has continued for over two years. Many new encampments have formed on

---

[1] The original Plaintiffs in this action include Steve Singleton, Samantha Jenkins, and Deborah Drake. residents of the Roseland Encampments who later dismissed their claims. They also included Ellen Brown, Nicholle Vannucci, and the advocacy organization Homeless Action!, who continue to be Plaintiffs in this matter. Shannon Hall, a former Roseland Encampments resident, joined the lawsuit in June 2018. As of June 10, 2022, the Parties have agreed to the voluntary dismissal Plaintiffs Ellen Brown and Shannon Hall; Plaintiffs await Defendants' final authorization to file a stipulation to that effect. This Second Amended and Supplemental Complaint now adds former Roseland Encampments residents Juanita Butterfly and Stephanie Somersall as Plaintiffs.

City and County property, only to be cleared by Defendants. Plaintiffs and other unsheltered residents have been pushed from place to place to place.

4.      One fact that has not changed, however, is the severe shortage of adequate housing and shelter available to meet the needs of the City's and County's unhoused residents. The County's most recent point-in-time homeless count, in 2020, found that 1,702 homeless persons are without shelter on any given night, while the number of available emergency shelter beds is less than half that amount. More stable placements, such as transitional housing and permanent supportive housing, are even more scarce and often require people to wait for many months or even years before they can access housing.

5.      The availability, adequacy, and safety of congregate settings has been even further limited by the pandemic. Samuel Jones Hall, the City of Santa Rosa's, primary emergency shelter has had at least three major outbreaks of COVID-19, resulting in over 150 infections and at least two deaths.

6.      But the City and County continue to force unhoused people off of public land when there is no adequate shelter available for those people. For example, the City of Santa Rosa cleared an encampment on Sebastopol Road in July 2021 during an active COVID-19 outbreak at Samuel Jones Hall. The shelter was closed to intakes, and the City did not offer shelter placements to encampment residents, instead forcing them to leave under threat of arrest with nowhere else to go.

7.      These practices disproportionately harm people with disabilities, who are more likely to be homeless than people without disabilities, and who are often unable to stay in congregate shelter settings due to their disabilities. Defendants have also denied reasonable accommodations

to unsheltered City residents who have requested housing or shelter placements that accommodate their disabilities.

8.      Disabled persons who are unable to access congregate shelter and who have not received reasonable accommodations in shelter placement often have no other option but to continue residing on the streets. Due to the day-to-day instabilities and hardships of living on the streets, these persons are effectively denied meaningful access to government services and assistance critical to procuring basic necessities, including addressing their housing and disability needs. They must spend time and effort just to locate food, a place to sleep, a place to use the restroom, or a place to bathe. Many lack a computer or even a phone and are unable to have regular communications or regular access to electricity to charge a phone or other device. Many persons also lack reliable transportation and cannot easily reach services such as clinics and government offices. They cannot leave their belongings unattended to tend to their needs or access services for fear that Defendants will seize and destroy their possessions while they are away. And all these hardships are exacerbated both by Defendants' focus on often-inaccessible congregate shelter as the primary shelter available and by their enforcement activities that push unhoused people from place to place under constant threat of citation or arrest.

9.      While it has been four years since Defendants destroyed the Roseland Encampments, the issues that gave rise to this lawsuit persist, and unsheltered individuals living on public land in Santa Rosa and Sonoma County continue to experience the violation of their constitutional and statutory rights by Defendants.

10.      Accordingly, Plaintiffs file this Second Amended and Supplemental Complaint to reflect current facts, to update their claims, to add two new Plaintiffs, and to seek relief from the Court to prevent the ongoing and future violation of Plaintiffs' rights, as well as the rights of other

unhoused City and County residents who are served and represented by Plaintiff Homeless Action!.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132, and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

12.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law and state constitutional claims because Plaintiffs' state claims are related to Plaintiffs' federal claims, arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the U.S. Constitution.

13.     Venue is proper in the Northern District of California because the events and conduct complained of herein all occurred in Sonoma County.

## PLAINTIFFS

14.     Plaintiffs Nicholle Vannucci, Juanita Butterfly, and Stephanie Somersall are all former residents of the now-closed Roseland Encampments, homeless encampments that were located on land owned by Defendant Sonoma County Community Development Commission within City of Santa Rosa.

15.     Ms. Vannucci was living unsheltered in Sonoma County for many years, including during the pendency of this lawsuit. While she is currently housed, the permanent supportive housing development where she lives has serious habitability conditions that render her housing unstable.

16.     Plaintiffs Juanita Butterfly and Stephanie Somersall now join this lawsuit. They are all currently unhoused, living outdoors in and around Santa Rosa.

17.    Plaintiff Homeless Action! (HA), an unincorporated association, is a group of grassroots activists in Northern California working towards ending the suffering of people who do not have a home. HA works with and for homeless people in Sonoma County.

## DEFENDANTS

18.    Defendant Sonoma County (County) is a government entity organized under the laws of the State of California with the capacity to sue and be sued. It is the larger government entity affiliated with Defendant Commission.

19.    The County is responsible for enforcement activities against unhoused County residents, including enforcement by the Sonoma County Regional Parks Department in County parks within the City of Santa Rosa.

20.    The County is a recipient of federal funds, including Community Development Block Grant funds.

21.    The County, its employees and agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs. The acts complained of herein constitute policies, practices and customs of the County.

22.    Defendant Commission is in part an agency of Sonoma County and is also the independent successor agency to the County's redevelopment agency. It is a government entity with the capacity to sue and be sued.

23.    The Commission is the County's lead agency for its housing and homelessness programs, including its Continuum of Care. It administers federal housing funds on behalf of the County and oversees the County's housing and homelessness programs.

24.     The Continuum of Care must have a "centralized or coordinated assessment system that provides an initial, comprehensive assessment of the needs of individuals and families for housing services" as a condition of receiving HUD funds. The Commission, together with its contract agencies, is responsible for administering the County's Coordinated Entry System, a countywide, multi-agency centralized intake system for matching individuals experiencing homelessness with housing programs, including permanent supportive housing placement and rapid rehousing services. Until January 2022, Defendants, through the Continuum of Care, also used the Coordinated Entry System to allocate emergency shelter resources. The Commission contracted with Catholic Charities of the Diocese of Santa Rosa to run the Coordinated Entry System until April 2022; it now contracts with HomeFirst.

25.     The Commission was the owner of the Roseland site at the time Defendants forcibly removed unhoused people who were living there in the Roseland Encampments. The Commission holds the Roseland site in trust pursuant to the California Dissolution Law that dissolved California redevelopment agencies and placed much of the real property owned by the agencies in the Community Redevelopment Property Trust Fund administered by the successor agency to the former redevelopment agency.

26.     The Commission, its employees and agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs. The acts complained of herein constitute policies, practices and customs of the Commission.

27.     Defendant City of Santa Rosa (City) is a municipal corporation organized under the laws of the state of California and the Santa Rosa City Charter, with the capacity to sue and be sued.

The Departments of the City include the Department of Housing and Community Services and the Police Department.

28.    The Santa Rosa Police Department, together with Commission staff and contractors, was the agency responsible for performing the eviction of the Roseland Encampments and subsequent encampments located within City limits.

29.    The City, including its Police Department, is also responsible for many of the other enforcement actions against unhoused people described in this Complaint, including enforcement actions against unhoused people living outdoors in City parks, taking shelter under freeway overpasses within the City, and residing on other public land within the City's jurisdiction.

30.    Defendant City of Santa Rosa is a recipient of federal funds, including Community Development Block Grant Funds.

31.    Defendant City of Santa Rosa participates in the Sonoma County Continuum of Care and has a representative on the Continuum of Care board.

32.    The City, the Urban (Sonoma) County, and the City of Petaluma are Sonoma County's three "entitlement jurisdictions" for purposes of HUD funding in Sonoma County; they jointly fund the Continuum of Care and have seats on its governing body.

33.    The City funds and oversees housing, shelter, and homelessness programs within the City.

34.    The City, its employees, and its agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs. The acts complained of herein constitute policies, practices and customs of the City.

## PROCEDURAL HISTORY

35.     Plaintiffs Deborah Drake, Samantha Jenkins, Steven Robert Singleton, Nicholle Vannucci, Ellen Brown, and Homeless Action! filed this action on March 30, 2018.

36.     Plaintiffs filed a Motion for Temporary Restraining Order on March 31, 2018, seeking a temporary and preliminary injunction to prevent Defendants from forcibly removing the residents and closing (or sweeping) the Roseland Encampments until all residents of the encampments had the opportunity to complete assessments for emergency shelter placement, and had been offered sufficient shelter placements. Plaintiffs further sought a temporary and preliminary injunction to prevent Defendants from enforcing the City's anti-camping ordinance in a manner that violates the constitutional rights of Plaintiffs and other homeless individuals, and from seizing or destroying encampment residents' personal property without pre-deprivation process of law.

37.     The Court entered a Temporary Restraining Order on March 31, 2018, staying enforcement of the City's Anti-Camping Ordinance against residents of the Roseland Encampments through April 5, 2018, and ordered the Parties to appear for the hearing on the Temporary Restraining Order on April 5.

38.     The Court asked Defendants during the April 5 hearing whether they would agree to voluntarily postpone the sweep of the Roseland Encampments for 21-days if the Court would order Plaintiff Homeless Action! to assist encampment residents in accessing assessment and placement through the County's Coordinated Entry System.

39.     Defendants declined the Court's proposal and scheduled the sweep for April 19, 2018.

40.     The Court denied Plaintiffs' Motion for Temporary Restraining Order on April 7, 2018, allowing the sweep of the Roseland Encampments to move forward.

41.    Plaintiffs filed an Amended Complaint on June 1, 2018, and a Supplemental Complaint on July 17, 2018. The Supplemental Complaint reflected the dismissal of claims by Plaintiffs Deborah Drake, Samantha Jenkins, and Steven Robert Singleton and also added Plaintiff Shannon Hall. The Supplemental Complaint updated Plaintiffs facts and claims to incorporate facts that occurred between March 30, 2018, and June 22, 2018, including facts related to Defendants' clearance the Roseland Encampments and their subsequent sweep of an encampment on the Joe Rodota Trail, a County park within the City of Santa Rosa.

42.    The County and Commission Answered on August 7, 2018.  The same day City filed a Motion to Dismiss and Motion for a More Definite Statement, which the Court denied on September 18, 2018. The City answered on November 7, 2018.

43.     The Parties entered into settlement negotiations, agreeing to the participation of Judge Chhabria as mediator. They eventually stipulated to a Preliminary Stipulated Injunction, which the Court entered on July 12, 2019. Dkt. No. 109-1. The Preliminary Stipulated Injunction limited Defendants' ability to enforce certain anti-camping and other laws against unhoused people living on public property in the City of Santa Rosa, requiring advance notice, including notice of rights, and an offer of adequate shelter prior to most enforcement actions—the primary exception was in cases of "immediate hazard or obstruction." The Preliminary Stipulated Injunction set forth standards for adequacy of shelter, including that a shelter placement be accessible to a person based on their disability-related needs. It also included provisions regarding the disposition of unhoused people's personal property, the development of a grievance process, and reporting of data.

44.    The original term of the Preliminary Stipulated Injunction and its corresponding stay of litigation was until June 30, 2020, but the Parties agreed to, and the Court ordered, subsequent

[Proposed] Second Amended and Supplemental Complaint; Case No. 3:18-cv-01955-VC

extensions in light of the COVID-19 pandemic and to facilitate discussions for a final settlement

of the case.

45.     Plaintiffs sought enforcement of the Preliminary Stipulated Injunction twice during its

term. Plaintiffs sought emergency relief to stop the County's closure of a large encampment on

the Joe Rodota Trail in January 2020, which the Court denied. In October 2020, Plaintiffs moved

to enforce and clarify the Preliminary Stipulated Injunction, and the Court issued an order

clarifying the Injunction's terms.

46.     The Parties were ordered to further mediation with Magistrate Judge Kim but did not

settle, and the last extension of the Preliminary Stipulated Injunction expired on December 31,

2021.

## **FACTUAL ALLEGATIONS**[2]

### **Homelessness in Santa Rosa and Sonoma County**

47.     Over the last decade, the problem of homelessness in Sonoma County, as in many parts

of the state and the country, has become more visible and has reached crisis proportions. The

2014 update to the 10-Year Homeless Action Plan for the County of Sonoma states that the

regional rate of homelessness for Sonoma County is almost four times the national rate.

48.     The City of Santa Rosa has proclaimed a state of homeless emergency, which has been in

place since August 2016. In its emergency declaration the City states "a significant number of

persons within the jurisdiction of Santa Rosa are without the ability to obtain shelter," which has

resulted in a "threat to the health and safety of those persons." The City most recently extended

---

[2] These allegations are current through May 19, 2022, the date that Plaintiffs sent the draft
Second Amended and Supplemental Complaint to Defendants for their review.

this emergency declaration on March 29, 2022, and it is still in effect as of the date of this Second Amended and Supplemental Complaint.

49.     At all times relevant to this litigation, Sonoma County has had a significant homeless population, and the majority of its homeless residents have been unsheltered, meaning that they are sleeping in places not designed for human habitation, including in tents, in vehicles, or outdoors without any type of shelter. The County's homeless point-in-time count estimated the County's homeless population to be 2,996 in 2018, 2,951 in 2019, and 2,745 in 2020. In all of these years, more than 60 percent of the County's homeless residents were unsheltered, with 66 percent living unsheltered in 2019. Due to the COVID-19 pandemic, the County did not conduct a point-in-time count in 2021.

50.     Preliminary results from the 2022 point-in-time count, conducted in February 2022, found 2,893 homeless residents in the County, a five percent increase from 2020.

51.     Point-in-time counts are widely understood to undercount the homeless population.

52.     The large majority of Sonoma County's homeless residents live in Santa Rosa: 1,797 in 2018; 1,803 in 2019; and 1,524 in 2020, according to point-in-time counts.

53.     Homeless residents of Sonoma County are disproportionately living with disabilities. According to the 2020 point-in-time count, 40% of survey respondents had "health conditions that prevent them from maintaining housing and/or a job." Forty percent identified as having a mental or emotional condition, 29 percent identified as having Post-Traumatic Stress Disorder (PTSD), and 23 percent identified as having a physical disability. In contrast, Census data indicate that only 8 percent of the County's population under 65 identifies as having a disability.

54.     Homelessness in Sonoma County is endemic in large part because of an extreme lack of housing affordable to persons at the lowest income levels. According to the California Housing

Partnership, over 12,700 lower-income renter households in Sonoma County do not have access to an affordable home, and the income needed to afford the average asking rent is $5,700 per month.

55.     According to the City of Santa Rosa's Annual Progress Reports to the California Department of Housing and Community Development on its housing production from 2013-2020, it produced fewer than a quarter of the affordable units necessary to accommodate its lower-income housing need. But it produced over four times as many above-moderate-income housing units as lower-income housing units, deepening the mismatch between the cost of housing and what lower-income residents can afford.

**The County's and City's Lack of Available Shelter**

56.     At all times relevant to this litigation, Sonoma County has lacked sufficient accessible, appropriate shelter options to meet the needs of its nearly 3,000 homeless residents.

57.     As of 2020, the Sonoma County Continuum of Care reported a total of 1,112 total year-round beds for "emergency, transitional and safe-haven" shelter, 40% of the total number of homeless individuals identified in the 2020 point-in-time census. Each shelter in the County has a different intake process, and some shelters only serve specific populations and have different criteria for entry.

58.     The primary shelter in Santa Rosa is Samuel Jones Hall, a co-ed homeless emergency shelter for individual adults operated by Catholic Charities. According to the Continuum of Care's 2020 report to HUD (pre-COVID-19), Samuel Jones Hall had 213 year-round beds. Samuel Jones Hall is a project of the City of Santa Rosa, the County of Sonoma, and the Community Foundation Sonoma County. The City spends 80% of its homeless services funds on Samuel Jones Hall. Except for some "Nightingale" beds that are set aside for individuals referred

by local hospitals, nearly all the beds at Samuel Jones Hall are bunk beds. Most beds are in large, congregate rooms without any separation between bunk beds.

59.    The City requires at least 70 beds at Samuel Jones Hall to be set aside for encampment sweeps. Plaintiffs are informed and believe that these beds are only available for people who are referred by the police or Catholic Charities' Homeless Outreach Street Team (HOST), and that other people who want and need shelter cannot access these beds. Plaintiffs are informed and believe that Samuel Jones Hall often has a waitlist, and that people who try to access the shelter cannot get in immediately, in part because the shelter is holding beds open to accommodate encampment sweeps.

60.    In response to the inadequacy of appropriate and sufficient shelter and housing for unhoused people in and in the surrounding region of the City, the City in March 2022 engaged a consulting company to come up with a five-year plan to reduce homelessness to a "functional zero."

61.    Samuel Jones Hall, a large, crowded congregate shelter, is not accessible to many unhoused individuals with disabilities, including Plaintiffs Nicholle Vannucci, Juanita Butterfly, and Stephanie Somersall. Individuals who have experienced severe or sustained trauma often have flashbacks, panic attacks, or other mental health symptoms triggered by crowded, loud environments. Similarly, many individuals who are homeless have agoraphobia, anxiety, or certain other mental health impairments that make staying at shelters like Samuel Jones Hall impossible for them.

62.    There is a strong correlation among trauma, disability, and homelessness, especially among unhoused women. According to one study, 92% of homeless women surveyed experienced severe physical and/or sexual assault at some point in their lives—60% of whom

experienced the assault by the age of 12. This childhood trauma often contributes to their experience of mental health disabilities and causes severe mental health symptoms throughout their lives.[3]

63.     Further, Plaintiffs Nicholle Vannucci and many other unhoused people, including several other former residents of the Roseland Encampments, have experienced sexual assault or other traumas at shelters in the past. Staying at—or even visiting—a shelter can cause them to experience that trauma again.

64.     As such, even when Samuel Jones Hall has beds available, many people with physical and/or mental disabilities cannot access those beds due to those disabilities.

65.     Since the litigation began, the County opened Los Guilicos Village in January 2020. Los Guilicos has 60 pallet homes and is operated by St. Vincent de Paul. Los Guilicos has been at capacity nearly the entire time it has been open.  Further, it is at least 10 miles from central Santa Rosa and most homeless services, and persons residing there are limited in the hours they may leave and return to the site, making it inadequate for many individuals.

66.     The City also opened the Finley Center Safe Social Distancing Program, consisting of 68 tents on a City parking lot, in May 2020, but it closed the program in July of 2020. The Finley Center site filled up almost immediately upon opening and remained mostly full during the entire time it was operational.

67.     Finally, neither staying in an emergency shelter nor enrolling in the Coordinated Entry System is likely to result in a person's transition from homelessness into housing—at least not in

---

[3] A. Browne, SS. Bassuk, Intimate Violence in the Lives of Homeless and Poor
Housed Women: Prevalence and Patterns in an Ethnically Diverse Sample, Am. J.
Orthopsychiatry 67(2): 261–278 (1997); Health Care for the Homeless Clinicians'
Network, National Health Care for the Homeless Council, Trauma and Homelessness
at 1 (1999).

[Proposed] Second Amended and Supplemental Complaint; Case No. 3:18-cv-01955-VC

the near term—because there is simply not enough supply of permanent supportive housing or otherwise deeply affordable housing to meet the community's need. According to the County's Coordinated Entry dashboard, the average wait time "between start and exit" for Coordinated Entry is 581.72 days for the 2021-22 fiscal year.

68.    When a temporary stay in emergency shelter or some other short-term shelter option ends, people often end up going back onto the streets. According to the most recent Year-End Status Report for the Samuel L. Jones Homeless Shelter, only 60 out of the 622 of people placed at Samuel Jones Hall were exited to permanent housing during the 2020-21 fiscal year.

### Defendants' Enforcement of Anti-Camping and Other Laws Against Unhoused Individuals and Encampments

69.    Both the City and County enforce anti-camping and other laws against unhoused people to remove them from public land. Some enforcement activities involve physical arrest, citation, or both. Others use verbal, written, or implied threats of criminal sanction by law enforcement officials to force unhoused people's displacement.

70.    During the pendency of this case, the Defendants have performed more than 40 enforcement actions to close larger (at least 5 or more residents) encampments. Some have involved all three Defendants, such as the enforcement actions at Roseland and the Joe Rodota Trail. Some have involved only the County and CDC, such as at Bane Avenue. Most have been conducted by the City in parks, beneath overpasses, and other public spaces within Santa Rosa. Defendants undertook enforcement actions notwithstanding the absence of adequate available alternative shelter placements. People can avoid citation, arrest, and/or criminal charges only by relocating to other areas that are outdoors, although they are not given permission to go to any location. The threat of criminal sanction exists for living outdoors in all public spaces, so

relocating does not resolve the threat of punishment. Instead, people are just forced to move from place to place to place.

71.     In taking these enforcement actions to close encampments, Defendants have failed to afford Plaintiffs and other disabled encampment residents reasonable accommodations in their shelter placement when expressly or implicitly requested.  This failure denies and has denied Plaintiffs and other disabled encampment residents with meaningful access to government services and programs for homeless persons.

72.     At many encampments, Defendants have not provided toilets, handwashing stations, garbage service, or other sanitary services, even as encampments grew in size. In others, they have provided inadequate sanitary services to accommodate the number of people living in the encampment. Defendants have even removed toilets, handwashing stations, and garbage cans placed by HA and other nonprofit organizations. Then, notwithstanding their complicity, Defendants have then cited refuse and other health hazards that could have been prevented or mitigated with adequate sanitary services as grounds for closing the encampment and displacing its residents.

73.     In addition to its anti-camping ordinance, Defendants have used other local ordinances to cite or remove unhoused people from public property, including: City Code Section 10-12.020: Obstructing tunnel, overpass by loitering; 10-12.030: Obstructing tunnel or overpass by sitting or lying on a street or sidewalk; 10-08.010: Public Excretion; and 9-12.050: Littering and Sonoma County Code sections 19-15 and 20-25: illegal camping. They also use state laws, including Penal Code 647(e): unlawful lodging, and Fish and Game Codes related to creeks and riparian areas to achieve the same purpose.

[Proposed] Second Amended and Supplemental Complaint; Case No. 3:18-cv-01955-VC

74.     While there are legal campgrounds within Sonoma County, all of these charge a daily fee, and many are located far away from the City of Santa Rosa, businesses, and social services and are therefore not accessible to homeless persons who lack reliable transportation. Additionally, most legal campgrounds, including campgrounds at state and county parks, impose limitations on how long campers may stay. As such, the only viable camping option for most homeless people who lack shelter is to camp in "unsanctioned" encampments on public or private land.

**The Roseland Encampments**

75.     The two encampments at "Roseland" site, located at 665 to 883 Sebastopol Road, in Santa Rosa, were among the largest encampments in the County at the time of filing. Over 100 people, including the current and former Plaintiffs in this matter, lived at the Roseland site, in two encampments (the Roseland Encampments).

76.     The Roseland site is held by Defendant Commission and is located in Santa Rosa. The City annexed the site on November 1, 2017.

77.     The first encampment at the Roseland site began forming in 2015, when approximately 20 people moved there after the City forced them to leave another encampment within the City. A second encampment formed in 2017 after the City cleared an encampment from under a Highway 101 overpass within the City.

78.     These sweeps by the City, in turn, reflected a years-long escalation of enforcement by Defendants, in particular the City, against unhoused people. On July 11, 2017, the City approved the Homeless Encampment Assistance Pilot Program (HEAPP), which has since become the Homeless Encampment Assistance Program (HEAP). The program utilizes Catholic Charities' Homeless Outreach Services Team (HOST), which includes a street outreach team working to engage unsheltered homeless into services and housing. However, the effect of HEAP has been

the City's more aggressive enforcement of its anti-camping and related ordinances, and the forcible displacement of homeless encampments and their residents.

79.     As with the homeless population more broadly, Roseland Encampments residents were disproportionately persons living with disabilities relative to the general population.

80.     On or about February 21, 2018, the Commission posted a written Notice to Vacate at the Roseland Encampments. The Notice provided a deadline of March 23, 2018, to vacate the encampments or face possible arrest and prosecution for the violation of California Penal Code section. 647(e) (unlawful lodging), Penal Code section 602(m)(trespass) and Santa Rosa City Ordinance 11-22-.030 (prohibited camping on private property without permission). The Notice indicated that the Commission was revoking any prior authority it may have granted for the occupants to reside at the encampment site. The Notice went on to state that other violations to which persons may be subject to arrest and prosecution include "unlawful storage of property", "unlawful refuse disposal", "unlawful failure to restrain an animal" and "unlawful fire."

81.     On or about February 27, 2018, after posting the notice of its intent to sweep the Roseland Encampments, the Commission opened a "Navigation Center" in an unoccupied building near the encampment site. The Navigation Center was run and staffed by the Homeless Outreach and Services Team (HOST) program through Catholic Charities, which was funded by Defendants.

82.     On or about March 7, 2018, the Commission posted a new Notice to Vacate, still dated February 21, 2018. This new Notice to Vacate contained substantially the same language as the previous February 21, 2018, notice, but changed the deadline to vacate to April 3, 2018.

83.     The primary—and, in many instances, only—placement that Defendants offered to the Roseland Encampments' residents was a shelter bed in an emergency shelter. Placement in such

a shelter was not appropriate for many residents of the Roseland Encampments who are living with mental health disabilities or other disabilities that limit their ability to live in a crowded shelter setting. For example, many residents have mental health disabilities that cause them to experience fear and anxiety in situations where they are in close quarters with others, or where they must give up their privacy. As such, it is not possible for them to stay—even for a short time—in a shelter setting.

84.    Plaintiffs sent letters to Defendants on March 9, 2018, and March 12, 2018, requesting that Defendants temporarily postpone the sweep of the Roseland Encampments until adequate alternative shelter placements, or an alternative encampment site, was available for the residents to be displaced by the sweep and inviting Defendants to enter into a dialogue about possible solutions.

85.    Over the next ten days, Defendant Commission and Plaintiffs entered into a dialogue process to discuss the situation. Defendant Commission provided Plaintiffs documentation it alleged supported its claim it had adequate grounds to close the Roseland Encampments. Plaintiffs also met with the City of Santa Rosa during this time.

86.    On March 26, 2018, Plaintiffs requested that Defendants postpone their planned sweep of the Roseland Encampments temporarily, until adequate alternative shelter had been offered to all residents as a reasonable accommodation under federal and state disability rights laws.

87.    While Defendant Commission offered to entertain specific accommodation requests from individual encampment residents if they could make them by April 3, the Commission refused to delay the sweep.

88.     On March 28, 2018, Plaintiffs requested that the sweep be temporarily postponed for 14 days to ensure that the Roseland Encampments' residents were not forcibly removed from the site without first having been offered appropriate shelter placements or alternative housing.

89.     However, on March 29, 2018, Defendants responded that they would proceed with the sweep on April 3, as planned.

90.     As of March 30, 2018, the date of the initial filing of this action, Defendants had not identified adequate alternative placements for all of the residents of the Roseland Encampments.

91.     Defendant Commission closed the Navigation Center adjacent to the Roseland Encampments on April 2, 2018.

92.     Plaintiffs are informed and believe and so allege that HOST staff were not on the Roseland site between the TRO hearing on April 5 and Monday, April 9.

93.     Plaintiffs are informed and believe and so allege that from April 10 to April 20, 2018, HOST staff visited the Roseland Encampments to conduct assessments and offer placements. HOST staff were not there every day, and their schedule was not always predictable to encampment residents.

94.     Representatives of Plaintiff Homeless Action! (HA) made efforts to assist encampment residents in obtaining assessments for shelter placement with HOST between the TRO on April 5 and the sweep of the Roseland Encampments on April 19. HA volunteers located encampment residents who had not yet been assessed, encouraged them to complete assessments, brought them to assessment appointments, and, when residents requested, attended assessments to provide support to residents going through the assessment process.

95.     HA also notified encampment residents of their right to request reasonable accommodations in the assessment and placement process and attempted to facilitate those requests to HOST and Commission.

96.     Plaintiffs' counsel forwarded 22 encampment residents' written requests for reasonable accommodations in the assessment and shelter placement process to Counsel for Commission on April 12, 2018. Additional residents requested accommodations from Commission and HOST in the days leading up to the sweep.

97.     Many of these individuals, including Plaintiffs Nicholle Vannucci, Juanita Butterfly, and Stephanie Somersall, requested alternatives to the generally offered placement at Samuel Jones Hall or requested partitioned beds or other accommodations at Samuel Jones Hall because their disabilities make placement in a large emergency shelter inappropriate for their health and wellbeing.

98.     Defendants evicted the residents of the Roseland Encampments on April 19 and 20, 2018, seized and destroyed personal property, and cleared the site.

99.     The Santa Rosa Police Department, staff from Commission and HOST, and counsel for all Defendants participated in the removal of the Roseland Encampments.

100.    Commission workers and contractors used bulldozers and other heavy machinery to "clean" the site and destroy personal property that Commission identified as abandoned.

101.    HA volunteers and Plaintiffs' counsel were also present during this time to assist and support residents.

102.    Defendants removed all the portable toilets and hand washing stations on or before April 19, while many encampment residents remained on the site; some of the toilets and handwashing stations had been provided by Defendants County and/or Commission, and some by HA.

103.    Defendants fenced off the Roseland Village site at approximately 3:00 p.m. on April 20, 2018; residents were not allowed to return to the site after that time.

104.    Plaintiffs are informed and believe and so allege that persons seeking to store items through the Commission at the site of the former Navigation Center were only allowed two 16" x 18" x 18" cardboard boxes for storage. Plaintiffs are informed and believe that only one person from the Roseland Encampments stored belongings according to this process.

105.    Plaintiffs are informed and believe and so allege that workers employed by Defendant Commission destroyed and did not inventory large amounts of personal property remaining on the site. Many of the encampment residents lost valuable personal property as part of the closure of that encampment, and many filed claims with the County and City for the loss.

106.    HOST offered temporary motel placements on April 19 and 20 to approximately 9 persons who had requested placements in settings other than a large shelter as reasonable accommodations of disabilities. Approximately 15 persons who had made such requests were not placed by HOST and were forced to vacate the Roseland Encampments without having been offered temporary or permanent shelter placements that met their disability-related needs. Plaintiffs are informed and believe and so allege that other residents requested reasonable accommodations in shelter placement during the sweep of the site but were not provided such accommodations prior to Defendants' forcing them to leave the Roseland site.

**Joe Rodota I (May 2018)**

107.    Approximately 60 residents of the Roseland Encampments, many of whom had requested reasonable accommodations in their shelter placements but who had not been offered placements that met their needs, relocated to the Joe Rodota Trail, an 8.5-mile-long public hike-and-bike-trail in Defendant Sonoma County's regional parks system when Defendants closed the Roseland Encampments. Plaintiffs are informed and believe and so allege that the individuals whom

Defendants forced to leave the Roseland site without alternative shelter were overwhelmingly people with disabilities who, because of their disabilities, were unable to stay in congregate shelter.

108.    The Joe Rodota Trail Encampment grew to nearly 100 people, including both former Roseland Encampments residents and other homeless individuals.

109.    Plaintiffs are informed and believe and so allege that the Roseland Encampments residents who had been placed by HOST in local motels with motel vouchers had all been removed from the motels by May 6, 2018, some without advance notice from the motel management, HOST, or Commission. Many returned to living on the streets after being ejected from the motels.

110.    HA alerted HOST and Defendants that approximately 12 additional former Roseland Encampments residents with disabilities residing in the Joe Rodota Trail area had identified need for reasonable accommodations in shelter placement.

111.    Plaintiffs are informed and believe and so allege that, many encampment residents experienced difficulty connecting with HOST workers, either in person or by telephone between April 23 and May 30, 2018.

112.    HA members rented porta-potties and handwashing stations on or about May 5, 2018, providing them to homeless individuals living on the Joe Rodota Trail.

113.    Defendant Sonoma County removed the porta-potties and handwashing stations on or about May 7, 2018, depriving encampment residents of facilities necessary to promote the health and safety of encampment residents, and the park more generally, and to prevent the spread of disease.

114.    HA requested orally and in writing that the County allow installation and maintenance of the porta-potties and hand washing stations at HA expense, but the County refused to allow the sanitary facilities on grounds that Sonoma County Parks and Recreation had not authorized portable toilets or water on the Joe Rodota Trail. The County also stopped providing trash pickup services, allowing garbage to pile up.

115.    HA volunteers attended camp meetings, spoke at Board of Supervisors and City Council meetings in support of transitional villages, surveyed camp residents regarding their needs for storage and shelter, serviced the garbage cans, paid for trash bags, purchased garbage cans with lids to help keep rodents away, delivered food and water, helped to pack and move residents' personal property during the week of May 26 to June 1.

116.    HA also asked the County to delay the eviction until a new location for encampment residents to live safely and without fear of prosecution could be obtained.

117.    Defendant County of Sonoma, through its Regional Parks Department, posted Notices to Vacate on the residents of the encampment on the Joe Rodota Trail on or about May 8 and May 16, 2018. The Notices did not provide a date by when residents were required to vacate the encampment, but the threatened that, if residents did not vacate the area, they would be subject to arrest and possible prosecution for violation of California Penal Code §§ 602 and 647(e) as well as Santa Rosa City Code § 11-22.030 (prohibiting camping on public land). The notices also stated all that personal property needed to be removed from the area, that property that posed a risk to health and safety would be destroyed, and that the remaining property would be stored for a period of up to 60 days. The Notice did not provide a deadline for the removal of property.

118.    The County announced through a press release dated May 23, 2018, that it would close a section of the Joe Rodota Trail on May 30, 2018, to remove the encampment and posted a Notice to Vacate Illegal Campsite/Lodging (Notice) that same day.

119.    Many of the residents of the Joe Rodota Trail Encampment, including individual Plaintiffs, made written requests for reasonable accommodations, based on disability, in their shelter placement process. These requests sought alternatives to placement in Sam Jones Hall.

120.    Approximately 32 of the former Roseland Encampments residents, identified by Homeless Action! as needing reasonable accommodations, including Plaintiffs Nicholle Vannucci, Juanita Butterfly and Stephanie Somersall, continued to reside in the Joe Rodota Trial Encampment as of May 30, 2018, and had not been placed in temporary or permanent shelter that met their disability-related needs.

121.    Santa Rosa Police Officers and Sonoma County Regional Parks rangers closed the Joe Rodota Trail encampment on May 31 and June 1, 2018. At least 30 persons who had requested reasonable accommodations in their shelter placement, including Plaintiffs Nicholle Vannucci, Shannon Hall, Juanita Butterfly and Stephanie Somersall were not placed and were forced by Defendants to leave the area with nowhere to go.

122.    After the Parties agreed to and the Court entered the Preliminary Stipulated Injunction in summer 2019, Defendants developed new notices, policies, and procedures for enforcement actions against unhoused people living on public land within the City of Santa Rosa. However, they continued to take such enforcement actions, often without having offered adequate shelter to prior to enforcement, especially in situations where encampment residents had requested reasonable accommodations in shelter placement based on disability-related needs that rendered congregate shelter inaccessible for them.

**Joe Rodota II and Bane Avenue (January-February 2020)**

123.    Another encampment began to form along the Joe Rodota Trail in mid-2019. The encampment then began to grow until it had over 200 people by December 2019. The County for many months did not provide any sanitation facilities to the encampment. It also refused to allow HA to supply porta-potties, trash cans, or washing stations to the encampment, although it eventually allowed HA to provide sanitary facilities at the end of November 2019, after the encampment had grown to over 150 tents. The County then installed additional bathrooms in mid-December 2019.

124.    On or about January 12, 2020, the County served Joe Rodota Trail encampment residents with a Notice of Legal Rights and Opportunity to Relocate.

125.    On January 14, 2020, County staff reported to the Board of Supervisors that, throughout the County, there were 15 beds available for emergency shelter, 22 transitional housing beds, zero rapid rehousing units, and 16 permanent supportive housing units available—far fewer available shelter and housing placements than the 200-plus people living in the encampment. At the same meeting, the Board adopted staff's proposed finding that conditions on the Joe Rodota Trail constituted an "immediate hazard requiring emergency action." The Board also approved a site for the Los Guilicos Village indoor-outdoor shelter.

126.    On or about January 15, 2020, the County and Commission issued a Notice to Vacate to Joe Rodota Trail residents that asserted residents had been offered opportunities for shelter placement and Coordinated Entry assessment and threatened citation and/or arrest if residents did not leave the Joe Rodota Trail by January 29, 2020.

127.    Plaintiffs, through their counsel, sent a letter to Defendants on January 22, 2020, requesting that the County meet and confer with them pursuant to the terms of the Stipulated Preliminary Injunction and notifying them that many encampment residents had not been offered

adequate shelter. In this and subsequent correspondence over the next few days, Plaintiffs'

counsel transmitted information to Defendants about 61 encampment residents who had not been

offered adequate shelter, including individuals who had requested reasonable accommodations in

shelter placement due to disabilities that made congregate shelter inaccessible to them.

128.    On January 27, 2020, Plaintiffs filed a letter with the Court seeking immediate relief

pursuant to the Stipulated Preliminary Injunction. Plaintiffs requested an "order restraining

Defendants from removing and confiscating the belongings of any homeless individual camping

on the Joe Rodota Trail without first offering the individual immediately available adequate

shelter and an opportunity to be assessed for Coordinated Entry, as required by paragraph 3 of

the Injunction, finding that not all residents of the Joe Rodota Trail have been afforded those

opportunities, and requiring the County to make a showing to the Court that every known

individual living on the Joe Rodota Trail has been offered both adequate shelter or housing and

an opportunity for assessment prior to clearing the Joe Rodota Trail II encampment." Dkt. No.

115 at 1. However, the Court denied the request, allowing Defendants to move forward with

clearing the encampment.

129.    The County and Commission, with support from the City's police department, closed the

Joe Rodota II encampment on January 30, 31 and February 1, 2020. At least 30 persons who had

requested reasonable accommodations in their shelter placement, including Plaintiffs Juanita

Butterfly and Stephanie Somersall, were not placed in shelter and were forced to move from the

area with nowhere else to go.

130.    Approximately 38 persons from the Joe Rodota II encampment who were not placed in

shelter, including Ms. Somersall, moved from the Joe Rodota II encampment at the time of its

closure to a new area in unincorporated Sonoma County just south of the City of Santa Rosa.

This newly formed encampment was located in an industrial area on Bane Avenue, a dead-end street.

131.    But the County closed the Bane Avenue encampment on February 10, 2020, without providing Plaintiff Stephanie Somersall—along with approximately 28 other encampment residents—an adequate shelter placement.  Without adequate alternative shelter or housing, these individuals scattered to attempt to find shelter and safety elsewhere, including in public parks within the City.

132.    In February and March 2020, the City cleared encampments at least five city parks, involving approximately 20 to 30 people at each location: A Place to Play Park, Olive Park South Davis Park, and Fremont Park (aka Cancer Survivors Park or Cancer Park), and Doyle Park.  Many residents of these encampments, including Stephanie Somersall, had been residents at Bane Avenue, Joe Rodota II before it, and other encampments stretching back to the Roseland Encampments and before. And many, also including Ms. Somersall, had made reasonable accommodation requests regarding their shelter needs, only to be forced to move again and again without having received any offer of shelter that met those needs.

**Enforcement During the COVID-19 Pandemic**

133.    Sonoma County issued a shelter-in-place order on March 17, 2020, in response to the growing COVID-19 pandemic. The order recognized that unhoused people are unable to shelter at home but indicated that they were ". . . strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to utilize Social Distancing Requirements in their operation)."

134.    People experiencing homelessness are disproportionately vulnerable to COVID-19. They are both at higher risk of contracting COVID-19 than the general population and more likely to experience severe symptoms and/or die if they become ill. Unhoused people tend to be older, and

to have higher rates of respiratory and cardiovascular disease, than the general population. Living in congregate shelter or unsheltered without access to adequate hygiene facilities also increases the risk of infection.

135.    The Centers for Disease Control and Prevention (CDC) issued guidance regarding unsheltered homelessness and COVID-19 on March 22, 2020, which instructed: "Unless individual housing units are available, do not clear encampments during community spread of COVID-19. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread."

136.    Although the CDC has updated the guidance multiple times over the last two years, its current guidance last updated February 10, 2022, says: "If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread." The CDC's guidance also urges local governments to ensure that encampments have access to adequate toilet and handwashing facilities 24 hours a day and to install portable toilets and handwashing stations to encampments that lack access to 24-hour public restroom facilities.

137.    In April 2020, after receiving a request from Plaintiffs, Defendants temporarily paused enforcement activities against homeless encampments in recognition of the pandemic's risks and the CDC guidance.

138.    But, contrary to the CDC guidance, in May 2020, the City announced systemic resumption of encampment sweeps during the last week of May 2020 and has cleared over 20 homeless encampments since then.

139.    The City's enforcement actions during the ongoing pandemic have included the clearance of encampments at Highway 101 overpasses, Corporate Center Parkway, and Fremont Park in summer 2020.

140.    During the spring of 2020, an encampment grew where Third, Fourth, Fifth, Sixth, and Ninth Streets pass under Highway 101 in downtown Santa Rosa.

141.    When the City cleared the 101 overpass encampment in late June 2020, it had approximately 90 residents, including Ms. Butterfly.

142.    While the City had placed some porta-potties, handwashing stations, and dumpsters at the 101 overpass encampment, there were not enough for the number of people who lived there. The City did not empty the dumpsters frequently enough, causing them to overfill.

143.    Then, in April 2020, the City began removing the porta-potties and handwashing stations, in direct contravention of the CDC's guidance on COVID-19 and unsheltered homelessness.

144.    The City posted notices regarding the planned clearance of the 101 overpass encampments in late May and early June 2020 but did not provide the Notice of Rights it had developed pursuant to the Preliminary Stipulated Injunction. HOST conducted outreach, but many encampment residents were not offered adequate shelter.

145.    The City cleared the 101 overpass encampments on June 24 and 25, 2020, although none of the previously posted notices had indicated that the encampment clearance would occur on these dates.

146.    Many residents still had not been offered adequate shelter on June 24. On information and belief, HOST and Santa Rosa police instructed individuals that, if they wanted a shelter placement, they needed to leave the area and go to the Homeless Service Center on Morgan Street. However, leaving to obtain a shelter placement would mean leaving behind any

belongings remaining in the area at a time when City staff and contractors were closing off and clearing out the area.

147.   Due to the lack of adequate notice and the way in which the City conducted the clearance of the 101 overpass encampment, many encampment residents lost their personal property when the City forced them to leave. On information and belief, the City did not inventory or store any personal property during its clearance of the 101 overpass area.

148.   On information and belief, the City booked at least three individuals for alleged violation of Penal Code section 647(e) (unlawful lodging) during its clearance of the 101 overpass area.

149.   Many people forced from the 101 overpass area by the City in June 2020 relocated to other encampments at Corporate Center Parkway and Fremont Park.

150.   Corporate Center Parkway is a public street in an industrial area of Santa Rosa. In spring of 2020, the encampment there was mostly people living in RVs, cars, or other vehicles parked along the street. However, it grew significantly after the City cleared the 101 overpass area, with more people living in tents or under tarps moving there.

151.   Approximately 90 people, including Ms. Somersall, were living there when the City cleared the encampment on July 9, 2020.

152.   As with other encampments, the City did not provide adequate bathrooms or handwashing facilities to accommodate the number of people living at Corporate Center Parkway.

153.   The City did not provide Corporate Center Parkway encampment residents with the written notice of enforcement or notice of rights that it had developed pursuant to the Preliminary Stipulated Injunction before it forced encampment residents to leave on July 9, 2020.

154.    The City forced many Corporate Center Parkway encampment residents, including
Stephanie Somersall, to leave without having received an offer of adequate shelter.

155.    An existing encampment at Fremont Park, a public park in Santa Rosa, also grew
significantly following the City's clearance of the 101 overpass area—from approximately 15 or
20 people to approximately 60 or 70 people. Ms. Butterfly was one of the people who relocated
to Fremont Park after the City forced her to leave the 101 overpass area.

156.    Others, like Ms. Somersall, moved to Fremont Park after having been forced to leave
Corporate Center Parkway.

157.    The only bathroom at Fremont Park was a single porta-potty, even after advocates asked
the City to add more bathrooms. There were no handwashing stations or dumpsters. Volunteer
organizations provided trash bags and trash pickups for encampment residents because the City
failed to do so. By late July, approximately 100 people were living at Fremont Park, but the City
still had not provided handwashing stations, dumpsters, or additional toilets.

158.    On July 28, 2020, Santa Rosa Police Department officers verbally told Fremont Park
residents that the police would return to clear the western portion of the park the following day
due to an alleged fire hazard, but they did not provide any written notice of the impending
enforcement or notice of rights.

159.    The Santa Rosa Police cleared the western half of the park on July 29, 2020, and closed it
off with fencing.

160.    Encampment residents, having not received sufficient advance notice, rushed to relocate,
and many lost their belongings. On information and belief, the City did not collect and store any
personal property during the July 29, 2020, sweep at Fremont Park.

161.    Most residents relocated to the eastern side of the park, greatly increasing the density of tents and people there.

162.    The City finally added two porta-potties, a handwashing station, and a dumpster *after* it cleared the western side of the park.

163.    Then, on August 28, 2020, the City posted written notices to vacate the park by September 1, 2020.

164.    The City cleared Fremont Park on September 1, 2020. Many residents, including Juanita Butterfly, were forced to leave without having been offered adequate shelter.

165.    Many residents were unable to move their belongings in time during the September 1, 2020, clearance of Fremont Park, and the City seized and destroyed unhoused people's personal property.

166.    Since the Fremont Park sweep, the City has continued to take enforcement actions against unhoused people on public property within the City, often when shelter is unavailable on a citywide basis, for a particular individual, or both.

167.    The County has also continued to take enforcement action against unhoused people who attempt to live along the Joe Rodota Trail, including against Ms. Butterfly and Ms. Somersall.

**Additional Facts Specific to Nicholle Vannucci**

168.    Plaintiff NICHOLLE VANNUCCI is 44 years old.

169.    Ms. Vannucci is part-Native American and has lived in Santa Rosa since she was eight years old.

170.    As of the date of filing, Ms. Vannucci had no income but had applied for CalFresh (aka Food Stamps).

171.    Ms. Vannucci is a survivor of domestic violence. Because of her experience in a violently abusive relationship, Ms. Vannucci has post-traumatic stress disorder (PTSD).

172.    The symptoms of Ms. Vannucci's PTSD make it extremely difficult for her to be around other people and to secure suitable work.

173.    Ms. Vannucci became homeless in November 2016 after her husband attacked her and she fled her home. She was on the streets for several weeks, spending time in Marin County and Sacramento.

174.    Around April 2017, Ms. Vannucci returned to Sonoma County and sought services from Catholic Charities through their Homeless Services Center. She has received mail at the Homeless Services Center, and has taken an occasional shower there, but she did not receive an appropriate temporary or permanent housing placement from the Homeless Services Center. Ms. Vannucci continued to live on the streets for several months but eventually moved into the Roseland Encampments.

175.    Living at the Roseland Encampments provided Ms. Vannucci with a sense of safety and stability that she had not been able to find elsewhere while she had been homeless. Having her own tent, which she shared with her partner, made her feel secure and gave her a place where she could find some degree of peace when she was experiencing extreme symptoms of PTSD. Having the ability to zip up her tent and be alone made her feel more secure than she had felt in other settings, including homeless shelters. She felt her possessions were safe at the Roseland Encampments, and she slept better there than she had slept in many months.

176.    Ms. Vannucci previously tried to stay at a homeless shelter, but, after being sexually assaulted during her first night there, she left. Because of this experience, her past history of abuse, and the symptoms of her mental health disability, Ms. Vannucci does not feel safe at homeless shelters.

177.    As of March 30, 2018, Ms. Vannucci was unemployed. She had worked some service jobs in Sonoma County, but the symptoms of her PTSD made it hard to stay in a job, especially a job where she had to interact with other people.

178.    During the time Ms. Vannucci was with her abusive husband, she was not able to work, due to his controlling behavior.

179.    Ms. Vannucci does not have reliable transportation, and her credit rating is very low; it is hard for her to search for housing.

180.    Ms. Vannucci sought assistance through the Navigation Center adjacent to the Roseland Encampments several weeks prior to the scheduled eviction of the encampments. Ms. Vannucci completed an assessment with the Navigation Center staff. At the time she did her assessment, Ms. Vannucci informed HOST as to the nature of disabilities and her needs regarding a shelter placement. The Navigation Center staff offered her a referral to a shelter bed at Sam Jones Hall, but Ms. Vannucci declined that offer as she cannot stay at a shelter due to her PTSD symptoms.

181.    As of the date of filing this lawsuit, neither Defendants nor their agents had offered Ms. Vannucci a placement that met her disability-related needs.

182.    At the time Defendants closed the Roseland encampments Ms. Vannucci had no other place to go and was concerned that, until she would be able to locate better shelter, she would not be able to find a place she would be able to reside without possible harassment by the authorities. She was also concerned that about the well-being of the other encampment residents. If they are scattered to other locations, they will face additional hardship and difficulty in accessing services and obtain shelter placements.

183.    Ms. Vannucci and her partner Bryan actively participated in the County's placement process and sought alternative housing following the TRO hearing in this case.

184.    Neither Ms. Vannucci nor her partner had been offered any placement that met their disability-related needs when the sweep of the Roseland Encampments began, and they were still living at the Roseland site.

185.    Ms. Vannucci visited Samuel Jones Hall to view the partitions on April 19, 2018, and broke down in tears. She was terrified of staying there because she had been previously assaulted there. She concluded that she could not stay at Samuel Jones Hall, even with individualized partitions.

186.    On April 20, HOST placed Ms. Vannucci and her partner in a local Motel 6 with a motel voucher; the placement was for a maximum of 14 days. HOST then extended the placement to May 9, 2018.

187.    Motel 6 management forced Ms. Vannucci to leave her motel room with less than a day's notice on May 4, 2018, before Ms. Vannucci's hotel voucher expired.

188.    She did not have alternative shelter, so Ms. Vannucci returned to living outside and joined the Joe Rodota Trail Encampment.

189.    At the time the Joe Rodota Trail Encampment was closed at the end of May 2018, Ms. Vannucci had not been offered another suitable shelter placement and so she was forced to move from that location with nowhere to go.  She continued to reside at various spots along the Joe Rodota Trail.

190.    Ms. Vannucci continued to reside on public property both in Santa Rosa and in Stockton, California, and in Oregon, during the rest of 2018 and 2019. She faced continual displacements by the police during this time. In August 2019 Ms. Vannucci began residing at an encampment that had formed along the Joe Rodota Trail in the City of Santa Rosa (Joe Rodota II). She continued to reside at that encampment until January 2020.

191.    In January 2020, after three years of attempting to access housing and services from Defendants, and after two years as a Plaintiff in this lawsuit, Ms. Vannucci finally received a placement in permanent supportive housing at the Palms Inn in Santa Rosa.

192.    However, the Palms Inn has serious and ongoing habitability issues—including cockroach and rodent infestations, as well as extreme mold and moisture problems—that threaten the stability of Ms. Vannucci's housing, putting her at risk of becoming homeless once more.

193.    Ms. Vannucci is further concerned that Defendants' continuing practices to force removal, seize property, arrest or threaten to arrest, and fail to provide reasonable accommodations of persons experiencing homelessness harms the well-being of other homeless encampment residents. The practices cause Ms. Vannucci and others experiencing homelessness to be scattered to other locations and face additional hardship and difficulty in accessing services and obtaining appropriate shelter or housing placements.

**Additional Facts Specific to Juanita Butterfly**

194.    Plaintiff JUANITA BUTTERFLY is 39 years old. She has lived in Santa Rosa since 2016. Ms. Butterfly was homeless when she moved to Santa Rosa, and she began living on the streets immediately upon her arrival.

195.    Ms. Butterfly is Native American and a member of the Karuk Tribe of Northern California. She is a widow and has four minor children who are currently living with relatives.

196.    Ms. Butterfly has a high school diploma and has previously worked as a nursing assistant. She currently has no income other than from occasionally collecting and turning in recyclables.

197.    Ms. Butterfly has various disabling health conditions which have rendered her unable to work. She has an anxiety condition as well as a mental disorder arising from severe trauma she has experienced, including one incident when she was kidnapped and raped and another where

she was physically attacked. These conditions make it difficult for her to be in a congregate

shelter setting where she is in close contact with persons she does not know. Due to the violence

she has experienced, she is fearful of further attacks and cannot share living space with large

numbers of persons she does not know well.

198.    When Ms. Butterfly came to Santa Rosa in 2016, she was accepted into the Roseland area

homeless encampment which, at that time, was called Camp Micaela.

199.    In the fall and winter of 2017, as many more people started coming to the Camp Micaela

(after several homeless encampment sweeps that took place in other areas of Santa Rosa) Ms.

Butterfly assisted in forming the new encampment, called "Last Chance," right next to Camp

Micaela and then began to reside there.

200.    Shortly before Defendants closed the Roseland Encampments, Ms. Butterfly made a

written request to the County and City for an alternative shelter placement. The request

explained that she has PTSD and dyslexia and that she needed a private or partitioned space to

feel safe. It also requested the accommodation of communicating with her in writing because she

has trouble understanding oral communication and needs time to think things over.

201.    Someone working for one or more Defendants—Ms. Butterfly is informed and believes it

was a representative from HOST—told her that they could place her at Samuel Jones Hall in a

smaller room with other people she knew from the encampment. Ms. Butterfly would have

accepted a placement like that, but the HOST representative did not follow through with

arrangements for that placement, and the offer never materialized. Defendants had not offered

Ms. Butterfly any other placement when they closed the Roseland Encampments in April 2018.

202.    When Defendants closed the Roseland Encampments, Ms. Butterfly was not able to move

all of her belongings, and she was not aware of any option to store them. As a result, is informed

and believes that Defendants destroyed the following belongings that she was unable to remove from the site: her tent, camping items, clothes, items for her dog.

203.    After the closure of the Roseland Encampments, Ms. Butterfly moved to the Joe Rodota Trail, along with other displaced Roseland Encampments residents, and she was part of the encampment that formed there.

204.    While she was living on Joe Rodota Trail, Ms. Butterfly was again offered a placement at Sam Jones Hall; she is informed and believes that HOST made this offer. This time, Ms. Butterfly was not offered the small room placement at Sam Jones Hall. Ms. Butterfly again requested an accommodation in her shelter placement process based on her disability to be placed in an alternate setting to the large emergency shelter. A May 23, 2018, letter from Plaintiffs' counsel to Defendants regarding the pending clearance of the encampment also reminded Defendants that Ms. Butterfly was among the encampment residents who had requested reasonable accommodations in shelter placement. Ms. Butterfly also enrolled in the Coordinated Entry System at that time.

205.    When the City and County cleared the Joe Rodota Trail on May 31, 2018, Ms. Butterfly still had not been offered any shelter or housing placement that met her disability-related needs. She left the Joe Rodota Trail encampment on or about May 31, 2018, to avoid getting arrested.

206.    After the closure of the Joe Rodota Trail encampment, Ms. Butterfly resided at various other locations elsewhere along the Joe Rodota Trail from 2018 to mid-2019. During that time County Park Rangers and Santa Rosa Police forced Ms. Butterfly to move under threat of arrest from those locations, without a prior offer of a suitable shelter or housing.

207.    Starting in late 2019, Ms. Butterfly began residing at an encampment that began forming along the Joe Rodota Trail about a mile from the previous year's large Joe Rodota Trail

encampment. During the time that Plaintiff resided at the new Joe Rodota Trail encampment the County set up a table to offer assessments and placements. Ms. Butterfly was offered and accepted a placement at the Los Guilicos Village which opened on January 31, 2020.

208.    Ms. Butterfly stayed at Los Guilicos for only a week before she was evicted for not checking in one evening. When she returned to Los Guilicos a few days later, they did not allow her back in. With nowhere else to go, she returned to living on the street again.

209.    After leaving Los Guilicos, Ms. Butterfly moved to another location along the Joe Rodota Trail. In April 2020 the County park rangers served a Notice to Vacate that said the people where Ms. Butterfly was residing along the Joe Rodota Trail were violating "state laws and County Ordinances" and required them to vacate the area by April 26, 2020. The park rangers and Santa Rosa police then forced Ms. Butterfly to move from that location along the Joe Rodota Trail under threat of arrest. At the time she moved from that location, Ms. Butterfly had not been offered a suitable shelter placement.

210.    Ms. Butterfly then moved to area in downtown Santa Rosa underneath the Highway 101 overpasses, where a larger encampment began to form.

211.    The encampment at the 101 overpasses grew to about 90 people living under the overpasses along several City streets.  At the end of June 2020, the Santa Rosa Police and other City staff arrived unannounced and gave the encampment residents only a few minutes to pack up their personal property and leave the area or face arrest. Ms. Butterfly was forced to move from her site at the 101 overpasses area by the City of Santa Rosa police under threat of arrest. Ms. Butterfly and many others were forced to leave with only what they could carry with them and did not have sufficient time to make other arrangements for their property. As a result, items of property were left behind. The City destroyed belongings that were left behind. Ms. Butterfly

[Proposed] Second Amended and Supplemental Complaint; Case No. 3:18-cv-01955-VC

lost various items of clothes, cooking supplies and blankets in the City's clearance of the 101 overpass area.

212.    None of the Defendants offered Ms. Butterfly any shelter placement that met her needs while she was staying at the 101 overpasses, and she did not receive an offer of adequate shelter when the City forced her to move from that location.

213.    Immediately after leaving the area of the 101 overpasses, Ms. Butterfly moved to Fremont Park in central Santa Rosa, where another encampment had formed. Approximately 60 other people at that encampment had, like Ms. Butterfly, been forced by the City to the 101 overpasses area encampment without an offer of adequate shelter placement.

214.    While at Fremont Park, Ms. Butterfly received no response to her accommodation request and was not offered a shelter placement that was adequate for her. She left the Fremont Park encampment with nowhere to go when it was closed by the City on September 1, 2020.

215.    When the City forced Ms. Butterfly to leave Fremont Park, she was forced to leave behind items of personal property she was not able to carry. Ms. Butterfly was not aware of any opportunity to store these items at the time she left the encampment, and she believes that the City destroyed these items.  These items included:  bedding, a tent, a backpack, clothes, jewelry and her unemployment benefits card.

216.    During the next several months, from September 2020 to approximately April 2021, Ms. Butterfly continued to live on the streets in Santa Rosa, mostly in areas along the Joe Rodota Trail. County Park Rangers and the Santa Rosa Police forced her to move several times. She was in contact with Defendants during that time about her shelter placement needs. While she discussed various placements with outreach workers, she never received a placement.

217.    At one point, in or about February 2021, as the County was about to close the encampment where Ms. Butterfly resided along the Joe Rodota Trail, a County representative told Ms. Butterfly that she had missed her chance to get a shelter placement that she would have accepted because she was not able to speak with them when they wanted to talk with her the day before. The County staff stated that, because Ms. Butterfly was not able to speak with them when they had wanted to talk with her, they considered her to have rejected the placement. When Ms. Butterfly asked the County representative the next day if she could have the placement, they told her it was no longer available for her, and they did not indicate where else to go.

218.    When, a few days later on February 25, 2021, the County and the Santa Rosa Police came to force everyone to leave the Joe Rodota Trail, Ms. Butterfly was not offered any other placement and was forced to move under threat of arrest. Ms. Butterfly moved to another area near the Joe Rodota Trail.

219.    At one point in March 2021, while living on the Joe Rodota Trail, Ms. Butterfly was again placed at Los Guilicos Village. But Ms. Butterfly stayed there for only a few weeks before Los Guilicos evicted her for arriving after the curfew one evening. Ms. Butterfly was late because she could not locate a ride or a shuttle back to the shelter location, which is several miles from the central Santa Rosa area. A representative from HOST said they would assist Ms. Butterfly in pursuing a grievance, but that assistance never materialized, and she was not able to pursue the grievance on her own.

220.    After being exited from Los Guilicos, Ms. Butterfly went back to living on the street. She was residing with a group of people along a street near the Joe Rodota Trail. Ms. Butterfly spoke with the representatives of the County several times about possible placements that would meet her disability needs, including a possible placement at Samuel Jones Hall in a small room with

people she knew so that she would feel safer and less anxious. However, the County did not provide the placement.

221.    When the County came to close the encampment at that site in April 2021, Ms. Butterfly asked County representatives to be placed at Los Guilicos with her partner because, after her previous experience there, she felt unsafe being placed there alone. She was experiencing depression and needed support, and not knowing who was coming and going around her made her anxious; so she wanted to have her partner there with her. The County would not agree to place her at Los Guilicos with her partner. Ms. Butterfly was not offered any other placement was forced to leave again under threat of arrest without a placement.

222.    Ms. Butterfly has continued to reside outside and has continued to be forced to move from various locations where she has resided when adequate shelter is not available for her.

223.    Ms. Butterfly has lost many of her personal possessions, including clothes, shoes, lights, cooking utensils, food items, dog food, personal hygiene items, and blankets, when she has been forced to move without adequate time to gather her belongings or any offer by Defendants to store her items.

224.    Although Ms. Butterfly signed up for Coordinated Entry in 2018 and recalls that she has periodically updated her information for Coordinated Entry, she has not received housing through Coordinated Entry.

225.    Ms. Butterfly has no source of regular transportation and no stable income. The stresses and difficulties of living on the street, including the need to often relocate from where she is staying and locate a new spot to sleep that is safe, the need to constantly take steps to assure her safety and to safeguard her possessions, and the need to locate food and to secure personal hygiene on a daily basis make it incredibly difficult to look for housing and access services.

Defendants' practices of clearing encampments, seizing personal property, and moving people from place to place exacerbate all of these challenges, creating more and more barriers accessing resources, achieving stability, and transitioning out of homelessness.

**Additional Facts Specific to Stephanie Somersall**

226.    Plaintiff STEPHANIE SOMERSALL is 54 years old. She was born in Santa Rosa, California, and has lived there most of her life.

227.    Ms. Somersall is a Pomo Indian. Her tribe is indigenous to the Sonoma County area of California. Ms. Somersall has four children; three are adults, and one is a minor child who resides with the child's father. She also has seven grandchildren and one great grandchild.

228.    Ms. Somersall has been homeless since 2004 and has not worked since that time. Her sole source of income is a small monthly payment from her tribe. Ms. Somersall has tried to apply for disability benefits but was unable to follow through on the application.

229.    Ms. Somersall has various disabling health conditions which have rendered her unable to work. Ms. Somersall has an anxiety-related condition and depression, as well as a mental disorder arising from severe trauma she has experienced, including one incident when she was sexually assaulted and raped and several other incidents where she was physically attacked. Since living on the streets, Ms. Somersall has been physically attacked several times.

230.    Ms. Somersall's mental conditions cause her to panic when she is in close contact with people she does not know or does not trust. She has a fear of being attacked again. She needs to have sufficient privacy or trust in those around her in order to feel safe and to avoid this exacerbation of her disabilities.

231.    After living in Oakland for several years, Ms. Somersall returned to Santa Rosa in 2017. She began living at the Camp Micaela encampment at the Roseland site.

232.    In April 2018, Ms. Somersall submitted a written request to Defendants indicating that, due to her disabling conditions, she was unable to reside in a large congregate emergency shelter because it would exacerbate her symptoms and cause her to have panic attacks. She stated she would feel unsafe being around men in that kind of situation. Ms. Somersall thus requested an alternative shelter or housing placement that would allow her more privacy than a congregate shelter and that would not require her to be in close contact with persons she did not know. When Ms. Somersall is camping on the street, her tent provides a level of privacy that helps her to feel relatively safe because she can close it and shut other people out. She also has the ability to move or leave if she is triggered by a particular situation, unlike at a shelter, where there are rules restricting when people are allowed to come and go. Ms. Somersall indicated that a tiny house, tent or apartment would be an appropriate placement for her because she would have her own dwelling unit where she can shut out other people if needed.

233.    On or about April 20, 2018, Defendants forced Ms. Somersall to leave the Roseland site under threat of arrest. Despite having made a written reasonable accommodation request, Ms. Somersall had not been offered any housing or shelter placement except for the large congregate emergency shelter at Sam Jones Hall.

234.    After Defendants closed the Roseland area encampments, Ms. Somersall moved to spot along the Joe Rodota Trail, near where she had been living at the Roseland Encampments. She moved to the Joe Rodota Trail along with 50 or 60 other people whom Defendants had displaced Roseland Encampments.

235.    Ms. Somersall is informed and believes a HOST representative again offered her a placement at Samuel Jones Hall while she was residing on the Joe Rodota Trail, but she could

not accept that placement. Ms. Somersall again requested an accommodation based on her disability to be placed in an alternate setting to the large emergency shelter.

236.    A May 23, 2018, letter from Plaintiffs' counsel to Defendants regarding the pending clearance of the encampment also reminded Defendants that Ms. Somersall was among the encampment residents who had requested reasonable accommodations in shelter placement.

237.    Neither Defendants nor HOST had provided Ms. Somersall with any substantive response to her reasonable accommodation request when they cleared the Joe Rodota Trail on May 31, 2018. Defendants did not offer Ms. Somersall an adequate placement that took into account her disability-related needs. Due to the threat of arrest if she stayed, Ms. Somersall was forced to move from the area of the Joe Rodota Trail Encampment on or about May 31, 2018.

238.    After Defendants cleared the Joe Rodota Trail encampment in May 2018, Ms. Somersall moved around among other smaller encampments at other locations along the Joe Rodota Trail for the rest of 2018 and into 2019. County Park Rangers and the Santa Rosa Police forced her to move from where she was staying several times.

239.    During this time, Defendants did not offer Ms. Somersall a suitable placement or other necessary services. Plaintiffs' counsel sent a letter to the County—with the City cc'd— reiterating Ms. Somersall's reasonable accommodation request in October 2018. The letter, sent on behalf of Ms. Somersall, Ms. Vannucci, HA, and others, requested that the County "cease and desist from forcing individuals living on the Joe Rodota Trail to leave unless and until an appropriate placement has been offered to each individual. Such appropriate placement must account for individuals' disabilities and need for reasonable accommodations, in accordance with the Americans with Disabilities Act and other state and federal civil rights laws."

240.    The County did not respond to that letter or to Ms. Somersall's accommodation request, and it continued to force Ms. Somersall and others to move from their locations along the Joe Rodota Trail without adequate shelter options.

241.    Starting in late 2019, Ms. Somersall began residing at an encampment that began forming along the Joe Rodota Trail about a mile from the prior year's large Joe Rodota Trail. During the time that Ms. Somersall resided at that encampment, the County set up a table to offer assessments and placements. Ms. Somersall sought assistance from workers at the table and told them would accept a placement at the newly formed Los Guilicos Village. But Ms. Somersall was not offered a placement at Los Guilicos. Instead, she was again offered a placement at Samuel Jones Hall which she informed the County she was declining to take due to the reasons she had previously articulated to the County. Ms. Somersall was not offered any other shelter placement at that time.

242.    On or about January 31, 2020, the County, with assistance from the Santa Rosa Police Department, forced Ms. Somersall to relocate from her site on the Joe Rodota Trail without offering her an adequate shelter placement.

243.    Ms. Somersall then moved to Bane Avenue, a dead-end street in an industrial area of the unincorporated County, along with approximately 38 other people whom Defendants displaced from the Joe Rodota Trail.

244.    On or about February 8, 2020, while she was staying at the Bane Avenue encampment, Ms. Somersall made yet another request for reasonable accommodations in shelter placement to the County. This written accommodation request explained that Ms. Somersall is a survivor of violence and that she has PTSD, anxiety, depression, and panic attacks; the symptoms of these conditions make it impossible for her to stay in a large congregate shelter. She further indicated

she would accept a temporary placement in an outdoor encampment or permanent supportive housing.

245.    The County did not respond to Ms. Somersall's reasonable accommodation request or offer her a placement other than Samuel Jones Hall; Ms. Somersall again declined to stay at Samuel Jones Hall because of her disabilities. The County forced Ms. Somersall to leave Bane Avenue on February 10, 2020, along with approximately 29 other persons who did not receive any offer of adequate shelter.

246.    When the County closed the Bane Avenue encampment, they provided bins to Ms. Somersall in to store some of her personal belongings. Ms. Somersall placed several of her personal belongings in the bins, including a generator, television, tent, bike, and important paperwork. After she was forced to move from the Bane Avenue encampment, Ms. Somersall went to retrieve her personal property from the location where the County told her it would be held, but that location was no longer serving as a storage site, and Ms. Somersall had no further information as where her property was. Ms. Somersall has never been able to get back the personal property that she thought the County was storing.

247.    After being swept from Bane avenue, Ms. Somersall moved with several others to a large public park area (Place to Play Park) in the City of Santa Rosa. Ms. Somersall and about 19 other persons who had previously resided at the Bane encampment set up an encampment that was away from most activity in the park and out of view from neighbors in the area.

248.    At the Place to Play Park Encampment, representatives from HOST again offered Ms. Somersall a placement at the Samuel Jones Hall. Ms. Somersall again told them that could not accept a placement at Sam Jones Hall and made a verbal reasonable accommodation request, again asking to be placed in a non-congregate setting.

249.    Santa Rosa Police closed the Place to Play encampment on or about February 17, 2020, and they forced Ms. Somersall to leave under threat of arrest. Ms. Somersall had not been offered any shelter placement other than Sam Jones Hall.

250.    The City did not provide Ms. Somersall with an opportunity to store her belongings when they forced to leave Place to Play Park. She was not able to move her belongings in time—Santa Rosa Police told her that she had to leave and that she could not return to retrieve any possessions that she left behind. In her rush to leave so that she could avoid arrest, Ms. Somersall had to leave behind items of clothing, blankets, hygiene items, a mattress, several pairs of shoes and food. She was never able to retrieve these items, and she is informed and believes that the City threw them away.

251.    In the week following her displacement from A Place to Play, Ms. Somersall moved to two different locations on public property within the City (Olive Park and South Davis Park), and the City forced her to leave both under threat of citation or arrest. No one offered any shelter or housing placements, other than Sam Jones Hall. During this week (from February 18 to 25, 2020), Ms. Somersall continued to seek a response to her accommodation request. Counsel for Plaintiffs wrote a letter dated February 24, 2020, to the City reiterating Ms. Somersall's February 8, 2020, accommodation request and seeking a response to her and others' accommodation requests. The City responded that it needed more information regarding the accommodation requests, but in the meantime, it would continue to take enforcement actions against Ms. Somersall and others who had made the accommodation requests.

252.    Ms. Somersall then moved to an industrial area near Corporate Center Parkway in Santa Rosa, where an encampment of tents and parked vehicles was forming. The tents and vehicles were along an area of the street that bordered an empty field. Ms. Somersall lived in a tent at the

Corporate Center Parkway encampment, which had grown to approximately 43 vehicles and several tents, for several months, but she is informed and believes that no one from the City or HOST or any of the other Defendants offered her any shelter during that time.

253.    On July 9, 2020, the Santa Rosa Police arrived at the Corporate Center Parkway encampment in the morning and gave residents only a few hours to leave the area or face arrest. Ms. Somersall was not present when the police arrived at the encampment. When she returned later that day, all of her personal possessions were gone. These included a tent, clothes, cooking items, blankets, and other items. Ms. Somersall is informed and believes that the City destroyed these items.

254.    After leaving Corporate Center Parkway, Ms. Somersall went with several others to another large encampment that had been forming in Fremont Park in Santa Rosa. Residents of the Fremont Park encampment also included many people from encampments at the Highway 101 overpasses in Santa Rosa, which the City had forcibly cleared in June. While residing at Fremont Park, Ms. Somersall spoke with sever HOST representatives regarding possible shelter placements, but only congregate shelter was available. However, HOST also told Ms. Somersall she might be able to receive a temporary placement in a hotel room.

255.    On September 1, 2020, the Santa Rosa Police forced everyone at the Fremont Park encampment to move under threat of arrest. The same day, Ms. Somersall was placed in a hotel room by HOST staff.

256.    Ms. Somersall's stay in the hotel room only lasted a few weeks. During the time she resided at the hotel room, Ms. Somersall began going through her possessions and throwing out items she did not need. On one day the hotel staff searched her room and found a piece of old

[Proposed] Second Amended and Supplemental Complaint; Case No. 3:18-cv-01955-VC

drug paraphernalia. Ms. Somersall was then summarily evicted from the hotel room the same day her room was searched, having wrongfully been accused of using drugs.

257.    After getting kicked out of the hotel, Ms. Somersall went to stay with relatives. But then, after only a few weeks, everyone living in the house was evicted, and Ms. Somersall returned to living on the streets.

258.    Ms. Somersall stayed on public property on or near the Joe Rodota Trail throughout 2021. During that time, Ms. Somersall was forced to move under threat of arrest several times without having been offered adequate shelter. During that time, Ms. Somersall had very little contact with representatives from Defendants regarding shelter placement options, Coordinated Entry, or her reasonable accommodation request, and she was not offered a shelter placement that was suitable for her.

259.    After being forced from place to place by Defendants without adequate shelter, never being able to stay in one place, Ms. Somersall ended up at a large encampment that formed on private property on Old Stony Point Road in the City of Santa Rosa. This location, which residents call the Mud Pit, has about 100 people living there in different types of structures, including vehicles and tents. The topography of the site causes it to flood when it rains, causing unsanitary conditions that can lead to infection and electrical hazards. The City is taking steps to close that encampment.

260.    Except for when she was at the Bane Avenue encampment, Ms. Somersall does not recall being offered storage for her possessions during the times that Defendants forced her to move from an encampment where she was residing.  When vacating an area Ms. Somersall just took whatever she could carry and always had to leave items behind such as clothes, lights, cooking utensils, and blankets.

261.    In the almost four years since Ms. Somersall first signed up for the Coordinated Entry program, Ms. Somersall has not been notified as to her position or placement status, and she has never received a placement offer other than Sam Jones Hall.

262.    Ms. Somersall does not have adequate funds to support herself. The stresses and difficulties of living on the street, including the need to often relocate from where she is staying and locate a new spot to sleep that is safe, the need to constantly take steps to assure her safety and to safeguard her possessions, and the need to locate food and to secure personal hygiene on a daily basis make it incredibly difficult to look for housing and access services. Defendants' practices of clearing encampments, seizing personal property, and moving people from place to place exacerbate all of these challenges, creating more and more barriers accessing resources, achieving stability, and transitioning out of homelessness.

**<u>Additional Facts Specific to Homeless Action!</u>**

263.    Plaintiff Homeless Action (HA) is comprised of students, church members, people who are homeless or have been homeless, and concerned individuals working to obtain housing and better conditions for people without homes. HA has helped create the safe parking program, held events, protests, and marches, educated the public, done emergency response work, lobbied county and city officials, and published articles in local papers.

264.    Starting in November 2017 (when the second encampment at the Roseland site began to form) and continuing through the closure of the Roseland Encampments in April 2018 and the Joe Rodota Trail encampment in May 2018, HA devoted majority of its time and financial resources to supporting the Roseland Encampments residents. These efforts included attending regular meetings with residents at the encampments, attending meetings with local officials to discuss logistics and issues related to the encampments, and holding weekly meetings with

members of Catholic Charities regarding support and available shelter resources for encampment residents.

265.    HA representatives performed various tasks to support individual residents at the Roseland and Joe Rodota encampments in 2017 and 2018, including assisting residents in accessing assessments and placements through the Navigation Center, making arrangements for storage of Roseland Encampments residents' personal property to prevent or mitigate the destruction of residents' property by Defendants, and arranging for a volunteer Registered Nurse to visit,

266.    After the first large Joe Rodota trail sweep, HA representatives continued to monitor and provide support to the residents of the many smaller encampments that formed and were closed along the Joe Rodota Trail and in other locations in Santa Rosa where there were larger encampments during the time period from mid-2018 to mid-2019.

267.    From October 2019 to February 2020 HA representatives maintained a regular presence at the large encampment that was formed along the Joe Rodota Trail.  This included assistance and support to individuals with shelter and housing placement related claims and reasonable accommodation requests for persons unable to stay in congregate shelter facilities, attendance at regular meetings of encampment residents and meetings with neighbors living in the area.

268.    During the two and a half years that the Preliminary Stipulated Injunction was in effect, HA focused many of its resources on monitoring and enforcing the Preliminary Stipulated Injunction's implementation.

269.    HA monitors the development of larger encampments in the Santa Rosa area as well as the City and County responses to those encampments. This includes sending representatives to

the encampment sites as well as interactions with City and County officials regarding homeless encampments.

270. In order to promote the health, safety, and wellbeing of unhoused individuals, and to mitigate potential hazards at homeless encampments on public property, HA has attempted to provide toilets, trash bins, and other sanitary facilities to those encampments. However, Defendants have prevented them from doing so, as described above.

271. Defendants' clearance of encampments and dispersal of their residents makes it harder for HA to maintain contact with its unhoused members and other unhoused individuals whom it provides support and assistance to.

272. HA has had to divert its resources from other work that it would be doing, including outreach, education, and advocacy for better local policies regarding homelessness, because of Defendants' enforcement actions against unhoused people on public property, seizure of unhoused people's belongings, and failure to accommodate individuals' disability-related needs in shelter placements and other programs.

## FIRST CAUSE OF ACTION
Cruel and Unusual Punishment
Eighth Amendment to the United States Constitution
[42 U.S.C. § 1983]
(all Plaintiffs against all Defendants)

273. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

274. Defendants' threatened and actual enforcement of the anti-camping and other laws against unhoused people for attempting to live on public property in the absence of available adequate shelter or housing effectively punishes Plaintiffs and other homeless individuals by virtue of their homelessness.

275.    The emergency shelter and housing available in the County for the homeless population are insufficient for the size of the homeless population in Sonoma County. A large portion of County's homeless population therefore must live and sleep outdoors. Defendants have criminalized camping and living outdoors for homeless persons who have no other available and appropriate option by enforcing laws that prevent homeless people from carrying out basic functions of survival--sleeping and resting—and staying dry and warm while doing so—without breaking the law.

276.    Additionally, when shelter beds have been available at the time Defendants took enforcement action, those shelter beds have not been appropriate for or accessible to certain individuals with disabilities, including Plaintiffs Juanita Butterfly, Stephanie Somersall, and Nicholle Vannucci, who are unable to stay in a large, crowded shelter due to disability-related mental health symptoms.

277.    Defendants have forced individual Plaintiffs and other unhoused people to leave public property under threat of citation or arrest when adequate housing and shelter is not available to them. The only way to avoid criminal sanction is to leave public property.

278.    Defendant City of Santa Rosa has also actually cited and arrested unhoused people, including former Plaintiff Shannon Hall, for living on public property when adequate shelter is not available.

279.    These actions by Defendants are part of an ongoing pattern and practice of criminalizing unsheltered homelessness despite the absence of adequate available shelter. They violate Plaintiffs' and other unhoused people's constitutional right to be free from cruel and unusual punishment.

280.    Plaintiffs, including unsheltered Plaintiffs Juanita Butterfly and Stephanie Somersall, are

at imminent risk for the future violation of their rights by Defendants.

281.    Defendants' continuing unlawful conduct frustrates Plaintiff HA's mission to assist

unhoused people in procuring adequate shelter and housing while safely sheltering outside until

housed. It has also caused HA to divert resources away from other activities that would further

its mission.

282.    Defendants' actions and threatened actions are with deliberate indifference to the harm

Plaintiffs have suffered and will suffer.

283.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants

have violated and/or are imminently threatening to violate the law.

284.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive,

declaratory, and other equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
Cruel and Unusual Punishment
[Cal. Const., art. I, §17]
(all Plaintiffs against all Defendants)

285.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set

forth herein.

286.    The California Constitution, like the United States Constitution, prohibits cruel and

unusual punishment.

287.    Accordingly, the above violations of the Eighth Amendment also violate Plaintiffs' and

others' rights under the California Constitution, and Plaintiffs are also entitled to injunctive and

declaratory relief regarding their state constitutional rights.

## THIRD CAUSE OF ACTION
Unreasonable Seizure
Fourth Amendment to the United States Constitution
[42 U.S.C. § 1983]
(all Plaintiffs against all Defendants)

288.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

289.    The individual Plaintiffs possess property that holds both monetary and personal value. Plaintiffs have an expectation to be free from meaningful interference with those their property rights, even if their property is stored on public property.

290.    Seizure of private property without a warrant or an exception to the warrant requirement constitutes an infringement upon Plaintiffs' Fourth Amendment rights. Infringement includes confiscation or destruction of property without adequate process including pre-deprivation notice and opportunity to be heard and post-deprivation notice and reclamation.

291.    Such seizure also increases the resources and time expended by Plaintiff Homeless Action! to assist and serve homeless individuals.

292.    Defendants unlawfully seized and destroyed the personal property of encampment residents in enforcing the closure of the Roseland Encampments and other encampments, including the personal property of Plaintiffs Juanita Butterfly and Stephanie Somersall.

293.    As of result of Defendants' unlawful seizure and destruction of homeless individuals' personal property, individual Plaintiffs have suffered and will continue to suffer the loss of their personal property without adequate due process unless enjoined.

294.    Defendants' continuing unlawful conduct has frustrated Plaintiff HA's mission and caused it to increase the resources and time expended to assist and serve homeless individuals.

295.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

296.    Plaintiffs have no adequate remedy at law and are therefore entitled to injunctive, declaratory, and other equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
Unreasonable Seizure
[Cal. Const. art. I, § 13]
(all Plaintiffs against all Defendants)

297.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

298.    The California Constitution, like the United States Constitution, prohibits unreasonable search and seizure by governmental entities.

299.    Accordingly, the above violations of the Fourth Amendment also violate Plaintiffs' and others' rights under the California Constitution, and Plaintiffs are also entitled to injunctive and declaratory relief regarding their state constitutional rights.

**FIFTH CAUSE OF ACTION**
State-Created Danger
Fourteenth Amendment of the United States Constitution
[42 U.S.C. § 1983]
(all Plaintiffs against all Defendants)

300.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

301.    Under the Substantive Due Process Clause of the Fourteenth Amendment, the state deprives a person of a substantive due process right if it affirmatively places the person in a position of danger.

302.    Seizure of homeless individuals' property when homeless encampments are swept causes them to lose their possessions, including their only shelter from the elements, without adequate provision of appropriate and accessible alternative shelter.

303.    Without any other available option for shelter, homeless individuals are forced to live exposed to the elements, including exposure to the cold, wind, and rain. These individuals' physical health will be jeopardized if forced to sleep with no protection from the cold, wind, and rain. Plaintiffs with mental health disabilities are likely to suffer aggravated and heightened mental health symptoms and psychological damage. Without protection, the health of homeless individuals with physical disabilities will be jeopardized and their disabilities exacerbated by exposure to the cold, wet, and wind.

304.    Defendants' enforcement actions at the Roseland Encampments and other, subsequent encampments have deprived Plaintiffs and other unhoused people of the survival gear that they need for their safety.

305.    Additionally, the City's and County's pattern and practice of depriving encampments of adequate toilets, handwashing facilities, and garbage service, then using the health and safety hazards that result from the absence of adequate sanitary facilities as justification to clear those encampments, threaten the health and safety of encampment residents.

306.    These practices have been especially dangerous during the COVID-19 pandemic, when both the lack of adequate sanitary facilities and the dispersal of unsheltered people through encampment sweeps increase the risk of disease spread, severe illness, and death among unhoused people and other community members. But Defendants—the City in particular—has continued these practices contrary to the prevailing public health guidance.

307.    That the City has continued to take enforcement actions when the only available shelter is a congregate setting that has been the site of multiple COVID outbreaks compounds this danger.

308.    Defendants' continued enforcement actions, which force people from place to place without being able to stay safely in a single location on public property, have caused people to end up in more dangerous circumstances.

309.    Defendants are aware that their actions endanger the health and safety of Plaintiffs and other homeless individuals.

310.    By knowingly and deliberately placing the health and safety of individual Plaintiffs and other homeless individuals in danger through their actions, Defendants are acting with deliberate indifference and have violated, and will continue to violate, Plaintiffs' substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.

311.    Defendants' continuing unlawful conduct has frustrated Plaintiff Homeless Action!'s mission and caused it to increase the resources and time expended to assist and serve homeless individuals.

312.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

313.    Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive, declaratory, and other equitable relief. Plaintiffs are also entitled to attorneys' fees and costs.

### SIXTH CAUSE OF ACTION
State-Created Danger
[Cal. Const., art. I, § 7]
(all Plaintiffs against all Defendants)

314.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

315.    The California Constitution, like the United States Constitution, protects individuals'

right to substantive due process, and a government entity deprives a person of a substantive due

process right if it affirmatively places the person in a position of danger.

316.    Accordingly, the above violations of the Fourteenth Amendment also violate Plaintiffs'

and others' rights under the California Constitution, and Plaintiffs are also entitled to injunctive

and declaratory relief regarding their state constitutional rights.

**SEVENTH CAUSE OF ACTION**
Disability Discrimination
[42 U.S.C. § 12131 et seq.]
(all Plaintiffs against all Defendants)

317.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set

forth herein.

318.    Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits

discrimination against people with disabilities by state and local governments and their

programs. Title II provides that "no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity."

319.    The City, the County, and Commission are all public entities covered by Title II of the

ADA.

320.    Individual Plaintiffs are "qualified persons with disabilities" as defined under the ADA.

42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.104.

321.    Likewise, many of the unhoused individuals on whose behalf HA advocates are people

with disabilities.

322.    The County's unhoused residents are disproportionately living with physical and mental

disabilities relative to the general population.

323.    Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (f).

324.    Defendants' duty not to discriminate against people with disabilities under Title II of the ADA includes a duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130 (b)(7)(i).

325.    The homelessness and shelter services that Defendants fund and administer are programs, services, activities, or benefits for purposes of Title II. Enforcement by police, park rangers, and other departments of the City and County are also programs, as are public streets, sidewalks, parks, and trails.

326.    Defendants, both individually and together, administer interrelated programs that rely on congregate shelter as the primary—and often only—source of emergency shelter.

327.    Congregate shelter is not accessible to many people with disabilities, including Plaintiffs Juanita Butterfly and Stephanie Somersall, who are unsheltered and whose mental health disabilities make it impossible for them to stay in a congregate setting. Congregate settings also pose serious health risks to people whose disabilities make them particularly vulnerable to serious illness or death if they contract COVID-19.

328.    At the same time, Defendants administer programs of enforcement that punish people who do not accept the shelter that is offered to them, even when that shelter is inaccessible,

removing and excluding them from public land under threat of criminal sanction with nowhere else to go.

329.    Even when unhoused people make their disability-related shelter needs known to Defendants—as each of the individual Plaintiffs has done multiple times—Defendants continue to remove them from public property under threat of citation and arrest without offering housing or shelter that meets their needs.

330.    Additionally, by pushing unsheltered people with disabilities from place to place, by taking their paperwork and other personal property, and by not offering shelter and housing that is responsive to their disability-related needs, Defendants also deprive those individuals of the stability necessary to access public benefits, housing services, and other government programs, including government programs administered by Defendants.

331.    Plaintiffs have requested both systemic modifications to Defendants' policies and practices and individualized reasonable accommodations on behalf of Ms. Vannucci, Ms. Butterfly, and Ms. Somersall, and others, beginning on March 26, 2018, when Plaintiffs, through their counsel, asked Defendants to postpone the sweep of the Roseland Encampments temporarily, until all residents with disabilities had been offered placements that met their disability-related needs. Defendants, however, did not postpone the sweep, denying Plaintiff's request.

332.    Defendants have likewise refused similar requests from Plaintiffs regarding other sweeps over the course of the intervening four years, as described in greater detail above.

333.    Defendants have also refused requests from both HA and other advocates to modify their practices with respect to parks and other public spaces by providing toilets, handwashing

stations, and garbage service, to mitigate any hazards created by encampments and to reduce the risk of COVID-19 spread.

334.    Ms. Vannucci, Ms. Butterfly, and Ms. Somersall, have all requested that Defendants (1) offer them housing or shelter that met their disability-related needs and (2) refrain from taking enforcement action against them until they were provided accessible housing or shelter. HA has also assisted other unhoused individuals in making similar requests. But Defendants have denied these requests and have continued to force these individuals to move from where they are staying under threat of arrest or citation when no accessible housing or shelter is available to them.

335.    By concentrating housing and shelter resources in congregate shelter, by operating programs that effectively punish unhoused people with disabilities for failing to accept shelter that is inaccessible to them, by failing to make reasonable modifications to these programs to afford people with disabilities meaningful access, and by denying reasonable accommodations to individuals with disabilities—including individual Plaintiffs—Defendants have discriminated against people with disabilities, and this discrimination is ongoing.

336.    The discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

337.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

338.     Plaintiffs have no adequate remedy at law for the violations stated herein and are therefore entitled to injunctive and declaratory relief, attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
Denial of Reasonable Accommodation
[42 U.S.C. § 12131 et seq.]
(Juanita Butterfly against all Defendants)

339.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

340.    Plaintiff Juanita Butterfly is a person with a disability for purposes of the ADA.

341.    Ms. Butterfly has repeatedly requested accommodations in both shelter placement and Defendants' enforcement actions: that she be provided a non-congregate shelter or housing placement where she can have privacy and not be surrounded by people whom she does not know, and that Defendants not punish her for living on public land while such accessible housing and shelter is unavailable to her.

342.    The accommodations that Ms. Butterfly has requested are necessary because of her mental disability.

343.    The requested accommodations, if granted, would not constitute fundamental alterations in Defendants' programs.

344.    Defendants have denied Ms. Butterfly's reasonable accommodation request by continuing to force her to move from public land under threat of criminal sanction when there is no accessible shelter or housing available to her.

345.    Ms. Butterfly is experiencing ongoing harm due to Defendants' failure to provide her with reasonable accommodations, and injunctive relief is necessary to protect Ms. Butterfly from future harm caused by violation of her rights.

346.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

347.    Ms. Butterfly no adequate remedy at law for these violations and is therefore entitled to injunctive and declaratory relief, attorneys' fees and costs.

### NINTH CAUSE OF ACTION
Denial of Reasonable Accommodation
[42 U.S.C. § 12131 et seq.]
(Stephanie Somersall against all Defendants)

348.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

349.    Plaintiff Stephanie Somersall is a person with a disability for purposes of the ADA.

350.    Ms. Somersall has repeatedly requested accommodations in both shelter placement and Defendants' enforcement actions: that she be provided a non-congregate shelter or housing placement that affords her privacy and that does not force her to be in close contact with people whom she does not know, and that Defendants not punish her for living on public land while such accessible housing and shelter is unavailable to her.

351.    The accommodations that Ms. Somersall has requested are necessary because of her mental disability.

352.    The requested accommodations, if granted, would not constitute fundamental alterations in Defendants' programs.

353.    Defendants have denied Ms. Somersall's reasonable accommodation request by continuing to force her to move from public land under threat of criminal sanction when there is no accessible shelter or housing available to her.

354.    Ms. Somersall is experiencing ongoing harm due to Defendants' failure to provide her with reasonable accommodations, and injunctive relief is necessary to protect Ms. Somersall from future harm caused by violation of her rights.

355.    An actual controversy exists between Ms. Somersall and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

356.    Ms. Somersall has no adequate remedy at law for these violations and is therefore entitled to injunctive and declaratory relief, attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
Discrimination Against People with Disabilities in Federally Assisted Programs
[ 29 U.S.C. § 794]
(all Plaintiffs against all Defendants)

357.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

358.    Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

359.    A "program or activity" includes "a department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives or administers federal funds. 29 U.S.C. § 794 (b)(1)(A).

360.    The homelessness and shelter services that Defendants fund and administer are "programs or activities" for purposes of Section 504 of the Rehabilitation Act of 1973. Enforcement by police, park rangers, and other departments of the City and County are also "programs or activities," as are public streets, sidewalks, parks, and trails.

361.    Plaintiffs are informed and believe and so allege that Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Commission all receive and/or administer federal funds and, as such, are covered by Section 504.

362.    Individual Plaintiffs are qualified individuals with disabilities under Section 504.

363.    Many of the other homeless individuals with and on whose behalf Plaintiff HA advocates are people with disabilities.

364.    Section 504 prohibits covered entities from administering their programs in a way that has a discriminatory effect, or disparate impact, on people with disabilities. See 24 C.F.R. § 8.4 (b)(4).

365.    Section 504 requires recipients of federal funds to provide people with disabilities with meaningful access to their programs. To ensure meaningful access, reasonable accommodations may be required unless the recipient of federal funding can demonstrate that such modifications would result in a fundamental alteration in the nature of the program.

366.    For the reasons described above, Defendants' enforcement actions against Plaintiffs and unsheltered County residents have discriminated against people with disabilities and has denied them meaningful access to Defendants programs, services or activities, in violation of Section 504.

367.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

368.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

369.    Plaintiffs have no adequate remedy at law for these violations and therefore are entitled to injunctive and declaratory relief, attorneys' fees and costs.

### ELEVENTH CAUSE OF ACTION
Discrimination on the Basis of Disability
Cal. Gov't Code § 11135
(all Plaintiffs against all Defendants)

370.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

371.    California Government Code Section 11135 states in relevant part that:

> No person in the State of California shall, on the basis of . . . mental disability, physical disability, [or] medical condition . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state. Gov't Code § 11135 (a).

372.    Plaintiffs are informed and believe and so allege that Defendants Sonoma County, City of Santa Rosa, and Sonoma County Community Development Committee are all recipients of state funding, and the programs and activities of Defendants described in this Complaint are administered with the use of state funds. As such, Defendants are subject to section 11135's prohibition against disability discrimination.

373.    Section 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. Subsection (b) states:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

374.    Accordingly, all violations of the Title II of the ADA and Section 504 by entities covered by section 11135 are also violations of section 11135.

375.    Individual Plaintiffs are persons with disabilities under section 11135, as are a significant number of the individuals with and on whose behalf Plaintiff HA works.

376.    For the reasons described above, Defendants' enforcement actions against Plaintiffs and unsheltered County residents have discriminated against people with disabilities in violation of section 11135.

377.    Such discrimination has caused injury to the individual Plaintiffs, as well as to Plaintiff HA via the frustration of its mission and the diversion of its resources.

378.    An actual controversy exists between Plaintiffs and Defendants as to whether Defendants have violated and/or are imminently threatening to violate the law.

379.    Plaintiffs are without adequate remedy at law and unless compelled by this Court to refrain from acts as required by law, Defendants will continue to refuse to perform said duties and continue to violate the law, and Plaintiffs will be injured as a result.

380.    Based on the foregoing, Plaintiffs are entitled to injunctive and declaratory relief, attorneys' fees, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

1.    For a preliminary and permanent injunction, enjoining and restraining Defendants from citing, arresting, or threatening to cite or arrest, any unhoused individual for camping or living on public property unless that individual has been offered available housing or shelter that is accessible to them.

2.    For a preliminary and permanent injunction, enjoining and restraining Defendants from removing unhoused individuals under threat of citation or arrest for camping or living on public property unless that individual has been offered available housing or shelter that is adequate and accessible to them.

3.    For a preliminary and permanent injunction, enjoining and restraining Defendants from seizing and destroying unhoused people's personal property in violation of federal and state laws as alleged.

4.      For a preliminary permanent injunction ordering Defendants and their agents to cease actions which discriminate against people with disabilities in the administration of their programs, and to offer and provide reasonable accommodations to people with disabilities, including reasonable accommodations with respect to shelter and housing placements.

5.      For a preliminary and permanent injunction ordering Defendants to grant Plaintiff Juanita Butterfly's request for reasonable accommodation in shelter placement, and not to take enforcement action against her for living on public property until she is provided shelter or housing that meets her disability-related needs.

6.      For a preliminary and permanent injunction ordering Defendants to grant Plaintiff Stephanie Somersall's request for reasonable accommodation in shelter placement, and not to take enforcement action against her for living on public property until she is provided shelter or housing that meets her disability-related needs.

7.      For declaratory judgment that Defendant's policies, practices, and conduct as alleged herein violate Plaintiffs' rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, section 11135 of the California Government Code, and the Constitutions of the United States and California as alleged.

8.      For costs of suit and reasonable attorney's fees as provided by law.

9.      For such other relief as the court deems just and proper.

Dated:  June 10, 2022          CALIFORNIA RURAL LEGAL ASSISTANCE

THE PUBLIC INTEREST LAW PROJECT


By:      /s/Jeffery Hoffman
          JEFFERY HOFFMAN, Attorneys for Plaintiffs




(Additional Counsel continued)

Cynthia L. Rice, SBN: 87630
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1430 Franklin Street, Suite 103
Oakland, CA 94612
Telephone: (510) 267-0762; Fax: (510) 267-0763
Email: crice@crla.org

Ilene J. Jacobs, SBN: 126812
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
511 D Street / P.O. Box 2600
Marysville, CA 95901
Telephone: (530) 742-7235; Fax: (530) 741-0854
Email: ijacobs@crla.org